# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
WJ HOLDING LTD and STRUBRIK LIMITED,

                              Plaintiffs,

        -against-                                               Civil Action No. 1:19-cv-07426-JGK

SHIREEN MARITIME LTD, MAZLIN TRADING          **OPPOSITION TO PLAINTIFFS'**
CORP., AMM CONSULTING AND                      **MOTION TO REMAND**
MANAGEMENT GROUP LLC, and ALEXANDER            **AND CROSS-MOTION FOR**
SPIEGEL,                                       **LEAVE TO AMEND**
                                               **DEFENDANTS' NOTICE OF**
                              Defendants.       **REMOVAL**
---------------------------------------------------------------X

        Defendants Shireen Maritime Ltd. ("Shireen"), Mazlin Trading Corp. ("Mazlin"), AMM

Consulting and Management Group LLC ("AMM"), and Alexander Spiegel ("Spiegel", and

collectively, "Defendants"), by and through their undersigned counsel, hereby submit this

Opposition to Plaintiffs' Motion to Remand and Cross-Motion to Amend Defendants' Notice of

Removal.

## PRELIMINARY STATEMENT

        This Motion to Remand must be rejected for what it is: a feeble attempt by Plaintiffs to

delay the end of a years-long effort to avoid justice through forum-shopping. Specifically, after

Defendants Shireen and Mazlin filed for arbitration in 2016 in the London Court of International

Arbitration – a non-domestic, international arbitration subject to the New York Convention[1] that

Plaintiffs participated in for months -- Plaintiffs attempted to choose a more friendly forum by

filing a Complaint in the Supreme Court of New York.

---

[1] Foreign Arbitration Awards pursuant to the United Nations Convention of the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 1957 was acceded to in the United States on December 29, 1970 ("New York Convention") and is implemented by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 ("FAA");

For years, Plaintiffs fabricated allegations to frame causes of action that would prevent dismissal of that suit. Now, however, findings of fact and conclusions of law have been made. These conclusions have been memorialized in an international arbitration award that this Court has original jurisdiction over, can be removed at *any time* prior to trial, and that basis does not need to be set forth on the face of the Complaint. 9 U.S.C. §205.

If this Court ignores Plaintiffs manifestly false, revisionist history of the dispute and the numerous meritless procedural arguments, which are designed to distract the Court away from focusing its attention on the substantive nature of Defendants' removal, the case law overwhelmingly supports this Court exercising jurisdiction over this dispute.

Although Defendants clearly laid out that removal of this non-domestic arbitration subject to the New York Convention and the fact that this matter is unquestionable related to the award from that arbitration, Defendants have sustained their burden for invoking an appropriate basis for removal.

As a result, Plaintiffs' Motion to Remand completely misses the mark because Plaintiffs' main argument in support of remand – the well-pleaded complaint rule – which looks to the plaintiff's complaint for determining federal jurisdiction – is irrelevant. As will be discussed more substantively below, both the Supreme Court and the Second Circuit have found that the statute directly on point – 9 U.S.C. § 205 – overrides the well-pleaded complaint rule. *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009)("FAA § 205 goes further and overrides the well-pleaded complaint rule *pro tanto*."); *see also Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No.* 0510135, No. 10-CV-1455 DLI LB, 2011 WL 4529668, at *7 (E.D.N.Y. Sept. 27, 2011), aff'd, 707 F.3d 140 (2d Cir. 2013).

As such, the proper inquiry into whether this Court has proper jurisdiction is not whether the Plaintiffs' First Amended Complaint implicates federal law, but rather whether an arbitration that falls under 9 U.S.C. § 205 could "conceivably affect" the outcome of a plaintiff's case. *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 863 F. Supp. 2d 351, 354 (S.D.N.Y. 2012)(*quoting Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002). Under that inquiry, there can be no doubt that this Court has jurisdiction because the Arbitration Agreements undeniably affect the outcome of the Parties' dispute because: (1) the Arbitrators have made findings of fact and conclusions of law that directly impact the allegations of the First Amended Complaint; and (2) the Court is currently considering and should grant Defendants' Motion to Dismiss, which seeks dismissal of the action under the doctrine of res judicata and issue preclusion.

The remainder of Plaintiffs' Motion to Remand, which attempts to persuade this Court to engage in the type of rigid procedural formalism that has no place in this dispute must be similarly rejected. For example, Plaintiffs' assert that the Notice of Removal was not filed within the thirty-day time limit of 28 U.S.C.A. §1446(b).[2] Again, like the well-pleaded Complaint Rule, Defendant is moving under 9 U.S.C. §205, and there is no 30-day requirement. Rather, this statute only requires that the petition for removal be filed at any time before trial, which Defendants have. *Dale Metals Corp. v. Kiwa Chem. Indus. Co.*, 442 F. Supp. 78, 81 (S.D.N.Y. 1977)("Nothing could be plainer than the language of 9 U.S.C. § 205, which plaintiffs have ignored and which, in pertinent part, provides that in cases involving arbitration agreements, 'the defendants may, at any time before the trial thereof, remove' to federal court (there is no dispute that the case was removed before trial). Given an explicit time rule contained in s 205, the notion that the time provision of 28 U.S.C. § 1446(b) applies is totally without merit.").

---

[2] Defendants dispute this allegation below.

Similarly, Plaintiffs argue that Defendants have waived their right to removal due to engaging in litigation activity in New York State Court. This too is obviated by 9 U.S.C. §205 because under this statute only a clear and unambiguous waiver could result in waiver of a litigants' removal rights under this statute. *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 158 (3d Cir. 2000)("there can be no waiver of a right to remove under the Convention Act in the absence of clear and unambiguous language requiring such a waiver."). No such language is identified by Plaintiffs because no such language occurs.

This case has from its inception been about a forum-shopping ploy by Plaintiffs in the hopes that it can avoid arbitration. It has now become a *de facto* appeal against the adverse arbitration awards entered in the forum Plaintiffs had first participated in tried and then so desperately to avoid, the London Court of International Arbitration ("LCIA"). Because Plaintiffs have already participated in the arbitration and had an adverse result through the Arbitrators findings of fact and conclusions of law on the issues in their First Amended Complaint, they are desperately attempting to avoid enforcement of the award by the Court with original jurisdiction to do so. This Court should not and cannot allow the re-litigation of these same issues again because Defendants have invariably removed this matter appropriately. As such, this Court has jurisdiction over this matter and should utilize it to bring about an end to this never-ending dispute.

Even if the Court credits Defendants argument that the basis for removal, 9 U.S.C. §205, is not stated in the petition for removal, clear an unequivocal law supports the amendment/supplementing of the notice of removal liberally.

## STATEMENT OF FACTS

4

The dispute arises out of a long-term friendship between two business owners. *See* ECF Doc. 1 at par. 15. Defendant Alex Spiegel, the owner of Mazlin and Shireen, had over the course of 25 years lent approximately $40 million to companies controlled by his longtime friend Yuri Drukker, including Plaintiffs WJ Holding and Stubrick. *See* Exhibit 1, at 30.

In or around 2011, Mr. Drukker – who solely owned Plaintiff WJ Holding – sought to invest in a vegetable oil production facility in the Transdniestrian region of Moldova. *See* ECF Doc. 1 at par. 17. Mr. Drukker, in need of money, approached Mr. Spiegel for financing. *See* Exhibit 1, at 30-31. To achieve this end, two Loan Agreements were entered into: (i) a written agreement named "Revolving Loan Agreement (Secured)" between Defendant Mazlin and the Plaintiffs dated August 10, 2012 ("Mazlin Loan Agreement"); and (ii) a written agreement named "Revolving Loan Agreement (Secured)" between Defendants Shireen and the Plaintiffs also dated August 10, 2012 ("Shireen Loan Agreement", and collectively, the "Loan Agreements"). *See* Exhibit 1 at pg. 2. Pursuant to the Loan Agreements, Mazlin lent millions of dollars to WJ Holdings and Stubrick. *See Id.*, at 46. These monies were never paid back. *See* ECF Doc. 1 at par. 15.

On November 21, 2016, Defendants Mazlin and Shireen requested arbitration under the London Court of International Arbitration ("LCIA") pursuant to an arbitration provision included in both Loan Agreements. *See* Exhibit 1, at 2. Clause 9 of each loan agreement provides, in relevant part, as follows:

> Any dispute arising out of or in connection with the definitive agreements shall be referred to and finally resolved by arbitration under the LCIA Rules. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London, the United Kingdom. The language to be used in the arbitral proceedings shall be English.

*See* Exhibit 1, at 2.

On January 13, 2017, less than three months after the arbitration proceeding was commenced, the Plaintiffs began asserting their substantive defenses in the Arbitration. One such defense was that the Loan Agreements were "not genuine commercial transaction but constitute sham agreements that were part of an elaborate scheme to document an equity investment that was made by . . . Mr. Alexander Spiegel" and that the "original agreement" that governs the Parties dispute is a March 15, 2012 Agreement of Sale made between WJ Holding and AMM Consulting and Management Group, LLC. *See Id.* at pg. 2, par. 8. This is the same argument advanced in Plaintiffs' Amended Complaint. *See* Exhibit 2 at par. 5-10, 45 (Plaintiffs arguing that Defendant Spiegel "scamm[ed]" and "duped" the Plaintiffs into entering into the Loan Agreements that would allow Defendants to acquire 30% equity in Bender Oil). Plaintiffs' reasserted this argument multiple times throughout the Arbitration Proceedings. *See Id.*, pg. 4, par. 14; *see also* Id. at pg. 7, par. 19(2)(ii).

On September, 6, 2017, after nearly nine-months of extremely active participation in the LCIA arbitration, the Plaintiffs made a strategic decision to advance their claims only in the Supreme Court of New York. In an apparent attempt to choose a more friendly forum, Plaintiffs filed a Complaint in the Supreme Court of New York on April 7, 2017, five (5) months after the demand for arbitration.

On September 6, 2017, one day before a disclosure of evidence was due by the Plaintiffs in the arbitration, the Respondents wrote, in an e-mail to the Tribunals, that they would not provide the disclosure as it may "cause irreparable harm to the position of the Respondents in the New York proceedings." *See* Exhibit 1 at pg. 22, par. 53. On October 16, 2017, Respondents ignored another deadline, instead sending a similar e-mail to the Tribunal. *See Id.* at pg, 23, par. 59. On November 14, 2017, two weeks before the Arbitration hearing was to commence, the

Plaintiffs again wrote the Tribunal that they will not be attending the Arbitration hearings on November 28-29, 2017, but that their position in the proceedings is "set forth in their Statement of Defense" *See Id.* at pg. 24, par. 62.

On that same day, after considering the Plaintiffs recent e-mail, the Tribunal wrote to all Parties stating that under the LCIA Rules (Articles 15.8, 15.10, and 19.1) they are able to proceed with Arbitration and to make an award even if the Plaintiffs chooses not to participate in the proceedings. *See Id.* at pg. 25, par. 64.

On November 28 and 29, 2017, the Tribunals conducted an oral merits hearing where, *inter alia*, a substantial amount of evidence was introduced and taken into the record and Defendant Spiegel testified, even being cross-examined by the Tribunals' Members.

On January 23, 2018, the Arbitration Tribunals rendered their decision finding that they had "no hesitation" in holding that the Loan Agreements were "true loan agreements" and were not shams intended to disguise an equity investment. *See Id.* at pg. 64, par. 163. In fact, the Tribunals opinions were so strong, they stated, "[t]he evidence is overwhelming and the Respondents' case is, based on the evidence put forward, hopeless." *See Id.*

As a result of their legal and factual finding, the Arbitration Tribunals entered the Awards in favor of Mazlin and Shireen and against Respondents. The total amount of the relief granted from both Awards totals $14,043,387.90, including interest accrued to date. *See Id.* at pg. 78, par. 201.

The LCIA also made the following observations regarding the Respondents' conduct:

a.   the Plaintiffs had "taken an unreasonable stance on the []joinder issue";

b.   and "then proceeded to conduct themselves in both arbitrations in a manner calculated to cause further inconvenience and expense to the [Defendants]";

c. "the [Plaintiffs] ha[d] consistently sought to procure a dismissal or stay of the[] arbitration proceedings on the basis that the true agreement between the relevant parties is governed by New York law... [But] the Tribunal ... rejected that case. The Tribunal consider[ed] that the [Plaintiffs'] allegations [were] unsustainable, and that their efforts to resist arbitration amount[ed] to forum-shopping";

d. "Although the [Plaintiffs] were fully aware of the timetable laid down in the Procedural Orders that had been made in each arbitration, they waited until the last minute before notifying the Tribunal and the [Defendants] that they did not propose to offer any disclosure";

e. "For this accumulation of reasons, the Tribunal h[eld] that the [Plaintiffs] ha[d] conducted the[] proceedings unreasonably, and with the intention of being as obstructive as they c[ould] to the [Defendants]."

*See* Exhibit 1, at 72-74.

On July 7, 2019, the Plaintiffs file their First Amended Complaint in the New York Action. See Exhibit 4. On August 9, 2019, Defendants filed their Notice of Removal to remove the New York Action to federal Court based off 9 U.S.C. § 201 and its other subchapters. *See generally* ECF Doc. 2. Additionally, on September 6, 2019, Defendants filed a pre-motion conference request for their pending Motion to Dismiss on the grounds of res judicata due to the factual conclusions reached by the Arbitration Panels. *See* ECF Doc. 16.

## LEGAL ARGUMENT

## I.    PLAINTIFFS' RELIANCE ON THE WELL-PLEADED COMPLAINT RULE IS MISPLACED AS IT IS IRRELEVANT TO DEFENDANTS' RIGHT TO REMOVE UNDER 9 U.S.C. § 205

8

Plaintiffs' only non-procedural argument in support of remand must be rejected because,

on the face of 9 U.S.C. §205, well-pleaded complaint rule is irrelevant. 9 U.S.C.§205 states:

> Where the subject matter of an action or proceeding pending in a
> State court relates to an arbitration agreement or award falling
> under the Convention, the defendant or the defendants may, at any
> time before the trial thereof, remove such action or proceeding to
> the district court of the United States for the district and division
> embracing the place where the action or proceeding is pending.
> **The procedure for removal of causes otherwise provided by
> law shall apply, except that the ground for removal provided in
> this section need not appear on the face of the complaint but
> may be shown in the petition for removal**. For the purposes of
> Chapter 1 of this title any action or proceeding removed under this
> section shall be deemed to have been brought in the district court
> to which it is removed.

9 U.S.C. §205 (emphasis added). The plain language of this rule indicates that: (1)

contrary to the well-pleaded complaint rule, the basis for removal under this statute "**need not**

**appear**" on the face of the Complaint; (2) that removal procedures provided by law "**shall**" be

applied; and (3) the petition for removal "**may**"[3] be showing in the petition for removal.

Critically, the Supreme Court has found that this statute overrides the well-pleaded

complaint rule. *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) ("FAA § 205 goes further and

overrides the well-pleaded complaint rule *pro tanto*."). Additionally, the Second Circuit, while

relying on *Vaden* and numerous cases from this Circuit, removed a state court action with state

court claims to federal court under this statute. *See Bakoss v. Certain Underwriters at Lloyds of

London Issuing Certificate No. 0510135*, No. 10-CV-1455 DLI LB, 2011 WL 4529668, at *7

---

[3] Upon the reading of this statute, it was unclear whether the "may" in this provision means that:
(1) the petition for removal can, but does not need to, include specific citation to 9 U.S.C. §205;
or (2) if the basis is not set forth in the Complaint, then the Petition for Removal should include
reference to specific citation to 9 U.S.C. §205. Here, however, this distinction is purely academic
since Defendants' Notice of Removal includes many references to a non-domestic arbitration
subject to the conventions and Defendants are cross-moving to amend/supplement this notice to
include specific citation to this rule.

(E.D.N.Y. Sept. 27, 2011), aff'd, 707 F.3d 140 (2d Cir. 2013)(*citing e.g. Bogdan Dumitru v. Princess Cruise Lines*, Ltd., 2 F.Supp.2d 328 (S.D.N.Y.2010); *Celulosa Del Pacifica S.A. v. A. Ahlstrom Corp.*, 1996 WL 103826, at *1, 3 (S.D.N.Y. Mar.11, 1996); *JF Surgutneftegaz v. President and Fellows of Harvard College*, 2005 WL 1863676, *2 fn. 3 (S.D.N.Y. Aug.3, 2005)). Third, Defendants have found no case – and Plaintiffs have not cited to any – where 9 U.S.C. §205 was not applied because of the well-pleaded complaint rule. Therefore, since 9 U.S.C. § 205 renders application of the well-pleaded complaint rule irrelevant, the only inquiry left for the Court on this issue is whether Defendants' removal falls under the scope of the statute, **which it clearly does**.

In order for a Defendant to seek removal under 9 U.S.C. § 205, the subject matter of the lawsuit must "relate to" an Arbitration Agreement under the Convention.[4] An overwhelming amount of authority shows courts in the Second Circuit and United States Court of Appeal – the Fifth and Ninth Circuit – that have ruled upon the issue, strongly favor a broad interpretation of this term. *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 863 F. Supp. 2d 351, 354 (S.D.N.Y. 2012)(*quoting Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002) ("Whenever an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit."); *Goel v. Ramachandran*, 823 F. Supp. 2d 206, 212 (S.D.N.Y. 2011). The Ninth Circuit has also held that §205 confers broad removal jurisdiction. *See also Infuturia Glob. Ltd. v. Sequus Pharm.*, Inc., 631 F.3d 1133, 1138 (9th Cir. 2011) ("The phrase 'relates to' is plainly broad, and has been interpreted to convey sweeping removal jurisdiction in analogous statutes.").

---

[4] Plaintiffs do not appear to challenge that the Arbitration Agreements fall under the Convention as Defendants established previously. *See* ECF Doc. 2 at pg. 1-3.

In *Banco*, the Southern District of New York utilized the broad approach when exercising removal. *Banco De Santander Cent. Hispano, S.A. v. Consalvi Int'l Inc.*, 425 F. Supp. 2d 421, 430 (S.D.N.Y. 2006))("Congress expressly granted removal jurisdiction to a class of state-court actions, which plaintiffs commenced without pleading any express claims under the Convention-*i.e.*, containing state claims only or setting out a vacatur action-so long as defendants could articulate a 'federal defense' 'related to' the Convention.").

Here, it is unquestionable that the New York State Action relates to an arbitration falling under the federal statute. As was made clear in Defendants' Motion to Dismiss for res judicata and collateral estoppel, which is incorporated as if fully set forth herein, the New York State Litigation was only a forum-shopping ploy by the Plaintiffs and has evolved into a *de facto* appeal of the very issues raised and decided by the London Court of Intentional Arbitration ("LCIA") against Plaintiffs. *See generally* ECF Doc. 16-1. However, despite Plaintiffs' efforts to avoid the Arbitration Decisions, they cannot as Defendants clearly meet all three prongs of *res judicata* as (i) the Arbitrations involved an adjudication on the merits – *e.g.*, that the Loan Agreements central to the Parties dispute were binding and enforceable – and were not decided on a procedural ground[5] (ii) the Arbitrations involve the same parties, and (iii) the issues raised in the Arbitrations are identical to the issues that were raised in the New York State Action, with large part of the Plaintiffs' First Amended Complaint and Complaint copying and pasting from

---

[5] The Arbitration Panels also made several other factual findings which directly implicate Defendants' defense to Plaintiffs' claims: (a) that the Loan Agreements clearly expressed themselves as loans and not equity investments (See Exhibit 1 at pg. 61, par. 162(1)); (b) the Plaintiffs' offered no evidence to support their argument that the Loan Agreements were shams for tax and inheritance purposes (*See Id.* at pg. 61, par. 162(2)); (c) even if the Plaintiffs offered evidence that the Loan Agreements were structed as loans for tax purposes this does not render them sham agreements as maximizing tax efficiency is not unlawful (*See Id.* at pg. 61, par. 162(3); and (d) there is not a single contemporaneous document which shows that Defendant Spiegel agreed to make an equity investment for $7,000,000 (*See Id.* at pg. 61, par. 162(7)).

Plaintiffs' own pleadings and motion papers in the Arbitrations. *See Id.* at pg. 21-30. As also demonstrated in Defendants' Motion to Dismiss, for the same reasons that the doctrine of res judicata applies to Plaintiffs' claims, collateral estoppel would apply with the same strength. *See Id.* at pg. 31-33.

Notably, when courts have granted remand, it was not because it applied a narrower interpretation, but rather because the defendants' claim was not "related to" an arbitration falling under the statute. *Goel v. Ramachandran*, 823 F. Supp. 2d 206, 216 (S.D.N.Y. 2011) ("Even applying *Beiser*'s broad conception of "relates to," the Court concludes that Ramachandran has not met his burden of showing that he properly removed the action.").

As a result, it is beyond reproach that Defendants will establish that the Arbitration Decisions would meet the minimum burden of "related to" as these decision would "conceivably affect" the outcome of the New York State Action since this Court should grant Defendants Motion to Dismiss the entire Action, a substantial part of it will be resolved in Defendants' favor, or apply the Arbitration Decisions to substantially decrease the scope of the litigation. Defendants have clearly shown a proper for removal under 9 U.S.C. §205.

## II.   DEFENDANTS SHOULD BE GRANTED LEAVE TO AMEND THE NOTICE OF REMOVAL TO REFLECT A JURSIDICTIONAL CLARIFICATION

Should the Court find that Defendants' Notice of Removal should have included a specific reference to 9 U.S.C. §205 and that the references to a non-domestic arbitration subject to the Convention Act are otherwise insufficient, the Court should grant Defendants leave to clarify this point in their Notice of Removal.

The law is clear: unless the notice of removal suffers from a complete absence of jurisdictional foundations, it may be cured. *See, e.g.*, 28 U.S.C. § 1653. An application to amend a notice of removal is addressed to the discretion of the Court and should be construed liberally

to permit the action to be maintained if it is at all possible to determine from the record that jurisdiction does in fact exist. *Cox v. Livingston*, 407 F.2d 392, 393 (2d Cir. 1969); *see also CBS Inc. v. Snyder*, 762 F. Supp. 71 (S.D.N.Y. 1991) (allowing amendment because "[m]aking express that which would normally be assumed from the facts alleged is a formal change of the type which should be allowed to prevent the loss of an important right. *Pro forma* defects cannot suffice to deprive a party of a plain entitlement to a federal forum."); *Grow Group, Inc. v. Jandernoa*, No. 94 Civ. 5679, 1995 WL 60025 (S.D.N.Y. Feb. 10, 1995) ("finding that amendment of a notice of removal should be subject to the same liberal rules employed in testing the sufficient of other pleadings").

Requests to clarify a notice of removal are routinely granted pursuant to 28 U.S.C. §1332(a). *See generally Cox v. Livingston*, 407 F.2d 392 (2d Cir. 1969); *See Stuart v. Adelphi Univ.*, No. 94 Civ. 4698, 1994 WL 455181 (S.D.N.Y. Aug. 19, 1994) ("Courts generally agree that such leave [to amend a notice of removal] should be given [where] the proposed amendments . . . serve to clarify what was contained in the original notice of removal."); *Grow Group*, 1995 WL 60025, at *2.

In *CBS, Inc. v. Snyder*, 762 F. Supp 71 (S.D.N.Y. 1991), a deficient allegation of diversity jurisdiction at the time of removal was found to have interfered with the Court's jurisdiction and, as a result, defendant was given leave to cure the Notice of Removal.

Here, while Defendants did not specifically cite to 9 U.S.C. §205 in their Notice of Removal, but rather to other sections of that same chapter and title (e.g., 9 U.S.C. §201, 9 U.S.C. § 203, 9 USCA § 204) the Court should give Defendants leave to amend. *See* ECF Doc. 2 at par. 2-5. As discussed above, leave to amend is liberally granted and is certainly appropriate here

because as set forth in Section I Defendants clearly have made *prima facie* showing – if not much more – that federal jurisdiction exists.

Additionally, amendment is especially appropriate since a remand on this basis would be rendered superfluous as Defendants would merely remove under 9 U.S.C. §205 upon a remand since such removal can be made at **any time** prior to trial. As such, if this Court remands the case and denies the Notice of Removal, Defendants will only be back in this Court filing a new Notice of Removal with the specific provision included the very next day. In determining whether remand is appropriate, courts have noted three principal considerations: judicial economy, comity, and lack of prejudice. *Manas y Pineiro v. Chase Manhattan Bank, N.A.*, 443 F.Supp. 418, 420 (S.D.N.Y.1978); *Cf. Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988*); Pan A. Group, Inc. v. Republic Ins. Co.*, 878 F. Supp. 630, 638 (S.D.N.Y. 1995. It would be a waste of this Court's resources to deny the Notice of Removal, only for a new Notice of Removal to be brought back the next day.

Consequent to the liberality given with such requests to amend, while taking into consideration this Court's resources, Defendants should be granted leave to amend its Notice of Removal to clarify the jurisdictional question.

III.    **PLAINTIFFS' NUMBERED BUT WEAK PROCEDURAL ATTACKS DO NOT WARRANT THIS COURT DENYING REMOVAL**

Perhaps knowing that Plaintiffs would lose on their substantive arguments, Plaintiffs then attempt to persuade this Court to employ a rigid formalism and deny Defendants' removal on technical grounds. However, each of Plaintiffs' procedural arguments are either rendered moot by 9 U.S.C. §205 or are otherwise factually incorrect. Accordingly, Plaintiffs' Motion to Remand should be denied. In the alternative, even if one of these arguments were found to have merit,

Defendants, if granted leave to amend its Notice of Removal, can rectify the infirmities in Defendants' Amended Notice of Removal.

## A.   PLAINTIFFS' TIMELINESS ARGUMENT IS RENDERED MOOT BY 9 U.S.C. §205

Plaintiffs' timeliness argument is entirely misplaced due to Defendants' reliance on 9 U.S.C. §205. Plaintiffs assert that Defendants removal is untimely because Defendants had thirty days from the initial pleading to remove to federal court which expired in May, 2017. *See* ECF Doc. 15 at pg. 21. First, the removal was filed in a timely manner. Pursuant to 28 U.S.C. §1446 (b)(3), a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable. At the time of the initial filing of the Complaint, there had been no award rendered by the LCIA. That award occurred more than a year later. The filing of the First Amended Complaint occurred after the Arbitration Decisions. The Notice of Removal was filed within 30 days of the First Amended Complaint.

Even if this were not the case, 9 U.S.C. §205 clearly states that "the defendant or the defendants may, **at any time before the trial thereof,** remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." 9 U.S.C.A. § 205 (West)(emphasis added). Further, the Southern Di S.D.N.Y. in *Dale Metals* specifically rejected the plaintiff's argument that the thirty day provision should still apply to a defendant seeking removal under 9 U.S.C.A. § 205:

> Plaintiffs also argue that removal here was untimely because the petition for removal was not filed 'within thirty days after the receipt by the defendant(s) . . . of a copy of the initial pleading . . .' 28 U.S.C. s 1446(b). Nothing could be plainer than the language of 9 U.S.C. s 205, which plaintiffs have ignored and which, in

15

> pertinent part, provides that in cases involving arbitration
> agreements, 'the defendants may, at any time before the trial
> thereof, remove' to federal court (there is no dispute that the case
> was removed before trial). Given an explicit time rule contained in
> s 205, **the notion that the time provision of 28 U.S.C. s 1446(b)**
> **applies is totally without merit**.

*Dale Metals Corp. v. Kiwa Chem. Indus. Co.*, 442 F. Supp. 78, 81 (S.D.N.Y. 1977)

Here, where no trial date has even been set, Defendants are clearly within their timeframe

to remove the suit. Thus, Plaintiffs' timeliness argument must be rejected.

### B. PLAINTIFFS' CLAIM THAT THE NOTICE OF REMOVAL WAS NOT FILED WITH THE CLERK OF THE STATE COURT IS SIMPLY UNTRUE

Plaintiffs argument that the Notice of Removal was not filed with the clerk of the State

Court is simply wrong. On August 08, 2018 the Notice of Removal was filed with the Supreme

Court State of New York, County of Kings. *See* Exhibit 4. As such, Plaintiffs' procedural

argument on this ground must be rejected.

Even though Defendants clearly overcome this argument by Plaintiffs, it should be noted

that Plaintiffs cite to a number of irrelevant cases in attempt to bolster their losing procedural

attacks. Specifically, the majority of cases Plaintiffs string cites all revolve around lack of notice

provided to adversaries, and not to a court which is the proposition Plaintiffs are citing these

cases for. *See* ECF Doc. 15 at 23-24 (*citing e.g.*, Doyle v. Staples, No. 99-CV-6062(JG), 2000

WL 194685, at *2 (E.D.N.Y. Feb. 18, 2000); 3735 Procedure for Removal—Filing and

Notification of the Notice of Removal, 14C Fed. Prac. & Proc. Juris. § 3735.)

What's worse, even in cases dealing with notice not being given to a court, clerk courts

have given another opportunity for proper service. *See Lewis & Kennedy, Inc. v. Perm. Mission*

*of Republic of Botswana to U.N.*, 05 CIV.2591(HB), 2005 WL 1621342, at *5 (S.D.N.Y. July 12,

2005) (finding "[t]he motion to dismiss for improper service is GRANTED. The Complaint is

DISMISSED without prejudice UNLESS Plaintiff properly serves the Mission within 60 days from the date hereof.").

### C.   PLAINTIFFS' CLAIM THAT ALL OF THE REQUIRED PAPERS WERE NOT FILED IS UNTRUE

Plaintiffs next rigid formalism attack deals with 28 U.S.C. § 1446's requirement that ". . . a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C.A. § 1446 (West). Plaintiffs argue that Defendants did not provide a copy of the required documents under this statute, e.g. a copy of the State Court's order on Defendants' Motion to Dismiss Plaintiff's initial Complaint.

However, Plaintiffs' argument is misplaced because Defendants did not need to file a copy of the prior Court Order that surrounded Plaintiff's initial complaint because Defendants are seeking removal under Plaintiff's First Amended Complaint.[6] *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.")

What's more, if this Court is unsatisfied with the papers that were filed, Defendants if granted leave to amend the Notice of Removal can file the papers this Court deems necessary.

### D.   PLAINTIFFS WAIVER ARGUMENT MUST ALSO BE REJECTED BECAUSE OF 9 U.S.C. § 205

Next, Plaintiffs incorrectly argue that the right to a notice of removal was waived because Defendants engaged in litigation activity in the State Court Action.

---

[6] At the time of the filing of the initial Complaint the arbitration award was not final. However, by the time of the First Amended Complaint the arbitration award was finalized causing Defendants to file its Notice of Removal. Therefore, Defendants followed the filing requirements of 28 U.S.C. § 1446.

Again, Plaintiffs' argument misses the mark entirely. 9 U.S.C. §205 clearly states that "the defendant or the defendants may, **at any time before the trial thereof**, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." 9 U.S.C.A. § 205 (West). Because of this broad language, Courts around the nation have held that litigants only waive their removal rights under  9 U.S.C.A. § 205 when they do so "explicitly" or "clear[ly] and unambiguous[ly]." *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 158 (3d Cir. 2000)("there can be no waiver of a right to remove under the Convention Act in the absence of clear and unambiguous language requiring such a waiver."); *see also McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1209 (5th Cir. 1991).

Since there certainly has been no express, clear, and unambiguous, waiver of Defendants' removal rights under 9 U.S.C.A. § 205, Plaintiffs' argument must be rejected.

### E.     PLAINTIFFS VENUE ARGUMENT DOES NOT WARRANT REMAND

Finally, Plaintiffs' argument that the venue of Defendants' removal is incorrect and thus remand is warranted must be denied. Plaintiffs argue that Plaintiff should have removed the case to the Eastern District of New York and not the Southern District. *See* ECF Doc. 15 at 20.

However, "[w]hether dismissal or transfer is appropriate following finding that case laid venue in wrong division or district lies within sound discretion of district court." 28 U.S.C.A. § 1406(a); *Minnette v. Time Warner*, 997 F.2d 1023 (2d Cir. 1993). Further, the language of § 1406(a) has been found "amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not." *Corke v. Sameiet M. S. Song of Norway*, 572 F.2d 77, 79 (2d Cir. 1978).

18

Thus, here, where arguably the case should have been removed to the Eastern District as opposed to the Southern District, the Court is certainly within its discretion to simply transfer the case as opposed to dismissing it. In fact, dismissing it would run afoul of all judicial resources concerns because if this case is dismissed Defendants will immediately remove to the Eastern District where the new judge will have to re-hear this entire motion. In contrast, if the Court grants Defendants' Motion for removal and transfers no judicial resources will be wasted and this Action will have taken a substantive step forward towards resolution.[7]

## IV.  PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES SHOULD BE DENIED AND THE COURT SHOULD CONSIDER REPRIMANDING PLAINTIFF FOR THE REQUEST

It does not take a lengthy jurisprudential analysis to establish why Plaintiffs' request for attorney's fees should be denied. The standard for awarding attorney's fees related to a petition for removal is "lack[ing] an objectively reasonable basis for seeking removal". *See* ECF Doc. 15 at pg. 26 (*citing Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Here, not only did Defendants have that objectively reasonable basis, their reasons for seeking removal are completely appropriate and triumph over Plaintiffs' meritless motion to remand. Thus, the only objectively unreasonable filing in this Court is Plaintiffs' request for attorney's fees which the Court should entertain reprimanding Plaintiffs for bringing.

## CONCLUSION

Plaintiffs' Motion to Remand must be denied and, if necessary, Defendants' Cross Motion to Amend its Notice of Removal must be granted.


Date:   September 24, 2019
        Paramus, New Jersey

---

Respectfully submitted,

**CALLAGY LAW, P.C.**

By:    /S/Michael J. Smikun, Esq.
       Michael J. Smikun, Esq.
       *Attorneys for Defendants*

# EXHIBIT 1

LCIA ARBITRATION № 163503

MAZLIN TRADING CORP

Claimant

- and -

(1) WJ HOLDING LIMITED
(2) STUBRICK LIMITED

Respondents

## FINAL AWARD
### Dated 23 January 2018

The Arbitral Tribunal:

Jonathan Crow QC
Kate Davies
Guy Pendell

CONTENTS

A.    Introduction                                                              p. 1
      A.1   The parties & their representatives                      p. 1
      A.2   The arbitration agreements                               p. 2
      A.3   The Awards                                               p. 2
      A.4   The procedural history of the conjoined claim            p. 2
      A.5   The procedural history of the separate arbitration claims  p. 10
      A.6   The oral jurisdiction and merits hearings                p. 28
      A.7   After the hearings                                       p. 29

B.    The Facts                                                                 p. 30
      B.1   The background                                           p. 30
      B.2   The valuations                                           p. 31
      B.3   The Agreement of Sale                                    p. 32
      B.4   The 2012 Privatisation Agreement & related agreements    p. 34
      B.5   The email of 11 July 2012                                p. 35
      B.6   The Loan Agreements                                      p. 36
      B.7   The Letter of Agreement                                  p. 39
      B.8   The Personal Guarantees                                  p. 41
      B.9   Mr Spiegel's visits to the plant                         p. 43
      B.10  Payments made by the Claimants to the Respondents        p. 45
      B.11  The December 2012 draft Agreement of Sale                p. 47
      B.12  Correspondence in early 2013                             p. 49
      B.13  Power of Attorney                                        p. 51
      B.14  Health insurance                                         p. 53
      B.15  The failure of the Bender Oil project                    p. 54
      B.16  The draft Operating Agreement & MIPA                     p. 54
      B.17  Termination of the negotiations                          p. 56
      B.18  Proceedings in Cyprus                                    p. 57
      B.19  Proceedings in New York                                  p. 58
      B.20  Conclusions on the facts                                 p. 61

C.    The Juridictional Challenge                                               p. 65

D.    Remedies                                                                  p. 67
      D.1   The capital sums                                         p. 67
      D.2   Interest                                                 p. 67
      D.3   The appropriate creditor                                 p. 70
      D.4   Joint, or joint & several liability                      p. 70

E.    Costs                                                                     p. 70
      E.1   Introduction                                             p. 70
      E.2   The costs of the conjoinder issue                        p. 71
      E.3   The parties' conduct generally                           p. 72
      E.4   The Claimants' Scehdule of Costs                         p. 74
      E.5   The Arbitration Costs                                    p. 77

F.    The Award                                                                 p. 78

A. INTRODUCTION

A.1 The parties & their representatives

1.  Mazlin Trading Corp ("Mazlin") is a British Virgin Islands company, Company Number
    1644425, with its registered office at Trident Chambers, P.O. Box 146, Road Town, Tortola,
    British Virgin Islands.  Mazlin is the Claimant in LCIA Arbitration № 163503 ("the Mazlin
    claim").

2.  Shireen Maritime Ltd ("Shireen") is a Liberian non-resident corporation, registration number
    C-112456, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia.  Shireen
    is the Claimant in LCIA Arbitration № 173638 ("the Shireen claim").

3.  The Claimants' representatives in these arbitrations are:
    •  Mr Stevie Loughrey, Onside Law, 23 Elysium Gate, 126-128 New Kings Road, London,
       SW6 4LZ.  Mr. Loughrey's email address is: stevie.loughrey@onsidelaw.co.uk.   His
       telephone number is +44 20 7384 6920 and his fax number is + 44 20 7384 1575.
    •  Ms Anna Lintner, Enterprise Chambers, 9 Old Square, Lincoln's Inn, London WC2A
       3SR.

4.  The Respondents are:
    •  WJ Holding Ltd ("WJ Holding") of Pamboridis Building, 45–47 Digenii Akrita Avenue,
       1070 Nicosia, Cyprus, with registration number HE104090.
    •  Stubrick Limited ("Stubrick"), also of Pamboridis Building, 45–47 Digenii Akrita
       Avenue, 1070 Nicosia, Cyprus, with registration number HE268820.

5.  The Respondents are jointly represented by:
    •  Ms Delphine Nougayrède, Solicitor of the Senior Courts of England & Wales, c/o
       Schneider Law Group, 150 Broadway, Suite 900, New York NY 10038, USA.  Her
       telephone number is +1 212 804 8400 and her email address is dn@lawoffice-
       avocats.com.
    •  Norair Babadjanian, Advocate (Russia) and Solicitor (England & Wales), Redstone
       Chambers, Smolenskaya Embankment 2-33, Moscow 121099, Russian Federation. His
       telephone number is +7 499 248 7278. His email address is nb@redstonechambers.com.

### A.2  The arbitration agreements

6.  The Mazlin claim was commenced by a Request for Arbitration dated 21 November 2016[1] made jointly by Mazlin and Shireen in relation to (i) a written 'Revolving Loan Agreement (Secured)' between Mazlin and the Respondents dated as of 10 August 2012[2] ("the Mazlin Loan Agreement") and (ii) a written 'Revolving Loan Agreement (Secured)' between Shireen and the Respondents also dated as of 10 August 2012[3] ("the Shireen Loan Agreement" and, together with the Mazlin Loan Agreement, "the Loan Agreements").  The relevant part of clause 9 of each Loan Agreement provides as follows:

> "Any dispute arising out of or in connection with the definitive agreements shall be referred to and finally resolved by arbitration under the LCIA Rules.  The number of arbitrators shall be three.  The seat, or legal place, of arbitration shall be London, the United Kingdom.  The language to be used in the arbitral proceedings shall be English."

### A.3  The Awards

7.  Identical Awards are being made in each of the Mazlin claim and the Shireen claim, save for the relief.  References in this Award in square brackets are to the documents contained in the bundles used at the concurrent oral jurisdiction and merits hearings on 28 and 29 November 2017.  Bundle 1 references are to the [bundle number / tab number / page number].  Bundle 2 references are to the [bundle number / page number].

### A.4  The procedural history of the conjoined claim

8.  A Response to Request for Arbitration dated 13 January 2017[4] was submitted on behalf of WJ Holding and Stubrick in which, without prejudice to their challenge to the validity of the arbitration agreements and the jurisdiction of the Tribunal (§17), they (inter alia) –

    (1)  took issue with the ability of Mazlin and Shireen under the Rules of the London Court of International Arbitration 2014 as amended ("the LCIA Rules") to bring a single claim for arbitration in relation to the two separate Loan Agreements (§8 & §11);

    (2)  asserted that "the Loan Agreements are not genuine commercial transactions but constitute sham agreements that were part of an elaborate scheme to document an equity investment that was made by … Mr Alexander Spiegel" (§9);

---

[1] [1/1].

[2] [2/371].

[3] [2/366].

[4] [1/2].

2

(3)   alleged that the *"original agreement"* that governs *"the real subject matter of this dispute"* was an Agreement of Sale dated 15 March 2012[5] ("the Agreement of Sale") made between WJ Holding and AMM Consulting and Management Group LLC ("**AMM Consulting**") *"together with other ancillary agreements"* which are subject to New York law (§10);

(4)   contended that the dispute that has arisen between WJ Holding and Stubrick (of the one part) and Mr Spiegel and his *alter ego* companies (of the other) is accordingly subject to the exclusive jurisdiction of the courts of New York (§10);

(5)   stated that proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§10); and

(6)   proposed that since the beneficial owner of the Claimants, Alexander Spiegel ("**Mr Spiegel**") and the beneficial owner of the Respondents, Yuri Drukker ("**Mr Drukker**") are both based in New York *"the proper venue for any arbitral hearings should be New York"* (§14).

9.   By email to the parties dated 23 January 2017, the LCIA required the Claimants and Respondents respectively to make a payment on account of costs in the sum of £10,000 each (*i.e.* a total of £20,000).

10.   By email dated 30 January 2017, the Respondents' legal representatives informed the LCIA that the Respondents declined to participate in funding the arbitration.

11.   By letter from the LCIA dated 23 February 2017,[6] the parties were notified of the identity of the Tribunal members who had been appointed.

12.   The Claimants replied to the Response to Request for Arbitration by letter dated 24 February 2017.[7] In that letter, they asserted that they were entitled to commence a single arbitration with both Mozlin and Shireen as Claimants. This question came to be known as 'the conjoinder issue'.

---

[5]   [2/376].

[6]   [1/23-221].

[7]   [1/23-225].

13. In light of the parties' respective positions in correspondence on the conjoinder issue, the Tribunal sent them an email on 1 March 2017[3] informing them that it was *"provisionally minded to give directions for the determination of the conjoinder issue as a preliminary issue"* and against that background invited the parties to discuss and if possible agree (i) whether it was expedient to determine the conjoinder issue first; (ii) if so, what timetable should be laid down for the parties to present their full argument in that regard; and (iii) whether the parties would wish the Tribunal to hold an oral hearing, or would be content for the matter to be determined on paper.

14. The Claimants' legal representatives sent an email to the Respondents' legal representatives on 7 March 2017[9] inviting them agree to the arbitration proceeding with both Claimants, on the basis either that the Claimants were entitled (under the LCIA Rules) to proceed in that manner or, if not, the only result would be the continuation of the original claim with only one Claimant and commencement of a parallel arbitration by the other Claimant.

15. The Respondents' legal representatives answered by email the same day,[10] saying that the Respondents' position remained as set forth in the Response, *i.e.* one of general jurisdictional challenge, and asserting that the two Loan Agreements formed part of a wider commercial dispute regarding an equity investment made by Mr Spiegel in a company called OJSC Bendersky Oil Extraction Plant ("Bender Oil"), a dispute in respect of which (the Respondents contended) the New York courts were the proper venue. They also submitted that the Claimants themselves acknowledged that the commercial reality was that the dispute was actually one between Mr. Spiegel and Mr. Drukker, who are both resident in the USA. They did not answer the Tribunal's question whether they were content for the conjoinder issue to be determined as a preliminary issue, either at an oral hearing or on paper.

16. The Claimants' legal representatives sent an email on 9 March 2017[11] reiterating that their clients were entitled to bring a single arbitration under both Loan Agreements simultaneously, and agreeing that the conjoinder issue should be determined on paper as a preliminary issue.

17. In light of the continuing disagreement between the parties on the conjoinder issue, and the Respondents' failure to explain whether they were content for the matter to be resolved as a

---

[3] [1/23/228]

[9] [1/23/230].

[10] [1/23/236].

[11] [1/23/235].

-4-

preliminary issue, the Tribunal sent the parties an email on 14 March 2017,[12] directing an oral hearing to be convened in London for the purpose of determining the following questions:

*(1)   Is the Tribunal precluded, by the LCIA Rules, from proceeding with this arbitration by reason of the fact that the claim seeks a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties do not consent to a consolidation?*

*(2)   If the answer to Question 1 is "yes", can the current claim be amended pursuant to Article 22.1(i) of the LCIA Rules by the deletion of one Claimant (and its claim), such that the amended claim would then proceed only in the name of the other Claimant and only in respect of that Claimant's claim?*

*(3)   If the answer to Question 2 is "yes", and if a separate arbitration claim were then also to be commenced by whichever Claimant had been amended out of the existing claim, would it be appropriate for the Tribunal to give matching procedural directions in both arbitrations, so that the common issues in each could be determined simultaneously?*

*(4)   In any event,*

*(i)   should the Tribunal give directions for the determination, as a preliminary issue, of the question whether the arbitration should be stayed pending the final determination of any legal proceedings in New York and*

*(ii)   if so, what directions should be given?*

*(5)   What, if any, further directions should be given for the efficient and final disposal of the issues between the parties?*

18.   By email dated 23 March 2017[13] the Tribunal was informed that the Respondents' legal representatives *"have requested and received [their] clients' instructions to present [their] case to the Tribunal, which of course does not imply that [they] consent to its jurisdiction"*. In a separate email the same day,[14] the Respondents' legal representatives repeated their assertion that legal proceedings *"have already been initiated against Mr Spiegel"* in New York.

19.   The parties' respective legal representatives each provided written submissions, as directed, on 11 April 2017.[15] In summary:

(1)   Mazlin and Shireen –

---

[12] [1/23/234].

[13] [1/23/239].

[14] [1/23/240]

[15] [1/3] and [1/4]

(i)   conceded that a joint claim by both companies could not proceed under the LCIA Rules without the Respondents' consent (§3-8),

(ii)  submitted that the Tribunal had jurisdiction to allow one Claimant to amend the Request for Arbitration by removing the other Claimant and proceeding with the amended claim alone (§9-10),

(iii) confirmed that whichever Claimant was amended out of the joint claim would issue a separate Request for Arbitration, and invited the Tribunal to make matching procedural directions in each arbitration (§11-13), and

(iv)  submitted that the Tribunal should proceed to determine the arbitration claims, and not to stay them pending any determination of the proceedings apparently issued in New York (§14-19).

(2)  The Respondents not only served written submissions on the conjoinder issue[16] but also provided to the Tribunal an exhibit comprising a copy of certain legal proceedings between WJ Holding and Stubrick (plaintiffs) and Mazlin, Shireen, AMM Consulting and Mr Spiegel (defendants) apparently filed in the New York court, County of Kings, Index № 506949/2017 ("the New York proceedings"). The New York proceedings did not appear to have been issued on 8 December 2016 in New York County (as stated in §10 of the Response to Request for Arbitration[17]) but on 7 April 2017 in Kings County. The Respondents' written submissions -

(i)   offered a 'Summary Presentation of the Facts' (§1-15) in which they alleged that: (a) Mr Spiegel and Mr Drukker *"agreed that Mr Spiegel would take an equity stake of 30%"* in Bender Oil *"and that the value of this stake would be US$7 million, corresponding to an enterprise valuation for [Bender Oil] of approximately US$20 million"* (§3); (b) *"the equity investment would be documented in a manner that would achieve certain specific structuring objectives for Mr Spiegel"* which Mr Drukker believed *"reflected certain tax and family estate planning considerations"* (§4); (c) the agreed structure implemented by Mr Spiegel for the purpose of his equity investment in Bender Oil consisted of (1) the March 2012 Agreement of Sale,[a] which would be the *"core agreement"* under which AMM Consulting *"would obtain 30% of the shares of [Bender Oil], in return for payment of a nominal price of US$210,000"* (§5(a)), (2) the transfer of the remaining equity investment

[16] [1/24].
[17] [1/2-7].
[a] [2/376].

by Mazlin and Shireen, which was documented by the two Loan Agreements which *"would be mere instruments to accomplish transfers of Mr Spiegel's funds to the companies owned by Mr Drukker as consideration for the 30% equity in [Bender Oil]"* (§5(b)), and (3) *"certain additional agreements"* (§7); (d) the *"transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013, i.e. after Mr Spiegel had satisfactorily completed his due diligence investigations into [Bender Oil]"* (§8); (e) Mr Drukker also invested over US$16 million into Bender Oil (§8); (f) neither Mr Drukker nor his wife ever agreed to provide, or ever signed, personal guarantees of the Respondents' liabilities under the Loan Agreements (§9); (g) as a result of the non-performance by certain Transdniestrian governmental authorities of various undertakings and guarantees they had given in a supplementary privatisation agreement signed with WJ Holding on 28 March 2012 ("the 2012 **Privatisation** **Agreement**"),[19] the Bender Oil project was not as successful as had been hoped (§10); (h) as he was aware of these developments, Mr Spiegel *"changed his tack"* and *"chose to disregard the real nature of the transaction and instead uphold the sham Loan Agreements of August 2012, as if these were genuine commercial transactions"* (§12); and (i) *"the Loan Agreements are null and void, that the arbitration agreements that are ostensibly included in these agreements are also null and void, and that instead, Mr Spiegel, through his affiliated companies, holds an equitable interest in 30% in the shares in [Bender Oil]"* (§15);

(ii)  offered a 'Presentation of Certain Legal Principles Affecting the Validity of the Loan Agreements and Arbitration Agreements' (§16–30), in which they submitted that (a) the Loan Agreements were 'shams' within the meaning of *Snook v. London & West Riding Investments Ltd* [1967] 2 QB 786, at 802 (§16); (b) the arbitration clauses could not be separated from the Loan Agreements in which they appeared and were accordingly also null and void (§17–18); (c) the principle of party autonomy in general, and Article V(1)(d) of the 1958 New York Convention in particular provide that an arbitral award cannot be enforceable unless the composition of the tribunal and the arbitral procedure are in accordance with the agreement of the parties, whereas in this case the Tribunal had been *"imposed on the parties at the sole demand of the Claimants"* (§19–20); (d) the Respondents did not consent to arbitration

(§21);  (e) the Loan Agreements *"did not reflect genuine loans, but were part of a larger equity investment made by Mr Spiegel"* which were *"governed by other contracts (and other dispute resolution clauses)"* (§22);  (f) New York was *"the only proper forum"* for the resolution of the dispute (§23);  (g) the arbitration agreement was null and void within Article II(3) of the New York Convention having been induced by Mr Spiegel's fraud and/or was unconscionable (§24–25);  (h) the dispute did not fall within the arbitration clause (§27) and could not be resolved by arbitration (§28);  (i) the Loan Agreements (and the arbitration clauses in them) are unenforceable *"due to lack of consideration"* (§29–30);

(iii)   in answer to the 5 questions posed by the Tribunal, the Respondents submitted that (a) there was no jurisdiction under the LCIA Rules to hear a combined claim by Mazlin and Shireen without the Respondents' consent, which was not forthcoming (§31–49); (b) the existing Request for Arbitration could not be amended by removing one Claimant (§50–53);  (c) the third question accordingly did not arise (§54);  (d) the arbitration ought to be stayed in favour of the New York proceedings because (1) the arbitration did not properly reflect the wider dispute between the parties (§55);  (2) the principle of *lis pendens* (§56) required the issues to be determined in the New York proceedings (§57–58), not least because the Agreement of Sale was subject to New York law and the *"equity related contracts were executed in New York"* and the *"dispute resolution clause in the last negotiated draft share sale agreement designates AAA arbitration with a seat in New York"* (§59); (3) both Mr Spiegel and Mr Drukker are citizens and residents of the USA (§60); (4) the factual circumstances central to the dispute are located in the USA (§60); (5) the power to compel disclosure in the arbitration would be inadequate when compared with the powers available in the New York proceedings (§60–62 & §64–65); and (6) the arbitration proceedings focused on the Loan Agreements, which were shams (§63); and

(iv)   in conclusion, the Respondents invited the Tribunal to give directions either (a) to discontinue the arbitration with immediate effect *"and the Claimants may be granted a leave [sic] to submit new requests for arbitration"* (§67), alternatively (b) the arbitration proceedings should be stayed until such time as discovery in the New York proceedings had taken place *"upon the reasonable expectation"* that the evidence obtained on discovery there *"will be relevant to the subsequent entertainment (by the Tribunal) of the*

*Respondents' principal claim*" that the Loan Agreements are shams, and the true dispute cannot be fully determined in the context of the arbitration (§68), (c) that the exchange of written submissions "*do not constitute determination of the jurisdictional issue at hand*" (§69–70), and (d) either the determination of costs should be deferred (§70) or the Claimants should be liable in costs for having improperly commenced proceedings in the joint names of Mazlin and Shireen under separate agreements (§71).

20.   Also on 11 April 2017, the LCIA issued a direction pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 20 April, a substitute payment of £10,000 in respect of the Respondents' share of the deposit.[76]

21.   On 21 April 2017, the Respondents' legal representatives provided to the Tribunal copies of four returns of service, one each in respect of Mr Spiegel, AMM Consulting, Mazlin and Shireen, as defendants in the New York proceedings commenced by WJ Holding and Stuhrick on 7 April 2017.

22.   The preliminary oral hearing in the Mazlin claim was duly held in London on 24 April 2017, at which –

   (1)   the parties' respective legal representatives each made oral submissions in support of their arguments, as outlined above;

   (2)   the Respondents' legal representative also provided hard copies of a 25-page slide presentation headed 'The Respondents' Comments to Claimants' Submissions on 11 April 2017', which had not been supplied in advance;

   (3)   the Respondents' legal representative stated that the Respondents had no objection in principle (i) to two new and separate arbitration claims being made, one under each of the Loan Agreements, or (ii) to the appointment of identical arbitral tribunals in relation to each such claim, or (iii) to identical directions being given in each such arbitration, so that they could each be run and decided in parallel;

   (4)   however, (i) the Respondents refused to consent to the arbitration proceeding in its original form: no reasoned explanation was offered for this approach (apart from the Respondents' reliance on the point of form under the LCIA Rules); and (ii) the

_____

[76] [1/23/243]

Respondents also refused to accept that one of the Claimants could be amended out of the arbitration.

23.    After careful consideration of the parties' respective written and oral submissions, the Tribunal issued Procedural Order № 1[21] ("Mazlin PO1") on 27 April 2017, determining that, on the correct interpretation of the LCIA Rules, (i) the Tribunal was precluded from proceeding with the arbitration in its then form (i.e. with both Mazlin and Shireen named as Claimants) by reason of the fact that the Request sought a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties did not consent to a consolidation, but (ii) the Tribunal could allow one Claimant to amend the Request so as to remove the other Claimant and its claim.  The Tribunal directed (a) the Claimants to deliver an amended Request by 5:00 pm on 28 April 2017, deleting one of the Claimants and its claim and (b) the Respondents to deliver an amended Response within 28 days of the Tribunal's confirmation of its approval to the amended Request.

### A.5  The procedural history of the separate arbitration claims

24.    Under cover of a letter from the Claimants' legal representatives also dated 27 April 2017[22] –

    (1)    Mazlin duly delivered an Amended Request for Arbitration in the Mazlin claim,[23] deleting reference to Shireen and its claim, and seeking US$4,987,061 only under the Mazlin Loan Agreement, together with "*interest (including default interest) and its costs and expenses (including legal fees) of enforcing the Loan Agreements (plus interest on those costs and expenses)*" (§8);

    (2)    Shireen delivered a separate Request for Arbitration[24] in substantially identical terms to the Mazlin claim, save that the amount of the claim was US$3,786,500 under the Shireen Loan Agreement, together with an equivalent claim for interest, costs and expenses to that in the Mazlin claim; and

    (3)    the Claimants' legal representatives submitted a suggested draft Procedural Order № 2 in the Mazlin claim, seeking directions leading to a determination of the merits of the claim together with the Shireen claim, and including (at §1) the following statement:

---

[21] [1/13].

[22] [1/23/249].

[23] [1/5].

[24] [1/6].

*"The Parties confirm their acceptance that the Arbitral Tribunal comprising Mr Jonathan Crow QC, Mr Guy Pendell and Ms Kate Davies appointed by the London Court of International Arbitration ("LCIA") by notification to the Parties dated 23 February 2017 has been validly established in accordance with Clause 9 of the "Revolving Loan Agreement (Secured)" between Mazlin Trading Corp ("Mazlin") and (1) WJ Holding Ltd ("WJH") and (2) Stubrick Ltd ("Stubrick") made on 10 August 2012 (the "Agreement") and Article 5 of the LCIA Rules (as hereinafter defined)".*

25.   By email dated 28 April 2017,[25] the Tribunal –

   (1)   confirmed to the parties its approval of the Amended Request for Arbitration in the Mazlin claim pursuant to §13 of Mazlin PO1;

   (2)   directed the Respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed by the Claimants in their draft PO2 in relation to the Mazlin claim and, to the extent that they disagreed, the reasons for such disagreement;

   (3)   if and to the extent that the Respondents expressed any disagreement, the Tribunal directed that the Claimant in the Mazlin claim indicate in writing any response it might have by 5.00 pm on 10 May;

   (4)   indicated that the Tribunal would then determine whether to give any further directions in the Mazlin claim; and

   (5)   stated that the Tribunal was not in a position to give any directions in relation to the Shireen claim unless and until the same panel had been appointed in relation to that arbitration.

26.   By letter dated 5 May 2017 from their legal representatives,[26] the Respondents –

   (1)   stated that they had no objection to the proposals set out in §1-16 of the Claimant's draft PO2 in relation to the Mazlin claim (*i.e.* including the paragraph quoted in §24(3) above).

   (2)   stated that they objected to any directions being given in relation to the Shireen claim;

---

[25] [1/23/251].

[26] [1/23/258].

    (3)    proposed that the Respondents should deliver their Statement of Defence within four weeks after the close of discovery in the New York proceedings; and

    (4)    proposed that all other procedural directions in the Mazlin claim should be dependent on the completion of discovery in the New York proceedings.

27.    By email dated 9 May 2017,[27] the Claimants' legal representative provided a detailed response to the Respondents' letter of 5 May and –

    (1)    accepted that no directions could be given in relation to the Shireen claim until such time as the LCIA appointed an arbitral tribunal, and

    (2)    submitted that the procedural directions in the Mazlin claim should not be deferred pending discovery in the New York proceedings.

28.    On 24 May 2017, the Respondents delivered their Responses to Arbitration in each of the Mazlin and the Shireen claims,[28] making essentially the same case as in their original Response dated 13 January 2017[29] (outlined in §8 above) and in their written submissions of 11 April 2017[30] (outlined in §19(2) above). In summary:

    (1)    The Respondents maintained their position that (i) neither Loan Agreement is "*a genuine commercial transaction but constitutes a sham agreement that was part of an elaborate scheme to document an equity investment [in Bender Oil] made by ... Mr Alexander Spiegel*" and that "*the arbitration agreement in [each] Loan Agreement is also a sham*" (§9), (ii) the "*original agreement*" that governs "*the relationship between the parties*" was the March 2012 Agreement of Sale "*together with other ancillary agreements*" (§10), (iii) those agreements are subject to New York law (§11), (iv) accordingly, the dispute that has arisen between Mr Spiegel and his *alter ego* companies (on the one hand) and WJ Holding and Stubrick (on the other) is subject to the exclusive jurisdiction of the courts of New York (§12), (v) proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§13) and (vi) since the beneficial owners of the Claimants and the Respondents respectively are based in New York "*the proper venue for any hearings should be New York*" (§14).

---

[27] [1.23-262].

[28] [1.7] and [1.8].

[29] [1.2].

[30] [1.4].

(2) On that basis, the Respondents invited the Tribunal to find that (i) the Mazlin Loan Agreement *"is null and void"* being a *"sham"* (§40), (ii) the arbitration agreements in the Loan Agreements *"are also null and void"* (§41), (iii) the *"genuine dispute at hand ... involves an equity investment that was entered into by other parties and is governed by other contracts governed by New York law (and other dispute resolution arrangements)"* (§42), (iv) the 'genuine dispute' *"also involves a number of important oral arrangements between WJH and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties"* (§43) and (v) *"since the issues, which the Claimant has referred to arbitration do not fall within the scope of the arbitration clause in the Loan Agreement, the Respondents are not bound by that arbitration clause"* (§46).

(3) Finally, the Respondents indicated that they did not object to the identity of the arbitrators (§52) but that they *"object to the jurisdiction of the arbitral tribunal"* and on that basis they would *"seek the relevant ruling from the tribunal by way of an award on the question of jurisdiction"* (§53).

29. On 25 May 2017, Mazlin lodged the substitute payment of £10,000 pursuant to the LCIA's direction on 11 April in relation to the Tribunal's costs and expenses of the Mazlin claim.[31]

30. By an e-mail sent to the parties on 30 May 2017,[32] the LCIA directed Shireen and the Respondents (together) to pay £10,000 each as their shares of the first deposit on account of the costs of the Shireen claim.

31. On 7 June 2017, the Tribunal issued Procedural Order № 2 in the Mazlin claim[33] ("Mazlin PO2") –

(1) giving those directions to which the parties had agreed (§5 & §15(1)–(16)), and in particular recording the fact (as confirmed in the Claimant's draft PO2 and in the Respondents' response dated 5 May 2017[34]) that the parties had confirmed their acceptance that the arbitral Tribunal appointed by the LCIA by notification to the parties dated 23 February 2017 had been validly established in accordance with Clause 9 of the Mazlin Loan Agreement and Article 5 of the LCIA Rules (§15(1));

---

[31] [1/23/268].
[32] [1/23/272].
[33] [1/16].
[34] [1-23/258].

    (2)    declining to give any directions in the Shireen claim (§7);

    (3)    giving detailed reasons for declining to stay the Mazlin claim pending completion of disclosure in the New York proceedings (§8–9); and

    (4)    giving directions for the further conduct of the arbitration, including an exchange of disclosure by lists (§15(22)) and witness statements of fact (§15(23)), and culminating in a substantive jurisdiction and merits hearing (§15(27)–(29)).

32.    By email dated 8 June 2017,[32] the Respondents' legal representatives notified the LCIA that the Respondents declined to fund the costs of the Shireen arbitration proceedings.

33.    By email dated 9 June 2017,[33] the Respondents' legal representatives invited the Tribunal to reconsider Mazlin PO2, and in particular its refusal to stay the Mazlin claim pending disclosure in the New York proceedings.

34.    By letter dated 12 June 2017,[34] the parties were informed that the LCIA had appointed the same members to the arbitral Tribunal in respect of the Shireen claim as in relation to the Mazlin claim.

35.    Also on 12 June 2017, Shireen lodged £20,000 with the LCIA, comprising £10,000 on its own behalf pursuant to the LCIA direction given on 30 May 2017 together with a substitute payment of £10,000 in respect of the Respondents' unpaid contribution towards the Tribunal's costs and expenses of the Shireen claim.[35]

36.    On 15 June 2017, each of Mazlin and Shireen served their Statements of Case in their respective arbitrations,[36] reflecting the claims outlined in their Requests for Arbitration (outlined in §24 above), together with a proposed procedural order in relation to the Shireen claim containing matching directions to those given in relation to the Mazlin claim, and including equivalent wording (in relation to the Shireen claim) to that quoted in §24(3) above (in relation to the Mazlin claim).

---

[32] [1/23/271].

[33] [1/23/274].

[34] [1/23/279]

[35] [1/23/277]

[36] [1/9] and [1/10].

37. By email dated 16 June 2017, the Claimants' legal representatives invited the Tribunal to make matching procedural directions in each of the Mazlin and Shireen claims.

38. By email from the Respondents' legal representatives dated 18 June 2017, a request was made to the Tribunal to reconsider certain timetable deadlines in Mazlin PO2.[40]

39. By email dated 19 June 2017,[41] the Tribunal responded to the requests received from the Respondents' legal representatives dated 9 and 18 June in the following terms:

> "In emails from their counsel dated 9 and 18 June, the respondents invited the Tribunal to revisit PO2, in particular with regard to the question whether further progress in this claim should be deferred pending disclosure in the NY proceedings, but also with regard to specific elements in the timetable.
>
> Before responding to the detail of the respondents' request, we would first make two important preliminary observations, after setting out the relevant procedural chronology:
>
>     1. Under cover of an email dated 27 April, the claimant's solicitors provided a draft PO2.
>
>     2. In an email dated 28 April, the Tribunal said this: "we direct the respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agree or disagree with the directions proposed in [the claimant's draft PO2] and, to the extent that they disagree, the reasons for such disagreement. If and to the extent that they express any disagreement, we direct that the claimant ... indicate in writing any response it might have by 5.00 pm on 10 May."
>
>     3. In accordance with the Tribunal's direction, the respondents duly provided their Response to the Claimant's Proposed Procedural Order No. 2 in a letter from their counsel dated 5 May.
>
>     4. The claimant then provided its response in an email from its solicitors dated 9 May.
>
>     5. Having carefully considered the parties' submissions, the Tribunal issued PO2 on 7 June.
>
> Our first preliminary observation is this. From the foregoing chronology it will be apparent that both parties had a full opportunity to comment on the proposed content of PO2 before it was issued. As a general rule, the Tribunal considers that, in the interests of (i) fairness between the parties (ii) the expeditious progress of the arbitration and (iii) minimising costs, it is undesirable for either party to try reopening an issue that has already been fully debated and ruled on by the Tribunal. Absent any express agreement by the parties to the contrary on any particular issue, the Tribunal has broad powers to order whatever procedure is appropriate to the circumstances of the case. Against that background, we do not consider that the respondents are justified in inviting the Tribunal to reopen PO2 on this occasion.

---

[40] [1/23/285].

[41] [1/23/286].

19

*Our second preliminary observation is this. The heart of the respondents' complaint is that the procedure for discovery available to it in the New York proceedings is more wide ranging and imposes greater obligations on the claimant than any disclosure procedure which might be available to it in these proceedings. In view of this, it seems to be the respondents' contention (previously raised and ruled on in PO2) that these proceedings should only progress once the discovery phase of the New York proceedings is complete because material disclosed in the course of discovery in New York will or may be used in this arbitration. Having carefully considered the points raised by the respondents in this regard, the Tribunal does not accept either the contention made or its premise. The respondents contractually agreed to arbitrate all disputes arising out of the agreements at issue in these proceedings in London. They therefore agreed to the various rules and procedures which govern and apply to such arbitrations with all the benefits and, in some cases, limitations which such proceedings entail. There is not – nor could there be – any suggestion that disclosure is not available in this arbitration. It is and it will be. To the extent such disclosure is different from (and less than) the disclosure that may be available to the respondents in New York, that is a limitation the respondents accepted when they agreed to arbitrate disputes arising out of the agreements at issue in these proceedings.*

*For these reasons, the Tribunal does not accept that it is appropriate to revisit its decision in PO2. Nevertheless, having received the respondents' detailed comments in their counsels' email of 9 June, and their further request of 18 June, the Tribunal has on this occasion taken the exceptional course of clarifying the reasons for its decision in PO by addressing the points raised:-*

1. *In relation to paragraph 9(1) of PO2, the respondents object to any "implied criticism" regarding delay. The respondents need not be concerned: as the context of that paragraph makes clear, the Tribunal's remark about delay was neutral as to either party's responsibility.*

2. *In relation to paragraph 9(2) of PO2, the respondents say that it "seems to effectively prejudge the outcome of the proceedings without affording the Respondents the benefit of due process". The Tribunal assures the respondents that it has not prejudged the outcome of any aspect of the proceedings. To clarify, paragraph 9(2) of PO2 merely summarised the nature of the pleaded claim, just as paragraph 2 summarised the nature of the pleaded defence. In considering a request regarding the necessity for disclosure (in these proceedings or any other), the Tribunal is fully within its powers (and required) to summarise on a prima facie basis the nature of the claims and defences in order to decide on the appropriate procedure as regards disclosure (and the timetable) going forwards.*

3. *The respondents say in relation to paragraph 9(3) that "on the one hand the Tribunal implies that the Respondents do not hold sufficient information to convince it that the New York proceedings are necessary, and on the other hand it effectively precludes the Respondents from obtaining the relevant information via the only sufficient means available to it, i.e., through the New York discovery process". The Tribunal refers to its preliminary observations above. The Tribunal is concerned with the progress of and procedure for this arbitration. Under its broad procedural powers, the Tribunal has dismissed the respondents' contention that disclosure in the New York proceedings is necessary before this arbitration can progress at all. That decision does not preclude the respondents from obtaining discovery either in the New York proceedings or in this arbitration in due course, nor from using disclosure obtained from either process in these proceedings (to the extent that is permitted by law). It also*

does not preclude the respondents from making any application in the
future as regards the timing of any final determination of the issues in this
arbitration. In the meantime, the Tribunal has merely concluded in PO2
that service of the Defence and any Cross-claim should not be deferred
until after completion of discovery in the New York proceedings.

4. The respondents say that paragraph 9(4) of PO2 "does not correspond to
the facts" and they refer in particular to their submissions of 11 April 2017,
sections 1-15, 18, 22, 55-65. The respondents make a similar point in
relation to paragraphs 9(7) of PO2. The Tribunal was and is fully alive to
the nature of the respondents' argument in this regard, and in particular
paragraphs 55-65 of its 11 April submissions. However, it remains
unpersuaded that this arbitration should effectively be stalled pending the
completion of disclosure in the New York proceedings. The fact that Mr
Spiegel and/or any corporate entities operated by him (rather than the
claimants) may hold some documents which are relevant to the issues in
dispute does not justify a complete standstill of these proceedings. The
Tribunal refers to its second preliminary observation above about any
limitations which may apply to disclosure in these proceedings. It also
remains open to the respondents to utilise the procedures available to it in
these proceedings.

5. In relation to paragraphs 9(5) and (6) of PO2, the respondents have now
provided a fuller set of documents relating to the proceedings in New
York. Nevertheless, we have still seen nothing issued there on 8 December
2016, nor any filed application for discovery. In any event, consistent with
paragraphs 15(13), (14) and (16) of PO2, the Tribunal does not expect in
future to receive information from the parties piecemeal in this
fashion. The respondents were directed, on 28 April, to indicate in writing
by 5.00 pm on 5 May the extent to which they agreed or disagreed with the
directions proposed in the claimant's draft PO2 and, to the extent that they
disagreed, they were required to set out their reasons for such
disagreement. If and to the extent that they wished to bring the Tribunal's
attention to the current state of the New York proceedings, they should have
done so by 5 May by disclosing any relevant documents. Having said that,
and having now reviewed the latest materials submitted by the respondents,
we have seen nothing to alter the directions given in PO2.

6. In relation to paragraph 9(8) of PO2, the respondents point out that
various sanctions would be available in the New York proceedings against
Mr Spiegel and his corporate vehicles for breach of their discovery
obligations which are not available in these proceedings. The Tribunal
refers to its second preliminary observation above.

7. Finally, in relation to paragraphs 15(18), (22) and (23) of PO2, the
respondents object that they are allowed only 14 days for the preparation of
their Statement of Defence which, they say (in their email of 9 June) "seems
very harsh on any standards (and is even harsher than the delay proposed
by the Claimants in their draft of Procedural Order No 2 of 31 May
2015)". They also say (in their email of 18 June) that it is inconsistent with
Article 15.3 of the LCIA Rules, and on that basis they again invite the
Tribunal to revisit PO2. The Tribunal observes that the default timetable
laid down in Article 15.3 is subject always to the Tribunal's discretion, as
provided in Article 15.1 of the LCIA Rules. Absent agreement of the parties
or any alternative timetable proposed by the respondents, it is entirely
within the Tribunal's powers to direct the filing of the Statement of Defence
within 14 days (in particular since the respondents have been in possession
of the original Request for Arbitration since November 2016). In the

*meantime, it has always remained open to the respondents (i) to propose an alternative timetable (which, to date, they have not done), (ii) to seek to agree an extension pursuant to paragraph 15(13) of PO2, and or (iii) to make a reasoned request for any extension pursuant to paragraph 15(1).*

*For all these reasons, having carefully considered the respondents' latest submissions, we do not alter the directions set out in PO2 and in future we will require due compliance with its terms. We will also not entertain any similar attempts to re-open procedural decisions, absent a showing of exceptional circumstances. If the respondents propose that we should treat their counsel's email of 18 June as a request for an extension of time, we direct them to provide by 5.00 pm on Friday 23 June a reasoned request in writing within §15(14) of PO2 specifying the proposed revised date for delivery of the Defence and any consequential alterations to the timetable laid down in PO2."*

40.  By separate emails also dated 19 June 2017,[42] the Tribunal invited the Respondents' submissions in answer to the Claimants' proposal for matching directions in the two arbitrations.

41.  By emails from the LCIA dated 21 June 2017,[43] the parties in the Shireen claim were each directed to lodge a further £15,000 (*i.e.* a total of £30,000), and the parties in the Mazlin claim were each directed to lodge a further £20,000 (*i.e.* a total of £40,000), on account of the Tribunal's fees and expenses, in each case by 12 July 2017.

42.  By email dated 23 June 2017[44] in relation to the Shireen claim, the Respondents' legal representatives stated that the Respondents "*do not object to the issuance of matching directions with LCIA No 163503 [i.e. the Mazlin claim] and do not have any comments on the proposed Procedural Order No 1*" (*i.e.* the draft procedural order in relation to the Shireen claim provided by the Claimants' legal representatives, as mentioned in §36 above).

43.  On 29 June 2017 the Tribunal accordingly issued Procedural Order №3 in the Mazlin claim[45] ("Mazlin PO3"), directing that –

   (1)  the purpose of the directions was to ensure that the Mazlin claim and the Shireen claim proceeded in parallel, with as little delay and added cost as reasonably practicable, with a view to any evidential hearing and any oral arguments being heard in each concurrently;

    (2)    to that end, the procedural timetable in each would thereafter be identical; and

    (3)    the Statements of Case, witness evidence and documents in one case should stand as part of the record in the other.

44.    On the same day, 29 June 2017, the Tribunal also issued Procedural Order № 1 ("Shireen PO1") in the Shireen claim,[16] (i) recording the parties' acceptance of the appointment of the Tribunal (§4) and (ii) tracking the equivalent directions as in Mazlin PO2 and Mazlin PO3 (§5–32).

45.    Also on 29 June 2017, the Respondents served their Statements of Defence in each of the Mazlin and Shireen claims[47] –

    (1)    making essentially the same case as they had made in their original Response dated 13 January 2017[48] (outlined in §8 above), in their written submissions dated 11 April 2017[49] (outlined in §19(2) above), and in their Responses dated 24 May 2017[50] (outlined in §28 above), and in addition –

    (2)    attaching numerous documents on which they relied in support of their case;

    (3)    specifically identifying an Operating Agreement[51] ("the Operating Agreement") and a Member Interest Purchase Agreement[52] ("the MIPA") as having been "*actively negotiated by the parties*" during 2013 and 2014 (§24 of the Defence to the Mazlin claim and §25 of the Defence to the Shireen claim);

    (4)    relying on certain health insurance agreements (§27), a Power of Attorney[53] (§28) executed by Mr Spiegel in favour of Sergey Rashkov ("Mr Rashkov"), and certain email exchanges on 23 September 2013[54] (§29) as evidence of the concluded nature of Mr Spiegel's agreement to acquire a 30% equity interest in Bender Oil;

---

[16] [1/18].

[47] [1/11] and [1/12].

[48] [1/2].

[49] [1/4].

[50] [1/7] and [1/8].

[51] [2/417].

[52] [2/456].

[53] [2/411].

[54] [2/409–410].

(5)   alleging that each Claimant was estopped from *"acting as if the Loan Agreement was a genuine document"* (§51 of the Defence to the Mazlin claim and §52 of the Defence to the Shireen claim);

(6)   denying that the Respondents are jointly and severally liable under the Loan Agreements (§52 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(7)   admitting that (i) *"On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000"* (§54 of the Defence to the Mazlin claim), (ii) *"On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000"* (§55 of the Defence to the Mazlin claim), and (iii) *"On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500"* (§53 of the Defence to the Shireen claim);

(8)   alleging that the sums transferred in Swiss Francs should be converted to US Dollars on the date of repayment, not on the date of transfer to the Respondents (§54 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(9)   disputing the Claimants' interest calculations (§56 of the Defence to the Mazlin claim and §54 of the Defence to the Shireen claim);

(10)  denying that certain relief allegedly obtained in Cyprus against the Respondents was binding (§81–84 of the Defence to the Mazlin claim, §79–82 of the Defence to the Shireen claim);

(11)  on that cumulative basis, alleging (in §38 of the Defence to the Mazlin claim and §37 of the Defence to the Shireen claim) that (i) the Loan Agreements were shams, (ii) the nullity of the Loan Agreements also affected the arbitration clauses, (iii) the actions of Mr Spiegel convinced the Respondents that the Bender Oil investment was an agreed joint equity investment, on which basis the Respondents entered into the Loan Agreements, and (iv) the New York proceedings were the only proper forum, because the arbitrations could not resolve the wider dispute involving other parties; and

(12)  in conclusion, seeking (i) a stay of the arbitrations in favour of the New York proceedings (§85 of the Defence to the Mazlin claim and §83 of the Defence to the Shireen claim); alternatively (ii) rejection by the Tribunal of each and every claim advanced by the Claimants and a declaration that the Loan Agreements (and the arbitration clauses contained therein) are null and void *ab initio* (§86 of the Defence to the Mazlin claim and §84 of the Defence to the Shireen claim), and in any event (iii) an

order for the Respondents' costs and expenses, including legal fees (§87 of the Defence to the Mazlin claim, §85 of the Defence to the Shireen claim).

46.   By email dated 7 July 2017,[35] the Respondents' legal representatives informed the Claimants' legal representatives that the Respondents were declining to fund the arbitration costs.   By emails dated 13 July 2017,[36] the Respondents' legal representatives similarly informed the LCIA that the Respondents declined to fund the arbitration costs of either the Mazlin or the Shireen claims.

47.   On 20 July 2017, Mazlin and Shireen served their Statements of Reply in each of their respective claims[37] in which they (*inter alia*) –

   (1)   denied (i) that the Loan Agreements were shams (§B(a)), and (ii) that Mr Spiegel improperly induced the Respondents to enter into the Loan Agreements (§8(b));

   (2)   relied on the entire agreement clause in the Loan Agreements as raising an estoppel against the Respondents (§8(b));

   (3)   denied that the Loan Agreements were void for want of consideration (§8(c));

   (4)   agreed that, during 2012/13, Mr Spiegel had been contemplating the acquisition of a 30% interest in Bender Oil, but denied that there had been any concluded and unconditional agreement to that effect (§9–19); and

   (5)   asserted that it was the Respondents' case in related proceedings in Cyprus that the Transdniestrian government which was party to 2012 Privatisation Agreement[38] was "*in repeated breach of its obligations, and has refused to close the privatisations program and release the shares [in Bender Oil] from the lien. As long as the lien still exists, no transfer of the shares in [Bender Oil] to third parties can occur*" (§21).

[35] [1/23/298]

[36] [1/23/301] and [1/23/302].

[37] [1/13] and [1/14].

[38] [2/3-43].

48. On 28 July 2017, the Claimants lodged their due payments on account of arbitration costs of £15,000 in respect of the Shireen claim and £20,000 in respect of the Mazlin claim.[59]

49. By emails dated 1 August 2017 from the Respondents' legal representatives, they repeated that the Respondents declined to fund the arbitration costs of either the Mazlin claim or the Shireen claim.[60]

50. By emails dated 9 August 2017,[61] the LCIA issued directions pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 30 August, a substitute payment of £10,000 in respect of the Respondents' share of the arbitration costs in the Shireen claim and of £20,000 in respect of the Respondents' share of the arbitration costs in the Mazlin claim.

51. On 24 August 2017, Mazlin and Shireen each made an application pursuant to Article 24.5 of the LCIA Rules by which they each sought an award against the Respondents for payment of the £10,000 substitute deposits paid by them to the LCIA on account of arbitration costs on 25 May and 12 June 2017 respectively ("the 1ˢᵗ Article 24.5 Applications").

52. By emails dated 1 September 2017, the Tribunal invited the Respondents to make any submissions in answer to the 1ˢᵗ Article 24.5 Applications by 14 September 2017.

53. By emails dated 6 September 2017[62] (i.e. the day before disclosure was due under §15(22) of Mazlin PO2 and §25 of Shireen PO1) the Respondents' legal representatives stated as follows:

> "We have been instructed to inform the Tribunal and the Claimant that the Respondents shall not be submitting any disclosure list, and that they will decline to produce any documents that might be requested by the Claimant in the context of these arbitration proceedings. The reason, as the Tribunal would hopefully appreciate, is that the disclosure of documents in these proceedings may cause irreparable harm to the position of the Respondents in the New York proceedings, which the Respondents believe are the only proper venue for this dispute.
>
> As regards the Claimant's application of 24 August 2017, the Respondents thank the Tribunal for its invitation to submit a response by 14 September. For the same reason as that stated above, i.e. the Respondents' view of New York as prevailing venue for the resolution of this dispute, they decline to submit any such response" (emphasis added).

---

[59] {1/23/305} and {1/23/306}.

[60] {1/23/307} and {1/23/308}.

[61] {1/23/309} and {1/23/310}.

[62] {1/23/313} and {1/23/314}.

54.   Under cover of emails dated 7 September 2017, the Claimants' legal representatives provided disclosure by lists.

55.   By emails dated 21 September 2017, the parties were informed that unless the substitute deposits ordered on 9 August 2017 were received from the Claimants, the Tribunal would not be proceeding with the arbitrations.

56.   By emails dated 5 October 2017 from the Claimants' legal representatives, the Tribunal was informed that the parties had agreed to defer exchange of witness statements to 16 October 2017.

57.   On 6 October 2017, Mazlin and Shireen lodged substitute payments of £20,000 and £15,000 respectively pursuant to the LCIA's direction on 9 August 2017 in relation to the arbitration costs. Mazlin and Shireen also each made a further application that day pursuant to Article 24.5 of the LCIA Rules seeking an award against the Respondents for those payments ("the 2nd Article 24.5 Applications").

58.   By email dated 10 October 2017, the Tribunal invited the Respondents to provide any submissions in answer to the 2nd Article 24.5 Applications by 18 October 2017.

59.   On 16 October 2017 –

   (1)   the Claimants served substantially identical witness statements from Mr Spiegel in respect of each arbitration;[51]

   (2)   the Respondents' legal representatives informed the Tribunal by email[52] *"that the Respondents will not be submitting any witness statement of fact. The reason is the same as that expressed in our email of 6 September 2017, i.e. the Respondents wish to preserve their position in view of the New York proceedings"*; and

   (3)   those emails also stated that the Respondents declined to file any response to the 2nd Article 24.5 Applications.

---

[51] [1/21] and [1/22].

[52] [1/23/323] and [1/23/324].

60. Later the same day, the Respondents' legal representatives sent another email to the Claimants' legal representatives,[ ] stating that the Respondents "*reserve their right to appear at the November hearing (in both cases)*".

61. On 21 October 2017, the Tribunal issued Procedural Order № 4 in the Mazlin claim[ ] and Procedural Order № 2 in the Shireen claim,[ ] granting the orders sought by the Claimants in each of the 1st and 2nd Article 24.5 Applications, but in the form of orders rather than awards in light of the Respondents' outstanding challenge to the Tribunal's jurisdiction at that time.

62. By emails dated 14 November 2017,[ ] the legal representatives of the Respondents stated as follows:

> "*On behalf of the Respondents, we inform the Tribunal and the legal representatives of the Claimant that the Respondents will not attend the hearing of 28/29 November, nor will they be represented.*
>
> *The position of the Respondents in relation to these proceedings and the underlying dispute remains that set forth in the Statement of Defence of 29 June 2017 (save in regard to costs, as set out below). We are informed that the status of the proceedings in the New York state court is as follows. Submissions were filed by both sides, the Respondents' submission of 22 June 2017 being attached as Exhibit 13 to the Statement of Defence. An oral hearing took place on 17 August, at which both sides were represented. The New York court has yet to render its decision regarding its jurisdiction and the Respondents' right to proceed with discovery. Until this decision is rendered the Respondents wish to preserve their position in the New York proceedings as a matter of priority over these proceedings.*
>
> *The Respondents will not be submitting their costs incurred in these proceedings and therefore withdraw their corresponding claim at Paragraph 87 of the Statement of Defence. As regards the costs that will be submitted by the Claimant, the Respondents wish to draw the Tribunal's attention to the circumstances that led to the hearing of 24 April 2017. That hearing took place to address the format of the Claimant's initial Request for Arbitration of 21 November 2016. In Procedural Order No 1, the Tribunal determined that it was precluded from proceeding on this arbitration in its then existing form, and the Claimant filed an Amended Request for Arbitration dated 27 April 2017. The issue of the format of the Request for Arbitration of 21 November 2017 [sic] was immediately raised by the Respondents in their Response of 13 January 2017 and this important procedural objection cannot be viewed as an unjustified attempt to delay or otherwise obstruct these proceedings.* The Respondents believe that these circumstances should have bearing on the Tribunal's final decision in relation to costs" (emphasis added).

---

[ ] [1/23/325].

[ ] [1/19].

[ ] [1/20].

[ ] [1/23/326] and [1/23/327].

24

63. By emails dated 16 November 2017,[69] the Respondents' legal representatives asked for permission to retain a transcriber at the concurrent oral jurisdiction and merits hearings on 28 & 29 November.

64. By emails also dated 16 November 2017,[70] the Tribunal informed the parties as follows:

> *"The Tribunal is in receipt of the email from the Respondents' representatives dated 14 November (i) indicating the Respondents' proposed non-attendance at the forthcoming oral hearing and (ii) containing the Respondents' submissions in relation to costs.*
>
> *Separately, the Tribunal is also in receipt of the Respondents' email dated 16 November 2017, requesting authorisation for a court reporter to be present at the oral hearing.*
>
> *It is convenient to deal with both at the same time.*
>
> <u>*Email of 14 November 2017*</u>
>
> *In light of (a) the agreed position of the parties, which is reflected in paragraph 15(1) of PO2, and (b) Articles 15.8, 15.10 and 19.1 of the LCIA Rules, the parties will be aware that the Tribunal is able to proceed with the arbitration and to make an award even if the Respondents choose not to participate in any stage of the proceedings and/or choose not to attend the oral hearing. In particular, and as noted in paragraphs 15 and 16 of PO4, the Tribunal has the jurisdiction conferred by Articles 23.1 and 23.4 of the LCIA Rules to rule on its own jurisdiction and, if it finds that it has jurisdiction, to make a pecuniary award under Article 26 notwithstanding the Respondents' non-attendance.*
>
> <u>*Email of 16 November 2017*</u>
>
> *The Tribunal has no objection to the presence of a court reporter at the forthcoming hearing. The Tribunal notes the agreement of the parties on the allocation between them of the attendant costs. The Tribunal would be grateful to receive copies of the transcript for their own use."*

65. On 23 November 2017, Mazlin's legal representatives served its Skeleton Argument, together with a Chronology, *Dramatis Personae*, List of Issues, Schedule of Costs and Submissions on Costs. It was disclosed in §7 of the Skeleton Argument that Shireen had apparently been dissolved on 30 October 2017, but that an application had been made for its restoration to the register in Liberia.

66. In response to this development, the Respondents' legal representatives circulated an email on 24 November 2017 in the Shireen claim saying this:

---

[69] [1/23/329] and [1/23/330].

[70] [1/23/331] and [1/23/332].

*"We write in connection with the above-referenced proceedings (the "Shireen Arbitration"). The elements set out below relate to procedural matters only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*We note that despite the Tribunal's directions, the Claimant has not filed any preparatory submissions for a hearing scheduled for 28 29 November. In its skeleton argument of 23 November 2017 in relation to concurrent proceedings No. 163503 (Mazlin Trading Corp v WJ Holding Limited and Stubrick Limited), the Claimant's counsel informed the Tribunal that the Claimant (Shireen) no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017 it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017. An application has or is imminently to be made to the Liberian registry of companies, based in Virginia, for Shireen to be immediately restored to the register in order that it can pursue the Shireen Arbitration."*

*It was then added that "Until such restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of the Claimant, in favour of Mazlin Trading Corporation as third party (following an assignment of debt that took place on 30 October 2017). It was suggested in this communication that "Given that the "third person" in question here is the Claimant in the linked arbitration (163503) and as the Tribunal is of course aware both claims share the same factual matrix, the same defences and are to be heard together on 28 November, we do not anticipate this presenting an issue and so should be most grateful if the Tribunal would confirm its agreement to the same."*

*This would appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of the Claimant's corporate existence during certain phases of this arbitration and absence of any pre-hearing submissions in accordance with the Tribunal's directions. These complex procedural manoeuvres cannot be properly understood or assessed in such a short time frame, and a hearing cannot validly take place on 28/29 November 2017 in the Shireen Arbitration. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing."*

67.    Later the same evening, the Respondents' legal representatives sent a further email in relation to the Mazlin claim saying this:

*"We write in connection with the above-referenced proceedings (the "Mazlin Arbitration"). The elements set out below relate to recent procedural developments only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*Hearing of 28 29 November 2017*

*In its skeleton argument submitted on 23 November 2017, the Claimant's counsel informed the Tribunal that claimant company Shireen Maritime Limited in concurrent proceedings No 173638 (Shireen Maritime Limited v WJ Holding Ltd and Stubrick Limited, the "Shireen Arbitration") no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017*

*...came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 201~."*

*It was then added that "Until [Shireen's] restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 201~, concurrently with the apparent restoration of Shireen, in favour of Mazlin Trading Corp as third party (following an assignment of debt that took place on 30 October 2017). It was also suggested in this communication that the claims in the Shireen Arbitration and Mazlin Arbitration should be heard together on 28/29 November.*

*The Respondents' interpretation of these developments in the Shireen Arbitration is that they appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of Shireen's corporate existence during certain phases of the Shireen Arbitration and absence of any pre-hearing submissions. It was submitted by the Respondents that these complex procedural manoeuvres could not be properly understood or assessed in such a short time frame, and that a hearing could not validly take place on 28/29 November 2017 in the Shireen Arbitration.*

*Pursuant to Procedural Order No 3 in this Mazlin Arbitration, the Tribunal directed that proceedings in the Mazlin Arbitration and in the Shireen Arbitration should "proceed in parallel, with as little delay and added cost as practicable, with a view to any evidential hearing and oral arguments being heard in each concurrently" (par. 1), and that "the procedural timetable in each shall hereafter be identical" (par.2). It would therefore appear that the defect having affected the conduct of the Shireen Arbitration (i.e. the dissolution of the claimant even if subsequently restored) must also affect the conduct of the Mazlin Arbitration.*

*On behalf of the Respondents, it is accordingly submitted that the hearing cannot take place on 28/29 November 2017 in the Mazlin Arbitration either. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing.*

<u>*Claimant's Costs Submission*</u>

*On 23 November 2017 the Claimant filed a short schedule of costs amounting to $635,845. The Respondents note the following:*

> *1.    The costs submitted (under the sole auspices of this Mazlin Arbitration) are very significant and represent not 3% of the claims as averred, but 12% of the Mazlin claim (of principal amount in the vicinity of $4 million). This cannot be considered a proportionate amount.*
>
> *2.    The Claimant did not distinguish between the costs related to the Mazlin Arbitration and those related to the Shireen Arbitration, which cannot be correct.*
>
> *3.    The hours submitted are provided in large blocks, in some instance of up to 102 hours, instead of granular increments of not more than several hours at a time (as would be customary), together with corresponding detailed chronology.*
>
> *4.    The Claimant seeks recovery of costs incurred in foreign proceedings, to which the jurisdiction of the Tribunal does not extend. The recovery of such costs must be governed by cost recovery laws in those foreign jurisdictions and by the proper fora.*

*The Respondents are accordingly of the view that the Claimant's costs submission is inadequate.*

27

*As a final comment, the Respondents' decision not to participate in disclosure and in the hearings scheduled for 28/29 November was based not only their in-principle view that the New York proceedings should prevail, but also in order to mitigate costs related to these London proceedings, including costs incurred by the Claimant. It was not intended to encourage an uncontested accumulation of costs."*

68. By email dated 24 November 2017, the Claimants' legal representatives –

    (1)    informed the Tribunal that Shireen had been restored to the register earlier that day, and provided a copy of the Proclamation of Rescission of Dissolution;

    (2)    provided a copy of a Deed of Assignment dated 30 October 2017 by which Shireen assigned absolutely to Mazlin all sums due and owing to Shireen under the Shireen Loan Agreement, including for the avoidance of doubt Shireen's claim in this arbitration and the benefit and proceeds of any award or order herein, including costs;

    (3)    provided a copy of a Confirmation of Consent to Joinder under Article 22.1(viii) of the LCIA Rules, dated 24 November 2017, signed by each of Shireen and Mazlin; and

    (4)    invited the Tribunal to make an order under Article 22.1(viii) joining or substituting Mazlin as Claimant in the Shireen claim.

69. By emails dated 25 November 2017, the Tribunal invited the Claimants to provide any responses to the Respondents' emails of 24 November by 10:00 am on 27 November.

70. By email dated 27 November 2017, timed at 16:47, the Respondents' legal representatives indicated that they *"will not be making any submission in regard to the application"* under Article 22.1(viii).

A.6  The oral jurisdiction and merits hearings

71. The concurrent oral jurisdiction and merits hearings were conducted over 28 & 29 November 2017 at the IDRC, 70 Fleet Street, London EC4Y 1EU. They were transcribed by Opus 2 International.

72. As they had previously indicated, the Respondents did not appear and were not represented

73.   The Claimants were represented by Anna Lintner, of counsel, and by Stevie Loughrey and James Hill of Onside Law.   Anya Freeman of Mr Spiegel's US attorneys was also in attendance, as was Mr Spiegel himself.

74.   At the commencement of the hearing the Tribunal indicated that, having considered the parties' submissions carefully, an order would be made, subsequently reflected in Procedural Order № 4 in the Shireen claim –

   (1)   joining Mazlin Trading Corp as a claimant in the Shireen claim, and

   (2)   providing that the Claimants are not required to serve an amended Request for Arbitration or any amended Statements of Case reflecting the addition of Mazlin as claimant.

75.   After the Claimants' counsel made certain opening submissions, Mr Spiegel gave oral evidence.   He affirmed both of his witness statements.[71]   He was asked some further questions by his own counsel, and he was then examined robustly and at some length by the Tribunal throughout the afternoon of the first day of the hearing.   In the course of that examination, the Tribunal put to Mr Spiegel the Respondents' case and the documents on which their Defences are based.

A.7  After the hearings

76.   By email dated 29 November 2017, the Claimants' legal representatives provided copies of certain documents that had been mentioned or handed up during the hearing, and also provided some interest calculations.   By email dated 11 January 2018, the Tribunal invited the Respondents to provide any response to those materials.   The Respondents' legal representatives duly provided their response by email dated 15 January, taking issue with certain aspects of the Claimants' interest calculations.

---

[71] [1.21] and [1.22]

B. THE FACTS

B.1 The background

77.   It is common ground that -

    (1)   the beneficial owner of Shireen and of Mazlin is, and always has been, Mr Spiegel;

    (2)   the beneficial owner of WJ Holding and of Stobrick is, and always has been, Mr Drukker; and

    (3)   Mr Spiegel and Mr Drukker were friends since childhood, having been brought up and gone to school in the same part of what is now west Ukraine.

78.   Mr Spiegel's evidence was, and the Tribunal accepts, that –

    (1)   he emigrated to the USA in 1972, after which he established a number of business ventures, specialising since the early 1990s in former Eastern bloc countries; and

    (2)   Mr Drukker emigrated to the USA in about 1989, and he too has established a number of business ventures.

79.   It is common ground that Mr Spiegel has made, or caused to be made, a number of loans to companies owned and controlled by Mr Drukker over a period of at least 25 years.  This is admitted in §6 of the Respondents' Defences.[12]  The Respondents say that Mr Spiegel was a *"small bridge lender"*.  By contrast, Mr Spiegel says he lent in aggregate somewhere in the region of $40 million.  The Tribunal has no reason to doubt Mr Spiegel's evidence in this regard, and accepts it.

80.   Mr Spiegel's oral evidence at the hearing was that he also became a director of approximately three of the companies in which Mr Drukker had an interest.   There was, however, no established pattern of Mr Spiegel making equity investments in Mr Drukker's business ventures.

81.   Mr Drukker's ventures were for many years conducted in collaboration with a number of business partners (not including Mr Spiegel) under the umbrella of WJ Group.  One of its assets

_____

[12] [1/11] and [1/12]

was the Bender Oil plant, a vegetable oil production facility in the Transdniestrian region of Moldova.

82.   It is not in dispute that Mr Drukker parted company from his former business partners in about 2011, after which he was left in sole ownership of WJ Holding, and through it the Bender Oil plant. The plant had not been operational for about 6 years, but he had plans to revive its production and turn it to profit. He approached Mr Spiegel to assist with the financing.

83.   The essential difference between the parties on the facts is this: Mr Drukker's case is that the two of them agreed a binding and unconditional deal under which Mr Spiegel would acquire a 30% equity stake in Bender Oil for $7 million, and the Loan Agreements were a sham mechanism to give partial effect to that equity investment, whereas Mr Spiegel's case is that the Loan Agreements reflected genuine loans, and although he spent a considerable amount of time and effort exploring the possibility of also making an equity investment, in the event there never was a concluded, unconditional agreement in that regard.

84.   That is the core factual issue on which both arbitrations turn. Its resolution demands a careful review of the evidence, and in particular a detailed consideration of the contemporaneous documentary record.

### B.2  The valuations

85.   Chronologically, the first document the Tribunal has seen is an Appraisal Certificate forming part of a valuation given by Industrial Consult SRL as at 8 December 2011.[13] It provides an appraisal of the market valuation of "*the properties (buildings and facilities) owned by [WJ Holding]*" comprising the tangible property of Bender Oil. It states that the plant is "*Not in use (mothballed)*". The Tribunal has not been shown the full valuation report, and does not know what information was provided to the valuer. The Certificate does not attempt to assess the net present value of Bender Oil based on its anticipated future business operations, merely the current market value of its tangible assets. Having said all that, it is the only valuation the Tribunal has been shown dating from 2011, and there are no apparent grounds for questioning its integrity. The value given is $637,830. The significance of this valuation is the light it casts on the parties' competing claims as to the nature of the deal between them. The Claimants say that it supports their case – namely, that the only discussions regarding a possible equity

investment by Mr Spiegel were reflected in the Agreement of Sale,[74] which valued a 30% equity stake at $210,000: that is in line with the Industrial Consult valuation. The Tribunal accepts that the valuation does lend at least some support to the Claimants' case in this regard, and that it is less consistent with the Respondents' case (which is that the parties put an enterprise value of about $20 million on Bender Oil, of which there is no contemporaneous evidence whatsoever).

86.    The next document is another valuation certificate, this time from Actimob Consulting Ltd giving a valuation as at 1 January 2012.[75]  Once again, the Tribunal has only seen the certificate, not the underlying valuation report, and does not know what information was provided to the valuer.  The report is again a property valuation, not an assessment of the potential development value of the plant as a going concern.  Furthermore, the certificate states that "*we have not carried out building surveys, tests services, made independent site investigations, inspected woodwork, [or] exposed parts of the structure*".  Nevertheless, it remains the only other independent piece of evidence regarding the value of the plant at the time, and the Tribunal has no reason to doubt its integrity.  The valuation figure is $1,516,580.  Mr Spiegel's evidence is that the reason for the increase in value over the month since the Industrial Consult valuation was that, in late 2011 the plant had no windows and no doors, the machinery had stood still for many years, and the grass was growing high all around the site.  Mr Drukker was trying to raise finance, and he spent considerable efforts and resources in reinstating the doors and windows, cleaning the machinery and cutting the grass to make it look like a viable project, and he procured a new valuation in January 2012 to reflect the added value his input had produced.  The Tribunal has no reason to doubt that evidence, and accepts it.

B.3  The Agreement of Sale

87.    The next document is the Agreement of Sale dated "*as of*" 15 March 2012."[76]  This is an agreement concluded between WJ Holding (*i.e.* Mr Drukker's company) and AMM Consulting (which, it is accepted by the Claimants, was one of Mr Spiegel's companies).  It was signed by Mr Drukker on behalf of WJ Holding, and by Mr Spiegel on behalf of AMM Consulting."[77]  The following provisions are relevant for present purposes:

---

[74] [2/376]
[75] [2/339].
[76] [2/376].
[77] [2/380]

(1)    The agreement recited that WJ Holding was the registered owner of 3,583 shares in Bender Oil, and that it wished to sell and AMM Consulting wished to buy 1,074 of those shares.

(2)    Clause 1 provided that WJ Holding agreed to sell, and AMM Consulting agreed to purchase, the 1,074 shares in Bender Oil "*upon the terms and conditions hereinafter set forth*".

(3)    Clause 2 referred to Exhibit A (comprising an 'Appraisal' of certain 'assets' owned by Bender Oil) and Exhibit B (containing a description of various 'Contracts' setting out Bender Oil's and WJ Holdings' privatisation obligations) which were ostensibly attached to the agreement, but neither document has been produced to the Tribunal.

(4)    Clause 3 provided that the purchase price was to be $210,000, with $100,000 payable on or before 31 December 2012, and $110,000 payable on or before 1 June 2013.

(5)    Clause 5 provided that, at closing, WJ Holding would execute and deliver to AMM Consulting transfer documents and deeds of title in respect of the shares in Bender Oil.

(6)    Under clause 6, headed 'Representations and Warranties of Seller', WJ Holding was recorded as having represented and warranted that it had full power and authority to carry out and perform its undertakings and obligation provided in the agreement –

> "*except the condition precedent to the sale is [WJ Holding's] fulfilment of the privatisation requirements and prior authorisation of the Pridnestrovian Moldavian Republic ("PMR") government authorizing the said sale and registration of the Shares. [AMM Consulting] acknowledges that [WJ Holding] is not giving any warranty or representation on [WJ Holding's] ability to fulfil the privatization requirements and to receive necessary government approvals. In the event, [WJ Holding] will not be able to obtain said governmental approval by the end of 2013, this Agreement shall be rescinded and all funds refunded to [AMM Consulting]*" (emphasis in the original).

The Claimants submit, and the Tribunal accepts, that this means that the Agreement of Sale was not unconditional. Rather, it was conditional on the fulfilment of certain privatisation conditions, and on the grant of certain governmental consents.

(7)    Clause 8 laid down certain 'Conditions to Closing'. In particular, clause 8.2 provided that the obligations of WJ Holding to close were subject, "*at the option of [WJ Holding], to the ... (b) Ability of [WJ Holding] to complete all privatisation requirements with the PMR Republic*". It is difficult to understand the intended effect of the words "*at the option of [WJ Holding]*" in this context, but the Tribunal considers it unnecessary to resolve that uncertainty.

33

    (8)   Pursuant to clause 10, the parties agreed that *"the purchase price is based on the value of the Shares before [WJ Holding] will have invested additional funds to make the factory operational and to fulfil privatization requirements"*. The Tribunal considers that this provision lends at least some further weight to the Claimants' case that the parties were proceeding on the basis that the value of Bender Oil was in the region of $630,000, not $20 million.

    (9)   Clause 15 provided that the agreement was to be governed by, and construed in accordance with, the laws of the State of New York.

88.    Leaving aside the detailed terms of the agreement, it is also significant to note that it pre-dates by four months any document that has been produced discussing the possibility of a loan being made in relation to the Bender Oil plant. If, as the Respondents contend, there was a concluded, unconditional deal for Mr Spiegel to make an equity investment, and if the March 2012 Agreement of Sale was put in place as part of the mechanism for giving effect to that agreement, it is surprising that there is no documentary record at the same time of any loan being advanced or even discussed.

### B.4   The 2012 Privatisation Agreement and related agreements

89.    A fortnight after the Agreement of Sale was signed, the 2012 Privatisation Agreement[78] was signed on 28 March 2012 between the Transdniestrian Moldovan Republic ("the Moldovan government") and WJ Holding. Clause 1.1 provided that the agreement had been concluded *"with the aim of launching and conducting actual operations"* at the Bender Oil plant. Under clause 3, each of the Moldovan government and WJ Holding entered into a number of mutual obligations. The exact content and detail of those obligations is unimportant. What matters for present purposes is the fact that it is common ground between the parties that the Moldovan government failed to perform its obligations under this agreement.[79]

90.    On 3 May 2012, two further agreements were entered into:

    (1)   The first was a loan agreement between Stubrick and Bender Oil in the sum of $1.5 million. The term of the loan expired on 10 December 2012.

---

[78] [2/343].

[79] See §32 of the Defence to the Mazlin claim [1 11 81] and §31 of the Defence to the Shireen claim [1 12 99]

34

(2)   The second was an Additional Agreement, made between Stubrick and WJ Holding, the effect of which appears to have been to treat the loan made by Stubrick to Bender Oil as if it had been a loan made by WJ Holding in discharge of part of its investment obligations under the 2012 Privatisation Agreement.

### B.5   The email of 11 July 2012

91.   On 11 July 2012, Mr Spiegel sent an email to William Schneider, who is a US attorney and also Mr Drukker's son-in-law. The subject of the email was stated to be 'Credit Line'. The relevant parts of the email said this:

> "Dear Bill,
>
> *As per our consulting agreement I have found 2 potential companies willing to extend the credit line in operation [sic] in Moldova-Transylvania.*
>
> *Here are the company details*
>
> *1. Shireen Maritime Limited (Republic of Liberia) 80 Broad Street, Monrovia, Republic of Liberia ...*
>
> *2. Terms: credit line up to 4 mill. Interest rate 6%, 3 years, with a option [sic] for extension for 2 more ...*
>
> *The Loan agreement has to be standard for 3-4 pages covering all concerns (pledges, guaranties etc.)*
>
> *The second company details you will receive directly from Arla Weber ... but the terms the same [sic] except the credit line is 9 mill and the first trans by mutual agreement both sides.*
>
> *Please put together ASAP."*

92.   In his oral evidence, Mr Spiegel explained that he had a consulting agreement with WJ Holding under which he would earn commission if he introduced third party finance. That appears to explain the language he chose to use in this email, which was clearly intended to suggest (wrongly) that Shireen and the 'second company' were unconnected with him. While Mr Spiegel confirmed in his oral evidence that he did not in fact receive any commission in connection with the loans ultimately advanced, the Tribunal regards this dissimulation on his part as being discreditable, and it makes the Tribunal cautious about accepting uncorroborated oral evidence from him.

93.   Nevertheless, in light of (i) the timing of this email, (ii) the reference to an operation in Moldova-Transylvania, (iii) the identity of at least one proposed lender mentioned in the email with one of the lenders under the Loan Agreements, (iv) the similarity in the amounts of the proposed loans, the interest rate and the potential extension of the loan period to those that ultimately appeared in the Loan Agreements and (v) the fact that the Respondents themselves

assert in their Defences that "*at the time Mr Spiegel maintained an appearance of being unaffiliated*" to the proposed lenders,[60] Tribunal is willing to and does infer that (a) this email was discussing proposed funding for the Bender Oil project, (b) Mr Spiegel was at the time discussing the possibility of procuring loans (not an equity investment) from Shireen and another company, and (c) Mr Schneider was being tasked with preparing the necessary loan documentation, including personal guarantees.

94.    Furthermore, it is significant that the first documented mention of any potential loan was made in connection with corporate lenders which were ostensibly unconnected with Mr Spiegel. Although (as we know) the lenders were in fact his companies, and although (as we have said) his initial dissimulation in this regard does him no credit in broader moral terms, nevertheless in the context of the present dispute it happens to support the Claimants' case. By contrast if, as the Respondents contend, the agreed deal in 2012 had been an equity investment by Mr Spiegel, disguised as a loan from companies owned and controlled by him, then it is difficult to see why he would have initially introduced those lenders to Mr Drukker under the pretence that they were not connected with him.

B.6   The Loan Agreements

95.    The Loan Agreements themselves[61] are dated "*As of August 10, 2012*". They are in materially identical terms to each other, save for the amount of each loan and the terms for the draw-down. Save where otherwise indicated below, the terms identified in this Award are the same in each agreement.

    (1)    Clause 1.1 provides that the loan was made "*for the purpose of inventory financing for the edible oil crushing facility*".

    (2)    Clause 1.2 provides that the borrowing "*shall be secured pursuant to the Security Agreement attached hereto as Exhibit A*". There is no Exhibit A attached to either Loan Agreement. Mr Spiegel's evidence is that the parties agreed that the loans would be secured by personal guarantees provided by Mr and Mrs Drukker. The Respondents deny that there was any agreement for personal guarantees to be provided by Mr and Mrs Drukker, but they provide no alternative explanation nor any evidence of what the 'Security Agreement' referred to in the Loan Agreements might be.

---

[60] See §15 of their Defences [1/11] and [1/13].

[61] [2/366] and [2/371].

(3) Clause 1.3 provides that interest shall accrue at 6°° on the outstanding principal balance of each advance.

(4) Clause 1.4 provides that each advance shall be made in certain fixed minimum amounts or multiples thereof, being $250,000 under the Shireen Loan Agreement and $1 million under the Mazlin Loan Agreement.

(5) Clause 1.7 provides that requests for advances would be made by written or telephone requests.

(6) Clause 1.9(a) provides that all payments by the borrower shall be made in US Dollars.

(7) Clause 1.9(c) provides that:  "*All calculations of interest hereunder shall be made on the basis of a 360 day year for elapsed [sic]*".

(8) Clause 1.10 provides as follows:  "*If any Advances is [sic] not paid when due, Borrower shall, on demand by Lender, pay interest thereon from its due date until paid in full at a rate of ten percent (10%) per annum*".

(9) Clause 2 provides that all advances "*shall be repaid in full together with all interest, fees, and other sums due Lender [sic] on September 30, 2015*" with the lender having an option to extend the loan period for a further year.

(10) Clause 3 contains certain representations and warranties on the part of the borrower.

(11) Clause 4 contains certain positive covenants on the part of the borrower.

(12) Clause 5 defines certain events of default.

(13) Under clause 6, each party agreed "*to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement and Notes [sic].*" No actual 'Notes' appear to form any part of the contract.

(14) The relevant part of clause 7 provides as follows:

> "*This Agreement and agreement [sic], document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto, and supersede all oral negotiations and prior writings in respect of the subject matter hereof.*"

(15) Clause 8 provides that the governing law shall be English law.

(16) Clause 9 is the arbitration agreement; quoted in §6 above.

96.   There is some disagreement over the authorship of the Loan Agreements.  Mr Spiegel's evidence is that the documents were drawn up by Mr Schneider, who borrowed from various precedents available to his law firm.   The Respondents say that this is *"not [their] recollection"*,[82] but they do not suggest who else might have drafted the documents.   The Tribunal is not persuaded that much turns on this particular aspect of the factual dispute, but nevertheless it accepts Mr Spiegel's evidence in this regard:

(1)   Mr Spiegel is not himself a lawyer, and the Tribunal has seen no evidence to suggest that he instructed any lawyers to draft the Loan Agreements on his behalf.

(2)   By contrast, Mr Schneider is a lawyer and he is also Mr Drukker's son-in-law.   He would have been well placed to draft the agreements.

(3)   The email from Mr Spiegel to Mr Schneider dated 11 July 2012 (referred to in §§91–94 above) discussed the proposed contents of a loan agreement, and ended with the words *"Please put together ASAP"*.  There is no documentary record of Mr Schneider having declined to do so.  This suggests he accepted the invitation from Mr Spiegel to draft the Loan Agreements.

(4)   For the reasons discussed in §107 below, the Tribunal finds that Mr Schneider drafted the guarantees.  That makes it more likely that he also drafted the Loan Agreements.

(5)   The formatting of the Loan Agreements lends some inferential support to Mr Spiegel's evidence because it suggests that the content of the agreements was cut and pasted from other precedents.  For example, the headings to clauses 1 to 7 inclusive are in capitals, whereas the headings to clauses 8 and 9 are in lower case.  Furthermore, as mentioned above, clause 6 refers to 'the Notes', when no notes formed any part of the transaction.

(6)   There is a slight but noticeable difference between the Respondents' case in these proceedings and the evidence they have adduced in support of the New York proceedings.  As noted above, the Respondents' Defences say no more than that they have no recollection of Mr Schneider drafting the Loan Agreements.[83]  By contrast, in the New York proceedings Mr Drukker has sworn an affidavit dated 22 June 2017,[84] in which he says this: *"The two loan agreements were produced by Mr Spiegel."*[85]  It does

---

[82] See §20 of their Defences [1 11] and [1/12]

[83] *Ibid* §20 [1/11] and [1/12].

[84] [2 533].

[85] See §17 [2 536].

not encourage the Tribunal's confidence in the integrity of the Respondents' case to see slightly varying accounts of the same factual issue.

(7) In any event, the Respondents have offered no witness evidence in these proceedings. By contrast, Mr Spiegel has made a witness statement setting out his evidence in this regard, and he has also tendered himself for cross-examination.

(8) In particular, Mr Spiegel's evidence was that he met Mr Schneider in a coffee bar in mid-August 2012 when Mr Schneider handed over copies of the draft Loan Agreements which he (Mr Schneider) had prepared. This evidence is to some extent corroborated by an exchange of emails between them on 10 August 2012[86] (which is the date of the Loan Agreements). Although the subject line of the emails is "*Re: Bendery Valuation – Part 2*" it is common experience that the subject matter of an email chain may evolve without the parties necessarily up-dating the subject line of their communications. In this instance, at 2:41 pm on 10 August 2012 Mr Spiegel was writing to Mr Schneider, asking: "*Then do we meet?*" Mr Schneider replied: "*I have been working on our stuff all morning ... I will try to finish in the AM and lets [sic] meet around 2 tomorrow. Will it work for you?*" Mr Spiegel replies at 3.22 pm "*Yes, Boss!!! anything good for you is good for me See you tomorrow at 2 (In Aroma?)*".

97. All of this tends to support Mr Spiegel's evidence that it was Mr Schneider who drafted the Loan Agreements.

**B.7   The Letter of Agreement**

98. On 17 August 2012, a Letter of Agreement between AMM Consulting and WJ Holding was executed ("the Letter of Agreement").[87] The copy produced to the Tribunal is signed only by Mr Spiegel on behalf of AMM Consulting, but the Respondents state in their Defences that both parties executed the agreement.[88] It refers to the Agreement of Sale, and it states that AMM Consulting acknowledges that valuable consideration for WJ Holding entering into that agreement "*is continued consulting provided by the managing member of [AMM Consulting], [Mr Spiegel]*". The agreement then continues as follows:

> "*Parties now agree that in the event [Mr Spiegel] stops providing consulting [WJ Holding], or any successor thereof, for any reason, including [WJ Holding] terminating [Mr Spiegel] for any reason at his sole and absolute discretion, [WJ*

---

[86] [3/580].

[87] [2/381].

[88] *Ibid* §22 [1/22] and [3/12]

> *Holding] shall be entitled to terminate the [Agreement of Sale] and rescind the
> transaction by giving notice to [AMM Consulting] and paying a sum of two
> hundred and fifty thousand dollars ($250,000) within thirty days of the Notice. In
> the event of rescission hereunder the payment of $250,000 by [WJ Holding] to
> [AMM Consulting], [AMM Consulting] agrees to transfer any and all rights it may
> have had (including any rights to accrued dividends) back to [WJ Holding]".*

99.  It is common ground between the parties that the Letter of Agreement was intended to make
     provision for the re-transfer to WJ Holding of any equity in Bender Oil which had been
     acquired by AMM Consulting under the Agreement of Sale. On that basis, each side seeks to
     rely on the Letter of Agreement to support its case:

     (1)  For their part, the Respondents say that it supports their argument that Mr Spiegel
          agreed to acquire an equity interest in Bender Oil, otherwise there would have been no
          need to make provision for its re-transfer.

     (2)  In answer, the Claimants say that the consideration payable on re-transfer under the
          Letter of Agreement is consistent with the figure of $210,000 in the Agreement of Sale,
          and is inconsistent with the Respondents' case that Mr Spiegel agreed to acquire a 30%
          equity stake for $7 million.

100. The Letter of Agreement provides at least some support for the Claimants' case, and it is less
     consistent with the Respondents' case, for a number of reasons:

     (1)  The Letter of Agreement talks only of the parties "*entering into*" the Agreement of
          Sale. It does not say either (i) that that agreement had been completed, or (ii) that
          AMM Consulting had in fact acquired any shares in Bender Oil, or (iii) that Mr
          Spiegel, through any corporate vehicle, had made an unconditional agreement to
          acquire an equity interest in Bender Oil. As such, it provides no support for the
          Respondents' case that there was an unconditional agreement for Mr Spiegel to enter
          into an equity purchase at all, let alone for $7 million.

     (2)  On rescission of the Agreement of Sale, the obligation on AMM Consulting under the
          Letter of Agreement is "*to transfer any and all rights it may have had*". The most
          natural interpretation of the Letter of Agreement is accordingly that it was intended to
          work prospectively, imposing an obligation on AMM Consulting (on the occurrence of
          some future contingency) to transfer back to WJ Holding rights in relation to Bender
          Oil which, as at the date of the Letter of Agreement, AMM Consulting had not yet
          acquired.

(3)   The consideration payable under the Letter of Agreement on re-transfer makes sense in the context of a potential 30% equity investment for $210,000. It makes no sense in the context of an equity investment for $7 million.

B.8   The personal guarantees

101.   Although the Loan Agreements were signed in early August, it is common ground that no moneys were advanced for several months. Mr Spiegel's explanation is that he was waiting for the personal guarantees to be signed by Mr Drukker and his wife. The Respondents deny that there was any agreement for personal guarantees.

102.   On 5 September 2012, Mr Spiegel sent Mr Drukker an email in Russian which has been translated as follows:

"*I was very surprised that you still haven't talked to Marina. As I understood, the matter is urgent. We talked about it August 27. As you understand, until the documents are signed correctly, we won't be able to do anything.*"

103.   Mr Spiegel's explanation for this email is that Marina is Mr Drukker's wife, and that this email was referring to the fact that Mr Drukker urgently needed money for the Bender Oil project (hence "*As I understood, the matter is urgent*"), but Mr Spiegel was not going to advance any funds until the personal guarantees had been signed by Mr and Mrs Drukker (hence "*until the documents are signed correctly, we won't be able to do anything*").

104.   The next day, 6 September 2012, Mr Spiegel sent an email to Mr Schneider in Russian, the translation of which shows that the subject line was "*Personal guarantee*". The body of the email says that Mr Spiegel thought "*we can mention Marina and Yura in one guarantee (without conditions and reservations) as the loan guarantors acting jointly and severally, and have it notarized in Moscow and sent to me by DHL*". Mr Spiegel's evidence is that "*Marina and Yura*" was a reference to Mr and Mrs Drukker, and that he was talking in this email about the personal guarantees that Mr Schneider was meant to be drafting for them to sign in support of the loans to be made to WJ Holding and Stubrick under the Loan Agreements.

105.   The day after that, 7 September 2012, Mr Schneider sent Mr Spiegel an email under the subject line "*Guaranty*". He said this:

"*Attached please find the form of the guaranty. I have drafted this as a mere accommodation for WJ Holding, and do not represent any parties to the loan and guaranty agreements (neither Lenders nor Borrowers nor Marina Drukker nor*

41

*Yuri Drukker). I strongly recommend that you all review these documents with the counsel of your choice."*

106. Attached to Mr Schneider's email were two draft guarantees in the names of Mr and Mrs Drukker, one in respect of WJ Holding's debt liability under the Shireen Loan Agreement, and one in respect of Stubrick's debt liability under the Mazlin Loan Agreement.

107. The accumulation of evidence outlined above leads the Tribunal to accept Mr Spiegel's case in relation to these documents:

   (1)   Mr Spiegel has given witness evidence which provides a coherent explanation of the documents, and the documents are consistent with his account.

   (2)   It is particularly striking that Mr Schneider, who is Mr Drukker's son-in-law, drafted the relevant guarantees, and expressed no surprise at having been asked to do so.

   (3)   The fact that Mr Schneider says he was not acting for any of the parties does not detract from this inference in any way. Rather the reverse: having referred to *"the loan and guaranty agreements"*, Mr Schneider specifically advises the parties to obtain independent legal advice, which strongly suggests that he regarded the Loan Agreements as being genuine, and that the guarantees would be legally binding on Mr and Mrs Drukker when executed.

   (4)   The Respondents have offered no witness evidence to contradict Mr Spiegel's account.

108. The existence of these draft guarantees, and the fact that Mr Spiegel was unwilling to allow any funds to be advanced under the Loan Agreements until the personal guarantees had been signed, provides further inferential support for the Claimants' case: if the funds to be advanced under the Loan Agreements had in truth been an equity investment, there would have been no need to hold back payment from the 'lenders', and there would have been no commercial purpose in obtaining personal 'guarantees' from Mr and Mrs Drukker.

109. As to subsequent events, Mr Spiegel's written evidence is that: he met with Mr Drukker at a coffee shop in November 2012 where Mr Drukker signed the personal guarantees; Mr Drukker then took the signed guarantees with him to procure his wife's signature; Mr Spiegel did not keep a copy of the guarantee signed by Mr Drukker; Mrs Drukker then refused to sign the guarantees; and Mr Drukker and the Respondents have since denied that it formed any part of

the deal that Mr and Mrs Drukker would provide any guarantees, or that Mr Drukker ever signed them.

110.  The Tribunal accepts Mr Spiegel's evidence in this regard, for a number of reasons:

(1)  The Loan Agreements refer to a 'Security Agreement'. As noted above, no explanation has been offered for that term other than as a reference to the intended guarantees.

(2)  The fact is that no funds were advanced under the Loan Agreements for several months after their execution. The timing of the emails in September, followed by Mr Spiegel's account of his meeting with Mr Drukker in November, followed by the first transfer of funds in late November 2012, lend support to the Claimants' case that they would not advance any money until Mr Drukker had agreed to give the personal guarantees.

(3)  The Respondents' case is that there never was any agreement to provide personal guarantees. For the reasons outlined above, the Tribunal has rejected that case. The Tribunal infers that the reason why the Respondents were keen to deny the existence of any agreement to provide personal guarantees is that (i) the moving spirit behind the Respondents is plainly Mr Drukker, and Mr Drukker was keen to deny having incurred any potential personal liability under a guarantee and (ii) the existence of a personal guarantee would have been more consistent with a true loan, rather than an equity investment.

(4)  Mr Spiegel has given witness evidence and submitted himself to cross-examination on this issue. The Tribunal found his testimony to be consistent with the documentary record and convincing on this point.

(5)  By contrast, the Respondents have offered no witness testimony, despite having filed a lengthy Response and Statement of Defence.

111.  For these reasons, the Tribunal is satisfied that Mr Drukker did sign the personal guarantees[59] in November 2012

### B.9  Mr Spiegel's visits to the plant

112.  The Respondents' case is that (i) the transfers of funds were made in late 2012 and early 2013 after Mr Spiegel had satisfactorily completed his due diligence investigations into Bender Oil,[60]

---

[59] [2/385] and [2/387].

(ii) Mr Spiegel conducted that due diligence on site at Bender Oil's premises, (iii) when he visited the Bender Oil plant he was introduced as Mr Drukker's partner and as a shareholder in Bender Oil, and (iv) he participated in management decisions. They rely on this as evidence of Mr Spiegel having agreed to acquire a 30% equity interest in Bender Oil.

113.   The Respondents' case in this regard is said to be supported by a document dated 14 December 2016,[20] apparently signed by a Mr M.M. Gurduza as a director of Bender Oil. That document is addressed *"To whom it may concern"*. The Tribunal has seen no witness statement from Mr Gurduza. Nevertheless, the Tribunal has no reason to doubt that he signed the document in question. It says this (with numbering inserted for ease of reference):

> *"[1]  We hereby confirm that during the period since 2012, from the commencement of actions to relaunch the factory after seven years of standstill, namely rebuilding, renovation and modernisation of Bender Oil Extraction Plant, Mr Alex Spiegel repeatedly visited, together with Mr Y.P. Drukker ...*
>
> *[2]  Mr Alex Spiegel was introduced to us as the partner of Mr Drukker - shareholder of [Bender Oil]. On numerous occasions, they noted that any actions regarding repair, installation and acquisition of equipment, and for the future and as far as was known, all matters concerning the procurement of raw materials, processing of such materials and sale of finished products, would have to be reported to both of them for their joint approval.*
>
> *[3]  On numerous occasions since 2012, Mr Drukker gave formal instructions for all reports relating to the economic activity of [Bender Oil] to be presented to Mr Spiegel in his capacity as shareholder.*
>
> *[4]  In addition, during his visits to the factory, Mr Alex Spiegel took part in management meetings of [Bender Oil], and held separate meetings with the deputy director of [Bender Oil] in charge of economic and financial affairs."*

114.   Mr Spiegel's evidence is that he did indeed visit the plant during 2012, because he was keen to find out about the progress of the venture. He says that his motivation was mixed: (i) as a trained mechanical engineer, he was curious, (ii) he was thinking of making an equity investment, and (iii) since he did not hold copies of any personal guarantees from Mr and Mrs Drukker, he was anxious to monitor progress at the plant, with a view to doing what he could to protect his companies' interests under the Loan Agreements. As such, he largely accepts the content of the document quoted above, with the exception of §3.

115.   The Tribunal's conclusions in relation to this document, and to Mr Spiegel's visits to the plant generally, are as follows:

---

[20] See for example §§ of their submissions dated 11 April 2017 [1/4] and §23 of their Defences [1/11] and [1/12].

[21] [2/494–495].

44

(1) To the extent that the document's content is admitted by Mr Spiegel, the Tribunal accepts it as accurate.

(2) To the extent that its content is not accepted by Mr Spiegel, it contains contested evidence from Mr Gurduza which has not been verified by a witness statement or tested by cross-examination. To that extent, the Tribunal cannot place any reliance on it.

(3) The fact that Mr Spiegel visited the plant and supervised some of its activities is consistent with each party's case: it is not consistent only with the Respondents' case that Mr Spiegel had entered into an unconditional agreement to take a 30% equity interest, whether for $7 million or at any other price; nor is it consistent only with the Claimants' case that the Loan Agreements genuinely reflected the bargain between the parties and that Mr Spiegel was merely exploring the possibility of making an equity investment.

(4) For these reasons, the Tribunal considers that the document, and the evidence regarding Mr Spiegel's visits to the plant, assists neither party.

B.10  Payments made by the Claimants to the Respondents

116. The Respondents admit in their Statements of Defence that –

(1) *"On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000"*;[92]

(2) *"On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500"*;[93]

(3) *"On 3 January 2013, Snubrick received from [Mazlin] an amount of USD 2,850,000"*.[94]

117. The Tribunal has also seen the following bank records:

(1) an account statement from Eurobank Cyprus Ltd dated 7 December 2012 relating to WJ Holding's account № 001-2011-00140829, which shows an amount of CHF 1,900,000 being credited to the account from Mazlin on 30 November 2012;[95]

---

[92] See §54 of the Defence in the Mazlin claim [1/11]

[93] See §53 of the Defence in the Shireen claim [1/12]

[94] See §55 of the Defence in the Mazlin claim [1/11].

[95] [2/582]

45

    (2)    a Debit Advice from Bank Frey & Co AG dated 3 December 2012 reflecting a transfer of CHF 3,490,500 from Shireen to WJ Holding;[96]

    (3)    an Inward Swift statement from Eurobank, Nicosia Main Branch, dated 3 December 2012 reflecting the receipt by WJ Holding of the CHF 3,490,500: against the line 'Details of Payment' it says *"Loan Agreement as per 10th of August 2012"*;[97]

    (4)    a bank statement from Compagnie Bancaire Helvétique dated 12 May 2013 in relation to Mazlin reflecting a payment order dated 3 January 2013 to Stubrick in the sum of US$2,850,088.60.[98]

118.    Based on this material, the Tribunal finds that the following sums were received by the Respondents from the Claimants on the following dates:

    (1)    on 30 November 2012 WJ Holding received CHF 1,900,000 from Mazlin;[99]

    (2)    on 3 December 2012 WJ Holding received CHF 3,490,500 from Shireen;[100] and

    (3)    on 3 January 2013 Stubrick received US$2,850,088.60 from Mazlin.[101]

119.    No evidence has been adduced of any requests having been made for draw-downs pursuant to the provisions of the Loan Agreements. It is therefore apparent that there was no strict adherence to those provisions, either in terms of (i) the currency (clause 1.1), (ii) the stipulated amount of each advance (clause 1.4) or (iii) the specified method for requesting advances (clause 1.7). The Respondents' case is that this non-compliance evidences the fact that the sums were advanced by way of an equity investment, and not as loans pursuant to the terms of the Loan Agreements.[102] In response, it was Mr Spiegel's evidence that the parties' actual

---

[96] [2 583].

[97] [2 584].

[98] [2 585].

[99] §10(a)(i) of the Statement of Case in the Mazlin claim [1 9] erroneously states that the transfer was made on 11 November 2012. Having seen the banking documentation referred to in §117 of this Award, we are satisfied that the Respondents are correct in saying (as they do in §54 of their Defence to the Mazlin claim [1 11 36]) that the transfer was effected on 30 November 2012.

[100] There is no dispute about this figure.

[101] In §55 of the Defence in the Mazlin claim [1 11] the Respondents say that only $2,850,000 was received, not $2,850,088. Nevertheless, having seen the bank statement at [2 585] we accept the Claimants' figure in this regard.

[102] See §21 of the Defences [1 11] and [1 12].

46

understanding was simply that he would advance the loan funds as and when they became available.

120. Having considered these competing arguments, the Tribunal does not find that the obvious non-compliance with the terms of the Loan Agreements in this regard is significant in resolving the factual issues in dispute. That non-compliance might be said to support the Respondents' case, but on the other hand it might be said simply to reflect the informal nature of the financial arrangements between two men who had known and trusted each other since childhood.

121. It is also significant to note the terms in which the Respondents have on occasion acknowledged the fact that these payments were made. For example, in §8 of their submissions dated 11 April 2017,[103] they admitted that *"transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013"* (emphasis added).

122. For these reasons, the Tribunal is in no doubt that (i) money was in fact paid by the Claimants to the Respondents respectively on the dates and in the sums listed in §118 above, (ii) the payments were so made ostensibly under the terms of the Loan Agreements and (iii) in all the circumstances of this case, the question whether those sums are now repayable turns on the answer to the question whether the Loan Agreements were shams, in the sense that the parties in fact agreed (as the Respondents contend) that any sums advanced in purported compliance with their terms actually represented an equity investment by Mr Spiegel in Bender Oil and would therefore not be repayable according to the tenor of the agreements.

B.11   The December 2012 draft Agreement of Sale

123. The final agreement relevant to the issues in dispute is a draft Agreement of Sale dated December 2012.[104] Like the executed Agreement of Sale from March 2012, it is concerned with an acquisition of a 30% equity interest in Bender Oil by AMM Consulting, but it differs from the earlier agreement in a number of respects:

 (1)   The seller is stated to be Mr Drukker personally, rather than WJ Holding.

 (2)   Clauses 2 and 6(a) recognise that WJ Holding may not be able to fulfil the privatisation requirements.

---

[103]  [1/4/21].  It is also worth noting that in §16 and §18 of the Complaint in the US proceedings mentioned in §19(2) above and §151 below, the Respondents describe these payments as having been made *"under the sham Loan Agreements"* [2/505].

[104]  [2/388].

47

(3)    Clause 3 provides that the purchase consideration shall be $500,000 (rather than the $210,000 stated in the March Agreement of Sale).

(4)    Under clause 7(e), AMM Consulting acknowledges that Mr Drukker and WJ Holding *"are not making and have not made any statement, representation or warranty to him or his advisors concerning (i) the fairness or adequacy of the Purchase Price"*.

124.   The existence of this draft document, together with the circumstances in which it was prepared, lend further support to the Claimants' case:

(1)    It is a fact that, by December 2012, no shares in Bender Oil had been transferred to AMM Consulting.

(2)    It is the Respondents' pleaded case that the Moldovan government was in breach of its obligations under the 2012 Privatisation Agreement.[101]

(3)    If Mr Spiegel had already committed unconditionally to acquire a 30% equity stake in Bender Oil, and if the March 2012 Agreement of Sale and the Loan Agreements had been created as the instruments ostensibly evidencing that agreement, there would have been no practical purpose in entering into another misleading Agreement of Sale.

(4)    If the agreed purchase price for the 30% equity stake had in truth been $7 million, there would have been no practical purpose in agreeing a variation of the purchase price from the $210,000 stated in the March Agreement of Sale to the $500,000 stated in the December draft.

(5)    The fact that a draft Agreement of Sale was being prepared in December 2012 supports the inference that the parties recognised that the March Agreement of Sale might expire pursuant to clause 6(a) without having been completed because the necessary governmental approvals were not forthcoming, and that as a result a replacement Agreement of Sale would need to be agreed if Mr Spiegel was to make an equity investment. That is inconsistent with the Respondents' case – namely, that Mr Spiegel had already concluded a binding and unconditional agreement to make an equity investment earlier in 2012.

(6)    Accordingly, both the existence and the contents of the December draft support Mr Spiegel's case that (i) he was considering and negotiating a possible equity investment, without having concluded any unconditional deal in that regard, and (ii) the plant was

───────────────

[101] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

48

beginning to commence production and was, as a result, increasing in value as time passed, hence the proposed increase in price.

B.12  Correspondence in early 2013

125. On 3 January 2013, Gerard Virga, of Finkelstein & Virga PC (a law firm representing Mr Spiegel's interests), wrote to Mr Schneider (representing Mr Drukker's interests).[106]  The first paragraph refers to *"the deal"*, and paragraph number 1 states that *"AMM understands that it is purchasing a thirty (30%) percent interest in the entire operation"*.  This wording might be taken to imply that a deal had already been concluded.  Furthermore, it is unlikely to have been a coincidence that the letter was written on the same day as the third and last transfer of funds was made (by Mazlin to Stubrick).  As such, it might be thought to provide support for the Respondents' case.

126. Nevertheless, it is apparent from a fair reading of the letter as a whole that it is discussing a potential deal which was still in the process of negotiation, and had not been concluded:

    (1)   In paragraph number 1, Mr Virga says this: *"We suggest that Delta Agro be a holding company owning 100%, directly or indirectly, of each of the companies constituting the operating group"* (emphasis added).  Paragraph 5(A) says this: *"AMM may form a wholly owned entity to own its membership interest in the holding company prior to contract execution"* (emphasis added).  It is therefore apparent that no agreement had even been reached as to the identity of the respective parties to any equity investment, or to the structure of the deal.  That is inconsistent with the Respondents' case that a binding equity investment deal had already been concluded in 2012.

    (2)   The second paragraph under numbered paragraph 1 says this:  *"Apparently, WJ Holding owns a fifty (50%) percent interest in [Bender Oil].  The other fifty (50%) percent interest is held by Kelley Oil Refinery Ltd."*  It is therefore clear that the prospective purchaser was not even sure that the prospective seller was in full ownership of the target.

    (3)   The following paragraph says this: *"Our understanding is that WJ Holding has an extensive history.  We should attempt to isolate that history from this transaction. Please advise us of your thoughts on this area."*  This may have been a reference to the circumstances in which Mr Drukker parted company from his former business partners.

[106] [2/364]

At all events, it further evidences the fact that the negotiations for any acquisition by Mr Spiegel of an equity interest in Bender Oil were still at an embryonic stage.

(4)   Paragraph number 2 contains a string of questions and requests for assurances regarding Bender Oil's financial position. Paragraph number 3 says this: "*AMAI expects representations and warranties that confirm the concepts set forth above*" (emphasis added). Paragraph number 4 says this: "*The PMR consent needs to be a closing condition*" (emphasis added). Together, these paragraphs all demonstrate clearly that the parties were still exploring the possibility and the terms of an equity investment. As such, they are entirely inconsistent with any unconditional deal having already been concluded for an equity investment by Mr Spiegel.

(5)   Paragraphs 5(B) to (I) contain a number of detailed proposed terms which had clearly not yet been agreed. Again, this is all entirely inconsistent with an unconditional deal having already been agreed.

127.   Mr Schneider replied by letter on 19 February 2013.[107] He said that his understanding was "*that our respective clients had a number of follow up meetings*". That clearly suggests the parties were still in negotiation. The same inference is to be drawn from the letter as a whole. For example, it refers in numbered paragraph 1 to Mr Schneider's understanding "*that AMM is buying into a group of companies*" (emphasis added) – not that Mr Spiegel had already bought into Bender Oil. Mr Schneider refers later in the same paragraph to the "*draft agreements that I have provided in the past*" (emphasis added): If the March 2012 Agreement of Sale and the August 2012 Loan Agreements had in fact been intended by the parties to reflect a concluded and unconditional deal for an equity investment by Mr Spiegel, it is difficult to see why Mr Schneider would still have been providing draft agreements many months later. Having answered the various points raised in the letter from Finkelstein & Virga, Mr Schneider ends his letter by saying that he "*would be happy to sit-down with [Mr Virga] to discuss any remaining open items*" (emphasis added):[108] the fact that he expressly acknowledges that there were open items is inconsistent with the Respondents' case that a concluded, unconditional deal had been made some months earlier.

---

[107] [2/398].

[108] [2/400]

B.13  Power of Attorney

128. There was an exchange of emails between Mr Rashkov and Mr Schneider on 23 September 2013,[109] and Mr Spiegel executed a Power of Attorney in favour of Mr Rashkov dated 27 September 2013.[110] The Respondents rely on these documents in support of their case.[111] They allege that the Power of Attorney was executed by Mr Spiegel in order to enable Mr Rashkov to execute the anticipated agreements for the equity investment by Mr Spiegel, and that the emails confirm their story. Mr Spiegel's evidence is that these documents were addressing other, unrelated prospective investments by him in the region.

129. The Power of Attorney[112] authorises Mr Rashkov to perform a number of actions on behalf of Mr Spiegel, including buying and selling "*shares or participation interest of any Moldovan enterprises*" (clause 1) and performing any actions and formalities "*related to the incorporation and registration of a limited liability company in the Republic of Moldova*" (clause 3). The emails comprise the following exchange.[113]  Mr Rashkov emailed Mr Schneider saying this:

> "*Volodya, we also need:*
>
> *1. Certificate of registration of AMM*
>
> *2. Extract from the commercial register regarding AMM*
>
> *3. Document confirming the founders of the company all the way to physical persons (Beneficial owner)*
>
> *4. Decision of the competent body of AMM on the purchase of shares in Moldova*
>
> *5. Power of attorney or personal presence director [sic] of AMM".*

130. Mr Schneider emailed Mr Rashkov as follows:

> "*Sergey:*
>
> *See the attachments. Full package of documents for Mr Spiegel. He will purchase shares of the companies for AMM. Please organise the translation of these documents. The originals are on their way to you.*"

---

[109] [2:409–410].

[110] [2:411–414].

[111] See §28 of the Defence to the Mazlin claim [1:11·81] and §27 of the Defence to the Shireen claim [1:12·99]. See also §24 of Mr Drukker's affidavit in the New York proceedings [2:538].

[112] The Respondents have provided an English translation [2:411·412] of the Russian original [2:413–414].

[113] The Respondents have again provided an English translation [2:409] of the Russian original [2:410]. It is not entirely clear which of the two emails came first. Neither one obviously answers the other. Furthermore, each party may have been in a different time zone when the messages were sent, so the apparent time of sending is not necessarily determinative. Moreover, the subject lines of the two emails do not match: the message from Mr Schneider is written under the heading "*FII*" whereas the message from Mr Rashkov is under the heading "*HA*". We have accordingly set them out in the order in which they appear on the page as an exhibit to the Respondents' Defences.

131. Whilst these documents might appear to be consistent with the Respondents' case, the Tribunal finds it difficult to attach any weight to them, for a number of reasons:

    (1)   First, neither the Power of Attorney nor the emails make any specific reference to the Bender Oil project.

    (2)   Second, the Power of Attorney confers powers on Mr Rashkov well in excess of what would have been necessary simply in order to enable him to enter into a share acquisition agreement on behalf of Mr Spiegel.

    (3)   Third, as the Respondents have been at pains to point out, both Mr Drukker and Mr Spiegel are resident in the USA, and the terms of Mr Spiegel's prospective equity investment in Bender Oil were negotiated between them and their respective US lawyers. In the circumstances, there is no obvious reason (and certainly none was suggested by the Respondents) why any share purchase agreement reflecting that equity investment would have had to be executed in Moldova.

    (4)   Fourth, it is apparent from Mr Schneider's email message that he was sending Mr Rashkov a *"package of documents"*. If those documents had supported the Respondents' case, the Tribunal would have assumed that they would have been produced as an exhibit to the Defences, along with the covering email. They were not.

    (5)   Fifth, Mr Schneider's email says that Mr Spiegel *"will purchase shares of the companies"* (plural). None of the documents that have been produced relating to the Bender Oil project involved Mr Spiegel (or any company owned and controlled by him) acquiring shares in more than one company.

    (6)   Finally, even if the Tribunal had rejected Mr Spiegel's evidence in this regard, it would not have considered that either the Power of Attorney or the emails support the Respondents' case. In particular, they do not demonstrate that a concluded, unconditional deal for an equity investment was ever made. At most they might show that Mr Spiegel was putting in place a mechanism for executing the necessary documents <u>if</u> an investment deal were to be concluded. But the fact that he was putting such a mechanism in place is not evidence that an unconditional deal was in the event concluded.

132. For these reasons, the Tribunal finds that the Power of Attorney of 27 September 2013 and the emails of 23 September 2013 do not assist the Respondents' case.

B.14  Health insurance

133.   The Respondents allege that Mr Drukker arranged for health insurance for Mr Spiegel and his
family (including his ex-wife), and that he paid them salaries through one of his New York
companies, YD Export Import Inc.[114]   They have produced some Forms W-2[115] and a table
prepared by Mr Drukker's accountant[116] both of which appear to evidence these payments.  The
Respondents say that this is proof of the concluded nature of Mr Spiegel's agreement to acquire
an equity interest in Bender Oil.[117]

134.   Mr Spiegel agrees that he and members of his family were indeed notionally employed by one
of Mr Drukker's companies and that they were enrolled in a health insurance plan.  However,
Mr Drukker's evidence is that these arrangements only lasted a matter of months, and also that
any salary paid to him and to members of his family was reimbursed by them.

135.   The Tribunal accepts Mr Spiegel's evidence in this regard.   The accountant's table covers a
period of less than a year during 2013, and the Forms W-2 appear to relate to the same
payments.

136.   In any event, the Tribunal does not consider that these arrangements are relevant to, or provide
any support for, the Respondents' case in relation to the issues that have to be decided.   The
payments are not expressly referable to Bender Oil, nor do they involve any of the corporate
vehicles which were involved in the attempted operation of the plant.  Furthermore, there is no
obvious reason why an equity investment would necessarily also have involved an employment
contract or a health insurance plan in the first place, nor do the Respondents seek to explain
why the Tribunal should draw the inference they suggest from the bare documentation they
have produced.

137.   For these reasons, the Tribunal does not consider that the evidence relating to health insurance
assists the Respondents' case.

---

[114] See §27 of the Defence to the Mazlin claim [1 11 80] and §26 of the Defence to the Shireen claim [1 12 98].
See also §23 of Mr Drukker's affidavit in the New York proceedings [2 538].

[115] [2 415—416].

[116] [2 404].

[117] See §23 of Mr Drukker's affidavit in the New York proceedings [2 538]

B.15  The failure of the Bender Oil project

138. It is common ground that the Bender Oil project was not a commercial success.   The Respondents attribute its failure to the non-performance by the Moldovan government of its various undertakings and guarantees under the 2012 Privatisation Agreement.[118]   For the purpose of these arbitration claims, it is unnecessary to make any findings as to the cause of the commercial failure.   The fact is that the project was not a success.

139. The Respondents' case is that in these "*changed circumstances*" Mr Spiegel decided to try relying on the Loan Agreements according to their tenor, and "*purposely delayed the efforts to finalize the corporate documentation*".[119]   This wording is almost an admission by the Respondents that, even on their own case, there was no concluded contract for an equity investment by Mr Spiegel.   At all events, the Tribunal rejects the Respondents' argument that Mr Spiegel purposely delayed finalising any documentation.   The record demonstrates that the negotiations drifted on inconclusively.

B.16  The draft Operating Agreement & MIPA

140. Each of the parties has sought to rely on the draft Operating Agreement[120] and the draft MIPA,[121] which were prepared at some point during 2014.   Each draft is more than 30 pages long.

141. For an accumulation of reasons, the Tribunal considers that both the existence and the content of these documents support the Claimants' case:

(1)   Neither party contends that the Operating Agreement or the MIPA was ever executed as a binding agreement.   They both remained in draft.   If there had been a concluded, unconditional deal in 2012 for Mr Spiegel to acquire a 30% equity interest in Bender Oil (whether for $7 million or at any other price), there would have been no need for the parties still to be negotiating detailed contractual documents nearly 2 years later.

(2)   The parties to the draft Operating Agreement and MIPA were different from those in the 2012 agreements.   The parties to the draft Operating Agreement and MIPA included

---

[118] See §32 of the Defence to the Mazlin claim [1.11/81] and §31 of the Defence to the Shireen claim [1.12/99].  The 2012 Privatisation Agreement is at [2.343].

[119] See §33 of the Defence to the Mazlin claim [1.11.82] and §32 of the Defence to the Shireen claim [1.12.100].

[120] [2.417].

[121] [2.456].

Mr Drukker personally, and also a company called AMM Bender Holdings LLC ("AMM Bender Holdings"), a Florida entity which is different from AMM Consulting (the party to the March 2012 Agreement of Sale). Furthermore, the subject matter of the agreements was another Florida entity, Delta Agro Holdings LLC, not Bender Oil or WJ Holding (as in the March 2012 Agreement of Sale). In other words, even the underlying structure of the deal had still not been concluded.

(3)  Clause 8 of the Operating Agreement refers to the 'Initial Capital Contributions' of the parties by reference to the figures set out in Schedule A. The column headed 'Capital Contributions' in Schedule A is in fact blank. This clearly shows that some of the most fundamental provisions of the deal were still under negotiation.

(4)  More generally, the detailed terms of the draft Operating Agreement broadly reflect the terms under negotiation between Mr Virga and Mr Schneider in early 2013. This reinforces the inference that the parties conducted lengthy negotiations, and had not concluded any deal.

(5)  The Purchase Price stipulated in the MIPA for a 30% equity stake was $500,000 (the same figure as in the draft December 2012 Agreement of Sale[122]). This is again inconsistent with any pre-existing deal having been concluded at $7 million. Conversely, it also lends inferential support to the Claimants' case that any potential equity investment by Mr Spiegel was to be measured in hundreds of thousands of dollars, not in millions. The increase in price from the $210,000 stipulated in the March 2012 Agreement of Sale to the $500,000 proposed in the MIPA some two years later was presumably attributable to the fact that the Bender Oil plant, albeit not as profitable as hoped, had at least entered into production.[123] At all events, if the Loan Agreements had been shams, and the true price for the equity investment had been $7 million, there would have been no need for the parties to have negotiated an upward lift in the purchase price in 2014 from $210,000 to $500,000.

142.  Each of the draft Operating Agreement and the draft MIPA provide for the application of New York law, and for disputes to be resolved by arbitration in New York under the Commercial Arbitration Rules of the American Arbitration Association. This may explain the Respondents'

---

[122] [2/388].

[123] In his letter of 19 February 2013 [2/398], Mr Schneider had said this: *"It is my understanding that [Bender Oil] is now reaching desired operational capacity"*.

repeated reference to "*other ancillary agreements*"[124] which are said to be governed by New York law and by "*other dispute resolution clauses*".[125] However, it is apparent that these drafts were never agreed or executed, and accordingly the Respondents' case in this regard cannot be sustained.

### B.17  Termination of the negotiations

143.  On 25 July 2014, Mr Virga wrote to Mr Schneider[126] saying that he represented AMM Bender Holdings, and continuing as follows:

> "*After attempting to negotiate the purchase of a thirty (30%) percent membership interest in Delta since December 2012, AMM has concluded that further efforts are futile. AMM terminates negotiations.*
>
> *After approximately twenty (20) months of negotiations, basic issues are still not resolved. The "Group" entities are not formed, or at least not disclosed to us. A draft of the Disclosure Schedule has not been provided. The Seller still insists on qualifying each and every representation by Seller's knowledge and information contained in documents outside of the Disclosure Schedule that may have been provided or seen by AMM. The obligation to enforce the Privatization Agreements is so vague and discretionary that it is essentially meaningless. The above items are not meant to be exhaustive.*"

144.  This letter does not seem to have prompted any response from Mr Schneider either (i) denying any of the points made by Mr Virga or (ii) suggesting that Mr Spiegel (or AMM Consulting) had already entered into a binding deal in 2012. As a result, and in light of all the other evidence, the Tribunal's conclusion is that (a) the existence of this letter and the apparent absence of any reply supports the Claimants' case that no unconditional deal was concluded in 2012 (or at any other time) for the acquisition by Mr Spiegel (or any company owned and controlled by him) of a 30% equity stake in Bender Oil and (b) by July 2014 the negotiations for such an acquisition had stalled for the reasons outlined by Mr Virga (and not because of any deliberate obstruction on Mr Spiegel's part).

145.  The Tribunal has also seen a similar letter from Mr Virga dated 12 January 2015, addressed "*To Whom It May Concern*".[127] It is unclear whether this later letter was in fact sent to anyone, so

---

[124] See for example §10 of the Response to Request for Arbitration [1/2/7]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[125] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[126] [2/492]

[127] [2/493].

neither its content nor the apparent absence of any reply assists the Tribunal in resolving these claims.

B.18  Proceedings in Cyprus

146.   In November 2016, Mazlin and Shireen apparently issued proceedings against WJ Holding and Stubrick in Cyprus, and on 30 March 2017 they obtained certain interim freezing and disclosure relief there.[128]   The interim nature of that relief meant that the Cypriot court did not conduct any substantive analysis of the merits of the underlying claim, and accordingly the Claimants cannot derive any support for their case in this Tribunal from the fact that such relief was granted.

147.   In his evidence in the New York proceedings, Mr Drukker alleges that an order was made by the Cyprus court on 30 March 2017 but was never served on Stubrick or WJ Holding because of Mr Spiegel's failure to post the necessary bank guarantees requested by the Cyprus court as security.[129]   The Tribunal has seen no evidence that the Cypriot court order was served on WJ Holding or Stubrick, but it does not accept Mr Drukker's evidence regarding the alleged failure to provide security to the Cypriot court.   The Tribunal has seen a copy of the court's order dated 30 March 2017[130] which recites on the first page that it was made "*following the deposit by [Shireen and Mazlin] of €150,000 each in cash to the Registrar of the District Court of Nicosia for covering any potential damages that may be suffered by [WJ Holding and Stubrick] due to the erroneous obtaining of the orders*".   The Tribunal notes, however, that the order was only drawn up on 14 July 2017,[131] which was about three weeks after Mr Drukker had sworn his affidavit in the New York proceedings, so there may have been a delay in paying the necessary deposits.

148.   The Tribunal notes that, in its summary interim judgment of 30 March 2017, the Cypriot court recorded that "*neither side disputed the signing of the [Loan Agreements], and therefore their existence*".[132]   That is consistent with the position taken by the Respondents in these proceedings.   The court also said this:

    "*On the basis of the submitted affidavit, and specifically, exhibit 9 (a letter sent by Mr Drukker's son in law which pertains to the form of the guaranty), the Court*

---

[128]  Appl № 479/16 [2/496] and [2/569].

[129]  See §32 of his affidavit in the New York proceedings [2/540].

[130]  [2/569].

[131]  [2/573].

[132]  [2/498].

> *noted that the Respondents seem to admit the due amount and promise a repayment using damages from another action."*

149. The Tribunal does not seem to have been shown the letter to which the court was referring, and accordingly no significant weight can be placed on this passage from the court's ruling: but the least the Tribunal can conclude is that it certainly does not support the Respondents' case in these proceedings.

150. Separately, the Claimants have tried drawing attention to certain alleged breaches by the Respondents of the freezing relief granted by the court in Cyprus.[13] The Tribunal is not in a position to assess the evidence in that regard, it is not relevant to the findings in these proceedings and the allegations are discounted entirely.

### B.19  Proceedings in New York

151. As noted above, on 7 April 2017 WJ Holding and Stubrick commenced the New York proceedings[14] against Shireen, Mazlin, AMM Consulting and Mr Spiegel, seeking (among other things) "*a declaratory judgment that certain loan agreements between Plaintiffs and Defendants are not binding, and constitute unenforceable sham loan agreements*" and also "*a permanent injunction barring Defendants from continuing their efforts to enforce these sham loan agreements*" (§1 of the Complaint).  The Respondents' case in those proceedings is essentially the same as in these arbitration claims, namely that (i) "*[Mr Drikker] agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7,000,000*" (§12 of the Complaint); (ii) the investment was structured as a loan to suit Mr Spiegel's "*tax and estate planning objectives*" (§13 of the Complaint);  (iii) the Bender Oil plant was not as successful as anticipated because the Moldovan Government failed to perform various undertakings and guarantees under the privatisation agreement, and also blocked WJ Holding from transferring any shares in Bender Oil to Mr Spiegel or his companies (§19 of the Complaint);  and (iv) Mr Spiegel thereafter started claiming that the Loan Agreements were genuine commercial transactions and purposefully delayed finalising the sale agreement (§20 of the Complaint).

152. It goes without saying that the resolution, as between the parties to the New York proceedings, of the various issues in those proceedings (including any question as to the court's jurisdiction)

---

[13] [2/512-532].

[14] Supreme Court of the State of New York, County of Kings, Index № 506940 2017 [2 501]

is a matter to be resolved only by the New York courts on the evidence adduced before them. It is equally stating the obvious to say that this Tribunal has jurisdiction to resolve the issues in these arbitral proceedings (including any question as to the Tribunal's jurisdiction[135]) as between the parties to these proceedings, on the evidence that has been adduced before the Tribunal. The only purpose in referring in this Award to the procedural steps taken and the evidence filed in the New York proceedings is to assess what light (if any) they throw on the determination by this Tribunal of the issues in these arbitral proceedings.

153. On or about 17 May 2017, the defendants in the New York proceedings (i.e. the Claimants in these arbitration proceedings, together with Mr Spiegel and AMM Consulting) appear to have filed a motion to dismiss the Complaint, although the Tribunal has not seen a copy of that motion.[136] What the Tribunal has seen is the affidavit sworn by Mr Drukker in response.[137] It tells essentially the same narrative and makes essentially the same allegations as the Respondents in this case, but there are some differences. In particular, in §14 Mr Drukker says this:

"In or about early 2012 ... I agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7 million. [Mr Spiegel] also agreed to provide another $2 million in working capital."

154. The allegation regarding the agreement at $7 million is consistent with the case advanced by the Respondents in these proceedings. By contrast, the allegation regarding an agreement by Mr Spiegel to provide another $2 million in working capital has formed no part of the defence in these proceedings. Once again, the fact that the Respondents are advancing slightly different arguments in different proceedings does not inspire confidence in the integrity of their case. Having said that, the suggestion that Mr Spiegel agreed to provide $2 million in working capital might be said to go some way to provide an explanation on behalf of the Respondents as to why, according to their version of events, the agreed purchase price for the equity investment was $7 million, but in the event the Claimants between them transferred more than $8 million to the Respondents. That appears to be what Mr Drukker means in §21 of his affidavit, where he says that, between November 2012 and January 2013, "Shireen and Muslin transferred approximately $8 million under the sham Loan Agreements" and adds this: "The bulk of this amount was [Mr Spiegel's] equity investment" (emphasis added). Nevertheless, the Tribunal considers that (i) the discrepancy between the Respondents' case in these proceedings and their

---

[135] See §164 below.

[136] It is mentioned in §25 of the affidavit of Frank R. Seddio dated 22 June 2017 [2 551].

[137] [2/533]

case in the New York proceedings, and (ii) the fact that there is indeed a significant difference between the alleged $7 million purchase price for the 30% stake and the amounts actually transferred by the Claimants further undermines the Respondents' case.

155. In §15 of his affidavit, Mr Drukker also says this:

> "Mr Spiegel told me, however, that he initially needed to structure his equity investment as a loan in order to achieve certain tax and estate planning objectives. This would be achieved by [Mr Spiegel] routing ostensible loans for [Bender Oil] through offshore companies and then restructuring or offsetting the debt. The parties were _always_ clear that regardless of formal structure, the investment made by Mr Spiegel (through his companies) was an equity investment and the equity purchase price ... was $7 million" (emphasis added).

156. This is again broadly similar to the defence advanced by the Respondents in these proceedings, but (i) it is unsupported by any contemporaneous documentary record and (ii) it is inconsistent on two grounds with the email of 11 July 2012 discussed above,[138] in which (a) the proposed advance of funds was clearly described as a loan (not an equity investment), and (b) Mr Spiegel was (at least initially) pretending that the lending companies were not even associated with him.

157. In §16 of his affidavit, Mr Drukker states that Bender Oil "was worth in excess of $20 million" in March 2012. That is again consistent with the case advanced by the Respondents in these proceedings, but (i) the Tribunal has seen no documentary evidence to support it, (ii) it seems unlikely in light of the two valuations that have been produced,[139] and (iii) it also seems optimistic in light of the fact that the facility had been inoperative for about 6 years, and the machinery was very dated.

158. In §17 of his affidavit, Mr Drukker says that the Loan Agreements "were produced by Mr Spiegel". That positive assertion is inconsistent with the neutral assertion in §20 of the Respondents' Defences that it is "not [their] recollection" that the Loan Agreements were drafted by Mr Schneider. For the reasons discussed in §96 above, the Tribunal is satisfied that Mr Schneider did draft the Loan Agreements.

159. The Tribunal has also seen an affirmation dated 22 June 2017 by Frank R. Seddio, co-counsel for WJ Holding and Stubrick in the New York proceedings.[140] It tells essentially the same

---

[138] [2/365]; see §91-94 above.

[139] [2/333] and [2/339]; see §85-86 above.

[140] [2/545].

narrative and makes essentially the same allegations as the Respondents in these proceedings. The Tribunal notes, however, that insufficient care seems to have been taken in preparing the affirmation, as Mr Seddio consistently misspells his own client's name as 'Drucker', and he also claims, for example, that *"Mr Spiegel was already a partner in my business"* and refers to *"a record prepared by my account"*[141] – neither of which makes any sense coming from Mr Seddio's mouth. Clearly the text has been cut and pasted from a document drafted for Mr Drukker. In any event, the affidavit does not contain any first-hand evidence concerning the disputed factual issues which have to be decided, and as a result its content is not of any further assistance in resolving these claims.

160. For these reasons the Tribunal has derived only limited assistance from the various materials disclosed from the New York proceedings in resolving the issues in these arbitral proceedings.

### B.20  Conclusions on the facts

161. It will be apparent that the Tribunal accepts the Claimants' case and rejects the Respondents' case on the main factual dispute between the parties. In short, the Loan Agreements were agreed and executed as loan agreements, and not as shams to disguise an equity investment by Mr Spiegel.

162. The Tribunal's principal reasons for reaching this conclusion may be summarised as follows:

   (1)  First, the Loan Agreements are clearly expressed as loan agreements, not as an equity investment. The starting point of any analysis is the assumption that the parties to any written contract intend to record in writing the bargain they have in fact made.

   (2)  Second, the Respondents have offered no witness or documentary evidence in support of their main contention, namely that the Loan Agreements were shams, having been agreed as 'loans' for tax and inheritance planning reasons.

   (3)  Even if the Loan Agreements had been structured as loans for tax and inheritance planning reasons, that in itself would not necessarily have rendered them shams, unless there had been some evidence that the purpose of the structure was to defraud relevant tax (or other) authorities. Structuring an investment to maximise its tax efficiency is entirely legitimate, assuming the structure is lawful. The Respondents have adduced no evidence of any unlawfulness.

---

[141] See §16 of the affidavit [2 548].

(4)  Mr Spiegel has given witness evidence and submitted himself to cross-examination (by the Tribunal) on these issues, whereas the Respondents, having made serious allegations of fraud against Mr Spiegel, have chosen to deploy no witness evidence at all, and to absent themselves from the hearing.

(5)  Having subjected Mr Spiegel to robust questioning, the Tribunal finds him to have been an essentially honest witness in relation to the issues in dispute (although not all of his conduct was necessarily creditable in a wider moral sense).

(6)  For the reasons outlined above, the Tribunal considers that Mr Spiegel's evidence is consistent with the contemporaneous documentation.

(7)  By contrast, there is not a single contemporaneous document which supports the Respondents' case either (i) that Bender Oil was valued at about $20 million in 2012, or (ii) that Mr Spiegel agreed to make an equity investment for $7 million, or (as noted above) (iii) that the investment was structured in the way it was to avoid (illegally) any tax obligations. Whilst the Respondents have made great play of the fact that they wish to pursue disclosure in the New York proceedings against Mr Spiegel personally and against AMM Consulting in order to verify their case, it is worth noting that neither of the Respondent companies, nor Mr Drukker nor Mr Schneider personally (both of whom could have been expected to assist the Respondents in any way available to them) has been able to produce a single document to support their primary case.

(8)  Furthermore, there is a significant discrepancy between the alleged agreement on which the Respondents seek to rely (i.e. an equity investment at $7 million) and (i) the aggregate amount of the loan facility under the two Loan Agreements (i.e. $17 million) and (ii) the amount of money actually transferred by the Claimant companies (i.e. over $8 million). Whilst there has been some suggestion from WJ Holding and Stubrick in the New York proceedings that they may seek to attribute this difference to a separate agreement by Mr Spiegel to make a further investment of $2 million by way of capital, (a) it is striking that that allegation has formed no part of the extensive pleadings and submissions made by the Respondents in these proceedings, (b) in any event it would not explain the difference between the combined value of the alleged equity and capital investments (i.e. $9 million) and the aggregate amount of the loan facilities (i.e. $17 million) and (c) it is again the case that there is no contemporaneous documentary support for the existence of any ancillary agreement by Mr Spiegel to advance a further $2 million. Furthermore, the Tribunal finds it undermines the Respondents' case that they have advanced varying arguments in these arbitration claims and in the New York proceedings.

(9)   Moreover, the Respondents' case is on analysis positively inconsistent with the documentary record in a number of respects. In particular, the March 2012 Agreement of Sale[142] was plainly conditional, and it is common ground that the conditions to completion were never satisfied. Furthermore, the fact that lengthy draft contracts were subsequently being negotiated throughout 2013 and until July 2014, and that those drafts involved different parties from those in the 2012 agreements, strongly suggests that no concluded, unconditional deal for an equity investment was ever agreed.

(10)  The Respondents have also made a number of other allegations which they have been unable to substantiate. For example, they have relied in their pleadings and submissions on *"other ancillary agreements"*[143] which they said were governed by New York law and by *"other dispute resolution clauses"*.[144] They have also referred to *"a number of important oral arrangements between [WJ Holding] and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties"*.[145] However, on analysis it emerges that no written agreements (apart from the Loan Agreements and the March 2012 Agreement of Sale) were ever concluded; and the Tribunal has also seen no evidence to substantiate the allegation that there were any oral agreements that are inconsistent with the terms of the Loan Agreements and the March 2012 Agreement of Sale.

(11)  There is no suggestion that AMM Consulting ever paid, or that WJ Holding ever demanded, the $100,000 due on 31 December 2012 under clause 3 of the March 2012 Agreement of Sale,[146] or the further instalment of $110,000 due on 1 June 2013. If that agreement had (as the Respondents contend) formed part of the concluded bargain for an equity investment, it is difficult to see why neither side sought either to comply with or to enforce its terms.

(12)  As noted above, the sequence of events between the making of the March 2012 Agreement of Sale and the first documented mention of a loan in the 11 July 2012

---

[142] [2/376].

[143] See for example §10 of the Response to Request for Arbitration [1/2-7]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[144] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1-7] & [1-8].

[145] See §43 of their Responses to the Claimants' Requests for Arbitration [1-7] and [1-8].

[146] [2-376].

63

email[147] is striking, as is the fact that that email was discussing the possibility of loans being made by companies unconnected with Mr Spiegel.

(13) For the reasons outlined in §101–111 above, the Tribunal finds that (i) there was an agreement that Mr and Mrs Drukker would provide personal guarantees, (ii) Mr Spiegel caused the Claimant companies not to advance any funds until late 2012 because the guarantees had not yet been signed, (iii) Mr Schneider drafted and Mr Drukker signed the guarantees in November 2012, and (iv) the Claimants thereafter advanced funds to the Respondents. All of this is consistent with the funds having been advanced by way of loan, not as an equity investment.

(14) The Respondents admit that, for a period of about 25 years, (i) Mr Spiegel had periodically made loans to companies controlled by Mr Drukker, (ii) all such loans had been provided pursuant to written agreements and (iii) they had been secured by personal guarantees from Mr Drukker and his wife.[148] That pattern of dealings is consistent with the Loan Agreements in these proceedings also being genuine loans.

(15) The Respondents say that Mr Drukker injected about $15 million of his own money into the Bender Oil project.[149] It is notable that his evidence in the New York proceedings is that he invested that money "*through loans which I personally extended*".[150] Although Mr Drukker emphasises that he has not sought repayment, the fact remains that he provided funding by way of loans, whereas he claims that Mr Spiegel agreed to invest by way of equity. If this was (as the Respondents contend) a joint venture between the two men, there would have been no obvious commercial reason (and none has been suggested by the Respondents) why Mr Spiegel would have agreed to make an equity investment of several million Dollars, while Mr Drukker (the initiator of the project) was only making loans.

(16) Finally, Mr Spiegel's evidence is that neither the Respondent companies nor Mr Drukker ever claimed that the Loan Agreements were shams until after these arbitration proceedings had been commenced. There is certainly no documented record of any such claim having been made, and the Respondents have not pleaded that any such

---

[147] [2/365].

[148] See §47–49 of the Defence to the Mazlin claim [1/11] and §46–48 of the Defence to the Shireen claim [1/12]. Similar admissions are made with less detail in §6 of the Statements of Defence, and also in §2 of the Respondents' submissions dated 11 April 2017 [1/4], and in §21 of their Response to the Claimant's Amended Request for Arbitration in the Mazlin claim [1/7].

[149] See §31 of the Defence to the Mazlin claim [1/11] and §30 of the Defence to the Shireen claim [1/12].

[150] See §26 of his affidavit in the New York proceedings [2/539].

claim was made before the Request for Arbitration in November 2016. In the circumstances, the Tribunal accepts Mr Spiegel's evidence in this regard. That provides further inferential support for the conclusion that the Respondents' argument that the Loan Agreements are shams is a recent invention by them which has been raised in an attempt to resist the claim for repayment.

163. For the reasons set out in this Award, the Tribunal has no hesitation in holding that the Loan Agreements were true loan agreements, and they were not shams intended to disguise an equity investment by Mr Spiegel. The evidence is overwhelming and the Respondents' case is, based on the evidence put forward, hopeless.

C. THE JURISDICTIONAL CHALLENGE

164. By virtue of Article 23.1 of the LCIA Rules, the Tribunal plainly has power to rule on its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the arbitration agreement.

165. As noted above, the Respondents have advanced their jurisdictional challenge to these arbitration proceedings on a number of different legal bases. Their principal case is that the arbitration agreements are null and void because the Loan Agreements are themselves null and void. They also contend that the true bargain between the relevant parties was an equity investment by Mr Spiegel through his corporate vehicles, and that that bargain is governed by New York law and should be resolved in the New York proceedings.

166. Irrespective of the various different legal labels that are applied to the jurisdictional challenge, it all turns on essentially the same factual allegation. For the reasons set out in Section B of this Award, the Tribunal rejects the Respondents' factual case on that issue. The Loan Agreements are not shams, and there was no binding, unconditional agreement by Mr Spiegel or any of his creature companies (whether governed by New York or any other law) to make an equity investment in the Bender Oil project. For this fundamental reason, the Respondents' jurisdictional challenge, in all its various guises (including the argument based on estoppel), is dismissed.

167. It is also important to emphasise that there is no basis at all for the Respondents' allegation that this Tribunal has been "*imposed on the parties at the sole demand of the Claimants*".[151] The true position is that (I) the Tribunal has been duly appointed by the LCIA pursuant to the provisions of clause 9 of the Loan Agreements,[152] (ii) the Respondents admit that they executed the Loan Agreements,[153] and (iii) the Respondents accepted the Tribunal's appointment.[154] The Tribunal having rejected the Respondents' evidential case that they only entered into the Loan Agreements on the understanding that they represented a cloak for an equity investment, there is no basis at all for the Respondents' challenge to the jurisdiction of this Tribunal.

168. In the circumstances, the Tribunal also rejects the Respondents' contention that New York (rather than these arbitration proceedings) is the natural forum for the resolution of a dispute between the parties. That argument was based on the same factual allegations as the sham argument, namely the Respondents' contention that (I) an equity investment was negotiated in New York, (ii) both Mr Drukker and Mr Spiegel have properties there, and Mr Spiegel's sons (who are co-owners of AMM Consulting) also reside there, (iii) the March 2012 Agreement of Sale was executed in New York and is governed by New York law, as is the draft December 2012 Agreement of Sale and the 2014 draft Operating Agreement and draft MIPA, (iv) the agreements were negotiated in New York and were drafted by lawyers based there (Mr Schneider and Mr Virga), (v) the deal is evidenced by the health insurance agreements with one of Mr Drukker's New York companies (YD Export Import Inc), (vi) relevant witnesses reside in New York, (vii) the true dispute includes parties who are not party to the Loan Agreements (Mr Spiegel and AMM Consulting), (viii) LCIA Arbitration does not allow disclosure to be ordered against non-parties, nor does it enable the Tribunal to compel witnesses to attend, and (ix) after the relationship between Mr Drukker and Mr Spiegel soured, they attended mediation in New York.[155] None of that detracts in any way from the fact that (a) the Respondents agreed to the provisions set out in the Loan Agreements, which include the LCIA arbitration clause, and (b) the Tribunal has rejected the evidential allegations on which the Respondents have sought to evade the consequences of that agreement.

---

[151] See §19-20 of the Respondents' submissions dated 11 April 2017 [1/4].

[152] [2/369] and [2/374].

[153] See §19 of each Defence [1/11-79] and [1/12/97]: "*On or about 10 August 2012, the Respondents entered into the Loan Agreements*".

[154] See §24(3), §26(1) & §31(1) above, and §15(1) of Mazlin PO2 [1-15]; and also §36, §42 & §44 above, and §4 of Shireen PO1 [1-18].

[155] See for example §34-47 of Mr Drukker's affidavit in the New York proceedings [2-540-542] and §32-36 of Mr Seddio's affirmation [2-553].

169. Finally, the Tribunal also rejects the Respondents' contention that the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*".[136] The relevant consideration comprised each party's mutual promises to be bound by, and to comply with, the terms of the Loan Agreements.


## D. REMEDIES

### D.1  The capital sums

170. Since the Tribunal has held that the Loan Agreements were not shams, it follows that the monies advanced by the Claimants to the Respondents were due to be repaid in full, together with interest, on 30 September 2015, pursuant to clause 2.

171. The contractual currency of the loans was denominated in US Dollars. The transfer made from Mazlin to Stubrick on 3 January 2013 was US$2,850,088.60. However, the other two transfers were made in Swiss Francs. It is accordingly necessary first to convert those two amounts to US Dollars. That conversion should be effected at the applicable exchange rates on the respective dates when those sums were advanced, because those were the dates on which the contractual entitlement of the borrower to receive US Dollars was discharged. Applying the live mid-market rates provided by the Claimants for exchanging Swiss Francs to US Dollars on 30 November and 3 December 2012 respectively produces the following figures (which are slightly different from the sums claimed by the Claimants):[137]

- 30 November: CHF1,900,000 @ 1.0792647328 USD/CHF = US$2,050,602.99
- 3 December 2012: CHF 3,490,500 @ 1.0809434530 USD/CHF = US$3,773,033.12

### D.2  Interest

172. Pursuant to clause 1.3 of the Loan Agreements, the Claimants are entitled to simple interest at 6% *per annum* on "*the outstanding principal balance*" (emphasis added) of each of the sums advanced from the date of advance until 30 September 2015 (the due date for repayment under clause 2 of the Loan Agreements). The Claimants' interest calculations, provided under cover of their email of 29 November 2017, reflected interest accruing in these years which had been

[136] See for example §29–30 of the Respondents' submissions dated 11 April 2017 [14].

[137] The Respondents' calculations, set out in their email of 15 January 2018, were fractionally different because they took the exchange rate only to 5 decimal places. The Tribunal has adopted a more accurate calculation.

compounded annually. The Tribunal agrees with the Respondents' submissions that the terms of the contract do not provide for such compound interest. Clause 1.3 refers to interest accruing on the "*principal*" amount outstanding only.

173. On the true construction of clause 1.10 of the Loan Agreements, and in the events which have happened, each Claimant is also entitled to simple interest at 10% *per annum* on "*any Advances*", *i.e.* on the capital amount of each advance outstanding as at the due date (*i.e.* 30 September 2015) until payment in full. The 'Default Interest' under clause 1.10 is triggered by a 'demand'. For these purposes (and contrary to the submissions of the Respondents), the Tribunal holds that the requirement for a 'demand' is satisfied by the Request for Arbitration dated 21 November 2016. However, once a demand has been made, the contractual Default Interest accrues from the due date for payment, *i.e.* from 30 September 2015, not from the date of demand. The Claimants again provided calculations on 29 November 2017 in which the Default Interest is compounded annually. The Claimants also claim (without explanation) in their Skeleton that they are entitled to "*default interest ... on both the capital sums advanced pursuant to the Agreement and the interest chargeable thereon*" (emphasis added). The Tribunal disagrees. The express terms of the Loan Agreements make clear that Default Interest under clause 1.10 accrues on the outstanding amount of each 'Advance', not on the amount of that Advance plus accrued interest. The Tribunal has applied clause 1.9(c) of the Loan Agreements by using a notional 360 day year where less than a full year of interest is to be calculated, and in the calculation of ongoing daily interest.

174. Accordingly, the correct interest calculations may be summarised as follows:

|   | Date | Days | Mazlin Loan 1 ($) | Rate | Interest calculation ($) | Total ($) |
|---|------|------|-------------------|------|--------------------------|-----------|
| 1 | 01/12/2012-30/11/2013 | 365 | 2,050,602.99 | 6% | 123,036.18 | 123,036.18 |
| 2 | 01/12/2013-30/11/2014 | 365 | 2,050,602.99 | 6% | 123,036.18 | 246,072.36 |
| 3 | 01/12/2014-30/09/2015 | 304 | 2,050,602.99 | 6% | 103,897.22 | 349,969.58 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,050,602.99 | 10% | 205,060.30 | 555,029.88 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,050,602.99 | 10% | 205,060.30 | 760,090.18 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,050,602.99 | 10% | 62,657.31 | 822,747.49 |

| | | | | | 822,737.49 | |
|---|---|---|---|---|---|---|

| | Date | Days | Mazlin Loan 2 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/01/2013-02/01/2014 | 365 | 2,850,088.60 | 6% | 171,005.32 | 171,005.32 |
| 2 | 03/01/2014-02/01/2015 | 365 | 2,850,088.60 | 6% | 171,005.32 | 342,010.63 |
| 3 | 03/01/2015-30/09/2015 | 271 | 2,850,088.60 | 6% | 128,729.00 | 470,739.63 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,850,088.60 | 10% | 285,008.86 | 755,748.49 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,850,088.60 | 10% | 285,008.86 | 1,040,757.35 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,850,088.60 | 10% | 87,086.04 | 1,127,843.39 |
| | | | | | 1,127,843.39 | |

| | Date | Days | Shireen Loan ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/12/2012-02/12/2013 | 365 | 3,773,033.12 | 6% | 226,381.99 | 226,381.99 |
| 2 | 03/12/2013-02/12/2014 | 365 | 3,773,033.12 | 6% | 226,381.99 | 452,763.97 |
| 3 | 03/12/2014-30/09/2015 | 302 | 3,773,033.12 | 6% | 189,909.33 | 642,673.31 |
| 4 | 01/10/2015-30/09/2016 | 366 | 3,773,033.12 | 10% | 377,303.31 | 1,019,976.62 |
| 5 | 01/10/2016-30/09/2017 | 365 | 3,773,033.12 | 10% | 377,303.31 | 1,397,279.93 |
| 6 | 01/10/2017-19/01/2018 | 110 | 3,773,033.12 | 10% | 115,287.12 | 1,512,567.06 |
| | | | | | 1,512,567.06 | |

### D.3  The appropriate creditor

175.  As noted above, on 30 October 2017 Shireen assigned the benefit of its claim to Mazlin, and Mazlin has been joined as a co-claimant in the Shireen claim.  In the circumstances, the appropriate award is to order all payments to be made by the Respondents to Mazlin.

### D.4  Joint, or joint and several liability

176.  The Respondents deny that they are jointly and severally liable under the Loan Agreements.[158] The Tribunal accepts that argument for the following reasons.

177.  The presumption under general law is that a promise made by two or more persons is joint, and that express words are necessary to make it joint and several.[159]  The opening words of each Loan Agreement in this case recite that the lender *"agrees to extend credit to [WJ Holding] and [Stubrick] (collectively the 'Borrower')"*.  Thereafter, all the obligations to repay capital and interest are expressed as obligations of 'Borrower'.[160]  No words are used to indicate that the liability of the two companies which constitute the 'Borrower' is several.

## E.  COSTS

### E.1  Introduction

178.  The Claimants have succeeded in their claims, and the Respondents have failed.  The starting point is accordingly a rebuttable presumption that the Claimants are entitled to their Legal Costs pursuant to Article 28.4 of the LCIA Rules, which provides as follows:

> *"The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay*

---

[158] See §53 of the Defence to the Mazlin claim [1-11/86] and §52 of the Defence to the Shireen claim [1-12/104].

[159] See *Chitty on Contract* (32nd ed.), §17-005

[160] See in particular clauses 1.2, 1.9(a), 1.10, 2, and 5.1(a)

78

*and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."*

179. Article 28.3 also provides that "*the Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate.*"[161] Accordingly, the Tribunal has a wide discretion subject to the presumption in Article 28.4. In making that determination, the Tribunal is entitled to take into account the parties' conduct in the arbitrations and, when making a determination as to the amount of Legal Costs to be awarded, to do so on such reasonable basis as the Tribunal thinks appropriate.

180. In addition, as noted in §95(13) above, by clause 6 of the Loan Agreements each party agreed "*to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement*". Thus, in addition to the power to award Legal Costs pursuant to the LCIA Rules, the Tribunal also has a power to do so under the terms of the Loan Agreements themselves.

### E.2 The costs of the conjoinder issue

181. The Respondents objected to the original constitution of the Mazlin claim, in which both Mazlin and Shireen had been named as Claimants despite the fact that the claim was based on two separate arbitration agreements with non-identical parties. The Tribunal determined that the Claimants were not entitled to proceed with the claim in that form without the Respondents' consent, which was withheld.[162] It was accordingly the Claimants' own procedural error that provided the occasion for the Respondents to raise their procedural objection.

182. Nevertheless, there was plainly no compulsion on the Respondents to take that objection, and at the procedural hearing on 24 March 2017 their counsel was unable to articulate any practical reason why the Respondents should insist on separate arbitration proceedings being issued. The Tribunal was simply told that that was the Respondents' position. They were not, and did not claim to be in any way prejudiced by the composition of the Mazlin claim in its original form.

---

[161] The Tribunal adopts the term Legal Costs as it is used in Article 28.3 of the LCIA Rules, and also the term Arbitration Costs as defined in Article 28.1 as "*The costs of the arbitration other than the legal or other expenses incurred by the parties themselves*".

[162] [1/15].

71

183. Furthermore, the Respondents argued strenuously, both at that hearing and in their written submissions, that the Tribunal did not have jurisdiction to allow the Mazlin claim to be amended by the deletion of one claimant. It was clearly the Respondents' objective to secure the dismissal of the arbitral proceedings in their entirety on purely procedural grounds. In the circumstances, and in the absence of any reasoned explanation from the Respondents as to why they chose to object to the original composition of the Mazlin claim, it would appear that the Respondents' strategy was prompted either (i) by a desire to make the whole recovery process as slow and expensive as possible for the Claimants, or (ii) by an opportunistic desire to try non-suiting the arbitral proceedings in London in their entirety, so that the Respondents could then issue the New York proceedings and claim that those proceedings should take priority as having been issued first,[163] or (iii) both.

184. Although the Respondents' position on the conjoinder issue was correct as a procedural matter, in terms of the interpretation of the LCIA Rules, nevertheless the Tribunal considers that the Respondents' conduct in withholding their consent to the conjoinder of both claims in one arbitration was unreasonable. In the event, the commencement of separate arbitration proceedings in the Shireen claim has achieved nothing other than additional inconvenience and expense. The Tribunal infers that that was the Respondents' intention.

E.3  The parties' conduct generally

185. Having taken an unreasonable stance on the conjoinder issue, the Respondents then proceeded to conduct themselves in both arbitrations in a manner calculated to cause further inconvenience and expense to the Claimants:

(1)  The Respondents have consistently refused to comply with the LCIA's directions to pay the advances to fund the Arbitration Costs. As a result, the Claimants have had to make substitute payments.

(2)  After being given a full opportunity to respond to the Claimants' proposals for procedural directions in the Mazlin claim, the Respondents then sought unreasonably to invite the Tribunal to reopen the directions it had given in Mazlin PO2.[164]

---

[163] Although the strategy failed in its principal objective, we see a reflection of that argument in the affidavit evidence sworn in the New York proceedings by Mr Drukker and Mr Seddio, both of whom make a point of emphasising that the Shireen claim was issued after the New York proceedings had been commenced: see §30 of Mr Drukker's affidavit [2-530] and §22 of Mr Seddio's affidavit [2-550].

[164] See §25(2), §26, §33 & §38 above.

(3)   The Respondents have consistently sought to procure a dismissal or stay of these arbitration proceedings on the basis that the true agreement between the relevant parties is governed by New York law. For the reasons set out in detail in this Award, the Tribunal has rejected that case. The Tribunal considers that the Respondents' allegations are unsustainable, and that their efforts to resist arbitration amount to forum-shopping.[165]

(4)   The Respondents' stated preference for the dispute to be resolved in the New York proceedings was ostensibly based on their contention that (i) the New York court has wider powers of disclosure against different parties from those available to this Tribunal in these arbitral proceedings, (ii) there was a *"reasonable expectation"* that the evidence obtained on discovery there *"will be relevant to the subsequent entertainment (by the Tribunal) of the Respondents' principal claim"*[166] and (iii) compliance by the Respondents with any disclosure order in these proceedings might cause *"irreparable harm to the position of the Respondents in the New York proceedings"*.[167] In the event, however, (a) the Respondents have never attempted to specify exactly what documents, or categories of document, they say will be disclosable in the New York proceedings to assist their case, (b) they have not produced any evidence before the Tribunal to suggest that any such documents exist, (c) they have not explained exactly what harm would be caused to their interests in the New York proceedings by complying with the directions for disclosure in these proceedings, and (d) they have not explained the apparent inconsistency between that assertion and the fact that they were content to exhibit over a dozen documents to their Statements of Defence without, apparently, causing irreparable harm to their position in the New York proceedings.

(5)   Although the Respondents were fully aware of the timetable laid down in the Procedural Orders that had been made in each arbitration, they waited until the last minute before notifying the Tribunal and the Claimants that they did not propose to offer any disclosure.[168]

---

[165] The Tribunal is also troubled not to have received a full explanation from the Respondents regarding the apparent discrepancies in their evidence regarding the commencement date of the New York proceedings: see §8(5), §19(2) and §28(1) above.

[166] See §68 of the Respondents' submissions dated 11 April 2017 [1-4].

[167] [1-23-313] and [1-23-314]

[168] See §53 above. The Tribunal also notes the relatively minor point in §13 15 above regarding the Respondents' failure to answer a simple question posed to them by the Tribunal

73

186. For this accumulation of reasons, the Tribunal holds that the Respondents have conducted these proceedings unreasonably, and with the intention of being as obstructive as they can to the Claimants. The Tribunal accordingly proceeds on the basis that (i) the presumption mentioned in §178 above has not been rebutted but has been reinforced, and furthermore (ii) if costs have been incurred which might be considered higher than expected, that is likely to be a result of the Respondents' conduct.

### E.4  The Claimants' Schedule of Costs

187. On 23 November 2017, Mazlin filed a Claimant's Schedule of Costs ("the Schedule of Costs"), together with separate written submissions on costs ("the Costs Submissions"). The Schedule of Costs recorded costs under headings (a) to (f) in accordance with §30 of Mazlin PO2, together with three additional headings: (g) attendance on Counsel; (h) attendance on third parties; and (i) costs incurred in foreign proceedings. The Schedule of Costs sets out the costs that had been incurred jointly by the Claimants in both arbitrations, and Shireen adopted and relied on the same Schedule of Costs.

188. Although the Respondents declined to attend the hearing, the Respondents' legal representatives sent an email on 24 November 2017 which included the submissions on the Schedule of Costs and Costs Submissions quoted in §67 above.

189. As to the specific numbered submissions made by the Respondents in that email on the Claimants' costs submissions:

    (1)  In the context of the amounts claimed in the Mazlin claim, and for that matter in the Shireen claim, the Tribunal does not consider the overall costs claimed to be disproportionate. Since the costs represent costs claimed in both proceedings, it is inappropriate to compare the costs against the debt claimed in the Mazlin claim only.

    (2)  The Respondents' second observation is correct. However, directions were made in the proceedings, to which the Respondents did not object, that the Mazlin claim and the Shireen claim proceed in parallel to avoid delay and added costs and with a view to any evidential hearing and oral arguments being heard concurrently.[160] The proceedings did largely proceed on that basis and, of course, the hearings were concurrent. As a consequence, the Tribunal's view is that the Claimants have acted reasonably in incurring their costs in this manner which is likely to have resulted in an overall costs

---

[160] See Mazlin PO3 and Shireen PO1, discussed at §43 and §44 above.

saving. For the purposes of this award, the Tribunal has split the costs between the Mazlin claim and the Shireen claim in the proportions 55% and 45% respectively in order to reflect the additional time taken in the Mazlin claim to deal with the Respondents' initial procedural objections, and to reflect the fact that the costs attributable to the Mazlin claim (which was in essence the lead claim) might be slightly greater than those attributable to the Shireen claim.

(3)    The Costs Schedule was submitted in a form consistent with §30 of Mazlin PO2 and §33 of Shireen PO1, which did not specify the level of detail to be provided against each heading. The Tribunal finds that the level of detail provided by the Claimants is reasonable, particularly when taking into account the overall reasonable level of costs claimed.

(4)    The Tribunal deals with the Claimants' claims in respect of the costs of foreign proceedings in §193–195 below.

190.  By two emails dated 27 November 2017, the Respondents' legal representatives made the following requests in relation to costs:

"(i)  the question of costs be reserved during the hearing,

(ii)  the Claimant be asked to provide a more detailed submission on costs that would inter alia provide:
-   a break-down between the two arbitrations;
-   copies of invoices and payments in relation to disbursements; and
-   detailed narratives and chronology for the hours incurred; and

(iii)  that the Respondents be thereafter allowed a submission commenting on these costs."

191.  There was no procedural timetable for submissions on costs to be made after the oral hearing. The Respondents themselves have withdrawn their own claims for costs and, accordingly, have filed no costs schedules themselves. For the reasons given above, the Tribunal finds that it is not necessary for further details to be provided by the Claimants.

192.  Turning to the specifics of the Claimants' Schedule of Costs, the hourly rates applied by solicitors for the Claimants are reasonable. The costs claimed against headings (a) to (e), (g) and (h) are also reasonable in total and there are no individual amounts which appear unreasonable. Costs under heading (f) include the LCIA fees on filing the Requests for Arbitration, together with payments made by the Claimants on account of the Arbitration Costs. Accordingly, those items, in the amount of US$150,387.50 (GBP113,500) are excluded from

the Legal Costs and are dealt with separately below. The remainder of the Claimants' costs under heading (f), in the amount of US$70,945.32, are reasonable and allowed in full.

193. Costs under heading (i) set out the costs incurred in foreign proceedings in the total sum of US$182,167.40. By reference to the Costs Submissions, those costs were incurred in relation to:

   (1)   injunction proceedings issued in Cyprus to obtain a worldwide freezing order against the Respondents in the sum of US$76,098.77;

   (2)   Hungarian legal advice in relation to enforcement action in Hungary and in relation to the sale by Stubrick of a wholly-owned Hungarian company BVDH Ingatlanhasznosito Kft in the sum of US$10,000;

   (3)   defence of the proceedings in New York in the sum of US$96,068.63.

194. The Tribunal accepts that the legal costs incurred by the Claimants in Cyprus and Hungary are in connection with the enforcement of the Loan Agreements and are, therefore, recoverable under clause 6 of the Loan Agreements. They are also reasonable in their amounts.

195. The legal costs incurred in New York relate to the defence of proceedings brought against the Claimants and related entities. Based on the relief sought and the findings outlined above, those proceedings were brought intending to disrupt the enforcement of the Loan Agreements in these proceedings and as such those costs were (at least arguably) incurred "*in connection with the enforcement*" of those agreements for the purpose of clause 6. However, (i) there is not an identity of parties in these arbitrations and the New York proceedings, and (ii) the Tribunal understands that the New York proceedings are not concluded and, therefore, the outcome of those proceedings, including (if appropriate) the award by the court of costs against any party, is yet to be determined. For those reasons, the Tribunal concludes that it would not be appropriate in these arbitration proceedings to award to the Claimants any part of the costs of the New York proceedings claimed under heading (i).

196. Costs under heading (h) include the costs incurred by solicitors for the Claimants on attendance on counsel in foreign proceedings. Although the Tribunal disallows the third party costs in relation to the New York proceedings, it allows all the costs on attendance on foreign counsel as reasonable, and notes that only 0.4 hours were incurred on attendance on New York counsel. The Tribunal also allows the Claimants' costs of attendance on third party funders, since the

application was necessitated by the Respondents' refusal to pay their share of the advance on the Arbitration Costs (see §16 Costs Submissions).

197. In summary, therefore, the Tribunal allows the Claimants' Legal Costs as follows:

    (1)    Heading (a) – Preparation and drafting documents: allowed in full – US$69,875

    (2)    Heading (b) – Attendance on opponent: allowed in full – US$8,355

    (3)    Heading (c) – Attendance on client and witnesses: allowed in full - US$56,465

    (4)    Heading (d) – Attendance on LCIA and Tribunal: allowed in full – US$9,615

    (5)    Heading (e) – Preparation for and attendance at hearings: allowed in full – US$50,085

    (6)    Heading (f) – Disbursements and travel costs: Arbitration Costs excluded, otherwise allowed in full – US$70,945.32

    (7)    Heading (g) – Attendance on Counsel: allowed in full – US$21,790

    (8)    Heading (h) – Attendance on third parties: allowed in full – US$16,160

    (9)    Heading (i) – Costs incurred in foreign proceedings: partially allowed - US$86,098.77

198. The total costs awarded are US$389,389.09, of which 55% (US$214,164.00) is to be attributed to the Mazlin claim and 45% (US$175,225.09) is to be attributed to the Shireen claim.

E.5  Arbitration Costs

199. The Arbitration Costs in the proceedings, having been determined by the LCIA Court pursuant to Article 28.1 of the LCIA Rules, are as follows:

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £11,447.15 |
| Tribunal's fees and expenses | £54,064.66 |
| Final Costs of the Mazlin claim | £67,261.81 |

Any remaining deposits shall be returned to the Claimants.

200. The Tribunal finds that the Respondents shall bear the Arbitration Costs. On the basis that the Arbitration Costs have been funded by the Claimants, the Claimants are, therefore, entitled to an award that the Respondents shall be liable to the Claimants in respect of those amounts,

thereby replacing the Procedural Orders issued in the Mazlin claim and the Shireen claim, referred to in §61 above.

F. THE AWARD

201. Accordingly, the Tribunal hereby awards as follows:

    (1)   Mazlin is entitled to repayment of the monies advanced under the Mazlin Loan Agreement in the amounts of US$2,050,602.99 and US$2,850,088.60;

    (2)   Mazlin is entitled to simple interest on US$2,050,602.99 at 6% per annum from 1 December 2013 to 30 September 2015 in the sum of US$349,969.58;

    (3)   Mazlin is entitled to simple interest on US$2,050,602.99 at 10% per annum from 1 October 2015 until payment in full. As at the date of this award, such interest is payable in the sum of US$472,777.91, and continues at a daily rate of US$569.61;

    (4)   Mazlin is entitled to simple interest on US$2,850,088.60 at 6% per annum from 3 January 2013 to 30 September 2015 in the sum of US$470,739.63;

    (5)   Mazlin is entitled to simple interest on US$2,850,088.60 at 10% per annum from 1 October 2015 until payment in full. As at the date of this award, interest is payable in the sum of US$657,103.76, and continues at a daily rate of US$791.69;

    (6)   Mazlin is entitled to Legal Costs of US$214,164.00; and

    (7)   Mazlin is entitled to Arbitration Costs of £67,261.81.

202. Any remaining applications, claims or counter-claims are hereby dismissed.

Place of arbitration: London
Date: 23 February 2018

Kate Davies

Jonathan Crow QC

Guy Pendell



LCIA ARBITRATION № 173638

(1) SHIREEN MARITIME LIMITED
(2) MAZLIN TRADING CORP

Claimants

- and -

(1) WJ HOLDING LIMITED
(2) STUBRICK LIMITED

Respondents

**FINAL AWARD**
**Dated 23 January 2018**

The Arbitral Tribunal:

Jonathan Crow QC
Kate Davies
Guy Pendell

CONTENTS

| A. | Introduction | | p. 1 |
|---|---|---|---|
| | A.1 | The parties & their representatives | p. 1 |
| | A.2 | The arbitration agreements | p. 2 |
| | A.3 | The Awards | p. 2 |
| | A.4 | The procedural history of the conjoined claim | p. 2 |
| | A.5 | The procedural history of the separate arbitration claims | p. 10 |
| | A.6 | The oral jurisdiction and merits hearings | p. 28 |
| | A.7 | After the hearings | p. 29 |
| B. | The Facts | | p. 30 |
| | B.1 | The background | p. 30 |
| | B.2 | The valuations | p. 31 |
| | B.3 | The Agreement of Sale | p. 32 |
| | B.4 | The 2012 Privatisation Agreement & related agreements | p. 34 |
| | B.5 | The email of 11 July 2012 | p. 35 |
| | B.6 | The Loan Agreements | p. 36 |
| | B.7 | The Letter of Agreement | p. 39 |
| | B.8 | The Personal Guarantees | p. 41 |
| | B.9 | Mr Spiegel's visits to the plant | p. 43 |
| | B.10 | Payments made by the Claimants to the Respondents | p. 45 |
| | B.11 | The December 2012 draft Agreement of Sale | p. 47 |
| | B.12 | Correspondence in early 2013 | p. 49 |
| | B.13 | Power of Attorney | p. 51 |
| | B.14 | Health insurance | p. 53 |
| | B.15 | The failure of the Bender Oil project | p. 54 |
| | B.16 | The draft Operating Agreement & MIPA | p. 54 |
| | B.17 | Termination of the negotiations | p. 56 |
| | B.18 | Proceedings in Cyprus | p. 57 |
| | B.19 | Proceedings in New York | p. 58 |
| | B.20 | Conclusions on the facts | p. 61 |
| C. | The Jurisdictional Challenge | | p. 65 |
| D. | Remedies | | p. 67 |
| | D.1 | The capital sums | p. 67 |
| | D.2 | Interest | p. 67 |
| | D.3 | The appropriate creditor | p. 70 |
| | D.4 | Joint, or joint & several liability | p. 70 |
| E. | Costs | | p. 70 |
| | E.1 | Introduction | p. 70 |
| | E.2 | The costs of the conjoinder issue | p. 71 |
| | E.3 | The parties' conduct generally | p. 72 |
| | E.4 | The Claimants' Scehdule of Costs | p. 74 |
| | E.5 | The Arbitration Costs | p. 77 |
| F. | The Award | | p. 78 |

A. INTRODUCTION

A.1 The parties & their representatives

1.  Mazlin Trading Corp ("Mazlin") is a British Virgin Islands company, Company Number
    1644425, with its registered office at Trident Chambers, P.O. Box 146, Road Town, Tortola,
    British Virgin Islands.  Mazlin is the Claimant in LCIA Arbitration № 163503 ("the Mazlin
    claim").

2.  Shireen Maritime Ltd ("Shireen") is a Liberian non-resident corporation, registration number
    C-112456, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia.  Shireen
    is the Claimant in LCIA Arbitration № 173638 ("the Shireen claim").

3.  The Claimants' representatives in these arbitrations are:
    • Mr Stevie Loughrey, Onside Law, 23 Elysium Gate, 126-128 New Kings Road, London,
      SW6 4LZ.  Mr. Loughrey's email address is: stevie.loughrey@onsidelaw.co.uk.  His
      telephone number is +44 20 7384 6920 and his fax number is + 44 20 7384 1575.
    • Ms Anna Lintner, Enterprise Chambers, 9 Old Square, Lincoln's Inn, London WC2A
      3SR.

4.  The Respondents are:
    • WJ Holding Ltd ("WJ Holding") of Pamboridis Building, 45–47 Digenii Akrita Avenue,
      1070 Nicosia, Cyprus, with registration number HE104090.
    • Stubrick Limited ("Stubrick"), also of Pamboridis Building, 45–47 Digenii Akrita
      Avenue, 1070 Nicosia, Cyprus, with registration number HE268820.

5.  The Respondents are jointly represented by:
    • Ms Delphine Nougayrède, Solicitor of the Senior Courts of England & Wales, c/o
      Schneider Law Group, 150 Broadway, Suite 900, New York NY 10038, USA: Her
      telephone number is +1 212 804 8400 and her email address is dn@lawoffice-
      avocats.com.
    • Norair Babadjanian, Advocate (Russia) and Solicitor (England & Wales), Redstone
      Chambers, Smolenskaya Embankment 2-33, Moscow 121099, Russian Federation. His
      telephone number is +7 499 248 7278. His email address is nb@redstonechambers.com.

1

A.2  The arbitration agreements

6.   The Mazlin claim was commenced by a Request for Arbitration dated 21 November 2016[1] made jointly by Mazlin and Shireen in relation to (i) a written 'Revolving Loan Agreement (Secured)' between Mazlin and the Respondents dated as of 10 August 2012[2] ("the Mazlin Loan Agreement") and (ii) a written 'Revolving Loan Agreement (Secured)' between Shireen and the Respondents also dated as of 10 August 2012[3] ("the Shireen Loan Agreement" and, together with the Mazlin Loan Agreement, "the Loan Agreements").  The relevant part of clause 9 of each Loan Agreement provides as follows:

> *"Any dispute arising out of or in connection with the definitive agreements shall be referred to and finally resolved by arbitration under the LCIA Rules.  The number of arbitrators shall be three.  The seat, or legal place, of arbitration shall be London, the United Kingdom.  The language to be used in the arbitral proceedings shall be English."*

A.3  The Awards

7.   Identical Awards are being made in each of the Mazlin claim and the Shireen claim, save for the relief.  References in this Award in square brackets are to the documents contained in the bundles used at the concurrent oral jurisdiction and merits hearings on 28 and 29 November 2017.  Bundle 1 references are to the [bundle number / tab number / page number].  Bundle 2 references are to the [bundle number / page number].

A.4  The procedural history of the conjoined claim

8.   A Response to Request for Arbitration dated 13 January 2017[4] was submitted on behalf of WJ Holding and Stubrick in which, without prejudice to their challenge to the validity of the arbitration agreements and the jurisdiction of the Tribunal (§17), they (*inter alia*) –

   (1)   took issue with the ability of Mazlin and Shireen under the Rules of the London Court of International Arbitration 2014 as amended ("the LCIA Rules") to bring a single claim for arbitration in relation to the two separate Loan Agreements (§8 & §11);

   (2)   asserted that *"the Loan Agreements are not genuine commercial transactions but constitute sham agreements that were part of an elaborate scheme to document an equity investment that was made by ... Mr Alexander Spiegel"* (§9);

---

[1] [1/1].

[2] [2/371].

[3] [2/366].

[4] [1/2].

(3)   alleged that the "*original agreement*" that governs "*the real subject matter of this dispute*" was an Agreement of Sale dated 15 March 2012[5] ("the Agreement of Sale") made between WJ Holding and AMM Consulting and Management Group LLC ("AMM Consulting") "*together with other ancillary agreements*" which are subject to New York law (§10);

(4)   contended that the dispute that has arisen between WJ Holding and Stubrick (of the one part) and Mr Spiegel and his *alter ego* companies (of the other) is accordingly subject to the exclusive jurisdiction of the courts of New York (§10);

(5)   stated that proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§10); and

(6)   proposed that since the beneficial owner of the Claimants, Alexander Spiegel ("Mr Spiegel") and the beneficial owner of the Respondents, Yuri Drukker ("Mr Drukker") are both based in New York "*the proper venue for any arbitral hearings should be New York*" (§14).

9.   By email to the parties dated 23 January 2017, the LCIA required the Claimants and Respondents respectively to make a payment on account of costs in the sum of £10,000 each (*i.e.* a total of £20,000).

10.   By email dated 30 January 2017, the Respondents' legal representatives informed the LCIA that the Respondents declined to participate in funding the arbitration.

11.   By letter from the LCIA dated 23 February 2017,[6] the parties were notified of the identity of the Tribunal members who had been appointed.

12.   The Claimants replied to the Response to Request for Arbitration by letter dated 24 February 2017.[7]  In that letter, they asserted that they were entitled to commence a single arbitration with both Mazlin and Shireen as Claimants.  This question came to be known as 'the conjoinder issue'.

---

[5] [2/376].

[6] [1/23/221].

[7] [1/23/225].

13.   In light of the parties' respective positions in correspondence on the conjoinder issue, the Tribunal sent them an email on 1 March 2017[8] informing them that it was *"provisionally minded to give directions for the determination of the conjoinder issue as a preliminary issue"* and against that background invited the parties to discuss and if possible agree (i) whether it was expedient to determine the conjoinder issue first;  (ii) if so, what timetable should be laid down for the parties to present their full argument in that regard;  and (iii) whether the parties would wish the Tribunal to hold an oral hearing, or would be content for the matter to be determined on paper.

14.   The Claimants' legal representatives sent an email to the Respondents' legal representatives on 7 March 2017[9] inviting them agree to the arbitration proceeding with both Claimants, on the basis either that the Claimants were entitled (under the LCIA Rules) to proceed in that manner or, if not, the only result would be the continuation of the original claim with only one Claimant and commencement of a parallel arbitration by the other Claimant.

15.   The Respondents' legal representatives answered by email the same day,[10] saying that the Respondents' position remained as set forth in the Response, *i.e.* one of general jurisdictional challenge, and asserting that the two Loan Agreements formed part of a wider commercial dispute regarding an equity investment made by Mr Spiegel in a company called OJSC Bendersky Oil Extraction Plant (**"Bender Oil"**), a dispute in respect of which (the Respondents contended) the New York courts were the proper venue. They also submitted that the Claimants themselves acknowledged that the commercial reality was that the dispute was actually one between Mr. Spiegel and Mr. Drukker, who are both resident in the USA. They did not answer the Tribunal's question whether they were content for the conjoinder issue to be determined as a preliminary issue, either at an oral hearing or on paper.

16.   The Claimants' legal representatives sent an email on 9 March 2017[11] reiterating that their clients were entitled to bring a single arbitration under both Loan Agreements simultaneously, and agreeing that the conjoinder issue should be determined on paper as a preliminary issue.

17.   In light of the continuing disagreement between the parties on the conjoinder issue, and the Respondents' failure to explain whether they were content for the matter to be resolved as a

---

[8] [1/23/228].

[9] [1/23/230].

[10] [1/23/236].

[11] [1/23/235].

preliminary issue, the Tribunal sent the parties an email on 14 March 2017,[12] directing an oral
hearing to be convened in London for the purpose of determining the following questions:

> *(1)   Is the Tribunal precluded, by the LCIA Rules, from proceeding with this
> arbitration by reason of the fact that the claim seeks a determination in relation
> to two separate arbitration agreements between non-identical parties in
> circumstances where those parties do not consent to a consolidation?*
>
> *(2)   If the answer to Question 1 is "yes", can the current claim be amended
> pursuant to Article 22.1(i) of the LCIA Rules by the deletion of one Claimant
> (and its claim), such that the amended claim would then proceed only in the
> name of the other Claimant and only in respect of that Claimant's claim?*
>
> *(3)   If the answer to Question 2 is "yes", and if a separate arbitration claim were
> then also to be commenced by whichever Claimant had been amended out of the
> existing claim, would it be appropriate for the Tribunal to give matching
> procedural directions in both arbitrations, so that the common issues in each
> could be determined simultaneously?*
>
> *(4)   In any event,*
>
>> *(i)      should the Tribunal give directions for the determination, as a
>> preliminary issue, of the question whether the arbitration should be
>> stayed pending the final determination of any legal proceedings in
>> New York and*
>>
>> *(ii)     if so, what directions should be given?*
>
> *(5)   What, if any, further directions should be given for the efficient and final
> disposal of the issues between the parties?*

18.   By email dated 23 March 2017[13] the Tribunal was informed that the Respondents' legal
representatives "*have requested and received [their] clients' instructions to present [their] case
to the Tribunal, which of course does not imply that [they] consent to its jurisdiction*". In a
separate email the same day,[14] the Respondents' legal representatives repeated their assertion
that legal proceedings "*have already been initiated against Mr Spiegel*" in New York.

19.   The parties' respective legal representatives each provided written submissions, as directed, on
11 April 2017.[15] In summary:

> (1)   Mazlin and Shireen –

---

[12] [1/23/234].

[13] [1/23/239].

[14] [1/23/240].

[15] [1/3] and [1/4].

(i)    conceded that a joint claim by both companies could not proceed under the LCIA Rules without the Respondents' consent (§3–8),

(ii)   submitted that the Tribunal had jurisdiction to allow one Claimant to amend the Request for Arbitration by removing the other Claimant and proceeding with the amended claim alone (§9–10),

(iii)  confirmed that whichever Claimant was amended out of the joint claim would issue a separate Request for Arbitration, and invited the Tribunal to make matching procedural directions in each arbitration (§11–13), and

(iv)  submitted that the Tribunal should proceed to determine the arbitration claims, and not to stay them pending any determination of the proceedings apparently issued in New York (§14–19).

(2)    The Respondents not only served written submissions on the conjoinder issue[16] but also provided to the Tribunal an exhibit comprising a copy of certain legal proceedings between WJ Holding and Stubrick (plaintiffs) and Mazlin, Shireen, AMM Consulting and Mr Spiegel (defendants) apparently filed in the New York court, County of Kings, Index № 506949/2017 ("the **New York proceedings**"). The New York proceedings did not appear to have been issued on 8 December 2016 in New York County (as stated in §10 of the Response to Request for Arbitration[17]) but on 7 April 2017 in Kings County. The Respondents' written submissions –

    (i)    offered a 'Summary Presentation of the Facts' (§1–15) in which they alleged that: (a) Mr Spiegel and Mr Drukker *"agreed that Mr Spiegel would take an equity stake of 30%"* in Bender Oil *"and that the value of this stake would be US$7 million, corresponding to an enterprise valuation for [Bender Oil] of approximately US$20 million"* (§3); (b) *"the equity investment would be documented in a manner that would achieve certain specific structuring objectives for Mr Spiegel"* which Mr Drukker believed *"reflected certain tax and family estate planning considerations"* (§4); (c) the agreed structure implemented by Mr Spiegel for the purpose of his equity investment in Bender Oil consisted of (1) the March 2012 Agreement of Sale,[18] which would be the *"core agreement"* under which AMM Consulting *"would obtain 30% of the shares of [Bender Oil], in return for payment of a nominal price of US$210,000"* (§5(a)), (2) the transfer of the remaining equity investment

---

[16] [1/4].

[17] [1/2/7].

[18] [2/376].

by Mazlin and Shireen, which was documented by the two Loan Agreements which "*would be mere instruments to accomplish transfers of Mr Spiegel's funds to the companies owned by Mr Drukker as consideration for the 30% equity in [Bender Oil]*" (§5(b)), and (3) "*certain additional agreements*" (§7); (d) the "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013, i.e. after Mr Spiegel had satisfactorily completed his due diligence investigations into [Bender Oil]*" (§8); (e) Mr Drukker also invested over US$16 million into Bender Oil (§8); (f) neither Mr Drukker nor his wife ever agreed to provide, or ever signed, personal guarantees of the Respondents' liabilities under the Loan Agreements (§9); (g) as a result of the non-performance by certain Transdniestrian governmental authorities of various undertakings and guarantees they had given in a supplementary privatisation agreement signed with WJ Holding on 28 March 2012 ("**the 2012 Privatisation Agreement**"),[19] the Bender Oil project was not as successful as had been hoped (§10); (h) as he was aware of these developments, Mr Spiegel "*changed his tack*" and "*chose to disregard the real nature of the transaction and instead uphold the sham Loan Agreements of August 2012, as if these were genuine commercial transactions*" (§12); and (i) "*the Loan Agreements are null and void, that the arbitration agreements that are ostensibly included in these agreements are also null and void, and that instead, Mr Spiegel, through his affiliated companies, holds an equitable interest in 30% in the shares in [Bender Oil]*" (§15);

(ii)    offered a 'Presentation of Certain Legal Principles Affecting the Validity of the Loan Agreements and Arbitration Agreements' (§16–30), in which they submitted that (a) the Loan Agreements were 'shams' within the meaning of *Snook v. London & West Riding Investments Ltd* [1967] 2 QB 786, at 802 (§16); (b) the arbitration clauses could not be separated from the Loan Agreements in which they appeared and were accordingly also null and void (§17–18); (c) the principle of party autonomy in general, and Article V(1)(d) of the 1958 New York Convention in particular provide that an arbitral award cannot be enforceable unless the composition of the tribunal and the arbitral procedure are in accordance with the agreement of the parties, whereas in this case the Tribunal had been "*imposed on the parties at the sole demand of the Claimants*" (§19–20); (d) the Respondents did not consent to arbitration

---

[19] [2/343].

(§21); (e) the Loan Agreements "*did not reflect genuine loans, but were part of a larger equity investment made by Mr Spiegel*" which were "*governed by other contracts (and other dispute resolution clauses)*" (§22); (f) New York was "*the only proper forum*" for the resolution of the dispute (§23); (g) the arbitration agreement was null and void within Article II(3) of the New York Convention having been induced by Mr Spiegel's fraud and/or was unconscionable (§24–25); (h) the dispute did not fall within the arbitration clause (§27) and could not be resolved by arbitration (§28); (i) the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*" (§29–30);

(iii)   in answer to the 5 questions posed by the Tribunal, the Respondents submitted that (a) there was no jurisdiction under the LCIA Rules to hear a combined claim by Mazlin and Shireen without the Respondents' consent, which was not forthcoming (§31–49); (b) the existing Request for Arbitration could not be amended by removing one Claimant (§50–53); (c) the third question accordingly did not arise (§54); (d) the arbitration ought to be stayed in favour of the New York proceedings because (1) the arbitration did not properly reflect the wider dispute between the parties (§55); (2) the principle of *lis pendens* (§56) required the issues to be determined in the New York proceedings (§57–58), not least because the Agreement of Sale was subject to New York law and the "*equity related contracts were executed in New York*" and the "*dispute resolution clause in the last negotiated draft share sale agreement designates AAA arbitration with a seat in New York*" (§59); (3) both Mr Spiegel and Mr Drukker are citizens and residents of the USA (§60); (4) the factual circumstances central to the dispute are located in the USA (§60); (5) the power to compel disclosure in the arbitration would be inadequate when compared with the powers available in the New York proceedings (§60–62 & §64–65); and (6) the arbitration proceedings focused on the Loan Agreements, which were shams (§63); and

(iv)   in conclusion, the Respondents invited the Tribunal to give directions either (a) to discontinue the arbitration with immediate effect "*and the Claimants may be granted a leave [sic] to submit new requests for arbitration*" (§67), alternatively (b) the arbitration proceedings should be stayed until such time as discovery in the New York proceedings had taken place "*upon the reasonable expectation*" that the evidence obtained on discovery there "*will be relevant to the subsequent entertainment (by the Tribunal) of the*

*Respondents' principal claim"* that the Loan Agreements are shams, and the true dispute cannot be fully determined in the context of the arbitration (§68), (c) that the exchange of written submissions *"do not constitute determination of the jurisdictional issue at hand"* (§69–70), and (d) either the determination of costs should be deferred (§70) or the Claimants should be liable in costs for having improperly commenced proceedings in the joint names of Mazlin and Shireen under separate agreements (§71).

20.   Also on 11 April 2017, the LCIA issued a direction pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 20 April, a substitute payment of £10,000 in respect of the Respondents' share of the deposit.[26]

21.   On 21 April 2017, the Respondents' legal representatives provided to the Tribunal copies of four returns of service, one each in respect of Mr Spiegel, AMM Consulting, Mazlin and Shireen, as defendants in the New York proceedings commenced by WJ Holding and Stubrick on 7 April 2017.

22.   The preliminary oral hearing in the Mazlin claim was duly held in London on 24 April 2017, at which –

    (1)   the parties' respective legal representatives each made oral submissions in support of their arguments, as outlined above;

    (2)   the Respondents' legal representative also provided hard copies of a 25-page slide presentation headed 'The Respondents' Comments to Claimants' Submissions on 11 April 2017', which had not been supplied in advance;

    (3)   the Respondents' legal representative stated that the Respondents had no objection in principle (i) to two new and separate arbitration claims being made, one under each of the Loan Agreements, or (ii) to the appointment of identical arbitral tribunals in relation to each such claim, or (iii) to identical directions being given in each such arbitration, so that they could each be run and decided in parallel;

    (4)   however, (i) the Respondents refused to consent to the arbitration proceeding in its original form:  no reasoned explanation was offered for this approach (apart from the Respondents' reliance on the point of form under the LCIA Rules);  and (ii) the

_____
[26] [1/23/243].

ɩɔ

Respondents also refused to accept that one of the Claimants could be amended out of the arbitration.

23.   After careful consideration of the parties' respective written and oral submissions, the Tribunal issued Procedural Order № 1[21] ("Mazlin PO1") on 27 April 2017, determining that, on the correct interpretation of the LCIA Rules, (i) the Tribunal was precluded from proceeding with the arbitration in its then form (i.e. with both Mazlin and Shireen named as Claimants) by reason of the fact that the Request sought a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties did not consent to a consolidation, but (ii) the Tribunal could allow one Claimant to amend the Request so as to remove the other Claimant and its claim. The Tribunal directed (a) the Claimants to deliver an amended Request by 5:00 pm on 28 April 2017, deleting one of the Claimants and its claim and (b) the Respondents to deliver an amended Response within 28 days of the Tribunal's confirmation of its approval to the amended Request.

### A.5  The procedural history of the separate arbitration claims

24.   Under cover of a letter from the Claimants' legal representatives also dated 27 April 2017[22] –

   (1)   Mazlin duly delivered an Amended Request for Arbitration in the Mazlin claim,[23] deleting reference to Shireen and its claim, and seeking US$4,987,061 only under the Mazlin Loan Agreement, together with "*interest (including default interest) and its costs and expenses (including legal fees) of enforcing the Loan Agreements (plus interest on those costs and expenses)*" (§8);

   (2)   Shireen delivered a separate Request for Arbitration[24] in substantially identical terms to the Mazlin claim, save that the amount of the claim was US$3,786,500 under the Shireen Loan Agreement, together with an equivalent claim for interest, costs and expenses to that in the Mazlin claim;  and

   (3)   the Claimants' legal representatives submitted a suggested draft Procedural Order № 2 in the Mazlin claim, seeking directions leading to a determination of the merits of the claim together with the Shireen claim, and including (at §1) the following statement:

---

[21] [1/15].

[22] [1/23/249].

[23] [1/5].

[24] [1/6].

> *"The Parties confirm their acceptance that the Arbitral Tribunal comprising Mr Jonathan Crow QC, Mr Guy Pendell and Ms Kate Davies appointed by the London Court of International Arbitration ("LCIA") by notification to the Parties dated 23 February 2017 has been validly established in accordance with Clause 9 of the "Revolving Loan Agreement (Secured)" between Mazlin Trading Corp ("Mazlin") and (1) WJ Holding Ltd ("WJH") and (2) Stubrick Ltd ("Stubrick") made on 10 August 2012 (the "Agreement") and Article 5 of the LCIA Rules (as hereinafter defined)".*

25.   By email dated 28 April 2017,[25] the Tribunal –

   (1)   confirmed to the parties its approval of the Amended Request for Arbitration in the Mazlin claim pursuant to §13 of Mazlin PO1;

   (2)   directed the Respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed by the Claimants in their draft PO2 in relation to the Mazlin claim and, to the extent that they disagreed, the reasons for such disagreement;

   (3)   if and to the extent that the Respondents expressed any disagreement, the Tribunal directed that the Claimant in the Mazlin claim indicate in writing any response it might have by 5.00 pm on 10 May;

   (4)   indicated that the Tribunal would then determine whether to give any further directions in the Mazlin claim;   and

   (5)   stated that the Tribunal was not in a position to give any directions in relation to the Shireen claim unless and until the same panel had been appointed in relation to that arbitration.

26.   By letter dated 5 May 2017 from their legal representatives,[26] the Respondents –

   (1)   stated that they had no objection to the proposals set out in §1–16 of the Claimant's draft PO2 in relation to the Mazlin claim (*i.e.* including the paragraph quoted in §24(3) above);

   (2)   stated that they objected to any directions being given in relation to the Shireen claim;

---

[25] [1/23/251].

[26] [1/23/258]

11

(3)   proposed that the Respondents should deliver their Statement of Defence within four weeks after the close of discovery in the New York proceedings; and

(4)   proposed that all other procedural directions in the Mazlin claim should be dependent on the completion of discovery in the New York proceedings.

27.   By email dated 9 May 2017,[27] the Claimants' legal representative provided a detailed response to the Respondents' letter of 5 May and –

(1)   accepted that no directions could be given in relation to the Shireen claim until such time as the LCIA appointed an arbitral tribunal, and

(2)   submitted that the procedural directions in the Mazlin claim should not be deferred pending discovery in the New York proceedings.

28.   On 24 May 2017, the Respondents delivered their Responses to Arbitration in each of the Mazlin and the Shireen claims,[28] making essentially the same case as in their original Response dated 13 January 2017[29] (outlined in §8 above) and in their written submissions of 11 April 2017[30] (outlined in §19(2) above). In summary:

(1)   The Respondents maintained their position that (i) neither Loan Agreement is *"a genuine commercial transaction but constitutes a sham agreement that was part of an elaborate scheme to document an equity investment [in Bender Oil] made by ... Mr Alexander Spiegel"* and that *"the arbitration agreement in [each] Loan Agreement is also a sham"* (§9), (ii) the *"original agreement"* that governs *"the relationship between the parties"* was the March 2012 Agreement of Sale *"together with other ancillary agreements"* (§10), (iii) those agreements are subject to New York law (§11), (iv) accordingly, the dispute that has arisen between Mr Spiegel and his *alter ego* companies (on the one hand) and WJ Holding and Stubrick (on the other) is subject to the exclusive jurisdiction of the courts of New York (§12), (v) proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§13) and (vi) since the beneficial owners of the Claimants and the Respondents respectively are based in New York *"the proper venue for any hearings should be New York"* (§14).

---

[27] [1/23-262].

[28] [1/7] and [1/8].

[29] [1/2].

[30] [1/4].

(2) On that basis, the Respondents invited the Tribunal to find that (i) the Mazlin Loan Agreement "*is null and void*" being a "*sham*" (§40), (ii) the arbitration agreements in the Loan Agreements "*are also null and void*" (§41), (iii) the "*genuine dispute at hand ... involves an equity investment that was entered into by other parties and is governed by other contracts governed by New York law (and other dispute resolution arrangements)*" (§42), (iv) the 'genuine dispute' "*also involves a number of important oral arrangements between WJH and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*" (§43) and (v) "*since the issues, which the Claimant has referred to arbitration do not fall within the scope of the arbitration clause in the Loan Agreement, the Respondents are not bound by that arbitration clause*" (§46).

(3) Finally, the Respondents indicated that they did not object to the identity of the arbitrators (§52) but that they "*object to the jurisdiction of the arbitral tribunal*" and on that basis they would "*seek the relevant ruling from the tribunal by way of an award on the question of jurisdiction*" (§53).

29. On 25 May 2017, Mazlin lodged the substitute payment of £10,000 pursuant to the LCIA's direction on 11 April in relation to the Tribunal's costs and expenses of the Mazlin claim.[31]

30. By an e-mail sent to the parties on 30 May 2017,[32] the LCIA directed Shireen and the Respondents (together) to pay £10,000 each as their shares of the first deposit on account of the costs of the Shireen claim.

31. On 7 June 2017, the Tribunal issued Procedural Order № 2 in the Mazlin claim[33] ("Mazlin PO2") –

(1) giving those directions to which the parties had agreed (§5 & §15(1)–(16)), and in particular recording the fact (as confirmed in the Claimant's draft PO2 and in the Respondents' response dated 5 May 2017[34]) that the parties had confirmed their acceptance that the arbitral Tribunal appointed by the LCIA by notification to the parties dated 23 February 2017 had been validly established in accordance with Clause 9 of the Mazlin Loan Agreement and Article 5 of the LCIA Rules (§15(1));

---

[31] [1/23/268].

[32] [1/23/272].

[33] [1/16].

[34] [1/23/258].

13

(2)   declining to give any directions in the Shireen claim (§7);

(3)   giving detailed reasons for declining to stay the Mazlin claim pending completion of disclosure in the New York proceedings (§8–9); and

(4)   giving directions for the further conduct of the arbitration, including an exchange of disclosure by lists (§15(22)) and witness statements of fact (§15(23)), and culminating in a substantive jurisdiction and merits hearing (§15(27)–(29)).

32.   By email dated 8 June 2017,[35] the Respondents' legal representatives notified the LCIA that the Respondents declined to fund the costs of the Shireen arbitration proceedings.

33.   By email dated 9 June 2017,[36] the Respondents' legal representatives invited the Tribunal to reconsider Mazlin PO2, and in particular its refusal to stay the Mazlin claim pending disclosure in the New York proceedings.

34.   By letter dated 12 June 2017,[37] the parties were informed that the LCIA had appointed the same members to the arbitral Tribunal in respect of the Shireen claim as in relation to the Mazlin claim.

35.   Also on 12 June 2017, Shireen lodged £20,000 with the LCIA, comprising £10,000 on its own behalf pursuant to the LCIA direction given on 30 May 2017 together with a substitute payment of £10,000 in respect of the Respondents' unpaid contribution towards the Tribunal's costs and expenses of the Shireen claim.[38]

36.   On 15 June 2017, each of Mazlin and Shireen served their Statements of Case in their respective arbitrations,[39] reflecting the claims outlined in their Requests for Arbitration (outlined in §24 above), together with a proposed procedural order in relation to the Shireen claim containing matching directions to those given in relation to the Mazlin claim, and including equivalent wording (in relation to the Shireen claim) to that quoted in §24(3) above (in relation to the Mazlin claim).

---

[35] [1/23/271].

[36] [1/23/274].

[37] [1/23/279].

[38] [1/23/277].

[39] [1/9] and [1/10].

14

37. By email dated 16 June 2017, the Claimants' legal representatives invited the Tribunal to make matching procedural directions in each of the Mazlin and Shireen claims.

38. By email from the Respondents' legal representatives dated 18 June 2017, a request was made to the Tribunal to reconsider certain timetable deadlines in Mazlin PO2.[40]

39. By email dated 19 June 2017,[41] the Tribunal responded to the requests received from the Respondents' legal representatives dated 9 and 18 June in the following terms:

> *"In emails from their counsel dated 9 and 18 June, the respondents invited the Tribunal to revisit PO2, in particular with regard to the question whether further progress in this claim should be deferred pending disclosure in the NY proceedings, but also with regard to specific elements in the timetable.*
>
> *Before responding to the detail of the respondents' request, we would first make two important preliminary observations, after setting out the relevant procedural chronology:*
>
> 1. *Under cover of an email dated 27 April, the claimant's solicitors provided a draft PO2.*
> 2. *In an email dated 28 April, the Tribunal said this: "we direct the respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agree or disagree with the directions proposed in [the claimant's draft PO2] and, to the extent that they disagree, the reasons for such disagreement. If and to the extent that they express any disagreement, we direct that the claimant ... indicate in writing any response it might have by 5.00 pm on 10 May."*
> 3. *In accordance with the Tribunal's direction, the respondents duly provided their Response to the Claimant's Proposed Procedural Order No. 2 in a letter from their counsel dated 5 May.*
> 4. *The claimant then provided its response in an email from its solicitors dated 9 May.*
> 5. *Having carefully considered the parties' submissions, the Tribunal issued PO2 on 7 June.*
>
> *Our first preliminary observation is this. From the foregoing chronology it will be apparent that both parties had a full opportunity to comment on the proposed content of PO2 before it was issued. As a general rule, the Tribunal considers that, in the interests of (i) fairness between the parties (ii) the expeditious progress of the arbitration and (iii) minimising costs, it is undesirable for either party to try reopening an issue that has already been fully debated and ruled on by the Tribunal. Absent any express agreement by the parties to the contrary on any particular issue, the Tribunal has broad powers to order whatever procedure is appropriate to the circumstances of the case. Against that background, we do not consider that the respondents are justified in inviting the Tribunal to reopen PO2 on this occasion.*

---

[40] [1/23/285].

[41] [1/23/286].

15

*Our second preliminary observation is this. The heart of the respondents' complaint is that the procedure for discovery available to it in the New York proceedings is more wide ranging and imposes greater obligations on the claimant than any disclosure procedure which might be available to it in these proceedings. In view of this, it seems to be the respondents' contention (previously raised and ruled on in PO2) that these proceedings should only progress once the discovery phase of the New York proceedings is complete because material disclosed in the course of discovery in New York will or may be used in this arbitration. Having carefully considered the points raised by the respondents in this regard, the Tribunal does not accept either the contention made or its premise. The respondents contractually agreed to arbitrate all disputes arising out of the agreements at issue in these proceedings in London. They therefore agreed to the various rules and procedures which govern and apply to such arbitrations – with all the benefits and, in some cases, limitations which such proceedings entail. There is not – nor could there be – any suggestion that disclosure is not available in this arbitration. It is and it will be. To the extent such disclosure is different from (and less than) the disclosure that may be available to the respondents in New York, that is a limitation the respondents accepted when they agreed to arbitrate disputes arising out of the agreements at issue in these proceedings.*

*For these reasons, the Tribunal does not accept that it is appropriate to revisit its decision in PO2. Nevertheless, having received the respondents' detailed comments in their counsels' email of 9 June, and their further request of 18 June, the Tribunal has on this occasion taken the exceptional course of clarifying the reasons for its decision in PO2 by addressing the points raised:-*

1. *In relation to paragraph 9(1) of PO2, the respondents object to any "implied criticism" regarding delay. The respondents need not be concerned: as the context of that paragraph makes clear, the Tribunal's remark about delay was neutral as to either party's responsibility.*

2. *In relation to paragraph 9(2) of PO2, the respondents say that it "seems to effectively prejudge the outcome of the proceedings without affording the Respondents the benefit of due process". The Tribunal assures the respondents that it has not prejudged the outcome of any aspect of the proceedings. To clarify, paragraph 9(2) of PO2 merely summarised the nature of the pleaded claim, just as paragraph 2 summarised the nature of the pleaded defence. In considering a request regarding the necessity for disclosure (in these proceedings or any other), the Tribunal is fully within its powers (and required) to summarise on a prima facie basis the nature of the claims and defences in order to decide on the appropriate procedure as regards disclosure (and the timetable) going forwards.*

3. *The respondents say in relation to paragraph 9(3) that "on the one hand the Tribunal implies that the Respondents do not hold sufficient information to convince it that the New York proceedings are necessary, and on the other hand it effectively precludes the Respondents from obtaining the relevant information via the only sufficient means available to it, i.e., through the New York discovery process". The Tribunal refers to its preliminary observations above. The Tribunal is concerned with the progress of and procedure for this arbitration. Under its broad procedural powers, the Tribunal has dismissed the respondents' contention that disclosure in the New York proceedings is necessary before this arbitration can progress at all. That decision does not preclude the respondents from obtaining discovery either in the New York proceedings or in this arbitration in due course, nor from using disclosure obtained from either process in these proceedings (to the extent that is permitted by law). It also*

*does not preclude the respondents from making any application in the future as regards the timing of any final determination of the issues in this arbitration. In the meantime, the Tribunal has merely concluded in PO2 that service of the Defence and any Cross-claim should not be deferred until after completion of discovery in the New York proceedings.*

4. *The respondents say that paragraph 9(4) of PO2 "does not correspond to the facts" and they refer in particular to their submissions of 11 April 2017, sections 1-15, 18, 22, 55-65. The respondents make a similar point in relation to paragraphs 9(7) of PO2. The Tribunal was and is fully alive to the nature of the respondents' argument in this regard, and in particular paragraphs 55-65 of its 11 April submissions. However, it remains unpersuaded that this arbitration should effectively be stalled pending the completion of disclosure in the New York proceedings. The fact that Mr Spiegel and/or any corporate entities operated by him (rather than the claimants) may hold some documents which are relevant to the issues in dispute does not justify a complete standstill of these proceedings. The Tribunal refers to its second preliminary observation above about any limitations which may apply to disclosure in these proceedings. It also remains open to the respondents to utilise the procedures available to it in these proceedings.*

5. *In relation to paragraphs 9(5) and (6) of PO2, the respondents have now provided a fuller set of documents relating to the proceedings in New York. Nevertheless, we have still seen nothing issued there on 8 December 2016, nor any filed application for discovery. In any event, consistent with paragraphs 15(13), (14) and (16) of PO2, the Tribunal does not expect in future to receive information from the parties piecemeal in this fashion. The respondents were directed, on 28 April, to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed in the claimant's draft PO2 and, to the extent that they disagreed, they were required to set out their reasons for such disagreement. If and to the extent that they wished to bring the Tribunal's attention to the current state of the New York proceedings, they should have done so by 5 May by disclosing any relevant documents. Having said that, and having now reviewed the latest materials submitted by the respondents, we have seen nothing to alter the directions given in PO2.*

6. *In relation to paragraph 9(8) of PO2, the respondents point out that various sanctions would be available in the New York proceedings against Mr Spiegel and his corporate vehicles for breach of their discovery obligations which are not available in these proceedings. The Tribunal refers to its second preliminary observation above.*

7. *Finally, in relation to paragraphs 15(18), (22) and (23) of PO2, the respondents object that they are allowed only 14 days for the preparation of their Statement of Defence which, they say (in their email of 9 June) "seems very harsh on any standards (and is even harsher than the delay proposed by the Claimants in their draft of Procedural Order No 2 of 31 May 2015)". They also say (in their email of 18 June) that it is inconsistent with Article 15.3 of the LCIA Rules, and on that basis they again invite the Tribunal to revisit PO2. The Tribunal observes that the default timetable laid down in Article 15.3 is subject always to the Tribunal's discretion, as provided in Article 15.1 of the LCIA Rules. Absent agreement of the parties or any alternative timetable proposed by the respondents, it is entirely within the Tribunal's powers to direct the filing of the Statement of Defence within 14 days (in particular since the respondents have been in possession of the original Request for Arbitration since November 2016). In the*

> *meantime, it has always remained open to the respondents (i) to propose an alternative timetable (which, to date, they have not done), (ii) to seek to agree an extension pursuant to paragraph 15(13) of PO2, and/or (iii) to make a reasoned request for any extension pursuant to paragraph 15(1).*
>
> *For all these reasons, having carefully considered the respondents' latest submissions, we do not alter the directions set out in PO2 and in future we will require due compliance with its terms. We will also not entertain any similar attempts to re-open procedural decisions, absent a showing of exceptional circumstances. If the respondents propose that we should treat their counsel's email of 18 June as a request for an extension of time, we direct them to provide by 5.00 pm on Friday 23 June a reasoned request in writing within §15(14) of PO2 specifying the proposed revised date for delivery of the Defence and any consequential alterations to the timetable laid down in PO2."*

40. By separate emails also dated 19 June 2017,[42] the Tribunal invited the Respondents' submissions in answer to the Claimants' proposal for matching directions in the two arbitrations.

41. By emails from the LCIA dated 21 June 2017,[43] the parties in the Shireen claim were each directed to lodge a further £15,000 (*i.e.* a total of £30,000), and the parties in the Mazlin claim were each directed to lodge a further £20,000 (*i.e.* a total of £40,000), on account of the Tribunal's fees and expenses, in each case by 12 July 2017.

42. By email dated 23 June 2017[44] in relation to the Shireen claim, the Respondents' legal representatives stated that the Respondents *"do not object to the issuance of matching directions with LCIA No 163503 [i.e. the Mazlin claim] and do not have any comments on the proposed Procedural Order No 1"* (i.e. the draft procedural order in relation to the Shireen claim provided by the Claimants' legal representatives, as mentioned in §36 above).

43. On 29 June 2017 the Tribunal accordingly issued Procedural Order №3 in the Mazlin claim[45] ("Mazlin PO3"), directing that –

    (1) the purpose of the directions was to ensure that the Mazlin claim and the Shireen claim proceeded in parallel, with as little delay and added cost as reasonably practicable, with a view to any evidential hearing and any oral arguments being heard in each concurrently;

---

[42] [1/23/290] and [1/23/291].

[43] [1/23/293] and [1/23/294].

[44] [1/23/296].

[45] [1/17].

18

     (2)   to that end, the procedural timetable in each would thereafter be identical; and

     (3)   the Statements of Case, witness evidence and documents in one case should stand as part of the record in the other.

44.   On the same day, 29 June 2017, the Tribunal also issued Procedural Order № 1 ("Shireen PO1") in the Shireen claim,[46] (i) recording the parties' acceptance of the appointment of the Tribunal (§4) and (ii) tracking the equivalent directions as in Mazlin PO2 and Mazlin PO3 (§5–32).

45.   Also on 29 June 2017, the Respondents served their Statements of Defence in each of the Mazlin and Shireen claims[47] –

     (1)   making essentially the same case as they had made in their original Response dated 13 January 2017[48] (outlined in §8 above), in their written submissions dated 11 April 2017[49] (outlined in §19(2) above), and in their Responses dated 24 May 2017[50] (outlined in §28 above), and in addition –

     (2)   attaching numerous documents on which they relied in support of their case;

     (3)   specifically identifying an Operating Agreement[51] ("the Operating Agreement") and a Member Interest Purchase Agreement[52] ("the MIPA") as having been *actively negotiated by the parties*" during 2013 and 2014 (§24 of the Defence to the Mazlin claim and §25 of the Defence to the Shireen claim);

     (4)   relying on certain health insurance agreements (§27), a Power of Attorney[53] (§28) executed by Mr Spiegel in favour of Sergey Rashkov ("Mr Rashkov"), and certain email exchanges on 23 September 2013[54] (§29) as evidence of the concluded nature of Mr Spiegel's agreement to acquire a 30% equity interest in Bender Oil;

---

[46] [1/18].
[47] [1/11] and [1/12].
[48] [1/2].
[49] [1/4].
[50] [1/7] and [1/8].
[51] [2/417].
[52] [2/456].
[53] [2/411].
[54] [2/409–410].

(5)   alleging that each Claimant was estopped from "*acting as if the Loan Agreement was a genuine document*" (§51 of the Defence to the Mazlin claim and §52 of the Defence to the Shireen claim);

(6)   denying that the Respondents are jointly and severally liable under the Loan Agreements (§52 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(7)   admitting that (i) "*On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000*" (§54 of the Defence to the Mazlin claim), (ii) "*On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000*" (§55 of the Defence to the Mazlin claim), and (iii) "*On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500*" (§53 of the Defence to the Shireen claim);

(8)   alleging that the sums transferred in Swiss Francs should be converted to US Dollars on the date of repayment, not on the date of transfer to the Respondents (§54 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(9)   disputing the Claimants' interest calculations (§56 of the Defence to the Mazlin claim and §54 of the Defence to the Shireen claim);

(10)  denying that certain relief allegedly obtained in Cyprus against the Respondents was binding (§81-84 of the Defence to the Mazlin claim, §79-82 of the Defence to the Shireen claim);

(11)  on that cumulative basis, alleging (in §38 of the Defence to the Mazlin claim and §37 of the Defence to the Shireen claim) that (i) the Loan Agreements were shams, (ii) the nullity of the Loan Agreements also affected the arbitration clauses, (iii) the actions of Mr Spiegel convinced the Respondents that the Bender Oil investment was an agreed joint equity investment, on which basis the Respondents entered into the Loan Agreements, and (iv) the New York proceedings were the only proper forum, because the arbitrations could not resolve the wider dispute involving other parties; and

(12)  in conclusion, seeking (i) a stay of the arbitrations in favour of the New York proceedings (§85 of the Defence to the Mazlin claim and §83 of the Defence to the Shireen claim);  alternatively (ii) rejection by the Tribunal of each and every claim advanced by the Claimants and a declaration that the Loan Agreements (and the arbitration clauses contained therein) are null and void *ab initio* (§86 of the Defence to the Mazlin claim and §84 of the Defence to the Shireen claim), and in any event (iii) an

order for the Respondents' costs and expenses, including legal fees (§87 of the Defence to the Mazlin claim, §85 of the Defence to the Shireen claim).

46.   By email dated 7 July 2017,[55] the Respondents' legal representatives informed the Claimants' legal representatives that the Respondents were declining to fund the arbitration costs. By emails dated 13 July 2017,[56] the Respondents' legal representatives similarly informed the LCIA that the Respondents declined to fund the arbitration costs of either the Mazlin or the Shireen claims.

47.   On 20 July 2017, Mazlin and Shireen served their Statements of Reply in each of their respective claims[57] in which they (*inter alia*) –

   (1)   denied (i) that the Loan Agreements were shams (§8(a)), and (ii) that Mr Spiegel improperly induced the Respondents to enter into the Loan Agreements (§8(b));

   (2)   relied on the entire agreement clause in the Loan Agreements as raising an estoppel against the Respondents (§8(b));

   (3)   denied that the Loan Agreements were void for want of consideration (§8(c));

   (4)   agreed that, during 2012/13, Mr Spiegel had been contemplating the acquisition of a 30% interest in Bender Oil, but denied that there had been any concluded and unconditional agreement to that effect (§9–19); and

   (5)   asserted that it was the Respondents' case in related proceedings in Cyprus that the Transdniestrian government which was party to 2012 Privatisation Agreement[58] was "*In repeated breach of its obligations, and has refused to close the privatisations program and release the shares [in Bender Oil] from the lien. As long as the lien still exists, no transfer of the shares in [Bender Oil] to third parties can occur*" (§21).

---

[55] [1/23/298].

[56] [1/23/301] and [1/23/302].

[57] [1/13] and [1/14].

[58] [2/343].

48.   On 28 July 2017, the Claimants lodged their due payments on account of arbitration costs of £15,000 in respect of the Shireen claim and £20,000 in respect of the Mazlin claim.[59]

49.   By emails dated 1 August 2017 from the Respondents' legal representatives, they repeated that the Respondents declined to fund the arbitration costs of either the Mazlin claim or the Shireen claim.[60]

50.   By emails dated 9 August 2017,[61] the LCIA issued directions pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 30 August, a substitute payment of £10,000 in respect of the Respondents' share of the arbitration costs in the Shireen claim and of £20,000 in respect of the Respondents' share of the arbitration costs in the Mazlin claim.

51.   On 24 August 2017, Mazlin and Shireen each made an application pursuant to Article 24.5 of the LCIA Rules by which they each sought an award against the Respondents for payment of the £10,000 substitute deposits paid by them to the LCIA on account of arbitration costs on 25 May and 12 June 2017 respectively ("the 1st Article 24.5 Applications").

52.   By emails dated 1 September 2017, the Tribunal invited the Respondents to make any submissions in answer to the 1st Article 24.5 Applications by 14 September 2017.

53.   By emails dated 6 September 2017[62] (i.e. the day before disclosure was due under §15(22) of Mazlin PO2 and §25 of Shireen PO1) the Respondents' legal representatives stated as follows:

   *"We have been instructed to inform the Tribunal and the Claimant that the Respondents shall not be submitting any disclosure list, and that they will decline to produce any documents that might be requested by the Claimant in the context of these arbitration proceedings. The reason, as the Tribunal would hopefully appreciate, is that the disclosure of documents in these proceedings may cause irreparable harm to the position of the Respondents in the New York proceedings, which the Respondents believe are the only proper venue for this dispute.*

   *As regards the Claimant's application of 24 August 2017, the Respondents thank the Tribunal for its invitation to submit a response by 14 September. For the same reason as that stated above, i.e. the Respondents' view of New York <u>as prevailing venue</u> for the resolution of this dispute, they decline to submit any such response"* (emphasis added).

---

[59] [1/23/305] and [1/23/306].

[60] [1/23/307] and [1/23/308].

[61] [1/23/309] and [1/23/310].

[62] [1/23/313] and [1/23/314].

54.   Under cover of emails dated 7 September 2017, the Claimants' legal representatives provided disclosure by lists.

55.   By emails dated 21 September 2017, the parties were informed that unless the substitute deposits ordered on 9 August 2017 were received from the Claimants, the Tribunal would not be proceeding with the arbitrations.

56.   By emails dated 5 October 2017 from the Claimants' legal representatives, the Tribunal was informed that the parties had agreed to defer exchange of witness statements to 16 October 2017.

57.   On 6 October 2017, Mazlin and Shireen lodged substitute payments of £20,000 and £15,000 respectively pursuant to the LCIA's direction on 9 August 2017 in relation to the arbitration costs. Mazlin and Shireen also each made a further application that day pursuant to Article 24.5 of the LCIA Rules seeking an award against the Respondents for those payments ("the 2nd Article 24.5 Applications").

58.   By email dated 10 October 2017, the Tribunal invited the Respondents to provide any submissions in answer to the 2nd Article 24.5 Applications by 18 October 2017.

59.   On 16 October 2017 –

   (1)   the Claimants served substantially identical witness statements from Mr Spiegel in respect of each arbitration;[63]

   (2)   the Respondents' legal representatives informed the Tribunal by email[64] *"that the Respondents will not be submitting any witness statement of fact. The reason is the same as that expressed in our email of 6 September 2017, i.e. the Respondents wish to preserve their position in view of the New York proceedings"*; and

   (3)   those emails also stated that the Respondents declined to file any response to the 2nd Article 24.5 Applications.

---

[63] [1/21] and [1/22].

[64] [1/23/323] and [1/23/324].

60.  Later the same day, the Respondents' legal representatives sent another email to the Claimants' legal representatives,[65] stating that the Respondents *"reserve their right to appear at the November hearing (in both cases)"*.

61.  On 21 October 2017, the Tribunal issued Procedural Order № 4 in the Mazlin claim[66] and Procedural Order № 2 in the Shireen claim,[67] granting the orders sought by the Claimants in each of the 1st and 2nd Article 24.5 Applications, but in the form of orders rather than awards in light of the Respondents' outstanding challenge to the Tribunal's jurisdiction at that time.

62.  By emails dated 14 November 2017,[68] the legal representatives of the Respondents stated as follows:

> *"On behalf of the Respondents, we inform the Tribunal and the legal representatives of the Claimant that the Respondents will not attend the hearing of 28/29 November, nor will they be represented.*
>
> *The position of the Respondents in relation to these proceedings and the underlying dispute remains that set forth in the Statement of Defence of 29 June 2017 (save in regard to costs, as set out below). We are informed that the status of the proceedings in the New York state court is as follows. Submissions were filed by both sides, the Respondents' submission of 22 June 2017 being attached as Exhibit 13 to the Statement of Defence. An oral hearing took place on 17 August, at which both sides were represented. The New York court has yet to render its decision regarding its jurisdiction and the Respondents' right to proceed with discovery. Until this decision is rendered the Respondents wish to preserve their position in the New York proceedings as a matter of priority over these proceedings.*
>
> *The Respondents will not be submitting their costs incurred in these proceedings and therefore withdraw their corresponding claim at Paragraph 87 of the Statement of Defence. As regards the costs that will be submitted by the Claimant, the Respondents wish to draw the Tribunal's attention to the circumstances that led to the hearing of 24 April 2017. That hearing took place to address the format of the Claimant's initial Request for Arbitration of 21 November 2016. In Procedural Order No 1, the Tribunal determined that it was precluded from proceeding on this arbitration in its then existing form, and the Claimant filed an Amended Request for Arbitration dated 27 April 2017. The issue of the format of the Request for Arbitration of 21 November 2017 [sic] was immediately raised by the Respondents in their Response of 13 January 2017 and this important procedural objection cannot be viewed as an unjustified attempt to delay or otherwise obstruct these proceedings. The Respondents believe that these circumstances should have bearing on the Tribunal's final decision in relation to costs"* (emphasis added).

---

[65] [1/23/325].

[66] [1/19].

[67] [1/20].

[68] [1/23/326] and [1/23/327].

63.     By emails dated 16 November 2017,[69] the Respondents' legal representatives asked for permission to retain a transcriber at the concurrent oral jurisdiction and merits hearings on 28 & 29 November.

64.     By emails also dated 16 November 2017,[70] the Tribunal informed the parties as follows:

> *"The Tribunal is in receipt of the email from the Respondents' representatives dated 14 November (i) indicating the Respondents' proposed non-attendance at the forthcoming oral hearing and (ii) containing the Respondents' submissions in relation to costs.*
>
> *Separately, the Tribunal is also in receipt of the Respondents' email dated 16 November 2017, requesting authorisation for a court reporter to be present at the oral hearing.*
>
> *It is convenient to deal with both at the same time.*
>
> <u>*Email of 14 November 2017*</u>
>
> *In light of (a) the agreed position of the parties, which is reflected in paragraph 15(1) of PO2, and (b) Articles 15.8, 15.10 and 19.1 of the LCIA Rules, the parties will be aware that the Tribunal is able to proceed with the arbitration and to make an award even if the Respondents choose not to participate in any stage of the proceedings and/or choose not to attend the oral hearing. In particular, and as noted in paragraphs 15 and 16 of PO4, the Tribunal has the jurisdiction conferred by Articles 23.1 and 23.4 of the LCIA Rules to rule on its own jurisdiction and, if it finds that it has jurisdiction, to make a pecuniary award under Article 26 notwithstanding the Respondents' non-attendance.*
>
> <u>*Email of 16 November 2017*</u>
>
> *The Tribunal has no objection to the presence of a court reporter at the forthcoming hearing. The Tribunal notes the agreement of the parties on the allocation between them of the attendant costs. The Tribunal would be grateful to receive copies of the transcript for their own use."*

65.     On 23 November 2017, MazJin's legal representatives served its Skeleton Argument, together with a Chronology, *Dramatis Personae*, List of Issues, Schedule of Costs and Submissions on Costs. It was disclosed in §7 of the Skeleton Argument that Shireen had apparently been dissolved on 30 October 2017, but that an application had been made for its restoration to the register in Liberia.

66.     In response to this development, the Respondents' legal representatives circulated an email on 24 November 2017 in the Shireen claim saying this:

---

[69] [1/23/329] and [1/23/330].

[70] [1/23/331] and [1/23/332]

"*We write in connection with the above-referenced proceedings (the "Shireen Arbitration"). The elements set out below relate to procedural matters only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*We note that despite the Tribunal's directions, the Claimant has not filed any preparatory submissions for a hearing scheduled for 28/29 November. In its skeleton argument of 23 November 2017 in relation to concurrent proceedings No. 163503 (Mazlin Trading Corp v WJ Holding Limited and Stubrick Limited), the Claimant's counsel informed the Tribunal that the Claimant (Shireen) no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017 it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017. An application has or is imminently to be made to the Liberian registry of companies, based in Virginia, for Shireen to be immediately restored to the register in order that it can pursue the Shireen Arbitration."*

*It was then added that "Until such restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of the Claimant, in favour of Mazlin Trading Corporation as third party (following an assignment of debt that took place on 30 October 2017). It was suggested in this communication that "Given that the "third person" in question here is the Claimant in the linked arbitration (163503) and as the Tribunal is of course aware both claims share the same factual matrix, the same defences and are to be heard together on 28 November, we do not anticipate this presenting an issue and so should be most grateful if the Tribunal would confirm its agreement to the same."*

*This would appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of the Claimant's corporate existence during certain phases of this arbitration and absence of any pre-hearing submissions in accordance with the Tribunal's directions. These complex procedural manoeuvres cannot be properly understood or assessed in such a short time frame, and a hearing cannot validly take place on 28/29 November 2017 in the Shireen Arbitration. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing.*"

67.  Later the same evening, the Respondents' legal representatives sent a further email in relation to the Mazlin claim saying this:

"*We write in connection with the above-referenced proceedings (the "Mazlin Arbitration"). The elements set out below relate to recent procedural developments only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

<u>*Hearing of 28/29 November 2017*</u>

*In its skeleton argument submitted on 23 November 2017, the Claimant's counsel informed the Tribunal that claimant company Shireen Maritime Limited in concurrent proceedings No 173638 (Shireen Maritime Limited v WJ Holding Ltd and Stubrick Limited, the "Shireen Arbitration") no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017*

26

*it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017 ."*

*It was then added that "Until [Shireen's] restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of Shireen, in favour of Mazlin Trading Corp as third party (following an assignment of debt that took place on 30 October 2017). It was also suggested in this communication that the claims in the Shireen Arbitration and Mazlin Arbitration should be heard together on 28/29 November.*

*The Respondents' interpretation of these developments in the Shireen Arbitration is that they appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of Shireen's corporate existence during certain phases of the Shireen Arbitration and absence of any pre-hearing submissions. It was submitted by the Respondents that these complex procedural manoeuvres could not be properly understood or assessed in such a short time frame, and that a hearing could not validly take place on 28/29 November 2017 in the Shireen Arbitration.*

*Pursuant to Procedural Order No 3 in this Mazlin Arbitration, the Tribunal directed that proceedings in the Mazlin Arbitration and in the Shireen Arbitration should "proceed in parallel, with as little delay and added cost as practicable, with a view to any evidential hearing and oral arguments being heard in each concurrently" (par. 1), and that "the procedural timetable in each shall hereafter be identical" (par.2). It would therefore appear that the defect having affected the conduct of the Shireen Arbitration (i.e. the dissolution of the claimant even if subsequently restored) must also affect the conduct of the Mazlin Arbitration.*

*On behalf of the Respondents, it is accordingly submitted that the hearing cannot take place on 28/29 November 2017 in the Mazlin Arbitration either. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing.*

<u>Claimant's Costs Submission</u>

*On 23 November 2017 the Claimant filed a short schedule of costs amounting to $635,845. The Respondents note the following:*

1. *The costs submitted (under the sole auspices of this Mazlin Arbitration) are very significant and represent not 3% of the claims as averred, but 12% of the Mazlin claim (of principal amount in the vicinity of $4 million). This cannot be considered a proportionate amount.*

2. *The Claimant did not distinguish between the costs related to the Mazlin Arbitration and those related to the Shireen Arbitration, which cannot be correct.*

3. *The hours submitted are provided in large blocks, in some instance of up to 102 hours, instead of granular increments of not more than several hours at a time (as would be customary), together with corresponding detailed chronology.*

4. *The Claimant seeks recovery of costs incurred in foreign proceedings, to which the jurisdiction of the Tribunal does not extend. The recovery of such costs must be governed by cost recovery laws in those foreign jurisdictions and by the proper fora.*

*The Respondents are accordingly of the view that the Claimant's costs submission is inadequate.*

27

*As a final comment, the Respondents' decision not to participate in disclosure and in the hearings scheduled for 28/29 November was based not only their in-principle view that the New York proceedings should prevail, but also in order to mitigate costs related to these London proceedings, including costs incurred by the Claimant. It was not intended to encourage an uncontested accumulation of costs."*

68.   By email dated 24 November 2017, the Claimants' legal representatives –

   (1)   informed the Tribunal that Shireen had been restored to the register earlier that day, and provided a copy of the Proclamation of Rescission of Dissolution;

   (2)   provided a copy of a Deed of Assignment dated 30 October 2017 by which Shireen assigned absolutely to Mazlin all sums due and owing to Shireen under the Shireen Loan Agreement, including for the avoidance of doubt Shireen's claim in this arbitration and the benefit and proceeds of any award or order herein, including costs;

   (3)   provided a copy of a Confirmation of Consent to Joinder under Article 22.1(viii) of the LCIA Rules, dated 24 November 2017, signed by each of Shireen and Mazlin;  and

   (4)   invited the Tribunal to make an order under Article 22.1(viii) joining or substituting Mazlin as Claimant in the Shireen claim.

69.   By emails dated 25 November 2017, the Tribunal invited the Claimants to provide any responses to the Respondents' emails of 24 November by 10:00 am on 27 November.

70.   By email dated 27 November 2017, timed at 16:47, the Respondents' legal representatives indicated that they *"will not be making any submission in regard to the application"* under Article 22.1(viii).

A.6   The oral jurisdiction and merits hearings

71.   The concurrent oral jurisdiction and merits hearings were conducted over 28 & 29 November 2017 at the IDRC, 70 Fleet Street, London EC4Y 1EU.  They were transcribed by Opus 2 International.

72.   As they had previously indicated, the Respondents did not appear and were not represented.

73.  The Claimants were represented by Anna Lintner, of counsel, and by Stevie Loughrey and James Hill of Onside Law.   Anya Freeman of Mr Spiegel's US attorneys was also in attendance, as was Mr Spiegel himself.

74.  At the commencement of the hearing the Tribunal indicated that, having considered the parties' submissions carefully, an order would be made, subsequently reflected in Procedural Order № 4 in the Shireen claim –

   (1)   joining Mazlin Trading Corp as a claimant in the Shireen claim, and

   (2)   providing that the Claimants are not required to serve an amended Request for Arbitration or any amended Statements of Case reflecting the addition of Mazlin as claimant.

75.  After the Claimants' counsel made certain opening submissions, Mr Spiegel gave oral evidence.  He affirmed both of his witness statements.[71]  He was asked some further questions by his own counsel, and he was then examined robustly and at some length by the Tribunal throughout the afternoon of the first day of the hearing.  In the course of that examination, the Tribunal put to Mr Spiegel the Respondents' case and the documents on which their Defences are based.

A.7  After the hearings

76.  By email dated 29 November 2017, the Claimants' legal representatives provided copies of certain documents that had been mentioned or handed up during the hearing, and also provided some interest calculations.   By email dated 11 January 2018, the Tribunal invited the Respondents to provide any response to those materials   The Respondents' legal representatives duly provided their response by email dated 15 January, taking issue with certain aspects of the Claimants' interest calculations.

---

[71] [1/21] and [1/22].

## B. THE FACTS

### B.1  The background

77.   It is common ground that –

(1)   the beneficial owner of Shireen and of Mazlin is, and always has been, Mr Spiegel;

(2)   the beneficial owner of WJ Holding and of Stubrick is, and always has been, Mr Drukker; and

(3)   Mr Spiegel and Mr Drukker were friends since childhood, having been brought up and gone to school in the same part of what is now west Ukraine.

78.   Mr Spiegel's evidence was, and the Tribunal accepts, that –

(1)   he emigrated to the USA in 1972, after which he established a number of business ventures, specialising since the early 1990s in former Eastern bloc countries;  and

(2)   Mr Drukker emigrated to the USA in about 1989, and he too has established a number of business ventures.

79.   It is common ground that Mr Spiegel has made, or caused to be made, a number of loans to companies owned and controlled by Mr Drukker over a period of at least 25 years.  This is admitted in §6 of the Respondents' Defences.[72]  The Respondents say that Mr Spiegel was a *"small bridge lender"*.  By contrast, Mr Spiegel says he lent in aggregate somewhere in the region of $40 million.  The Tribunal has no reason to doubt Mr Spiegel's evidence in this regard, and accepts it.

80.   Mr Spiegel's oral evidence at the hearing was that he also became a director of approximately three of the companies in which Mr Drukker had an interest.  There was, however, no established pattern of Mr Spiegel making equity investments in Mr Drukker's business ventures.

81.   Mr Drukker's ventures were for many years conducted in collaboration with a number of business partners (not including Mr Spiegel) under the umbrella of WJ Group.  One of its assets

---

[72] [1/11] and [1/12].

30

was the Bender Oil plant, a vegetable oil production facility in the Transdniestrian region of Moldova.

82.   It is not in dispute that Mr Drukker parted company from his former business partners in about 2011, after which he was left in sole ownership of WJ Holding, and through it the Bender Oil plant. The plant had not been operational for about 6 years, but he had plans to revive its production and turn it to profit. He approached Mr Spiegel to assist with the financing.

83.   The essential difference between the parties on the facts is this: Mr Drukker's case is that the two of them agreed a binding and unconditional deal under which Mr Spiegel would acquire a 30% equity stake in Bender Oil for $7 million, and the Loan Agreements were a sham mechanism to give partial effect to that equity investment, whereas Mr Spiegel's case is that the Loan Agreements reflected genuine loans, and although he spent a considerable amount of time and effort exploring the possibility of also making an equity investment, in the event there never was a concluded, unconditional agreement in that regard.

84.   That is the core factual issue on which both arbitrations turn. Its resolution demands a careful review of the evidence, and in particular a detailed consideration of the contemporaneous documentary record.

### B.2   The valuations

85.   Chronologically, the first document the Tribunal has seen is an Appraisal Certificate forming part of a valuation given by Industrial Consult SRL as at 8 December 2011.[73] It provides an appraisal of the market valuation of "*the properties (buildings and facilities) owned by [WJ Holding]*" comprising the tangible property of Bender Oil. It states that the plant is "*Not in use (mothballed)*". The Tribunal has not been shown the full valuation report, and does not know what information was provided to the valuer. The Certificate does not attempt to assess the net present value of Bender Oil based on its anticipated future business operations, merely the current market value of its tangible assets. Having said all that, it is the only valuation the Tribunal has been shown dating from 2011, and there are no apparent grounds for questioning its integrity. The value given is $637,830. The significance of this valuation is the light it casts on the parties' competing claims as to the nature of the deal between them. The Claimants say that it supports their case – namely, that the only discussions regarding a possible equity

---

[73] [2/333].

investment by Mr Spiegel were reflected in the Agreement of Sale,[74] which valued a 30% equity stake at \$210,000: that is in line with the Industrial Consult valuation. The Tribunal accepts that the valuation does lend at least some support to the Claimants' case in this regard, and that it is less consistent with the Respondents' case (which is that the parties put an enterprise value of about \$20 million on Bender Oil, of which there is no contemporaneous evidence whatsoever).

86.   The next document is another valuation certificate, this time from Actimob Consulting Ltd giving a valuation as at 1 January 2012.[75]   Once again, the Tribunal has only seen the certificate, not the underlying valuation report, and does not know what information was provided to the valuer.   The report is again a property valuation, not an assessment of the potential development value of the plant as a going concern.   Furthermore, the certificate states that "*we have not carried out building surveys, tests services, made independent site investigations, inspected woodwork, [or] exposed parts of the structure*".   Nevertheless, it remains the only other independent piece of evidence regarding the value of the plant at the time, and the Tribunal has no reason to doubt its integrity.   The valuation figure is \$1,516,580.   Mr Spiegel's evidence is that the reason for the increase in value over the month since the Industrial Consult valuation was that, in late 2011 the plant had no windows and no doors, the machinery had stood still for many years, and the grass was growing high all around the site.   Mr Drukker was trying to raise finance, and he spent considerable efforts and resources in reinstating the doors and windows, cleaning the machinery and cutting the grass to make it look like a viable project, and he procured a new valuation in January 2012 to reflect the added value his input had produced.   The Tribunal has no reason to doubt that evidence, and accepts it.

B.3   The Agreement of Sale

87.   The next document is the Agreement of Sale dated "*as of*" 15 March 2012.[76]   This is an agreement concluded between WJ Holding (*i.e.* Mr Drukker's company) and AMM Consulting (which, it is accepted by the Claimants, was one of Mr Spiegel's companies).   It was signed by Mr Drukker on behalf of WJ Holding, and by Mr Spiegel on behalf of AMM Consulting.[77]   The following provisions are relevant for present purposes:

---

[74] [2/376]

[75] [2/339].

[76] [2/376].

[77] [2/380].

(1)   The agreement recited that WJ Holding was the registered owner of 3,583 shares in Bender Oil, and that it wished to sell and AMM Consulting wished to buy 1,074 of those shares.

(2)   Clause 1 provided that WJ Holding agreed to sell, and AMM Consulting agreed to purchase, the 1,074 shares in Bender Oil *"upon the terms and conditions hereinafter set forth"*.

(3)   Clause 2 referred to Exhibit A (comprising an 'Appraisal' of certain 'assets' owned by Bender Oil) and Exhibit B (containing a description of various 'Contracts' setting out Bender Oil's and WJ Holdings' privatisation obligations) which were ostensibly attached to the agreement, but neither document has been produced to the Tribunal.

(4)   Clause 3 provided that the purchase price was to be $210,000, with $100,000 payable on or before 31 December 2012, and $110,000 payable on or before 1 June 2013.

(5)   Clause 5 provided that, at closing, WJ Holding would execute and deliver to AMM Consulting transfer documents and deeds of title in respect of the shares in Bender Oil.

(6)   Under clause 6, headed 'Representations and Warranties of Seller', WJ Holding was recorded as having represented and warranted that it had full power and authority to carry out and perform its undertakings and obligation provided in the agreement –

> *"except the condition precedent to the sale is [WJ Holding's] fulfilment of the privatisation requirements and prior authorisation of the Pridnestrovian Moldavian Republic ("PMR") government authorizing the said sale and registration of the Shares. [AMM Consulting] acknowledges that [WJ Holding] is not giving any warranty or representation on [WJ Holding's] ability to fulfil the privatization requirements and to receive necessary government approvals. In the event, [WJ Holding] will not be able to obtain said governmental approval by the end of 2013, this Agreement shall be rescinded and all funds refunded to [AMM Consulting]"*
> (emphasis in the original).

The Claimants submit, and the Tribunal accepts, that this means that the Agreement of Sale was not unconditional. Rather, it was conditional on the fulfilment of certain privatisation conditions, and on the grant of certain governmental consents.

(7)   Clause 8 laid down certain 'Conditions to Closing'. In particular, clause 8.2 provided that the obligations of WJ Holding to close were subject, *"at the option of [WJ Holding], to the ... (b) Ability of [WJ Holding] to complete all privatisation requirements with the PMR Republic"*. It is difficult to understand the intended effect of the words *"at the option of [WJ Holding]"* in this context, but the Tribunal considers it unnecessary to resolve that uncertainty.

33

(8)     Pursuant to clause 10, the parties agreed that "*the purchase price is based on the value of the Shares before [WJ Holding] will have invested additional funds to make the factory operational and to fulfil privatization requirements*". The Tribunal considers that this provision lends at least some further weight to the Claimants' case that the parties were proceeding on the basis that the value of Bender Oil was in the region of $630,000, not $20 million.

(9)     Clause 15 provided that the agreement was to be governed by, and construed in accordance with, the laws of the State of New York.

88.   Leaving aside the detailed terms of the agreement, it is also significant to note that it pre-dates by four months any document that has been produced discussing the possibility of a loan being made in relation to the Bender Oil plant. If, as the Respondents contend, there was a concluded, unconditional deal for Mr Spiegel to make an equity investment, and if the March 2012 Agreement of Sale was put in place as part of the mechanism for giving effect to that agreement, it is surprising that there is no documentary record at the same time of any loan being advanced or even discussed.

## B.4  The 2012 Privatisation Agreement and related agreements

89.   A fortnight after the Agreement of Sale was signed, the 2012 Privatisation Agreement[78] was signed on 28 March 2012 between the Transdniestrian Moldovan Republic ("the Moldovan government") and WJ Holding. Clause 1.1 provided that the agreement had been concluded "*with the aim of launching and conducting actual operations*" at the Bender Oil plant. Under clause 3, each of the Moldovan government and WJ Holding entered into a number of mutual obligations. The exact content and detail of those obligations is unimportant. What matters for present purposes is the fact that it is common ground between the parties that the Moldovan government failed to perform its obligations under this agreement.[79]

90.   On 3 May 2012, two further agreements were entered into:

(1)     The first was a loan agreement between Stubrick and Bender Oil in the sum of $1.5 million. The term of the loan expired on 10 December 2012.

---

[78] [2/343].

[79] See §32 of the Defence to the Mazlin claim [1/11:81] and §31 of the Defence to the Shireen claim [1/12:99].

(2)   The second was an Additional Agreement, made between Stubrick and WJ Holding, the effect of which appears to have been to treat the loan made by Stubrick to Bender Oil as if it had been a loan made by WJ Holding in discharge of part of its investment obligations under the 2012 Privatisation Agreement.

B.5  The email of 11 July 2012

91.   On 11 July 2012, Mr Spiegel sent an email to William Schneider, who is a US attorney and also Mr Drukker's son-in-law.  The subject of the email was stated to be 'Credit Line'.  The relevant parts of the email said this:

> *"Dear Bill,*
>
> *As per our consulting agreement I have found 2 potential companies willing to extend the credit line in operation [sic] in Moldova-Transylvania.*
>
> *Here are the company details*
>
> *1. Shireen Maritime Limited (Republic of Liberia) 80 Broad Street, Monrovia, Republic of Liberia ...*
>
> *2. Terms: credit line up to 4 mill. Interest rate 6%, 3 years, with a option [sic] for extension for 2 more ...*
>
> *The Loan agreement has to be standard for 3-4 pages covering all concerns (pledges, guaranties etc.)*
>
> *The second company details you will receive directly from Arla Weber ... but the terms the same [sic] except the credit line is 9 mill and the first trans by mutual agreement both sides.*
>
> *Please put together ASAP."*

92.   In his oral evidence, Mr Spiegel explained that he had a consulting agreement with WJ Holding under which he would earn commission if he introduced third party finance.  That appears to explain the language he chose to use in this email, which was clearly intended to suggest (wrongly) that Shireen and the 'second company' were unconnected with him.  While Mr Spiegel confirmed in his oral evidence that he did not in fact receive any commission in connection with the loans ultimately advanced, the Tribunal regards this dissimulation on his part as being discreditable, and it makes the Tribunal cautious about accepting uncorroborated oral evidence from him.

93.   Nevertheless, in light of (i) the timing of this email, (ii) the reference to an operation in Moldova-Transylvania, (iii) the identity of at least one proposed lender mentioned in the email with one of the lenders under the Loan Agreements, (iv) the similarity in the amounts of the proposed loans, the interest rate and the potential extension of the loan period to those that ultimately appeared in the Loan Agreements and (v) the fact that the Respondents themselves

assert in their Defences that "*at the time Mr Spiegel maintained an appearance of being unaffiliated*" to the proposed lenders,[80] Tribunal is willing to and does infer that (a) this email was discussing proposed funding for the Bender Oil project, (b) Mr Spiegel was at the time discussing the possibility of procuring loans (not an equity investment) from Shireen and another company, and (c) Mr Schneider was being tasked with preparing the necessary loan documentation, including personal guarantees.

94.     Furthermore, it is significant that the first documented mention of any potential loan was made in connection with corporate lenders which were ostensibly unconnected with Mr Spiegel. Although (as we know) the lenders were in fact his companies, and although (as we have said) his initial dissimulation in this regard does him no credit in broader moral terms, nevertheless in the context of the present dispute it happens to support the Claimants' case.  By contrast if, as the Respondents contend, the agreed deal in 2012 had been an equity investment by Mr Spiegel, disguised as a loan from companies owned and controlled by him, then it is difficult to see why he would have initially introduced those lenders to Mr Drukker under the pretence that they were <u>not</u> connected with him.

### B.6  The Loan Agreements

95.     The Loan Agreements themselves[81] are dated "*As of August 10, 2012*".  They are in materially identical terms to each other, save for the amount of each loan and the terms for the draw-down. Save where otherwise indicated below, the terms identified in this Award are the same in each agreement.

    (1)     Clause 1.1 provides that the loan was made "*for the purpose of inventory financing for the edible oil crushing facility*".

    (2)     Clause 1.2 provides that the borrowing "*shall be secured pursuant to the Security Agreement attached hereto as Exhibit A*".  There is no Exhibit A attached to either Loan Agreement.  Mr Spiegel's evidence is that the parties agreed that the loans would be secured by personal guarantees provided by Mr and Mrs Drukker.  The Respondents deny that there was any agreement for personal guarantees to be provided by Mr and Mrs Drukker, but they provide no alternative explanation nor any evidence of what the 'Security Agreement' referred to in the Loan Agreements might be.

---

[80]  See §15 of their Defences [1/11] and [1/12].

[81]  [2/366] and [2/371].

(3)   Clause 1.3 provides that interest shall accrue at 6% on the outstanding principal balance of each advance.

(4)   Clause 1.4 provides that each advance shall be made in certain fixed minimum amounts or multiples thereof, being $250,000 under the Shireen Loan Agreement and $1 million under the Mazlin Loan Agreement.

(5)   Clause 1.7 provides that requests for advances would be made by written or telephone requests.

(6)   Clause 1.9(a) provides that all payments by the borrower shall be made in US Dollars.

(7)   Clause 1.9(c) provides that: *"All calculations of interest hereunder shall be made on the basis of a 360 day year for elapsed [sic]"*.

(8)   Clause 1.10 provides as follows: *"If any Advances is [sic] not paid when due, Borrower shall, on demand by Lender, pay interest thereon from its due date until paid in full at a rate of ten percent (10%) per annum"*.

(9)   Clause 2 provides that all advances *"shall be repaid in full together with all interest, fees, and other sums due Lender [sic] on September 30, 2015"* with the lender having an option to extend the loan period for a further year.

(10)  Clause 3 contains certain representations and warranties on the part of the borrower.

(11)  Clause 4 contains certain positive covenants on the part of the borrower.

(12)  Clause 5 defines certain events of default.

(13)  Under clause 6, each party agreed *"to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement and Notes [sic]."* No actual 'Notes' appear to form any part of the contract.

(14)  The relevant part of clause 7 provides as follows:
      *"This Agreement and agreement [sic], document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto, and supersede all oral negotiations and prior writings in respect of the subject matter hereof."*

(15)  Clause 8 provides that the governing law shall be English law.

(16)  Clause 9 is the arbitration agreement, quoted in §6 above.

96.     There is some disagreement over the authorship of the Loan Agreements.   Mr Spiegel's
        evidence is that the documents were drawn up by Mr Schneider, who borrowed from various
        precedents available to his law firm.     The Respondents say that this is "*not [their]
        recollection*",[82] but they do not suggest who else might have drafted the documents.   The
        Tribunal is not persuaded that much turns on this particular aspect of the factual dispute, but
        nevertheless it accepts Mr Spiegel's evidence in this regard:

        (1)     Mr Spiegel is not himself a lawyer, and the Tribunal has seen no evidence to suggest
                that he instructed any lawyers to draft the Loan Agreements on his behalf.

        (2)     By contrast, Mr Schneider is a lawyer and he is also Mr Drukker's son-in-law.   He
                would have been well placed to draft the agreements.

        (3)     The email from Mr Spiegel to Mr Schneider dated 11 July 2012 (referred to in §91–94
                above) discussed the proposed contents of a loan agreement, and ended with the words
                "*Please put together ASAP*".   There is no documentary record of Mr Schneider having
                declined to do so.   This suggests he accepted the invitation from Mr Spiegel to draft the
                Loan Agreements.

        (4)     For the reasons discussed in §107 below, the Tribunal finds that Mr Schneider drafted
                the guarantees.   That makes it more likely that he also drafted the Loan Agreements.

        (5)     The formatting of the Loan Agreements lends some inferential support to Mr Spiegel's
                evidence because it suggests that the content of the agreements was cut and pasted from
                other precedents.   For example, the headings to clauses 1 to 7 inclusive are in capitals,
                whereas the headings to clauses 8 and 9 are in lower case.   Furthermore, as mentioned
                above, clause 6 refers to 'the Notes', when no notes formed any part of the transaction.

        (6)     There is a slight but noticeable difference between the Respondents' case in these
                proceedings and the evidence they have adduced in support of the New York
                proceedings.   As noted above, the Respondents' Defences say no more than that they
                have no recollection of Mr Schneider drafting the Loan Agreements.[83]   By contrast, in
                the New York proceedings Mr Drukker has sworn an affidavit dated 22 June 2017,[84] in
                which he says this: "*The two loan agreements were produced by Mr Spiegel.*"[85]   It does

---

[82] See §20 of their Defences [1/11] and [1/12].

[83] *Ibid* §20 [1/11] and [1/12].

[84] [2/533].

[85] See §17 [2/536].

not encourage the Tribunal's confidence in the integrity of the Respondents' case to see slightly varying accounts of the same factual issue.

(7)   In any event, the Respondents have offered no witness evidence in these proceedings. By contrast, Mr Spiegel has made a witness statement setting out his evidence in this regard, and he has also tendered himself for cross-examination.

(8)   In particular, Mr Spiegel's evidence was that he met Mr Schneider in a coffee bar in mid-August 2012 when Mr Schneider handed over copies of the draft Loan Agreements which he (Mr Schneider) had prepared. This evidence is to some extent corroborated by an exchange of emails between them on 10 August 2012[86] (which is the date of the Loan Agreements). Although the subject line of the emails is *"Re: Bendery Valuation – Part 2"* it is common experience that the subject matter of an email chain may evolve without the parties necessarily up-dating the subject line of their communications. In this instance, at 2:41 pm on 10 August 2012 Mr Spiegel was writing to Mr Schneider, asking: *"Then do we meet?"* Mr Schneider replied: *"I have been working on our stuff all morning ... I will try to finish in the AM and lets [sic] meet around 2 tomorrow. Will it work for you?"* Mr Spiegel replies at 3.22 pm *"Yes, Boss!!! anything good for you is good for me See you tomorrow at 2 (In Aroma?)"*.

97.   All of this tends to support Mr Spiegel's evidence that it was Mr Schneider who drafted the Loan Agreements.

B.7   The Letter of Agreement

98.   On 17 August 2012, a Letter of Agreement between AMM Consulting and WJ Holding was executed ("the Letter of Agreement").[87] The copy produced to the Tribunal is signed only by Mr Spiegel on behalf of AMM Consulting, but the Respondents state in their Defences that both parties executed the agreement.[88] It refers to the Agreement of Sale, and it states that AMM Consulting acknowledges that valuable consideration for WJ Holding entering into that agreement *"is continued consulting provided by the managing member of [AMM Consulting], [Mr Spiegel]"*. The agreement then continues as follows:

> *"Parties now agree that in the event [Mr Spiegel] stops providing consulting [WJ Holding], or any successor thereof, for any reason, including [WJ Holding] terminating [Mr Spiegel] for any reason at his sole and absolute discretion, [WJ*

---

[86] [2/580].

[87] [2/381].

[88] *Ibid* §22 [1/22] and [1/12].

*Holding] shall be entitled to terminate the [Agreement of Sale] and rescind the transaction by giving notice to [AMM Consulting] and paying a sum of two hundred and fifty thousand dollars (\$250,000) within thirty days of the Notice. In the event of rescission hereunder the payment of \$250,000 by [WJ Holding] to [AMM Consulting], [AMM Consulting] agrees to transfer any and all rights it may have had (including any rights to accrued dividends) back to [WJ Holding]".*

99.   It is common ground between the parties that the Letter of Agreement was intended to make provision for the re-transfer to WJ Holding of any equity in Bender Oil which had been acquired by AMM Consulting under the Agreement of Sale. On that basis, each side seeks to rely on the Letter of Agreement to support its case:

   (1)   For their part, the Respondents say that it supports their argument that Mr Spiegel agreed to acquire an equity interest in Bender Oil, otherwise there would have been no need to make provision for its re-transfer.

   (2)   In answer, the Claimants say that the consideration payable on re-transfer under the Letter of Agreement is consistent with the figure of \$210,000 in the Agreement of Sale, and is inconsistent with the Respondents' case that Mr Spiegel agreed to acquire a 30% equity stake for \$7 million.

100.   The Letter of Agreement provides at least some support for the Claimants' case, and it is less consistent with the Respondents' case, for a number of reasons:

   (1)   The Letter of Agreement talks only of the parties "*entering into*" the Agreement of Sale. It does not say either (i) that that agreement had been completed, or (ii) that AMM Consulting had in fact acquired any shares in Bender Oil, or (iii) that Mr Spiegel, through any corporate vehicle, had made an unconditional agreement to acquire an equity interest in Bender Oil. As such, it provides no support for the Respondents' case that there was an unconditional agreement for Mr Spiegel to enter into an equity purchase at all, let alone for \$7 million.

   (2)   On rescission of the Agreement of Sale, the obligation on AMM Consulting under the Letter of Agreement is "*to transfer any and all rights it may have had*". The most natural interpretation of the Letter of Agreement is accordingly that it was intended to work prospectively, imposing an obligation on AMM Consulting (on the occurrence of some future contingency) to transfer back to WJ Holding rights in relation to Bender Oil which, as at the date of the Letter of Agreement, AMM Consulting had not yet acquired.

(3)    The consideration payable under the Letter of Agreement on re-transfer makes sense in the context of a potential 30% equity investment for $210,000. It makes no sense in the context of an equity investment for $7 million.

### B.8  The personal guarantees

101.  Although the Loan Agreements were signed in early August, it is common ground that no moneys were advanced for several months. Mr Spiegel's explanation is that he was waiting for the personal guarantees to be signed by Mr Drukker and his wife. The Respondents deny that there was any agreement for personal guarantees.

102.  On 5 September 2012, Mr Spiegel sent Mr Drukker an email in Russian which has been translated as follows:

> *"I was very surprised that you still haven't talked to Marina. As I understood, the matter is urgent. We talked about it August 27. As you understand, until the documents are signed correctly, we won't be able to do anything."*

103.  Mr Spiegel's explanation for this email is that Marina is Mr Drukker's wife, and that this email was referring to the fact that Mr Drukker urgently needed money for the Bender Oil project (hence *"As I understood, the matter is urgent"*), but Mr Spiegel was not going to advance any funds until the personal guarantees had been signed by Mr and Mrs Drukker (hence *"until the documents are signed correctly, we won't be able to do anything"*).

104.  The next day, 6 September 2012, Mr Spiegel sent an email to Mr Schneider in Russian, the translation of which shows that the subject line was *"Personal guarantee"*. The body of the email says that Mr Spiegel thought *"we can mention Marina and Yura in one guarantee (without conditions and reservations) as the loan guarantors acting jointly and severally, and have it notarized in Moscow and sent to me by DHL"*. Mr Spiegel's evidence is that *"Marina and Yura"* was a reference to Mr and Mrs Drukker, and that he was talking in this email about the personal guarantees that Mr Schneider was meant to be drafting for them to sign in support of the loans to be made to WJ Holding and Stubrick under the Loan Agreements.

105.  The day after that, 7 September 2012, Mr Schneider sent Mr Spiegel an email under the subject line *"Guaranty"*. He said this:

> *"Attached please find the form of the guaranty. I have drafted this as a mere accommodation for WJ Holding, and do not represent any parties to the loan and guaranty agreements (neither Lenders nor Borrowers nor Marina Drukker nor*

*Yuri Drukker). I strongly recommend that you all review these documents with the counsel of your choice."*

106.  Attached to Mr Schneider's email were two draft guarantees in the names of Mr and Mrs Drukker, one in respect of WJ Holding's debt liability under the Shireen Loan Agreement, and one in respect of Stubrick's debt liability under the Mazlin Loan Agreement.

107.  The accumulation of evidence outlined above leads the Tribunal to accept Mr Spiegel's case in relation to these documents:

  (1)  Mr Spiegel has given witness evidence which provides a coherent explanation of the documents, and the documents are consistent with his account.

  (2)  It is particularly striking that Mr Schneider, who is Mr Drukker's son-in-law, drafted the relevant guarantees, and expressed no surprise at having been asked to do so.

  (3)  The fact that Mr Schneider says he was not acting for any of the parties does not detract from this inference in any way. Rather the reverse: having referred to *"the loan and guaranty agreements"*, Mr Schneider specifically advises the parties to obtain independent legal advice, which strongly suggests that he regarded the Loan Agreements as being genuine, and that the guarantees would be legally binding on Mr and Mrs Drukker when executed.

  (4)  The Respondents have offered no witness evidence to contradict Mr Spiegel's account.

108.  The existence of these draft guarantees, and the fact that Mr Spiegel was unwilling to allow any funds to be advanced under the Loan Agreements until the personal guarantees had been signed, provides further inferential support for the Claimants' case: if the funds to be advanced under the Loan Agreements had in truth been an equity investment, there would have been no need to hold back payment from the 'lenders', and there would have been no commercial purpose in obtaining personal 'guarantees' from Mr and Mrs Drukker.

109.  As to subsequent events, Mr Spiegel's written evidence is that: he met with Mr Drukker at a coffee shop in November 2012 where Mr Drukker signed the personal guarantees; Mr Drukker then took the signed guarantees with him to procure his wife's signature; Mr Spiegel did not keep a copy of the guarantee signed by Mr Drukker; Mrs Drukker then refused to sign the guarantees; and Mr Drukker and the Respondents have since denied that it formed any part of

the deal that Mr and Mrs Drukker would provide any guarantees, or that Mr Drukker ever signed them.

110.   The Tribunal accepts Mr Spiegel's evidence in this regard, for a number of reasons:

   (1)   The Loan Agreements refer to a 'Security Agreement'. As noted above, no explanation has been offered for that term other than as a reference to the intended guarantees.

   (2)   The fact is that no funds were advanced under the Loan Agreements for several months after their execution. The timing of the emails in September, followed by Mr Spiegel's account of his meeting with Mr Drukker in November, followed by the first transfer of funds in late November 2012, lend support to the Claimants' case that they would not advance any money until Mr Drukker had agreed to give the personal guarantees.

   (3)   The Respondents' case is that there never was any agreement to provide personal guarantees. For the reasons outlined above, the Tribunal has rejected that case. The Tribunal infers that the reason why the Respondents were keen to deny the existence of any agreement to provide personal guarantees is that (i) the moving spirit behind the Respondents is plainly Mr Drukker, and Mr Drukker was keen to deny having incurred any potential personal liability under a guarantee and (ii) the existence of a personal guarantee would have been more consistent with a true loan, rather than an equity investment.

   (4)   Mr Spiegel has given witness evidence and submitted himself to cross-examination on this issue. The Tribunal found his testimony to be consistent with the documentary record and convincing on this point.

   (5)   By contrast, the Respondents have offered no witness testimony, despite having filed a lengthy Response and Statement of Defence.

111.   For these reasons, the Tribunal is satisfied that Mr Drukker did sign the personal guarantees[89] in November 2012.

B.9   Mr Spiegel's visits to the plant

112.   The Respondents' case is that (i) the transfers of funds were made in late 2012 and early 2013 after Mr Spiegel had satisfactorily completed his due diligence investigations into Bender Oil,[90]

_____

[89] [2/385] and [2/387].

33

(ii) Mr Spiegel conducted that due diligence on site at Bender Oil's premises, (iii) when he visited the Bender Oil plant he was introduced as Mr Drukker's partner and as a shareholder in Bender Oil, and (iv) he participated in management decisions. They rely on this as evidence of Mr Spiegel having agreed to acquire a 30% equity interest in Bender Oil.

113. The Respondents' case in this regard is said to be supported by a document dated 14 December 2016,[91] apparently signed by a Mr M.M. Gurduza as a director of Bender Oil. That document is addressed "*To whom it may concern*". The Tribunal has seen no witness statement from Mr Gurduza. Nevertheless, the Tribunal has no reason to doubt that he signed the document in question. It says this (with numbering inserted for ease of reference):

> "*[1] We hereby confirm that during the period since 2012, from the commencement of actions to relaunch the factory after seven years of standstill, namely rebuilding, renovation and modernisation of Bender Oil Extraction Plant, Mr Alex Spiegel repeatedly visited, together with Mr Y.P. Drukker ...*
>
> *[2] Mr Alex Spiegel was introduced to us as the partner of Mr Drukker – shareholder of [Bender Oil]. On numerous occasions, they noted that any actions regarding repair, installation and acquisition of equipment, and for the future and as far as was known, all matters concerning the procurement of raw materials, processing of such materials and sale of finished products, would have to be reported to both of them for their joint approval.*
>
> *[3] On numerous occasions since 2012, Mr Drukker gave formal instructions for all reports relating to the economic activity of [Bender Oil] to be presented to Mr Spiegel in his capacity as shareholder.*
>
> *[4] In addition, during his visits to the factory, Mr Alex Spiegel took part in management meetings of [Bender Oil], and held separate meetings with the deputy director of [Bender Oil] in charge of economic and financial affairs.*"

114. Mr Spiegel's evidence is that he did indeed visit the plant during 2012, because he was keen to find out about the progress of the venture. He says that his motivation was mixed: (i) as a trained mechanical engineer, he was curious, (ii) he was thinking of making an equity investment, and (iii) since he did not hold copies of any personal guarantees from Mr and Mrs Drukker, he was anxious to monitor progress at the plant, with a view to doing what he could to protect his companies' interests under the Loan Agreements. As such, he largely accepts the content of the document quoted above, with the exception of §3.

115. The Tribunal's conclusions in relation to this document, and to Mr Spiegel's visits to the plant generally, are as follows:

[90] See for example §8 of their submissions dated 11 April 2017 [1/4] and §23 of their Defences [1/11] and [1/12].

[91] [2/494–495].

44

(1) To the extent that the document's content is admitted by Mr Spiegel, the Tribunal accepts it as accurate.

(2) To the extent that its content is not accepted by Mr Spiegel, it contains contested evidence from Mr Gurduza which has not been verified by a witness statement or tested by cross-examination. To that extent, the Tribunal cannot place any reliance on it.

(3) The fact that Mr Spiegel visited the plant and supervised some of its activities is consistent with each party's case: it is not consistent only with the Respondents' case that Mr Spiegel had entered into an unconditional agreement to take a 30% equity interest, whether for $7 million or at any other price; nor is it consistent only with the Claimants' case that the Loan Agreements genuinely reflected the bargain between the parties and that Mr Spiegel was merely exploring the possibility of making an equity investment.

(4) For these reasons, the Tribunal considers that the document, and the evidence regarding Mr Spiegel's visits to the plant, assists neither party.

### B.10  Payments made by the Claimants to the Respondents

116. The Respondents admit in their Statements of Defence that –

(1) "*On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000*";[92]

(2) "*On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500*";[93]

(3) "*On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000*".[94]

117. The Tribunal has also seen the following bank records:

(1) an account statement from Eurobank Cyprus Ltd dated 7 December 2012 relating to WJ Holding's account № 001-2011-00140829, which shows an amount of CHF 1,900,000 being credited to the account from Mazlin on 30 November 2012;[95]

---

[92] See §54 of the Defence in the Mazlin claim [1/11].

[93] See §53 of the Defence in the Shireen claim [1/12].

[94] See §55 of the Defence in the Mazlin claim [1/11].

[95] [2/582].

45

(2)    a Debit Advice from Bank Frey & Co AG dated 3 December 2012 reflecting a transfer of CHF 3,490,500 from Shireen to WJ Holding;[96]

(3)    an Inward Swift statement from Eurobank, Nicosia Main Branch, dated 3 December 2012 reflecting the receipt by WJ Holding of the CHF 3,490,500: against the line 'Details of Payment' it says *"Loan Agreement as per 10th of August 2012"*;[97]

(4)    a bank statement from Compagnie Bancaire Helvétique dated 12 May 2013 in relation to Mazlin reflecting a payment order dated 3 January 2013 to Stubrick in the sum of US$2,850,088.60.[98]

118.  Based on this material, the Tribunal finds that the following sums were received by the Respondents from the Claimants on the following dates:

(1)    on 30 November 2012 WJ Holding received CHF 1,900,000 from Mazlin;[99]

(2)    on 3 December 2012 WJ Holding received CHF 3,490,500 from Shireen;[100] and

(3)    on 3 January 2013 Stubrick received US$2,850,088.60 from Mazlin.[101]

119.  No evidence has been adduced of any requests having been made for draw-downs pursuant to the provisions of the Loan Agreements. It is therefore apparent that there was no strict adherence to those provisions, either in terms of (i) the currency (clause 1.1), (ii) the stipulated amount of each advance (clause 1.4) or (iii) the specified method for requesting advances (clause 1.7). The Respondents' case is that this non-compliance evidences the fact that the sums were advanced by way of an equity investment, and not as loans pursuant to the terms of the Loan Agreements.[102] In response, it was Mr Spiegel's evidence that the parties' actual

---

[96] [2/583].

[97] [2/584].

[98] [2/585].

[99] §10(a)(i) of the Statement of Case in the Mazlin claim [1/9] erroneously states that the transfer was made on 11 November 2012. Having seen the banking documentation referred to in §117 of this Award, we are satisfied that the Respondents are correct in saying (as they do in §54 of their Defence to the Mazlin claim [1/11/86]) that the transfer was effected on 30 November 2012.

[100] There is no dispute about this figure.

[101] In §55 of the Defence in the Mazlin claim [1/11] the Respondents say that only $2,850,000 was received, not $2,850,088. Nevertheless, having seen the bank statement at [2/585] we accept the Claimants' figure in this regard.

[102] See §21 of the Defences [1/11] and [1/12].

understanding was simply that he would advance the loan funds as and when they became available.

120. Having considered these competing arguments, the Tribunal does not find that the obvious non-compliance with the terms of the Loan Agreements in this regard is significant in resolving the factual issues in dispute. That non-compliance might be said to support the Respondents' case, but on the other hand it might be said simply to reflect the informal nature of the financial arrangements between two men who had known and trusted each other since childhood.

121. It is also significant to note the terms in which the Respondents have on occasion acknowledged the fact that these payments were made. For example, in §8 of their submissions dated 11 April 2017,[103] they admitted that "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013*" (emphasis added).

122. For these reasons, the Tribunal is in no doubt that (i) money was in fact paid by the Claimants to the Respondents respectively on the dates and in the sums listed in §118 above, (ii) the payments were so made ostensibly under the terms of the Loan Agreements and (iii) in all the circumstances of this case, the question whether those sums are now repayable turns on the answer to the question whether the Loan Agreements were shams, in the sense that the parties in fact agreed (as the Respondents contend) that any sums advanced in purported compliance with their terms actually represented an equity investment by Mr Spiegel in Bender Oil and would therefore not be repayable according to the tenor of the agreements.

B.11   The December 2012 draft Agreement of Sale

123. The final agreement relevant to the issues in dispute is a draft Agreement of Sale dated December 2012.[104] Like the executed Agreement of Sale from March 2012, it is concerned with an acquisition of a 30% equity interest in Bender Oil by AMM Consulting, but it differs from the earlier agreement in a number of respects:

    (1)   The seller is stated to be Mr Drukker personally, rather than WJ Holding.

    (2)   Clauses 2 and 6(a) recognise that WJ Holding may not be able to fulfil the privatisation requirements.

---

[103] [1/4/21]. It is also worth noting that in §16 and §18 of the Complaint in the US proceedings mentioned in §19(2) above and §151 below, the Respondents describe these payments as having been made "*under the sham Loan Agreements*" [2/505].

[104] [2/388].

(3)     Clause 3 provides that the purchase consideration shall be $500,000 (rather than the $210,000 stated in the March Agreement of Sale).

(4)     Under clause 7(e), AMM Consulting acknowledges that Mr Drukker and WJ Holding *"are not making and have not made any statement, representation or warranty to him or his advisors concerning (i) the fairness or adequacy of the Purchase Price"*.

124.   The existence of this draft document, together with the circumstances in which it was prepared, lend further support to the Claimants' case:

(1)     It is a fact that, by December 2012, no shares in Bender Oil had been transferred to AMM Consulting.

(2)     It is the Respondents' pleaded case that the Moldovan government was in breach of its obligations under the 2012 Privatisation Agreement.[105]

(3)     If Mr Spiegel had already committed unconditionally to acquire a 30% equity stake in Bender Oil, and if the March 2012 Agreement of Sale and the Loan Agreements had been created as the instruments ostensibly evidencing that agreement, there would have been no practical purpose in entering into another misleading Agreement of Sale.

(4)     If the agreed purchase price for the 30% equity stake had in truth been $7 million, there would have been no practical purpose in agreeing a variation of the purchase price from the $210,000 stated in the March Agreement of Sale to the $500,000 stated in the December draft.

(5)     The fact that a draft Agreement of Sale was being prepared in December 2012 supports the inference that the parties recognised that the March Agreement of Sale might expire pursuant to clause 6(a) without having been completed because the necessary governmental approvals were not forthcoming, and that as a result a replacement Agreement of Sale would need to be agreed if Mr Spiegel was to make an equity investment. That is inconsistent with the Respondents' case – namely, that Mr Spiegel had already concluded a binding and unconditional agreement to make an equity investment earlier in 2012.

(6)     Accordingly, both the existence and the contents of the December draft support Mr Spiegel's case that (i) he was considering and negotiating a possible equity investment, without having concluded any unconditional deal in that regard, and (ii) the plant was

---

[105] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

48

beginning to commence production and was, as a result, increasing in value as time passed, hence the proposed increase in price.

B.12  Correspondence in early 2013

125. On 3 January 2013, Gerard Virga, of Finkelstein & Virga PC (a law firm representing Mr Spiegel's interests), wrote to Mr Schneider (representing Mr Drukker's interests).[106] The first paragraph refers to "*the deal*", and paragraph number 1 states that "*AMM understands that it is purchasing a thirty (30%) percent interest in the entire operation*". This wording might be taken to imply that a deal had already been concluded. Furthermore, it is unlikely to have been a coincidence that the letter was written on the same day as the third and last transfer of funds was made (by Mazlin to Stubrick). As such, it might be thought to provide support for the Respondents' case.

126. Nevertheless, it is apparent from a fair reading of the letter as a whole that it is discussing a potential deal which was still in the process of negotiation, and had not been concluded:

   (1) In paragraph number 1, Mr Virga says this: "*We suggest that Delta Agro be a holding company owning 100%, directly or indirectly, of each of the companies constituting the operating group*" (emphasis added). Paragraph 5(A) says this: "*AMM may form a wholly owned entity to own its membership interest in the holding company prior to contract execution*" (emphasis added). It is therefore apparent that no agreement had even been reached as to the identity of the respective parties to any equity investment, or to the structure of the deal. That is inconsistent with the Respondents' case that a binding equity investment deal had already been concluded in 2012.

   (2) The second paragraph under numbered paragraph 1 says this: "*Apparently, WJ Holding owns a fifty (50%) percent interest in [Bender Oil]. The other fifty (50%) percent interest is held by Kelley Oil Refinery Ltd.*" It is therefore clear that the prospective purchaser was not even sure that the prospective seller was in full ownership of the target.

   (3) The following paragraph says this: "*Our understanding is that WJ Holding has an extensive history. We should attempt to isolate that history from this transaction. Please advise us of your thoughts on this area.*" This may have been a reference to the circumstances in which Mr Drukker parted company from his former business partners.

---

[106] [2/394].

49

At all events, it further evidences the fact that the negotiations for any acquisition by Mr Spiegel of an equity interest in Bender Oil were still at an embryonic stage.

(4)     Paragraph number 2 contains a string of questions and requests for assurances regarding Bender Oil's financial position. Paragraph number 3 says this: "*AMM expects representations and warranties that confirm the concepts set forth above*" (emphasis added). Paragraph number 4 says this: "*The PMR consent needs to be a closing condition*" (emphasis added). Together, these paragraphs all demonstrate clearly that the parties were still exploring the possibility and the terms of an equity investment. As such, they are entirely inconsistent with any unconditional deal having already been concluded for an equity investment by Mr Spiegel.

(5)     Paragraphs 5(B) to (I) contain a number of detailed proposed terms which had clearly not yet been agreed. Again, this is all entirely inconsistent with an unconditional deal having already been agreed.

127.    Mr Schneider replied by letter on 19 February 2013.[107]  He said that his understanding was "*that our respective clients had a number of follow up meetings*". That clearly suggests the parties were still in negotiation. The same inference is to be drawn from the letter as a whole. For example, it refers in numbered paragraph 1 to Mr Schneider's understanding "*that AMM is buying into a group of companies*" (emphasis added) – not that Mr Spiegel had already bought into Bender Oil. Mr Schneider refers later in the same paragraph to the "*draft agreements that I have provided in the past*" (emphasis added): if the March 2012 Agreement of Sale and the August 2012 Loan Agreements had in fact been intended by the parties to reflect a concluded and unconditional deal for an equity investment by Mr Spiegel, it is difficult to see why Mr Schneider would still have been providing draft agreements many months later. Having answered the various points raised in the letter from Finkelstein & Virga, Mr Schneider ends his letter by saying that he "*would be happy to sit-down with [Mr Virga] to discuss any remaining open items*" (emphasis added):[108]  the fact that he expressly acknowledges that there were open items is inconsistent with the Respondents' case that a concluded, unconditional deal had been made some months earlier.

---

[107]  [2/398].

[108]  [2/400].

### B.13  Power of Attorney

128. There was an exchange of emails between Mr Rashkov and Mr Schneider on 23 September 2013,[109] and Mr Spiegel executed a Power of Attorney in favour of Mr Rashkov dated 27 September 2013.[110]  The Respondents rely on these documents in support of their case.[111]  They allege that the Power of Attorney was executed by Mr Spiegel in order to enable Mr Rashkov to execute the anticipated agreements for the equity investment by Mr Spiegel, and that the emails confirm their story.  Mr Spiegel's evidence is that these documents were addressing other, unrelated prospective investments by him in the region.

129. The Power of Attorney[112] authorises Mr Rashkov to perform a number of actions on behalf of Mr Spiegel, including buying and selling "*shares or participation interest of any Moldovan enterprises*" (clause 1) and performing any actions and formalities "*related to the incorporation and registration of a limited liability company in the Republic of Moldova*" (clause 3).  The emails comprise the following exchange.[113]  Mr Rashkov emailed Mr Schneider saying this:

> "*Volodya, we also need:*
> *1. Certificate of registration of AMM*
> *2. Extract from the commercial register regarding AMM*
> *3. Document confirming the founders of the company all the way to physical persons (Beneficial owner)*
> *4. Decision of the competent body of AMM on the purchase of shares in Moldova*
> *5. Power of attorney or personal presence director [sic] of AMM*".

130. Mr Schneider emailed Mr Rashkov as follows:

> "*Sergey:*
> *See the attachments. Full package of documents for Mr Spiegel. He will purchase shares of the companies for AMM.  Please organise the translation of these documents. The originals are on their way to you.*"

---

[109] [2/409–410].

[110] [2/411–114].

[111] See §28 of the Defence to the Mazlin claim [1/11/81] and §27 of the Defence to the Shireen claim [1/12/99]. See also §24 of Mr Drukker's affidavit in the New York proceedings [2/538].

[112] The Respondents have provided an English translation [2/411–412] of the Russian original [2/413–414].

[113] The Respondents have again provided an English translation [2/409] of the Russian original [2/410]. It is not entirely clear which of the two emails came first. Neither one obviously answers the other. Furthermore, each party may have been in a different time zone when the messages were sent, so the apparent time of sending is not necessarily determinative. Moreover, the subject lines of the two emails do not match: the message from Mr Schneider is written under the heading "*FW:*" whereas the message from Mr Rashkov is under the heading "*HA:*". We have accordingly set them out in the order in which they appear on the page as an exhibit to the Respondents' Defences.

51

131.   Whilst these documents might appear to be consistent with the Respondents' case, the Tribunal finds it difficult to attach any weight to them, for a number of reasons:

(1)   First, neither the Power of Attorney nor the emails make any specific reference to the Bender Oil project.

(2)   Second, the Power of Attorney confers powers on Mr Rashkov well in excess of what would have been necessary simply in order to enable him to enter into a share acquisition agreement on behalf of Mr Spiegel.

(3)   Third, as the Respondents have been at pains to point out, both Mr Drukker and Mr Spiegel are resident in the USA, and the terms of Mr Spiegel's prospective equity investment in Bender Oil were negotiated between them and their respective US lawyers. In the circumstances, there is no obvious reason (and certainly none was suggested by the Respondents) why any share purchase agreement reflecting that equity investment would have had to be executed in Moldova.

(4)   Fourth, it is apparent from Mr Schneider's email message that he was sending Mr Rashkov a *"package of documents"*. If those documents had supported the Respondents' case, the Tribunal would have assumed that they would have been produced as an exhibit to the Defences, along with the covering email. They were not.

(5)   Fifth, Mr Schneider's email says that Mr Spiegel "*will purchase shares of the companies*" (plural). None of the documents that have been produced relating to the Bender Oil project involved Mr Spiegel (or any company owned and controlled by him) acquiring shares in more than one company.

(6)   Finally, even if the Tribunal had rejected Mr Spiegel's evidence in this regard, it would not have considered that either the Power of Attorney or the emails support the Respondents' case. In particular, they do not demonstrate that a concluded, unconditional deal for an equity investment was ever made. At most they might show that Mr Spiegel was putting in place a mechanism for executing the necessary documents if an investment deal were to be concluded. But the fact that he was putting such a mechanism in place is not evidence that an unconditional deal was in the event concluded.

132.   For these reasons, the Tribunal finds that the Power of Attorney of 27 September 2013 and the emails of 23 September 2013 do not assist the Respondents' case.

B.14  Health insurance

133. The Respondents allege that Mr Drukker arranged for health insurance for Mr Spiegel and his family (including his ex-wife), and that he paid them salaries through one of his New York companies, YD Export Import Inc.[114]  They have produced some Forms W-2[115] and a table prepared by Mr Drukker's accountant[116] both of which appear to evidence these payments.  The Respondents say that this is proof of the concluded nature of Mr Spiegel's agreement to acquire an equity interest in Bender Oil.[117]

134. Mr Spiegel agrees that he and members of his family were indeed notionally employed by one of Mr Drukker's companies and that they were enrolled in a health insurance plan.  However, Mr Drukker's evidence is that these arrangements only lasted a matter of months, and also that any salary paid to him and to members of his family was reimbursed by them.

135. The Tribunal accepts Mr Spiegel's evidence in this regard.  The accountant's table covers a period of less than a year during 2013, and the Forms W-2 appear to relate to the same payments.

136. In any event, the Tribunal does not consider that these arrangements are relevant to, or provide any support for, the Respondents' case in relation to the issues that have to be decided.  The payments are not expressly referable to Bender Oil, nor do they involve any of the corporate vehicles which were involved in the attempted operation of the plant.  Furthermore, there is no obvious reason why an equity investment would necessarily also have involved an employment contract or a health insurance plan in the first place, nor do the Respondents seek to explain why the Tribunal should draw the inference they suggest from the bare documentation they have produced.

137. For these reasons, the Tribunal does not consider that the evidence relating to health insurance assists the Respondents' case.

---

[114] See §27 of the Defence to the Mazlin claim [1/11/80] and §26 of the Defence to the Shireen claim [1/12/98].
See also §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

[115] [2/415–416].

[116] [2/401].

[117] See §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

B.15  The failure of the Bender Oil project

138.  It is common ground that the Bender Oil project was not a commercial success.  The Respondents attribute its failure to the non-performance by the Moldovan government of its various undertakings and guarantees under the 2012 Privatisation Agreement.[118]  For the purpose of these arbitration claims, it is unnecessary to make any findings as to the cause of the commercial failure.  The fact is that the project was not a success.

139.  The Respondents' case is that in these "*changed circumstances*" Mr Spiegel decided to try relying on the Loan Agreements according to their tenor, and "*purposely delayed the efforts to finalize the corporate documentation*".[119]  This wording is almost an admission by the Respondents that, even on their own case, there was no concluded contract for an equity investment by Mr Spiegel.  At all events, the Tribunal rejects the Respondents' argument that Mr Spiegel purposely delayed finalising any documentation.  The record demonstrates that the negotiations drifted on inconclusively.

B.16  The draft Operating Agreement & MIPA

140.  Each of the parties has sought to rely on the draft Operating Agreement[120] and the draft MIPA,[121] which were prepared at some point during 2014.  Each draft is more than 30 pages long.

141.  For an accumulation of reasons, the Tribunal considers that both the existence and the content of these documents support the Claimants' case:

    (1)  Neither party contends that the Operating Agreement or the MIPA was ever executed as a binding agreement.  They both remained in draft.  If there had been a concluded, unconditional deal in 2012 for Mr Spiegel to acquire a 30% equity interest in Bender Oil (whether for $7 million or at any other price), there would have been no need for the parties still to be negotiating detailed contractual documents nearly 2 years later.

    (2)  The parties to the draft Operating Agreement and MIPA were different from those in the 2012 agreements.  The parties to the draft Operating Agreement and MIPA included

---

[118] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99]. The 2012 Privatisation Agreement is at [2/343].

[119] See §33 of the Defence to the Mazlin claim [1/11/82] and §32 of the Defence to the Shireen claim [1/12/100].

[120] [2/417].

[121] [2/456].

Mr Drukker personally, and also a company called AMM Bender Holdings LLC ("AMM Bender Holdings"), a Florida entity which is different from AMM Consulting (the party to the March 2012 Agreement of Sale). Furthermore, the subject matter of the agreements was another Florida entity, Delta Agro Holdings LLC, not Bender Oil or WJ Holding (as in the March 2012 Agreement of Sale). In other words, even the underlying structure of the deal had still not been concluded.

(3)    Clause 8 of the Operating Agreement refers to the 'Initial Capital Contributions' of the parties by reference to the figures set out in Schedule A. The column headed 'Capital Contributions' in Schedule A is in fact blank. This clearly shows that some of the most fundamental provisions of the deal were still under negotiation.

(4)    More generally, the detailed terms of the draft Operating Agreement broadly reflect the terms under negotiation between Mr Virga and Mr Schneider in early 2013. This reinforces the inference that the parties conducted lengthy negotiations, and had not concluded any deal.

(5)    The Purchase Price stipulated in the MIPA for a 30% equity stake was $500,000 (the same figure as in the draft December 2012 Agreement of Sale[122]). This is again inconsistent with any pre-existing deal having been concluded at $7 million. Conversely, it also lends inferential support to the Claimants' case that any potential equity investment by Mr Spiegel was to be measured in hundreds of thousands of dollars, not in millions. The increase in price from the $210,000 stipulated in the March 2012 Agreement of Sale to the $500,000 proposed in the MIPA some two years later was presumably attributable to the fact that the Bender Oil plant, albeit not as profitable as hoped, had at least entered into production.[123] At all events, if the Loan Agreements had been shams, and the true price for the equity investment had been $7 million, there would have been no need for the parties to have negotiated an upward lift in the purchase price in 2014 from $210,000 to $500,000.

142.  Each of the draft Operating Agreement and the draft MIPA provide for the application of New York law, and for disputes to be resolved by arbitration in New York under the Commercial Arbitration Rules of the American Arbitration Association. This may explain the Respondents'

---

[122] [2/388].

[123] In his letter of 19 February 2013 [2/398], Mr Schneider had said this: *"It is my understanding that [Bender Oil] is now reaching desired operational capacity".*

repeated reference to "*other ancillary agreements*"[124] which are said to be governed by New York law and by "*other dispute resolution clauses*".[125] However, it is apparent that these drafts were never agreed or executed, and accordingly the Respondents' case in this regard cannot be sustained.

### B.17  Termination of the negotiations

143.  On 25 July 2014, Mr Virga wrote to Mr Schneider[126] saying that he represented AMM Bender Holdings, and continuing as follows:

> "*After attempting to negotiate the purchase of a thirty (30%) percent membership Interest in Delta since December 2012, AMM has concluded that further efforts are futile. AMM terminates negotiations.*
>
> *After approximately twenty (20) months of negotiations, basic issues are still not resolved. The "Group" entities are not formed, or at least not disclosed to us. A draft of the Disclosure Schedule has not been provided. The Seller still insists on qualifying each and every representation by Seller's knowledge and information contained in documents outside of the Disclosure Schedule that may have been provided or seen by AMM. The obligation to enforce the Privatization Agreements is so vague and discretionary that it is essentially meaningless. The above items are not meant to be exhaustive.*"

144.  This letter does not seem to have prompted any response from Mr Schneider either (i) denying any of the points made by Mr Virga or (ii) suggesting that Mr Spiegel (or AMM Consulting) had already entered into a binding deal in 2012. As a result, and in light of all the other evidence, the Tribunal's conclusion is that (a) the existence of this letter and the apparent absence of any reply supports the Claimants' case that no unconditional deal was concluded in 2012 (or at any other time) for the acquisition by Mr Spiegel (or any company owned and controlled by him) of a 30% equity stake in Bender Oil and (b) by July 2014 the negotiations for such an acquisition had stalled for the reasons outlined by Mr Virga (and not because of any deliberate obstruction on Mr Spiegel's part).

145.  The Tribunal has also seen a similar letter from Mr Virga dated 12 January 2015, addressed "*To Whom It May Concern*".[127] It is unclear whether this later letter was in fact sent to anyone, so

---

[124] See for example §10 of the Response to Request for Arbitration [1/2/7]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[125] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[126] [2/492].

[127] [2/493].

neither its content nor the apparent absence of any reply assists the Tribunal in resolving these claims.

### B.18  Proceedings in Cyprus

146.  In November 2016, Mazlin and Shireen apparently issued proceedings against WJ Holding and Stubrick in Cyprus, and on 30 March 2017 they obtained certain interim freezing and disclosure relief there.[128]  The interim nature of that relief meant that the Cypriot court did not conduct any substantive analysis of the merits of the underlying claim, and accordingly the Claimants cannot derive any support for their case in this Tribunal from the fact that such relief was granted.

147.  In his evidence in the New York proceedings, Mr Drukker alleges that an order was made by the Cyprus court on 30 March 2017 but was never served on Stubrick or WJ Holding because of Mr Spiegel's failure to post the necessary bank guarantees requested by the Cyprus court as security.[129]  The Tribunal has seen no evidence that the Cypriot court order was served on WJ Holding or Stubrick, but it does not accept Mr Drukker's evidence regarding the alleged failure to provide security to the Cypriot court.  The Tribunal has seen a copy of the court's order dated 30 March 2017[130] which recites on the first page that it was made *"following the deposit by [Shireen and Mazlin] of €150,000 each in cash to the Registrar of the District Court of Nicosia for covering any potential damages that may be suffered by [WJ Holding and Stubrick] due to the erroneous obtaining of the orders"*.  The Tribunal notes, however, that the order was only drawn up on 14 July 2017,[131] which was about three weeks after Mr Drukker had sworn his affidavit in the New York proceedings, so there may have been a delay in paying the necessary deposits.

148.  The Tribunal notes that, in its summary interim judgment of 30 March 2017, the Cypriot court recorded that *"neither side disputed the signing of the [Loan Agreements], and therefore their existence"*.[132]  That is consistent with the position taken by the Respondents in these proceedings.  The court also said this:

> *"On the basis of the submitted affidavit, and specifically, exhibit 9 (a letter sent by Mr Drukker's son in law which pertains to the form of the guaranty), the Court*

---

[128] Appl № 479/16 [2/496] and [2/569].

[129] See §32 of his affidavit in the New York proceedings [2/540].

[130] [2/569].

[131] [2/573].

[132] [2/498].

> *noted that the Respondents seem to admit the due amount and promise a repayment using damages from another action."*

149. The Tribunal does not seem to have been shown the letter to which the court was referring, and accordingly no significant weight can be placed on this passage from the court's ruling: but the least the Tribunal can conclude is that it certainly does not support the Respondents' case in these proceedings.

150. Separately, the Claimants have tried drawing attention to certain alleged breaches by the Respondents of the freezing relief granted by the court in Cyprus.[133] The Tribunal is not in a position to assess the evidence in that regard, it is not relevant to the findings in these proceedings and the allegations are discounted entirely.

### B.19  Proceedings in New York

151. As noted above, on 7 April 2017 WJ Holding and Stubrick commenced the New York proceedings[134] against Shireen, Mazlin, AMM Consulting and Mr Spiegel, seeking (among other things) *"a declaratory judgment that certain loan agreements between Plaintiffs and Defendants are not binding, and constitute unenforceable sham loan agreements"* and also *"a permanent injunction barring Defendants from continuing their efforts to enforce these sham loan agreements"* (§1 of the Complaint).  The Respondents' case in those proceedings is essentially the same as in these arbitration claims, namely that (i) *"[Mr Drukker] agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7,000,000"* (§12 of the Complaint);  (ii) the investment was structured as a loan to suit Mr Spiegel's *"tax and estate planning objectives"* (§13 of the Complaint);  (iii) the Bender Oil plant was not as successful as anticipated because the Moldovan Government failed to perform various undertakings and guarantees under the privatisation agreement, and also blocked WJ Holding from transferring any shares in Bender Oil to Mr Spiegel or his companies (§19 of the Complaint);  and (iv) Mr Spiegel thereafter started claiming that the Loan Agreements were genuine commercial transactions and purposefully delayed finalising the sale agreement (§20 of the Complaint).

152. It goes without saying that the resolution, as between the parties to the New York proceedings, of the various issues in those proceedings (including any question as to the court's jurisdiction)

---

[133] [2/512–532].

[134] Supreme Court of the State of New York, County of Kings, Index № 506949/2017 [2/501].

is a matter to be resolved only by the New York courts on the evidence adduced before them. It is equally stating the obvious to say that this Tribunal has jurisdiction to resolve the issues in these arbitral proceedings (including any question as to the Tribunal's jurisdiction[135]) as between the parties to these proceedings, on the evidence that has been adduced before the Tribunal. The only purpose in referring in this Award to the procedural steps taken and the evidence filed in the New York proceedings is to assess what light (if any) they throw on the determination by this Tribunal of the issues in these arbitral proceedings.

153. On or about 17 May 2017, the defendants in the New York proceedings (*i.e.* the Claimants in these arbitration proceedings, together with Mr Spiegel and AMM Consulting) appear to have filed a motion to dismiss the Complaint, although the Tribunal has not seen a copy of that motion.[136] What the Tribunal has seen is the affidavit sworn by Mr Drukker in response.[137] It tells essentially the same narrative and makes essentially the same allegations as the Respondents in this case, but there are some differences. In particular, in §14 Mr Drukker says this:

> "In or about early 2012 ... I agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7 million. [Mr Spiegel] also agreed to provide another $2 million in working capital."

154. The allegation regarding the agreement at $7 million is consistent with the case advanced by the Respondents in these proceedings. By contrast, the allegation regarding an agreement by Mr Spiegel to provide another $2 million in working capital has formed no part of the defence in these proceedings. Once again, the fact that the Respondents are advancing slightly different arguments in different proceedings does not inspire confidence in the integrity of their case. Having said that, the suggestion that Mr Spiegel agreed to provide $2 million in working capital might be said to go some way to provide an explanation on behalf of the Respondents as to why, according to their version of events, the agreed purchase price for the equity investment was $7 million, but in the event the Claimants between them transferred more than $8 million to the Respondents. That appears to be what Mr Drukker means in §21 of his affidavit, where he says that, between November 2012 and January 2013, "*Shireen and Mazlin transferred approximately $8 million under the sham Loan Agreements*" and adds this: "*The bulk of this amount was [Mr Spiegel's] equity investment*" (emphasis added). Nevertheless, the Tribunal considers that (i) the discrepancy between the Respondents' case in these proceedings and their

---

[135] See §164 below.

[136] It is mentioned in §25 of the affidavit of Frank R. Seddio dated 22 June 2017 [2/551].

[137] [2/533].

case in the New York proceedings, and (ii) the fact that there is indeed a significant difference between the alleged $7 million purchase price for the 30% stake and the amounts actually transferred by the Claimants further undermines the Respondents' case.

155. In §15 of his affidavit, Mr Drukker also says this:

> "Mr Spiegel told me, however, that he initially needed to structure his equity investment as a loan in order to achieve certain tax and estate planning objectives. This would be achieved by [Mr Spiegel] routing ostensible loans for [Bender Oil] through offshore companies and then restructuring or offsetting the debt. The parties were always clear that regardless of formal structure, the investment made by Mr Spiegel (through his companies) was an equity investment and the equity purchase price ... was $7 million" (emphasis added).

156. This is again broadly similar to the defence advanced by the Respondents in these proceedings, but (i) it is unsupported by any contemporaneous documentary record and (ii) it is inconsistent on two grounds with the email of 11 July 2012 discussed above,[138] in which (a) the proposed advance of funds was clearly described as a loan (not an equity investment); and (b) Mr Spiegel was (at least initially) pretending that the lending companies were not even associated with him.

157. In §16 of his affidavit, Mr Drukker states that Bender Oil "was worth in excess of $20 million" in March 2012. That is again consistent with the case advanced by the Respondents in these proceedings, but (i) the Tribunal has seen no documentary evidence to support it, (ii) it seems unlikely in light of the two valuations that have been produced,[139] and (iii) it also seems optimistic in light of the fact that the facility had been inoperative for about 6 years, and the machinery was very dated.

158. In §17 of his affidavit, Mr Drukker says that the Loan Agreements "were produced by Mr Spiegel". That positive assertion is inconsistent with the neutral assertion in §20 of the Respondents' Defences that it is "not [their] recollection" that the Loan Agreements were drafted by Mr Schneider. For the reasons discussed in §96 above, the Tribunal is satisfied that Mr Schneider did draft the Loan Agreements.

159. The Tribunal has also seen an affirmation dated 22 June 2017 by Frank R. Seddio, co-counsel for WJ Holding and Stubrick in the New York proceedings.[140] It tells essentially the same

---

[138] [2/365]; see §91–94 above.

[139] [2/333] and [2/339]; see §85–86 above.

[140] [2/543].

narrative and makes essentially the same allegations as the Respondents in these proceedings. The Tribunal notes, however, that insufficient care seems to have been taken in preparing the affirmation, as Mr Seddio consistently misspells his own client's name as 'Drucker', and he also claims, for example, that "*Mr Spiegel was already a partner in my business*" and refers to "*a record prepared by my account*"[141] – neither of which makes any sense coming from Mr Seddio's mouth. Clearly the text has been cut and pasted from a document drafted for Mr Drukker. In any event, the affidavit does not contain any first-hand evidence concerning the disputed factual issues which have to be decided, and as a result its content is not of any further assistance in resolving these claims.

160.   For these reasons the Tribunal has derived only limited assistance from the various materials disclosed from the New York proceedings in resolving the issues in these arbitral proceedings.

### B.20  Conclusions on the facts

161.   It will be apparent that the Tribunal accepts the Claimants' case and rejects the Respondents' case on the main factual dispute between the parties. In short, the Loan Agreements were agreed and executed as loan agreements, and not as shams to disguise an equity investment by Mr Spiegel.

162.   The Tribunal's principal reasons for reaching this conclusion may be summarised as follows:

   (1)   First, the Loan Agreements are clearly expressed as loan agreements, not as an equity investment. The starting point of any analysis is the assumption that the parties to any written contract intend to record in writing the bargain they have in fact made.

   (2)   Second, the Respondents have offered no witness or documentary evidence in support of their main contention, namely that the Loan Agreements were shams, having been agreed as 'loans' for tax and inheritance planning reasons.

   (3)   Even if the Loan Agreements had been structured as loans for tax and inheritance planning reasons, that in itself would not necessarily have rendered them shams, unless there had been some evidence that the purpose of the structure was to defraud relevant tax (or other) authorities. Structuring an investment to maximise its tax efficiency is entirely legitimate, assuming the structure is lawful. The Respondents have adduced no evidence of any unlawfulness.

---

[141] See §16 of the affidavit [2/548].

(4)  Mr Spiegel has given witness evidence and submitted himself to cross-examination (by the Tribunal) on these issues, whereas the Respondents, having made serious allegations of fraud against Mr Spiegel, have chosen to deploy no witness evidence at all, and to absent themselves from the hearing.

(5)  Having subjected Mr Spiegel to robust questioning, the Tribunal finds him to have been an essentially honest witness in relation to the issues in dispute (although not all of his conduct was necessarily creditable in a wider moral sense).

(6)  For the reasons outlined above, the Tribunal considers that Mr Spiegel's evidence is consistent with the contemporaneous documentation.

(7)  By contrast, there is not a single contemporaneous document which supports the Respondents' case either (i) that Bender Oil was valued at about $20 million in 2012, or (ii) that Mr Spiegel agreed to make an equity investment for $7 million, or (as noted above) (iii) that the investment was structured in the way it was to avoid (illegally) any tax obligations. Whilst the Respondents have made great play of the fact that they wish to pursue disclosure in the New York proceedings against Mr Spiegel personally and against AMM Consulting in order to verify their case, it is worth noting that neither of the Respondent companies, nor Mr Drukker nor Mr Schneider personally (both of whom could have been expected to assist the Respondents in any way available to them) has been able to produce a single document to support their primary case.

(8)  Furthermore, there is a significant discrepancy between the alleged agreement on which the Respondents seek to rely (i.e. an equity investment at $7 million) and (i) the aggregate amount of the loan facility under the two Loan Agreements (i.e. $17 million) and (ii) the amount of money actually transferred by the Claimant companies (i.e. over $8 million). Whilst there has been some suggestion from WJ Holding and Stubrick in the New York proceedings that they may seek to attribute this difference to a separate agreement by Mr Spiegel to make a further investment of $2 million by way of capital, (a) it is striking that that allegation has formed no part of the extensive pleadings and submissions made by the Respondents in these proceedings, (b) in any event it would not explain the difference between the combined value of the alleged equity and capital investments (i.e. $9 million) and the aggregate amount of the loan facilities (i.e. $17 million) and (c) it is again the case that there is no contemporaneous documentary support for the existence of any ancillary agreement by Mr Spiegel to advance a further $2 million. Furthermore, the Tribunal finds it undermines the Respondents' case that they have advanced varying arguments in these arbitration claims and in the New York proceedings.

(9)  Moreover, the Respondents' case is on analysis positively inconsistent with the documentary record in a number of respects. In particular, the March 2012 Agreement of Sale[142] was plainly conditional, and it is common ground that the conditions to completion were never satisfied. Furthermore, the fact that lengthy draft contracts were subsequently being negotiated throughout 2013 and until July 2014, and that those drafts involved different parties from those in the 2012 agreements, strongly suggests that no concluded, unconditional deal for an equity investment was ever agreed.

(10)  The Respondents have also made a number of other allegations which they have been unable to substantiate. For example, they have relied in their pleadings and submissions on "*other ancillary agreements*"[143] which they said were governed by New York law and by "*other dispute resolution clauses*".[144] They have also referred to "*a number of important oral arrangements between [WJ Holding] and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*".[145] However, on analysis it emerges that no written agreements (apart from the Loan Agreements and the March 2012 Agreement of Sale) were ever concluded; and the Tribunal has also seen no evidence to substantiate the allegation that there were any oral agreements that are inconsistent with the terms of the Loan Agreements and the March 2012 Agreement of Sale.

(11)  There is no suggestion that AMM Consulting ever paid, or that WJ Holding ever demanded, the $100,000 due on 31 December 2012 under clause 3 of the March 2012 Agreement of Sale,[146] or the further instalment of $110,000 due on 1 June 2013. If that agreement had (as the Respondents contend) formed part of the concluded bargain for an equity investment, it is difficult to see why neither side sought either to comply with or to enforce its terms.

(12)  As noted above, the sequence of events between the making of the March 2012 Agreement of Sale and the first documented mention of a loan in the 11 July 2012

---

[142] [2/376].

[143] See for example §10 of the Response to Request for Arbitration [1/2/7]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[144] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[145] See §43 of their Responses to the Claimants' Requests for Arbitration [1/7] and [1/8].

[146] [2/376].

email[147] is striking, as is the fact that that email was discussing the possibility of loans being made by companies unconnected with Mr Spiegel.

(13)   For the reasons outlined in §101–111 above, the Tribunal finds that (i) there was an agreement that Mr and Mrs Drukker would provide personal guarantees, (ii) Mr Spiegel caused the Claimant companies not to advance any funds until late 2012 because the guarantees had not yet been signed, (iii) Mr Schneider drafted and Mr Drukker signed the guarantees in November 2012, and (iv) the Claimants thereafter advanced funds to the Respondents. All of this is consistent with the funds having been advanced by way of loan, not as an equity investment.

(14)   The Respondents admit that, for a period of about 25 years, (i) Mr Spiegel had periodically made loans to companies controlled by Mr Drukker, (ii) all such loans had been provided pursuant to written agreements and (iii) they had been secured by personal guarantees from Mr Drukker and his wife.[148] That pattern of dealings is consistent with the Loan Agreements in these proceedings also being genuine loans.

(15)   The Respondents say that Mr Drukker injected about $15 million of his own money into the Bender Oil project.[149] It is notable that his evidence in the New York proceedings is that he invested that money *"through loans which I personally extended"*.[150] Although Mr Drukker emphasises that he has not sought repayment, the fact remains that he provided funding by way of loans, whereas he claims that Mr Spiegel agreed to invest by way of equity. If this was (as the Respondents contend) a joint venture between the two men, there would have been no obvious commercial reason (and none has been suggested by the Respondents) why Mr Spiegel would have agreed to make an equity investment of several million Dollars, while Mr Drukker (the initiator of the project) was only making loans.

(16)   Finally, Mr Spiegel's evidence is that neither the Respondent companies nor Mr Drukker ever claimed that the Loan Agreements were shams until after these arbitration proceedings had been commenced. There is certainly no documented record of any such claim having been made, and the Respondents have not pleaded that any such

---

[147] [2/365].

[148] See §47–49 of the Defence to the Mazlin claim [1/11] and §46–48 of the Defence to the Shireen claim [1/12]. Similar admissions are made with less detail in §6 of the Statements of Defence, and also in §2 of the Respondents' submissions dated 11 April 2017 [1/4], and in §21 of their Response to the Claimant's Amended Request for Arbitration in the Mazlin claim [1/7].

[149] See §31 of the Defence to the Mazlin claim [1/11] and §30 of the Defence to the Shireen claim [1/12].

[150] See §26 of his affidavit in the New York proceedings [2/539].

claim was made before the Request for Arbitration in November 2016. In the circumstances, the Tribunal accepts Mr Spiegel's evidence in this regard. That provides further inferential support for the conclusion that the Respondents' argument that the Loan Agreements are shams is a recent invention by them which has been raised in an attempt to resist the claim for repayment.

163.  For the reasons set out in this Award, the Tribunal has no hesitation in holding that the Loan Agreements were true loan agreements, and they were not shams intended to disguise an equity investment by Mr Spiegel. The evidence is overwhelming and the Respondents' case is, based on the evidence put forward, hopeless.

## C. THE JURISDICTIONAL CHALLENGE

164.  By virtue of Article 23.1 of the LCIA Rules, the Tribunal plainly has power to rule on its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the arbitration agreement.

165.  As noted above, the Respondents have advanced their jurisdictional challenge to these arbitration proceedings on a number of different legal bases. Their principal case is that the arbitration agreements are null and void because the Loan Agreements are themselves null and void. They also contend that the true bargain between the relevant parties was an equity investment by Mr Spiegel through his corporate vehicles, and that that bargain is governed by New York law and should be resolved in the New York proceedings.

166.  Irrespective of the various different legal labels that are applied to the jurisdictional challenge, it all turns on essentially the same factual allegation. For the reasons set out in Section B of this Award, the Tribunal rejects the Respondents' factual case on that issue. The Loan Agreements are not shams, and there was no binding, unconditional agreement by Mr Spiegel or any of his creature companies (whether governed by New York or any other law) to make an equity investment in the Bender Oil project. For this fundamental reason, the Respondents' jurisdictional challenge, in all its various guises (including the argument based on estoppel), is dismissed.

167.    It is also important to emphasise that there is no basis at all for the Respondents' allegation that this Tribunal has been *"imposed on the parties at the sole demand of the Claimants"*.[151]   The true position is that (i) the Tribunal has been duly appointed by the LCIA pursuant to the provisions of clause 9 of the Loan Agreements,[152] (ii) the Respondents admit that they executed the Loan Agreements,[153] and (iii) the Respondents accepted the Tribunal's appointment.[154]   The Tribunal having rejected the Respondents' evidential case that they only entered into the Loan Agreements on the understanding that they represented a cloak for an equity investment, there is no basis at all for the Respondents' challenge to the jurisdiction of this Tribunal.

168.    In the circumstances, the Tribunal also rejects the Respondents' contention that New York (rather than these arbitration  proceedings) is the natural forum for the resolution of a dispute between the parties.  That argument was based on the same factual allegations as the sham argument, namely the Respondents' contention that (i) an equity investment was negotiated in New York, (ii) both Mr Drukker and Mr Spiegel have properties there, and Mr Spiegel's sons (who are co-owners of AMM Consulting) also reside there, (iii) the March 2012 Agreement of Sale was executed in New York and is governed by New York law, as is the draft December 2012 Agreement of Sale and the 2014 draft Operating Agreement and draft MIPA, (iv) the agreements were negotiated in New York and were drafted by lawyers based there (Mr Schneider and Mr Virga), (v) the deal is evidenced by the health insurance agreements with one of Mr Drukker's New York companies (YD Export Import Inc), (vi) relevant witnesses reside in New York, (vii) the true dispute includes parties who are not party to the Loan Agreements (Mr Spiegel and AMM Consulting), (viii) LCIA Arbitration does not allow disclosure to be ordered against non-parties, nor does it enable the Tribunal to compel witnesses to attend, and (ix) after the relationship between Mr Drukker and Mr Spiegel soured, they attended mediation in New York.[155]   None of that detracts in any way from the fact that (a) the Respondents agreed to the provisions set out in the Loan Agreements, which include the LCIA arbitration clause, and (b) the Tribunal has rejected the evidential allegations on which the Respondents have sought to evade the consequences of that agreement.

---

[151] See §19–20 of the Respondents' submissions dated 11 April 2017 [1/4].

[152] [2/369] and [2/374].

[153] See §19 of each Defence [1/11/79] and [1/12/97]:  *"On or about 10 August 2012, the Respondents entered into the Loan Agreements"*.

[154] See §24(3), §26(1) & §31(1) above, and §15(1) of Mazlin PO2 [1/15];  and also §36, §42 & §44 above, and §4 of Shireen PO1 [1/18].

[155] See for example §34–47 of Mr Drukker's affidavit in the New York proceedings [2/540–542] and §32–36 of Mr Seddio's affirmation [2/553].

169. Finally, the Tribunal also rejects the Respondents' contention that the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*".[136] The relevant consideration comprised each party's mutual promises to be bound by, and to comply with, the terms of the Loan Agreements.

## D. REMEDIES

### D.1 The capital sums

170. Since the Tribunal has held that the Loan Agreements were not shams, it follows that the monies advanced by the Claimants to the Respondents were due to be repaid in full, together with interest, on 30 September 2015, pursuant to clause 2.

171. The contractual currency of the loans was denominated in US Dollars. The transfer made from Mazlin to Stubrick on 3 January 2013 was US$2,850,088.60. However, the other two transfers were made in Swiss Francs. It is accordingly necessary first to convert those two amounts to US Dollars. That conversion should be effected at the applicable exchange rates on the respective dates when those sums were advanced, because those were the dates on which the contractual entitlement of the borrower to receive US Dollars was discharged. Applying the live mid-market rates provided by the Claimants for exchanging Swiss Francs to US Dollars on 30 November and 3 December 2012 respectively produces the following figures (which are slightly different from the sums claimed by the Claimants):[137]

   - 30 November: CHF 1,900,000 @ 1.0792647328 USD/CHF = US$2,050,602.99
   - 3 December 2012: CHF 3,490,500 @ 1.0809434530 USD/CHF = US$3,773,033.12

### D.2 Interest

172. Pursuant to clause 1.3 of the Loan Agreements, the Claimants are entitled to simple interest at 6% *per annum* on "*the outstanding principal balance*" (emphasis added) of each of the sums advanced from the date of advance until 30 September 2015 (the due date for repayment under clause 2 of the Loan Agreements). The Claimants' interest calculations, provided under cover of their email of 29 November 2017, reflected interest accruing in these years which had been

---

[136] See for example §29-30 of the Respondents' submissions dated 11 April 2017 [1/4].

[137] The Respondents' calculations, set out in their email of 15 January 2018, were fractionally different because they took the exchange rate only to 5 decimal places. The Tribunal has adopted a more accurate calculation.

compounded annually. The Tribunal agrees with the Respondents' submissions that the terms of the contract do not provide for such compound interest. Clause 1.3 refers to interest accruing on the "*principal*" amount outstanding only.

173. On the true construction of clause 1.10 of the Loan Agreements, and in the events which have happened, each Claimant is also entitled to simple interest at 10% *per annum* on "*any Advances*", *i.e.* on the capital amount of each advance outstanding as at the due date (*i.e.* 30 September 2015) until payment in full. The 'Default Interest' under clause 1.10 is triggered by a 'demand'. For these purposes (and contrary to the submissions of the Respondents), the Tribunal holds that the requirement for a 'demand' is satisfied by the Request for Arbitration dated 21 November 2016. However, once a demand has been made, the contractual Default Interest accrues from the due date for payment, *i.e.* from 30 September 2015, not from the date of demand. The Claimants again provided calculations on 29 November 2017 in which the Default Interest is compounded annually. The Claimants also claim (without explanation) in their Skeleton that they are entitled to "*default interest ... on both the capital sums advanced pursuant to the Agreement <u>and the interest chargeable thereon</u>*" (emphasis added). The Tribunal disagrees. The express terms of the Loan Agreements make clear that Default Interest under clause 1.10 accrues on the outstanding amount of each 'Advance', not on the amount of that Advance plus accrued interest. The Tribunal has applied clause 1.9(c) of the Loan Agreements by using a notional 360 day year where less than a full year of interest is to be calculated, and in the calculation of ongoing daily interest.

174. Accordingly, the correct interest calculations may be summarised as follows:

| | Date | Days | Mazlin Loan 1 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 01/12/2012–30/11/2013 | 365 | 2,050,602.99 | 6% | 123,036.18 | 123,036.18 |
| 2 | 01/12/2013–30/11/2014 | 365 | 2,050,602.99 | 6% | 123,036.18 | 246,072.36 |
| 3 | 01/12/2014–30/09/2015 | 304 | 2,050,602.99 | 6% | 103,897.22 | 349,969.58 |
| 4 | 01/10/2015–30/09/2016 | 366 | 2,050,602.99 | 10% | 205,060.30 | 555,029.88 |
| 5 | 01/10/2016–30/09/2017 | 365 | 2,050,602.99 | 10% | 205,060.30 | 760,090.18 |
| 6 | 01/10/2017–19/01/2018 | 110 | 2,050,602.99 | 10% | 62,657.31 | 822,747.49 |

| | | | | | 822,747.49 | |
|---|---|---|---|---|---|---|

| | Date | Days | Mazlin Loan 2 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/01/2013-02/01/2014 | 365 | 2,850,088.60 | 6% | 171,005.32 | 171,005.32 |
| 2 | 03/01/2014-02/01/2015 | 365 | 2,850,088.60 | 6% | 171,005.32 | 342,010.63 |
| 3 | 03/01/2015-30/09/2015 | 271 | 2,850,088.60 | 6% | 128,729.00 | 470,739.63 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,850,088.60 | 10% | 285,008.86 | 755,748.49 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,850,088.60 | 10% | 285,008.86 | 1,040,757.35 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,850,088.60 | 10% | 87,086.04 | 1,127,843.39 |
| | | | | | 1,127,843.39 | |

| | Date | Days | Shireen Loan ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/12/2012-02/12/2013 | 365 | 3,773,033.12 | 6% | 226,381.99 | 226,381.99 |
| 2 | 03/12/2013-02/12/2014 | 365 | 3,773,033.12 | 6% | 226,381.99 | 452,763.97 |
| 3 | 03/12/2014-30/09/2015 | 302 | 3,773,033.12 | 6% | 189,909.33 | 642,673.31 |
| 4 | 01/10/2015-30/09/2016 | 366 | 3,773,033.12 | 10% | 377,303.31 | 1,019,976.62 |
| 5 | 01/10/2016-30/09/2017 | 365 | 3,773,033.12 | 10% | 377,303.31 | 1,397,279.93 |
| 6 | 01/10/2017-19/01/2018 | 110 | 3,773,033.12 | 10% | 115,287.12 | 1,512,567.06 |
| | | | | | 1,512,567.06 | |

### D.3 The appropriate creditor

175. As noted above, on 30 October 2017 Shireen assigned the benefit of its claim to Mazlin, and Mazlin has been joined as a co-claimant in the Shireen claim.  In the circumstances, the appropriate award is to order all payments to be made by the Respondents to Mazlin.

### D.4 Joint, or joint and several liability

176. The Respondents deny that they are jointly and severally liable under the Loan Agreements.[158] The Tribunal accepts that argument for the following reasons.

177. The presumption under general law is that a promise made by two or more persons is joint, and that express words are necessary to make it joint and several.[159]  The opening words of each Loan Agreement in this case recite that the lender "*agrees to extend credit to [WJ Holding] and [Stubrick] (collectively the 'Borrower')*".  Thereafter, all the obligations to repay capital and interest are expressed as obligations of 'Borrower'.[160]  No words are used to indicate that the liability of the two companies which constitute the 'Borrower' is several.

## E.  COSTS

### E.1  Introduction

178. The Claimants have succeeded in their claims, and the Respondents have failed.  The starting point is accordingly a rebuttable presumption that the Claimants are entitled to their Legal Costs pursuant to Article 28.4 of the LCIA Rules, which provides as follows:

> "*The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay*

---

[158]  See §53 of the Defence to the Mazlin claim [1/11/86] and §52 of the Defence to the Shireen claim [1/12/104].

[159]  See *Chitty on Contract* (32nd ed.), §17-005.

[160]  See in particular clauses 1.2, 1.9(a), 1.10, 2, and 5.1(a).

70

*and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."*

179.  Article 28.3 also provides that *"the Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate."*[161]  Accordingly, the Tribunal has a wide discretion subject to the presumption in Article 28.4.  In making that determination, the Tribunal is entitled to take into account the parties' conduct in the arbitrations and, when making a determination as to the amount of Legal Costs to be awarded, to do so on such reasonable basis as the Tribunal thinks appropriate.

180.  In addition, as noted in §95(13) above, by clause 6 of the Loan Agreements each party agreed *"to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement".*  Thus, in addition to the power to award Legal Costs pursuant to the LCIA Rules, the Tribunal also has a power to do so under the terms of the Loan Agreements themselves.

E.2  The costs of the conjoinder issue

181.  The Respondents objected to the original constitution of the Mazlin claim, in which both Mazlin and Shireen had been named as Claimants despite the fact that the claim was based on two separate arbitration agreements with non-identical parties.  The Tribunal determined that the Claimants were not entitled to proceed with the claim in that form without the Respondents' consent, which was withheld.[162]  It was accordingly the Claimants' own procedural error that provided the occasion for the Respondents to raise their procedural objection.

182.  Nevertheless, there was plainly no compulsion on the Respondents to take that objection, and at the procedural hearing on 24 March 2017 their counsel was unable to articulate any practical reason why the Respondents should insist on separate arbitration proceedings being issued. The Tribunal was simply told that that was the Respondents' position. They were not, and did not claim to be in any way prejudiced by the composition of the Mazlin claim in its original form.

---

[161] The Tribunal adopts the term Legal Costs as it is used in Article 28.3 of the LCIA Rules, and also the term Arbitration Costs as defined in Article 28.1 as *"The costs of the arbitration other than the legal or other expenses incurred by the parties themselves"*.

[162] {1/15}.

183. Furthermore, the Respondents argued strenuously, both at that hearing and in their written submissions, that the Tribunal did not have jurisdiction to allow the Mazlin claim to be amended by the deletion of one claimant. It was clearly the Respondents' objective to secure the dismissal of the arbitral proceedings in their entirety on purely procedural grounds. In the circumstances, and in the absence of any reasoned explanation from the Respondents as to why they chose to object to the original composition of the Mazlin claim, it would appear that the Respondents' strategy was prompted either (i) by a desire to make the whole recovery process as slow and expensive as possible for the Claimants, or (ii) by an opportunistic desire to try non-suiting the arbitral proceedings in London in their entirety, so that the Respondents could then issue the New York proceedings and claim that those proceedings should take priority as having been issued first,[163] or (iii) both.

184. Although the Respondents' position on the conjoinder issue was correct as a procedural matter, in terms of the interpretation of the LCIA Rules, nevertheless the Tribunal considers that the Respondents' conduct in withholding their consent to the conjoinder of both claims in one arbitration was unreasonable. In the event, the commencement of separate arbitration proceedings in the Shireen claim has achieved nothing other than additional inconvenience and expense. The Tribunal infers that that was the Respondents' intention.

E.3   The parties' conduct generally

185. Having taken an unreasonable stance on the conjoinder issue, the Respondents then proceeded to conduct themselves in both arbitrations in a manner calculated to cause further inconvenience and expense to the Claimants:

(1)   The Respondents have consistently refused to comply with the LCIA's directions to pay the advances to fund the Arbitration Costs. As a result, the Claimants have had to make substitute payments.

(2)   After being given a full opportunity to respond to the Claimants' proposals for procedural directions in the Mazlin claim, the Respondents then sought unreasonably to invite the Tribunal to reopen the directions it had given in Mazlin PO2.[164]

---

[163] Although the strategy failed in its principal objective, we see a reflection of that argument in the affidavit evidence sworn in the New York proceedings by Mr Drukker and Mr Seddio, both of whom make a point of emphasising that the Shireen claim was issued after the New York proceedings had been commenced: see §30 of Mr Drukker's affidavit [2/530] and §22 of Mr Seddio's affidavit [2/550].

[164] See §25(2), §26, §33 & §38 above.

(3)   The Respondents have consistently sought to procure a dismissal or stay of these arbitration proceedings on the basis that the true agreement between the relevant parties is governed by New York law.   For the reasons set out in detail in this Award, the Tribunal has rejected that case.   The Tribunal considers that the Respondents' allegations are unsustainable, and that their efforts to resist arbitration amount to forum-shopping.[165]

(4)   The Respondents' stated preference for the dispute to be resolved in the New York proceedings was ostensibly based on their contention that (i) the New York court has wider powers of disclosure against different parties from those available to this Tribunal in these arbitral proceedings, (ii) there was a *"reasonable expectation"* that the evidence obtained on discovery there *"will be relevant to the subsequent entertainment (by the Tribunal) of the Respondents' principal claim"*[166] and (iii) compliance by the Respondents with any disclosure order in these proceedings might cause *"irreparable harm to the position of the Respondents in the New York proceedings"*.[167]   In the event, however, (a) the Respondents have never attempted to specify exactly what documents, or categories of document, they say will be disclosable in the New York proceedings to assist their case, (b) they have not produced any evidence before the Tribunal to suggest that any such documents exist, (c) they have not explained exactly what harm would be caused to their interests in the New York proceedings by complying with the directions for disclosure in these proceedings, and (d) they have not explained the apparent inconsistency between that assertion and the fact that they were content to exhibit over a dozen documents to their Statements of Defence without, apparently, causing irreparable harm to their position in the New York proceedings.

(5)   Although the Respondents were fully aware of the timetable laid down in the Procedural Orders that had been made in each arbitration, they waited until the last minute before notifying the Tribunal and the Claimants that they did not propose to offer any disclosure.[168]

---

[165]  The Tribunal is also troubled not to have received a full explanation from the Respondents regarding the apparent discrepancies in their evidence regarding the commencement date of the New York proceedings: see §8(5), §19(2) and §28(1) above.

[166]  See §68 of the Respondents' submissions dated 11 April 2017 [1/4].

[167]  [1/23/313] and [1/23/314].

[168]  See §53 above.  The Tribunal also notes the relatively minor point in §13–15 above regarding the Respondents' failure to answer a simple question posed to them by the Tribunal.

186. For this accumulation of reasons, the Tribunal holds that the Respondents have conducted these proceedings unreasonably, and with the intention of being as obstructive as they can to the Claimants. The Tribunal accordingly proceeds on the basis that (i) the presumption mentioned in §178 above has not been rebutted but has been reinforced, and furthermore (ii) if costs have been incurred which might be considered higher than expected, that is likely to be a result of the Respondents' conduct.

### E.4 The Claimants' Schedule of Costs

187. On 23 November 2017, Mazlin filed a Claimant's Schedule of Costs ("the Schedule of Costs"), together with separate written submissions on costs ("the Costs Submissions"). The Schedule of Costs recorded costs under headings (a) to (f) in accordance with §30 of Mazlin PO2, together with three additional headings: (g) attendance on Counsel; (h) attendance on third parties; and (i) costs incurred in foreign proceedings. The Schedule of Costs sets out the costs that had been incurred jointly by the Claimants in both arbitrations, and Shireen adopted and relied on the same Schedule of Costs.

188. Although the Respondents declined to attend the hearing, the Respondents' legal representatives sent an email on 24 November 2017 which included the submissions on the Schedule of Costs and Costs Submissions quoted in §67 above.

189. As to the specific numbered submissions made by the Respondents in that email on the Claimants' costs submissions:

    (1) In the context of the amounts claimed in the Mazlin claim, and for that matter in the Shireen claim, the Tribunal does not consider the overall costs claimed to be disproportionate. Since the costs represent costs claimed in both proceedings, it is inappropriate to compare the costs against the debt claimed in the Mazlin claim only.

    (2) The Respondents' second observation is correct. However, directions were made in the proceedings, to which the Respondents did not object, that the Mazlin claim and the Shireen claim proceed in parallel to avoid delay and added costs and with a view to any evidential hearing and oral arguments being heard concurrently.[169] The proceedings did largely proceed on that basis and, of course, the hearings were concurrent. As a consequence, the Tribunal's view is that the Claimants have acted reasonably in incurring their costs in this manner which is likely to have resulted in an overall costs

---

[169] See Mazlin PO3 and Shireen PO1, discussed at §43 and §44 above.

saving. For the purposes of this award, the Tribunal has split the costs between the Mazlin claim and the Shireen claim in the proportions 55% and 45% respectively in order to reflect the additional time taken in the Mazlin claim to deal with the Respondents' initial procedural objections, and to reflect the fact that the costs attributable to the Mazlin claim (which was in essence the lead claim) might be slightly greater than those attributable to the Shireen claim.

(3)   The Costs Schedule was submitted in a form consistent with §30 of Mazlin PO2 and §33 of Shireen PO1, which did not specify the level of detail to be provided against each heading. The Tribunal finds that the level of detail provided by the Claimants is reasonable, particularly when taking into account the overall reasonable level of costs claimed.

(4)   The Tribunal deals with the Claimants' claims in respect of the costs of foreign proceedings in §193–195 below.

190. By two emails dated 27 November 2017, the Respondents' legal representatives made the following requests in relation to costs:

"(i)   the question of costs be reserved during the hearing;

(ii)   the Claimant be asked to provide a more detailed submission on costs that would inter alia provide:
-   a break-down between the two arbitrations;
-   copies of invoices and payments in relation to disbursements; and
-   detailed narratives and chronology for the hours incurred; and

(iii)   that the Respondents be thereafter allowed a submission commenting on these costs."

191. There was no procedural timetable for submissions on costs to be made after the oral hearing. The Respondents themselves have withdrawn their own claims for costs and, accordingly, have filed no costs schedules themselves. For the reasons given above, the Tribunal finds that it is not necessary for further details to be provided by the Claimants.

192. Turning to the specifics of the Claimants' Schedule of Costs, the hourly rates applied by solicitors for the Claimants are reasonable. The costs claimed against headings (a) to (e), (g) and (h) are also reasonable in total and there are no individual amounts which appear unreasonable. Costs under heading (f) include the LCIA fees on filing the Requests for Arbitration, together with payments made by the Claimants on account of the Arbitration Costs. Accordingly, those items, in the amount of US$150,387.50 (GBP113,500) are excluded from

the Legal Costs and are dealt with separately below. The remainder of the Claimants' costs under heading (I), in the amount of US$70,945.32, are reasonable and allowed in full.

193. Costs under heading (i) set out the costs incurred in foreign proceedings in the total sum of US$182,167.40. By reference to the Costs Submissions, those costs were incurred in relation to:

   (1)  injunction proceedings issued in Cyprus to obtain a worldwide freezing order against the Respondents in the sum of US$76,098.77;

   (2)  Hungarian legal advice in relation to enforcement action in Hungary and in relation to the sale by Stubrick of a wholly-owned Hungarian company BVDH Ingatlanhasznosíto Kft in the sum of US$10,000;

   (3)  defence of the proceedings in New York in the sum of US$96,068.63.

194. The Tribunal accepts that the legal costs incurred by the Claimants in Cyprus and Hungary are in connection with the enforcement of the Loan Agreements and are, therefore, recoverable under clause 6 of the Loan Agreements. They are also reasonable in their amounts.

195. The legal costs incurred in New York relate to the defence of proceedings brought against the Claimants and related entities. Based on the relief sought and the findings outlined above, those proceedings were brought intending to disrupt the enforcement of the Loan Agreements in these proceedings and as such those costs were (at least arguably) incurred "*in connection with the enforcement*" of those agreements for the purpose of clause 6. However, (i) there is not an identity of parties in these arbitrations and the New York proceedings, and (ii) the Tribunal understands that the New York proceedings are not concluded and, therefore, the outcome of those proceedings, including (if appropriate) the award by the court of costs against any party, is yet to be determined. For those reasons, the Tribunal concludes that it would not be appropriate in these arbitration proceedings to award to the Claimants any part of the costs of the New York proceedings claimed under heading (I).

196. Costs under heading (h) include the costs incurred by solicitors for the Claimants on attendance on counsel in foreign proceedings. Although the Tribunal disallows the third party costs in relation to the New York proceedings, it allows all the costs on attendance on foreign counsel as reasonable, and notes that only 0.4 hours were incurred on attendance on New York counsel. The Tribunal also allows the Claimants' costs of attendance on third party funders, since the

application was necessitated by the Respondents' refusal to pay their share of the advance on the Arbitration Costs (see §16 Costs Submissions).

197. In summary, therefore, the Tribunal allows the Claimants' Legal Costs as follows:

 (1) Heading (a) – Preparation and drafting documents: allowed in full – US$69,875

 (2) Heading (b) – Attendance on opponent: allowed in full – US$8,355

 (3) Heading (c) – Attendance on client and witnesses: allowed in full – US$56,465

 (4) Heading (d) – Attendance on LCIA and Tribunal: allowed in full – US$9,615

 (5) Heading (e) – Preparation for and attendance at hearings: allowed in full – US$50,085

 (6) Heading (f) – Disbursements and travel costs: Arbitration Costs excluded, otherwise allowed in full – US$70,945.32

 (7) Heading (g) – Attendance on Counsel: allowed in full – US$21,790

 (8) Heading (h) – Attendance on third parties: allowed in full – US$16,160

 (9) Heading (i) – Costs incurred in foreign proceedings: partially allowed – US$86,098.77

198. The total costs awarded are US$389,389.09, of which 55% (US$214,164) is to be attributed to the Mazlin claim and 45% (US$175,225.09) is to be attributed to the Shireen claim.

E.5 Arbitration Costs

199. The Arbitration Costs in the proceedings, having been determined by the LCIA Court pursuant to Article 28.1 of the LCIA Rules, are as follows:

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £8,372.21 |
| Tribunal's fees and expenses | £43,429.74 |
| **Final Costs of the Shireen claim** | **£53,551.95** |

Any remaining deposits shall be returned to the Claimants.

200. The Tribunal finds that the Respondents shall bear the Arbitration Costs. On the basis that the Arbitration Costs have been funded by the Claimants, the Claimants are, therefore, entitled to an award that the Respondents shall be liable to the Claimants in respect of those amounts,

77

thereby replacing the Procedural Orders issued in the Mazlin claim and the Shireen claim, referred to in §61 above.

F. THE AWARD

201.  Accordingly, the Tribunal hereby awards as follows:

    (1)   Mazlin is entitled to repayment of the monies advanced under the Shireen Loan Agreement in the sum of US$3,773,033.12;

    (2)   Mazlin is entitled to simple interest at 6% per annum from 3 December 2012 to 30 September 2015 in the sum of US$642,673.31;

    (3)   Mazlin is entitled to simple interest at 10% per annum from 1 October 2015 until payment in full.  As at the date of this award, interest is payable in the sum of US$869,893.75, and continues at a daily rate of US$1,048.07;

    (4)   Mazlin is entitled to Legal Costs of US$175,225.09;  and

    (5)   Mazlin is entitled to Arbitration Costs of £53,551.95.

202.  Any remaining applications, claims or counter-claims are hereby dismissed.

Place of arbitration: London
Date: 23 January 2018

**Kate Davies**

**Jonathan Crow QC**

**Guy Pendell**

# EXHIBIT 2

Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 186 of 228

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

-----------------------------------------------------------------x

WJ HOLDING LIMITED and STUBRICK
LIMITED,

                              Plaintiffs,                Index No._____

          - against -                                    Filed 4/7/17

                                                         **SUMMONS**

SHIREEN MARITIME LTD, MAZLIN
TRADING CORP, AMM CONSULTING AND
MANAGEMENT GROUP LLC, and ALEXANDER
SPIEGEL,

                              Defendants.

-----------------------------------------------------------------x


**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy
of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on Plaintiff's Attorney within twenty (20) days after the service of this summons,
exclusive of the day of service (or within thirty (30) days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to answer or appear, judgment will be taken against you by default for the relief
demanded in the notice set forth below and in the complaint.

Plaintiff designates Kings County as the venue for trial. The basis for venue is that the contracts
which are the subject of the dispute were entered into in Kings County.

Dated: April 7, 2017
          New York, New York

                                        LAW OFFICE OF JEFFREY FLEISCHMANN PC
                                        By: /s/Jeffrey Fleischmann
                                                  Jeffrey Fleischmann, Esq.

                                        Attorneys for Plaintiff
                                        150 Broadway, Suite 900
                                        New York, N.Y. 10038
                                        Tel. (646) 657-9623
                                        Fax (646) 351-0694
                                        jf@lawjf.com


1

Case 1:19-cv-07426-JGK Document 21-1 Filed 09/24/19 Page 187 of 228

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**
----------------------------------------------------------------x

WJ HOLDING LIMITED and STUBRICK
LIMITED,

                                                                        Index No._____

                           Plaintiff,

          - against -                                      **VERIFIED COMPLAINT**

SHIREEN MARITIME LTD, MAZLIN
TRADING CORP, AMM CONSULTING AND
MANAGEMENT GROUP LLC, and ALEXANDER
SPIEGEL,

                           Defendants.
----------------------------------------------------------------x

     Plaintiffs WJ Holding Limited ("WJ Holding") and Stubrick Limited ("Stubrick" and

together with Holding, the "Plaintiffs")), by and through their undersigned counsel, alleges for

their verified complaint against defendants Shireen Maritime LTD ("Shireen LTD"), Mazlin

Trading Corp ("Mazlin Corp"), AMM Consulting and Management Group LLC ("AMM") and

Alexander Spiegel ("Spiegel") and together with Shireen LTD, AMM, and Mazlin Corp, the

"Defendants"), as follows:

## PRELIMINARY STATEMENT

     1.     This is an action for declaratory judgment and a permanent injunction.  Through

this action, Plaintiffs seek a declaratory judgment that certain loan agreements between Plaintiffs

and Defendants are not binding, and constitute unenforceable sham loan agreements.  Plaintiffs

also seek a permanent injunction barring Defendants from continuing their efforts to enforce these

sham loan agreements.

## PARTIES

2

2. Plaintiff WJ Holding Limited is a Cyprus based company with its principal place of business in Cyprus. It is owned by Mr. Yuri Drukker ("Drukker").

3. Plaintiff Stubrick Limited is a Cyprus based company with its principal place of business in Cyprus. It too is owned by Drukker.

4. Upon information and belief, Defendant Shireen Maritime Ltd. is a Liberian shell company.

5. Upon information and belief, Defendant Mazlin Trading Corp. is a British Virgin Islands shell company.

6. Upon information and belief, Defendant AMM Consulting and Management Group LLC is a Florida corporation controlled by Defendant Alexander Spiegel and owned by his children.

7. Upon information and belief, Defendant Alexander Spiegel is a citizen of Florida. He owns or controls AMM, Shireen Maritime and Mazlin Corp.

8. Jurisdiction is proper, inter alia, because the contracts at issue were entered into between the parties within the State of New York.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

#### I. The Dispute

9. WJ Limited is owned by Mr. Drukker, an agricultural engineer by training, and had for many years owned edible oil production facilities in Moldova and Russia. It primarily produces sunflower seed and rapeseed oil for commercial markets, as well as soy seed meal for the animal feed market.

10. WJ Holding owns Open-Joint Stock Company Bender Oil Extraction Plant ("OSJC Bender"), a large vegetable oil extraction facility located in the Transdniestrian region of

Moldova. In 2003, it had been placed on the privatization list of previously public companies by the Transdniestrian authorities, and was purchased by WJ Holding thereafter.

11.     Mr. Alexander Spiegel is the owner and controller of Defendants and a childhood friend of Mr. Drukker. Mr. Spiegel had been a small bridge lender to WJ Holding and a board member of companies owned by WJ Holding.

12.     In or about 2011, Mr. Drukker told Mr. Spiegel that his business plan for OSJC Bender consisted of modernizing, operating, and then selling the plant. Spiegel told Drukker that he wanted to become an equity investor in OSJC Bender. Drucker agreed to sell Spiegel and his entities a 30 percent stake in OSJC Bender in exchange for $7,000,000.00.

13.     Mr. Spiegel told Drukker, however, that he needed to structure his equity investment as a loan in order to achieve certain tax and estate planning objectives. The parties were always clear that regardless of formal structure, the investment made by Mr. Spiegel (through his companies) was an equity investment and the equity purchase price for a 30% stake in OSJC Bender was $7,000,000.00.

14.     On or about March 15, 2012, the parties executed an Agreement of Sale between Plaintiff WJ Holding and a Florida entity owned by Mr. Spiegel's children and controlled by Mr. Spiegel, AMM Consulting and Management Group LLC ("AMM") (the "Sale Agreement"). Pursuant to the Sale Agreement, AMM acquired the right to obtain 30% of the shares in OJSC Bender in exchange for a nominal price, a fraction of any appraisal value of the shares of OSJC Bender, of $210,000.00.

15.     Mr Spiegel then was to effectuate the transfer of the remaining equity investment in a form that would reflect his estate and tax planning objectives. He determined that this should be in the form of asham loans extended by two offshore companies owned or controlled by him—

4

Case 1:19-cv-07426-JGK  Document 21-1  Filed 09/24/19  Page 190 of 228
INDEX NO. 506949/2017

RECEIVED NYSCEF: 04/07/2017

Shireen and Mazlin, who are also Defendants in this action. These agreements were not intended to be final or enforceable, and no sums transferred under them were expected to be repaid, as they were intended as an equity investment. The documents were produced by Mr. Spiegel and consisted of two loan agreements dated August 10, 2012, one signed by Shireen and one signed by Mazlin (the "Loan Agreements").

16.     Mr. Spiegel performed due diligence on OJSC Bender between March and November 2012, and was a consistent presence at the plant location. This occurred prior to Defendants transferring any funds under the sham Loan Agreements.

17.     On or about August 12, 2012, AMM and WJ Holding executed a letter of agreement whereby the parties agreed that "in the event Alexander Spiegel stops consulting Vendor [WJ Limited] . . . for any reason, including Vendor's terminating Spiegel for any reason at his sole and absolute discretion, Vendor shall be entitled to terminate the SPA . . ."   The purpose of this agreement was to ensure that if Spiegel was no longer involved in the project his companies (including AMM) would have to transfer back their right to 30% of the OJSC Bender shares.

18.     Between November 2012 and January 2013, Defendants transferred approximately 8 million dollars under the sham Loan Agreements. As per the agreement between Spiegel and WJ Holding on Spiegel's equity investment, these funds were utilized to modernize the industrial facility at OJSC Bender and to support its trading activity.

19.     Thereafter, due to the non-performance of government undertakings and guarantees by the Transdniestrian authorities under a supplementary privatization agreement between the Transdniestrian authorities and WJ Holding, the investment in OSJC Bender was not

5

Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 191 of 228

as profitable as anticipated by the parties. WJ Holding was also blocked by government actions from formally transferring any OJSC Bender shares to Spiegel or his companies.

20.     Mr. Spiegel, reacting to the changed circumstances, started claiming that he had not made an equity investment and that the sham Loan Agreements were not sham agreements but genuine commercial transactions. Mr. Spiegel also purposefully delayed finalizing the final Sale Agreement by claiming that his counsel had advised him that for tax purposes the purchase price had to be stated at a higher amount. .

21.     Ultimately, he changed the formal stated price to $500,000.00. This price, however, was stated as such for tax purposes and the real price was always $7,000,000.00, with the loan agreements simple sham agreements utilized to mask the transaction price and support fund transfers by Defendants at the direction of Spiegel.

22.     Plaintiffs, through this action, seek a declaratory judgment that the loan agreements are sham agreements and unenforceable.

## II.     Procedural History

23.     In November 2016, Defendants commenced arbitration proceedings in the London Court of International Arbitration seeking repayment of approximately $8m dollars under the Loan Agreements. The arbitral tribunal was formed at LCIA in February 2017..

24.     Plaintiffs have objected to these arbitration proceedings on grounds that the Loan Agreements are sham and were entered into only to mask an equity investment by Mr. Spiegel and because the forum is improper.

25.     Through this action, Plaintiffs seek an order barring Defendants from further seeking to enforce the sham Loan Agreements.

6

## AS AND FOR AN FIRST CAUSE OF ACTION
### (Declaratory Judgment)

26.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

27.    As set forth above, Plaintiff WJ Holding and Defendants Spiegel and AMM entered into an agreement for the sale of equity in OSJC Bender.

28.    As part of this equity sale, the parties entered into sham Loan Agreements that actually constituted a part of the purchase price for the equity stake purchased by Defendants.

29.    There is a dispute amongst the parties whether the Loan Agreements are unenforceable sham agreements or real loan agreements.

30.    The present dispute presents a justiciable controversy in which the issues are present, real, definite, and substantial and affect existing legal relations between Plaintiffs and Defendants. Without a declaration of rights, Plaintiffs will be severely prejudiced and the agreement between the parties will be unenforcable.

31.    Accordingly, Plaintiffs are entitled to a judgment declaring that the loan agreements are sham agreement and not legally binding.

## AS AND FOR AN SECOND CAUSE OF ACTION
### (Permanent Injunction)

32.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

33.    Plaintiffs will be irreparably harmed if Defendants are allowed to enforce the sham loan agreements against Plaintiffs and evade their obligations to purchase the equity in OSJC Bender.

34.    Plaintiffs lack an adequate remedy at law.

7

35.    Defendants should be preliminarily and permanently enjoined from attempting to enforce the sham loan agreements.

## CLAIM FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests that judgment be granted as follows:

a)    On the First Cause of Action, declaring that the :Loan Agreements are sham agreements and not binding or enforceable; and

b)    On the Second Cause of Action, enjoining Defendants from attempting to enforce the Loan Agreements; and

c)    Awarding plaintiff pre-judgment Interest, Attorneys Fees, Costs, and such other and further relief as the court deems just and proper.


Dated: April 7, 2017
       New York, New York

                              LAW OFFICE OF JEFFREY FLEISCHMANN PC
                              By: /s/Jeffrey Fleischmann
                                  Jeffrey Fleischmann, Esq.

                              Attorneys for Plaintiff
                              150 Broadway, Suite 900
                              New York, N.Y. 10038
                              Tel. (646) 657-9623
                              Fax (646) 351-0694
                              jf@lawjf.com

8

# EXHIBIT 3

Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 195 of 228

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| WJ HOLDING LIMITED and STUBRICK LIMITED, <br><br>                  Plaintiffs, <br><br>     -against- <br><br> SHIREEN MARITIME LTD, MAZLIN TRADING CORP, AMM CONSULTING AND MANAGEMENT GROUP LLC, and ALEXANDER SPIEGEL, <br><br>                  Defendants. | Index No. 506949/2017 <br><br><br> **FIRST AMENDED COMPLAINT** |

Plaintiffs WJ Holding Limited ("WJH") and Stubrick Limited ("Stubrick," and, together with WJH, the "Drukker Companies"), by their attorneys, Sher Tremonte LLP, as and for their amended complaint against Defendants Shireen Maritime LTD ("Shireen"), Mazlin Trading Corp. ("Mazlin," and, together with Shireen, the "Spiegel Companies"), AMM Consulting and Management Group LLC ("AMM"), and Alexander Spiegel ("Spiegel") allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action seeks compensatory damages resulting from Defendants' scheme to fraudulently induce Plaintiffs to enter into loan agreements (the "Loan Agreements") under false pretenses and to breach an oral agreement to assume liability under the Loan Agreements.

2.      Additionally, Plaintiffs seek a judgment declaring the Loan Agreements part of Spiegel's consideration for an equity transaction and therefore not binding on Plaintiffs.

1

FILED: KINGS COUNTY CLERK 07/09/2019 11:34 AM
Case 1:19-cv-07426-JGK Document 21-1 Filed 09/24/19 Page 196 of 228
NYSCEF DOC. NO. 71

INDEX NO. 506949/2017
RECEIVED NYSCEF: 07/09/2019

3.    Plaintiff WJH owns the Open-Joint Stock Company Bender Oil Extraction Plant ("Bender Oil"), a large vegetable oil extraction facility located in the Transdniestrian region of Moldova. WJH and plaintiff Stubrick are owned by Yuri Drukker ("Drukker").

4.    Spiegel was a life-long friend and business partner of Drukker's and was a director of WJH. Upon information and belief, Spiegel owns and controls Shireen, Mazlin, and AMM.

5.    In 2011 Spiegel expressed interest to his friend Drukker in becoming a 30% equity owner in Bender Oil in exchange for $7,000,000.

6.    But Spiegel had no intention of paying the full, fair price for his shares in Bender Oil. Instead, Spiegel and the other Defendants schemed and conspired to dupe the Drukker Companies into signing agreements that would, on their face, seem to allow the Defendants to acquire 30% of Bender Oil at a fraction of the actual price and leave the Drukker Companies holding the bag for the balance of the cost of the shares.

7.    To make the scam work, Spiegel advised the Drukker Companies that he could not inject more than a nominal amount of cash into Bender Oil in return for his shares. Spiegel told the Drukker Companies that, for undisclosed tax and estate-planning reasons, he would require financing in order to make the balance of his equity contribution. He told the Drukker Companies that he had access to financial institutions and investors who could provide that financing.

8.    Spiegel thereby induced the Drukker Companies to enter into an agreement under which Spiegel, through his company AMM, would purchase the right to acquire the 30% shares in Bender Oil for a fraction of their true price. Spiegel told Drukker that he would finance the

2

remainder of his equity contribution by acquiring for WJH, and then personally assuming, third-party debt financing, which he would then convert into an equity stake in Bender Oil.

9.      Spiegel informed WJH that he had identified two companies, Shireen and Mazlin, that would be willing to provide financing.

10.     Under this arrangement, Spiegel would assume liability for the loans and repay the outstanding loans to Mazlin and Shireen.  In this manner, the loans made by Shireen and Mazlin would be converted to an equity investment by Spiegel upon repayment of the loans. Spiegel's promises were made as consideration for his 30% stake in Bender Oil and constituted a valid oral contract (the "Oral Contract").

11.     However, Spiegel never informed the Plaintiffs that he, in fact, owned and controlled the lending institutions, Mazlin and Shireen, and was using them in furtherance of his scheme to acquire the 30% of Bender Oil at a fraction of their value.

12.     Spiegel never had any intention of repaying the loans.  Spiegel devised this scheme for three purposes.

13.     First, Spiegel would acquire the shares in Bender Oil for a nominal price, while sticking the Drukker Companies with the bill for the remaining cost.

14.     Second, Spiegel was seeking to defraud United States and foreign tax collection authorities who were, upon information and belief, investigating Spiegel's off-shore investments. Spiegel wanted to ensure that the tax collecting authorities remained unaware that Spiegel and his companies were making a seven-million-dollar equity investment.

15.     Third, Spiegel devised and implemented this scheme because he wanted to retain liquid assets that he could distribute to his children, Michael Spiegel and Matthew Spiegel, while

3

INDEX NO. 506949/2017
RECEIVED NYSCEF: 07/09/2019

preventing those assets from entering his estate upon his passing and being subject to the estates tax.

16.    In furtherance of this scheme, Spiegel caused Mazlin and Shireen to enter into two Loan Agreements with WJH and Stubrick, another company owned by Drukker. Under these Loan Agreements, the Spiegel Companies would advance funds to Bender Oil.

17.    Spiegel promised Drukker that Spiegel would assume the debt under the Loan Agreements. Spiegel thereby fraudulently induced the Drukker Companies into entering the Loan Agreements with Mazlin and Shireen which, unbeknownst to Drukker, were owned and controlled by Spiegel.

18.    Eventually, the Transdniestrian government itself reneged on certain of its obligations to Bender Oil, which reduced Bender Oil's potential profitability. Reacting to the changed circumstances, Spiegel reneged on his agreement to assume the debt under the Loan Agreements. Spiegel, for the first time, insisted that the Drukker Companies were responsible to pay the debt, which was actually Spiegel's equity investment in Bender Oil, to Spiegel's own companies. Spiegel thereby breached the Oral Contract and left the Drukker Companies holding the bag for the debt that Spiegel had promised to assume.

19.    As a direct and foreseeable consequence of Defendants' fraudulent actions, WJH and Stubrick have been unable to obtain any additional financing to fund their operations. Consequently, both WJH and Stubrick have been unable to operate, causing damages in an amount to be determined at trial.

20.    Plaintiffs bring this action seeking an order granting Plaintiffs damages for fraudulent inducement; breach of contract; promissory estoppel, breach of the implied covenant

4

of good faith and fair dealing, civil conspiracy, and breach of fiduciary duty. Plaintiffs also seek an order declaring the Loan Agreements to be unenforceable as against the Plaintiffs.

## THE PARTIES

21.     Plaintiff WJH is a Cyprus based company with its principal place of business in Cyprus. It is owned by Yuri Drukker ("Drukker").

22.     Plaintiff Stubrick is a Cyprus based company with its principal place of business in Cyprus. It, too, is owned by Drukker.

23.     Upon information and belief, Defendant Shireen is a Liberian shell company owned and controlled by Spiegel.

24.     Upon information and belief, Defendant Mazlin is a British Virgin Islands shell company owned and controlled by Spiegel.

25.     Upon information and belief, Defendant AMM is a dissolved Florida corporation beneficially owned and directly controlled by Defendant Spiegel and his children, Matthew and Michael. Upon information and belief, legal ownership in AMM was held by the Alexander Spiegel Revocable Family Trust, of which Spiegel is Trustee.

26.     Upon information and belief, Defendant Spiegel is a citizen of Florida. At all relevant times, Spiegel owned and controlled defendants AMM, Shireen, and Mazlin and was their functional alter ego. Spiegel is also a former director of WJH.

## JURISDICTION AND VENUE

27.     Jurisdiction is proper because the contracts at issue were negotiated and entered into between the parties within the State of New York by attorneys operating within the State. Jurisdiction is proper for the additional reason that Defendants have asserted counterclaims in this action. Jurisdiction is proper for the additional reason that Defendants have agreed to an

5

Case 1:09-cv-07426-RBK Document 29-11 Filed 09/24/19 Page 200 of 228

abatement of related claims pending in the Florida Court for the District of Miami pending resolution of the parties' claims in this Court.

28.     Venue is proper under CPLR 509 because Plaintiffs have designated Kings County as the place of trial.

## FACTS COMMON TO ALL CLAIMS

**WJH Acquires Bender Oil**

29.     Drukker is an agricultural engineer by training who had for many years owned edible oil production facilities in Moldova and Russia. He is the principal of both WJH and Stubrick. WJH owned businesses in Moldova and Russia that had been very successful.

30.     Drukker and Spiegel were lifelong friends, and, throughout the years, they had numerous business dealings together. Spiegel was a board member of companies owned by Drukker, including WJH, and had often acted as a small bridge lender for them.

31.     In 2003, the government of Transdniestra, a separatist enclave in Moldova, released certain companies that had been previously government-owned and made them available for private ownership.

32.     Sometime thereafter, WJH purchased one such company, Bender Oil, an edible oil crushing facility that primarily produces sunflower seed and rapeseed oil for commercial markets, as well as soy seed meal for the animal feed market.

33.     In or about 2011, Drukker told Spiegel that his business plan for Bender Oil consisted of modernizing, operating, and then selling the plant. Drukker told Spiegel that Drukker placed an estimated value on Bender Oil of $20 million.

34.     Spiegel responded that he wanted to become an equity investor in Bender Oil.

6

**Spiegel Agrees to Purchase a 30% Equity Stake in Bender Oil for $7 Million Using a Convertible Debt Structure**

35.     In early 2012, Drukker agreed to sell Spiegel a 30% stake in Bender Oil in exchange for $7 million. Spiegel also agreed to infuse an additional $2 million in working capital into Bender Oil. The money invested would be used to modernize the Bender Oil plant.

36.     Spiegel advised Drukker that Spiegel would purchase his 30% equity stake in Bender Oil using one of his companies, AMM, which Spiegel created as a holding company for Spiegel's shares in Bender Oil.

37.     However, in March 2012, Spiegel told Drukker that, in order to achieve certain tax and estate planning objectives, his investment would have to be structured as a convertible note.

38.     Spiegel did not disclose the nature of these tax and estate planning objectives. Nevertheless, due to their long friendship and prior partnerships, Drukker trusted Spiegel and agreed to structure the transaction in the manner Spiegel required.

39.     The parties orally agreed to a structure that would combine a nominal cash infusion along with considerable debt financing that would be convertible into equity.

40.     Specifically, the parties agreed that Spiegel would inject cash in an amount that would be a small fraction of the value of the 30% shares.

41.     Spiegel would also identify $7,000,000 in international debt financing for Bender Oil. Once Bender Oil received the debt financing, Spiegel would assume liability for the debt, and would repay, restructure, or offset the debt.

42.     Once Spiegel assumed liability for the debt and paid the cash portion of his investment, the investment would then convert into a 30% equity interest, as the parties had previously agreed.

7

43.     The parties contemplated that the equity and debt portions of the transaction would be memorialized in written agreements, along with an agreement requiring Spiegel to perform consulting work on behalf of Bender Oil.

44.     In reliance on the Oral Contract and Spiegel's promises, WJH finalized its negotiations with the Transdniestrian regional authorities and entered into a renewed privatization agreement (the "Privatization Agreement"), under which WJH undertook significant investment obligations. Among the obligations undertaken by WJH in the Privatization Agreement was the re-launch of industrial production at the factory, which was previously at a standstill, and an overhaul of its equipment and technology. WJH also undertook to extend significant working capital into acquisition of oilseeds for crushing purposes.

**The Parties Execute Written Agreements**

45.     In furtherance of the Oral Contract, in March 15, 2012, WJH and AMM executed an Agreement of Sale ("SPA") for the purchase of a 30% share of Bender Oil. Under the SPA, AMM acquired the right to the shares in exchange for the nominal price of $210,000, a tiny fraction of Bender Oil's true value. The parties always understood that the remainder of Spiegel's monetary consideration was his promise to provide debt financing under the Oral Contract.

46.     AMM was owned and controlled by Spiegel and his sons, Matthew and Michael.

47.     In furtherance of the Oral Contract, on August 10, 2012, the Spiegel Companies, as lenders, and the Drukker Companies, as the borrowers, entered into the two respective Loan Agreements.

8

48.     Spiegel also agreed, on behalf of AMM, in a Letter of Agreement dated August 17, 2012 that references the March 15, 2012 SPA, that, as part of the consideration for the 30% equity stake in Bender Oil, Spiegel would provide continued consulting services to WJH.

49.     However, in late 2012, Spiegel demanded that the SPA be replaced with a new purchase agreement. He claimed his counsel had advised him that for tax purposes the purchase price had to be stated at a higher amount than the $210,000 price in the SPA.

50.     Drukker viewed this change as an improper retrade on the SPA. Nevertheless, because Spiegel was his close friend who had promised to provide the balance of the investment in the form of convertible debt financing, Drukker agreed to participate in negotiations on a new SPA. Consequently, several drafts were circulated.

51.     Ultimately, in December 2012, Spiegel attempted to increase the cash portion of the purchase price from $210,000 to $500,000. This proposed price, like the SPA price, represented only a fraction of the $7 million total monetary consideration for the 30% stake in Bender Oil.

52.     Negotiations on a new purchase agreement went on for two more years, and drafts of a new purchase agreement and a holding company operating agreement were circulated. None of these drafts was ever executed.

**Spiegel Holds Himself Out as an Owner of Bender Oil**

53.     Between March and November 2012, Spiegel performed due diligence on Bender Oil and was a consistent presence at the plant location. This occurred prior to Defendants' transferring any funds under the Loan Agreements.

54.     After completing his due diligence, which included visiting the Bender Oil plant, Spiegel held himself out as a partner and stakeholder in Bender Oil and participated in

9

management decisions, including participating in the approval or disapproval of any actions regarding repair, installation, and acquisition of equipment, and all matters concerning the procurement of raw materials, the processing of such materials, and the sale of finished products. Moreover, because he was treated as a major shareholder, Spiegel received copies of all reports relating to the economic activity of Bender Oil. Spiegel also took part in management meetings and held separate meetings with the deputy director of Bender Oil in charge of economic and financial affairs.

55.     Because Spiegel was expected to be a 30% partner in Bender Oil, even though shares had not yet formally changed hands, Spiegel and his entire family received salaries and health insurance benefits from YD Export Inc., a subsidiary of WJH.

56.     In September 2013, Spiegel also executed a power of attorney to a local attorney in Moldova named Sergey Rashkov, which gave Rashkov authority to execute Spiegel's anticipated interests in the WJH-related entities, including Bender Oil.

57.     On September 23, 2013, Drukker's attorney emailed Rashkov, noting that Spiegel would be purchasing shares in the WJH-related entities, including Bender Oil. Spiegel is copied on the email. Rashkov's reply to the email requested certain corporate documents of AMM, including a certificate of regularity, an extract from the Department of State, proof of beneficial ownership, and a corporate resolution concerning the purchase in Moldova. Drukker's attorney provided these documents to Mr. Rashkov.

58.     Spiegel, directly and through his Moldovan attorney Rashkov, worked as a partner in the Bender Oil business and simultaneously served on WJH's board of directors.

**Defendants Defraud the Drukker Companies**

59.     In actuality, the entire process of negotiating and entering into the various

10

agreements between the Drukker Companies and Defendants was essential to Defendants'
conspiracy to defraud the Drukker Companies and take control of the Bender Oil shares for a
nominal price, thereby avoiding government scrutiny and leaving the Drukker Companies with
the bill.

60.     During the negotiation process, the Defendants made several misrepresentations
that induced the Drukker Companies to enter into the various agreements.

61.     The parties had always agreed that Spiegel would purchase a 30% equity stake in
Bender Oil. However, in March 2012, Spiegel told Drukker that, in order to achieve certain tax
and estate planning objectives, Spiegel's investment would have to be structured as a convertible
note.

62.     Spiegel did not disclose the nature of these tax and estate planning objectives.
Nevertheless, due to their long friendship and prior partnerships, Drukker trusted Spiegel and
agreed to structure the transaction in the manner Spiegel required.

63.     Spiegel represented that the Drukker Companies would have no obligation to
make payments under the Loan Agreements. Instead, Spiegel represented that he would repay
the debt by restructuring the debt through his other companies or offsetting the debt.

64.     Had Drukker known that the Drukker Companies would be on the hook for debt
service in what Spiegel represented was an equity deal, the Drukker Companies never would
have entered the Loan Agreements, nor would the Drukker Companies have taken on investment
obligations under the Privatization Agreement.

65.     After the parties entered the SPA, Spiegel was tasked with identifying lenders and
procuring the convertible debt piece of his equity investment in Bender Oil.

11

Case 1:19-cv-07426-JGK Document 21-1 Filed 09/24/19 Page 206 of 228

66.     In July 2012, Spiegel told Drukker that the loans forming the bulk of Spiegel's consideration for the Bender Oil shares would be routed through two offshore companies, Shireen and Mazlin.

67.     Upon information and belief, Spiegel's sons, Michael and Matthew, are the record owners of Shireen and Mazlin. However, at all relevant times Spiegel has maintained full control over the Spiegel Companies. Spiegel completely dominates, and is the alter ego of, each of these companies. Spiegel used his domination and control over the Spiegel Companies as mechanism to commit fraud against the Drukker Companies.

68.     Spiegel told Drukker that one reason it was necessary to structure his equity transaction in this way was that the offshore companies could then be conduits for additional debt infusions should Bender Oil's operations require additional capital.

69.     In fact, unbeknownst to the Drukker Companies, Spiegel was attempting to defraud the Internal Revenue Service by laundering his investment through offshore companies.

70.     Around November 2017, the Drukker Companies learned that, in 2014, the Internal Revenue Service had flagged Spiegel for investigation due to suspicion that he was improperly sheltering income by laundering it through his offshore companies for the purpose of avoiding taxation. Upon information and belief, Spiegel entered into a voluntary disclosure arrangement with the Internal Revenue Service in order to dodge further investigation into his illegal tax-avoidance practices.

71.     As part of his tax-avoidance scheme, Spiegel never told Drukker, and deliberately concealed the fact, that Spiegel himself owned and controlled the two offshore companies, Mazlin and Shireen, that would be used to provide the debt financing for his acquisition of his stake in Bender Oil.

12

72.     Had the Drukker Companies known that Spiegel planned to use the debt financing for Bender Oil as part of his scheme to defraud the Internal Revenue Service, the Drukker Companies would never have entered into any agreements with Spiegel or his companies.

73.     The Drukker Companies did not discover Spiegel's fraud until November 2017, during an arbitration proceeding concerning related claims in London (the "Arbitration").

74.     In July 2012, Spiegel falsely told Drukker, in an email to Drukker's attorney, that Shireen and Mazlin were independent lenders. Spiegel failed to disclose that he owned and controlled Mazlin and Shireen.

75.     According to the tribunal that heard the Arbitration (the "Tribunal"), Spiegel's misrepresentation was a "dissimulation" that is "discreditable" and "makes the Tribunal cautious about accepting uncorroborated oral evidence from him." The Tribunal added that Spiegel's "dissimulation in this regard does him no credit in broader moral terms." The Tribunal further added that "not all of his conduct was necessarily creditable in a wider moral sense."

76.     In fact, Spiegel schemed to make the Spiegel Companies the beneficiaries of the debt service, which included a 6% interest rate, while Spiegel would take control of 30% of Bender Oil without attracting unwanted government scrutiny.

77.     Spiegel's scheme was also designed to elicit a commission for introducing third-party financing to WJH. Spiegel had a consulting agreement with WJH under which he would earn commission if he introduced third-party financing to WJH.

78.     Had Drukker known that the Spiegel Companies were merely instruments of Spiegel, the Drukker Companies would never have agreed to pay 6% interest on what was actually a $7,000,000 equity purchase by Spiegel. Drukker agreed to the 6% interest rate only because he was led to believe that this interest rate was required by Mazlin and Shireen to effect

13

the loans and because Spiegel represented to Drukker that Spiegel would assume the debt burden.

**Defendants Make Advances under the Loan Agreements**

79.     After Spiegel completed his due diligence investigations, he procured the transfer of funds from his companies, Mazlin and Shireen. These amounts were the materialization of Spiegel's equity investment.

80.     Under the two Loan Agreements, between November 2012 and January 2013, three advances totaling $8.2 million at 6% interest were made by the Spiegel Companies to the Drukker Companies.

81.     The advances did not conform to the strict terms under the Loan Agreements, and, therefore, there was no precise date for repayment of the advances.

82.     On January 3, 2013, the last advance under the Loan Agreements was made. Consequently, under the Oral Contract, Spiegel was required to assume the debt and commence repayment in order to convert the debt financing into Spiegel's 30% equity interest, which would be held by AMM.

83.     Accordingly, on that same day, Spiegel's lawyer, Gerard Virga, confirmed to Drukker's counsel that "AMM understands that it is purchasing a thirty (30%) percent interest in the entire operation." Virga suggested forming certain corporate entities that would hold Spiegel's equity interest once the debt financing was converted to an equity stake.

84.     Various contract drafts were circulated. These drafts contemplated modifying the SPA such that Spiegel would receive his 30% equity stake in Bender Oil through different holding companies and for a higher cash portion of his investment. However, these draft contracts were never executed.

14

**Defendants Breach the Oral Contract**

85.    The investment in Bender Oil was not as profitable as anticipated by the parties.

86.    The Transdniestrian government reneged on its obligations under the Privatization Agreement. WJH was also illegally blocked by government actions from formally transferring any of Bender Oil's shares to Spiegel or his companies.

87.    In July 2014, Spiegel, reacting to the unexpectedly changed circumstances, purposely delayed the efforts to finalize the corporate documentation, before entirely pulling out of his deal to purchase a 30% equity stake in Bender Oil and reneging on his commitment to assume the debt under the Loan Agreements.

88.    Thus, Spiegel reneged on and breached the Oral Contract. In particular, Spiegel failed and refused to assume the debt or repay the balance owed to the Spiegel Companies under the Loan Agreements. This bad faith breach of contract left the Drukker Companies holding the bag for the entire amount owed to the Spiegel Companies under the Loan Agreements.

## FIRST CAUSE OF ACTION
### Breach of Contract (Against Spiegel and AMM)

89.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

90.    In early 2012, Drukker agreed to sell Spiegel a 30% stake in Bender Oil in exchange for $7 million. Spiegel also agreed to infuse an additional $2 million in working capital into Bender Oil. The money invested would be used to modernize the Bender Oil Facility.

91.    Spiegel advised Drukker that Spiegel would purchase his 30% equity stake in Bender Oil using one of his companies, AMM, which Spiegel created as a holding company for Spiegel's shares in Bender Oil.

15

92.     However, in March 2012, Spiegel told Drukker that, in order to achieve certain tax and estate planning objectives, his investment would have to be structured as a convertible note.

93.     The parties orally agreed to a structure that would combine a cash infusion along with debt financing that would be convertible into equity.

94.     Specifically, the parties agreed that Spiegel would inject cash in an amount that would be a small fraction of the value of the 30% shares.

95.     Spiegel would also identify at least $7,000,000 in international debt financing for Bender Oil.  Once Bender Oil received the debt financing, Spiegel would assume liability for the debt, and would repay, restructure, or offset the debt.

96.     Once Spiegel assumed liability for the debt and paid the cash portion of his investment, the investment would then convert into a 30% equity interest, as the parties had previously agreed.

97.     Spiegel's promises under this agreement were made as consideration for his 30% stake in Bender Oil under the Oral Contract.

98.     On August 10, 2012, Mazlin and Shireen, as lenders, and the Drukker Companies, as the borrowers, entered into the Loan Agreements.

99.     In late December 2012 and early January 2013, the Spiegel Companies advanced approximately $8.2 million under the Loan Agreements to WJH as Drukker's convertible debt investment in Bender Oil.  The last advance was made on January 3, 2013.  At that time, Spiegel and AMM were required to begin the process of assuming the debt and converting Spiegel's investment to equity.

16

100.    However, in July 2014, in breach of the Oral Contract, Spiegel and AMM failed and refused, and continue to fail and refuse, to assume the debt incurred under the Loan Agreements. Instead, Spiegel and AMM reneged on their commitment to Drukker and WJH and pulled out of the deal to purchase a 30% equity stake in Bender Oil.

101.    The Drukker Companies were, and remain, fully committed to providing Spiegel and AMM the 30% share of Bender Oil. The only reason Spiegel and AMM have not received their shares is that Spiegel reneged on the Oral Contract and refused to execute the documents necessary to consummate the parties' agreement.

102.    Spiegel and AMM's breach of the Oral Contract left the Drukker Companies holding the bag for debt incurred under the Loan Agreements. This outstanding debt became an albatross for the Drukker Companies because they were unable to acquire additional financing. Because the Drukker Companies could not obtain financing, they were forced to cease operations.

103.    Spiegel and AMM's breach of the Oral Contract thereby directly and proximately caused, and continues to cause, the Drukker Companies damages in an amount to be determined at trial.

104.    In the alternative, the Drukker Companies pray that the Court order Spiegel to specifically perform under the Oral Contract by assuming and paying the debt under the Loan Agreements.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Spiegel and the Spiegel Companies)

105.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

17

FILED: KINGS COUNTY CLERK 07/09/2019 11:34 AM
Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 212 of 228     INDEX NO. 506949/2017

NYSCEF DOC. NO. 71                                                RECEIVED NYSCEF: 07/09/2019

106.    The parties had always agreed that Spiegel would purchase a 30% equity stake in Bender Oil. However, in March 2012, Spiegel told Drukker that, in order to achieve certain tax and estate planning objectives, Spiegel's investment would have to be structured as a convertible note.

107.    Spiegel did not disclose the nature of these tax and estate planning objectives. Nevertheless, due to their long friendship and prior partnerships, Drukker trusted Spiegel and agreed to structure the transaction in the manner Spiegel required.

108.    Spiegel, who owned and dominated, and acted on behalf of the Drukker Companies, represented that the Drukker Companies would have no obligation to make payments under the Loan Agreements. Instead, Spiegel represented that he would repay the debt by restructuring the debt through his other companies or offsetting the debt.

109.    Had Drukker known that the Drukker Companies would be on the hook for debt service, along with 6% interest, in what Spiegel represented was an equity deal, the Drukker Companies never would have entered the Loan Agreements.

110.    After the parties entered the Oral Contract, Spiegel was tasked with identifying lenders and procuring the debt portion of his investment in Bender Oil.

111.    In July 2012, Spiegel told Drukker that the loans forming the bulk of Spiegel's consideration for the Bender Oil shares would be routed through two offshore companies, Shireen and Mazlin.

112.    Upon information and belief, Spiegel's sons, Michael and Matthew, are the record owners of Shireen and Mazlin. However, at all relevant times Spiegel has maintained full control over the Spiegel Companies. Spiegel completely dominates, and is the alter ego of, each

18

Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 213 of 228

of these companies. Spiegel used his domination and control over the Spiegel Companies as mechanism to commit fraud against the Drukker Companies.

113.    Spiegel told Drukker that one reason it was necessary to structure his equity transaction in this way was that the offshore companies could then be conduits for additional debt infusions should Bender Oil's operations require additional capital.

114.    In fact, unbeknownst to the Drukker Companies, Spiegel was attempting to defraud the Internal Revenue Service by laundering his funds through offshore companies.

115.    The Drukker Companies later learned that, in 2014, the Internal Revenue Service flagged Spiegel for investigation due to suspicion that he was improperly sheltering income by laundering it through his offshore companies for the purpose of avoiding taxation. Upon information and belief, Spiegel entered into a voluntary disclosure arrangement with the Internal Revenue Service in order to dodge further investigation into his illegal tax-avoidance practices

116.    As part of his tax-avoidance scheme, Spiegel never told Drukker, and deliberately concealed the fact, that Spiegel himself owned and controlled the two offshore companies, Mazlin and Shireen, that would be used to provide the debt financing for his acquisition of his stake in Bender Oil.

117.    According to the Tribunal, this misrepresentation by Spiegel was a "dissimulation" that is "discreditable" and "makes the Tribunal cautious about accepting uncorroborated oral evidence from him." The Tribunal added that Spiegel's "dissimulation in this regard does him no credit in broader moral terms." The Tribunal further added that "not all of his conduct was necessarily creditable in a wider moral sense."

19

Case 1:19-cv-07426-JGK   Document 21-1   Filed 09/24/19   Page 214 of 228

INDEX NO. 506949/2017

RECEIVED NYSCEF: 07/09/2019

118.    In fact, Spiegel schemed in bad faith to make the Spiegel Companies the beneficiaries of the debt service, which included a six percent interest rate, while Spiegel would take control of 30% of Bender Oil without attracting government scrutiny.

119.    Spiegel's scheme was also designed to elicit a commission for introducing third party financing to WJH. Spiegel had a consulting agreement with WJH under which he would earn commission if he introduced third-party financing to WJH.

120.    Had Drukker known that Mazlin and Shireen were merely instruments of Spiegel, that Spiegel was deliberately concealing this fact, and that Spiegel was in fact scheming to use the Loan Agreements in order to defraud government taxation authorities, the Drukker Companies would not have entered into the Loan Agreements with the Spiegel Companies.

121.    Because of Spiegel's bad faith in withholding critical information from the Drukker Companies, the Drukker Companies were induced into entering the Loan Agreements.

122.    Because of Spiegel and the Spiegel Companies' bad faith and unfair dealing, the Drukker Companies were deprived of their expected benefit under the Loan Agreements and Oral Contract of receiving millions of dollars as an equity investment that the Drukker Companies were not required to repay.

123.    As a result of Spiegel and the Spiegel Companies' bad faith dissimulation and unfair self-dealing, the outstanding debt became an albatross for the Drukker Companies because they were unable to acquire additional financing. Because the Drukker Companies could not obtain financing, they were forced to cease operations.

124.    Spiegel and AMM's breach of the Oral Contract thereby directly and proximately caused, and continues to cause, the Drukker Companies damages in an amount to be determined at trial.

20

## THIRD CAUSE OF ACTION
### Promissory Estoppel (Against Spiegel)

125.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

126.    In the alternative, Spiegel clearly and unambiguously promised Drukker that Spiegel would assume liability for the debt incurred by WJH under the Loan Agreements. Spiegel told Drukker that the loans would be routed through offshore companies, Spiegel would then restructure or offset the debt, and Spiegel would then convert his interest into a 30% equity interest, as the parties had previously agreed.

127.    In reasonable reliance on these promises, the Drukker Companies entered into the Loan Agreements. Had the Drukker Companies known that Spiegel would break his promise to assume the debt, the Drukker Companies would not have entered into the Loan Agreements.

128.    Spiegel and AMM failed and refused, and continue to fail and refuse, to assume the debt incurred under the Loan Agreements. Instead, Spiegel reneged on his promise to assume the debt under the Loan Agreements.

129.    Spiegel's breaking his promise to assume the debt incurred under the Loan Agreements left the Drukker Companies holding the bag for that debt. Because the Drukker Companies relied on Spiegel's broken promise, the outstanding debt became an albatross for the Drukker Companies because they were unable to acquire additional financing. Because the Drukker Companies could not obtain financing, they were forced to cease operations.

130.    Spiegel and AMM's broken promises thereby directly and proximately caused, and continues to cause, the Drukker Companies damages in an amount to be determined at trial.

21

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement (Against Spiegel)

131.   Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

132.   During the negotiation process, Spiegel made several fraudulent misrepresentations that induced the Drukker Companies to enter into the various agreements. The Drukker Companies discovered the fraud in November 2017.

133.   The parties had always agreed that Spiegel would purchase a 30% equity stake in Bender Oil. However, in March 2012, Spiegel told Drukker that, in order to achieve certain tax and estate planning objectives, Spiegel's investment would have to be structured as a convertible note.

134.   Spiegel did not disclose the nature of these tax and estate planning objectives. Nevertheless, due to their long friendship and prior partnerships, Drukker trusted Spiegel and agreed to structure the transaction in the manner Spiegel required.

135.   Spiegel represented that the Drukker Companies would have no obligation to make payments under the Loan Agreements.  Instead, Spiegel represented that he would repay the debt by restructuring the debt through his other companies or offsetting the debt.

136.   Had Drukker known that the Drukker Companies would be on the hook for debt service in what Spiegel represented was an equity deal, the Drukker Companies never would have entered the Loan Agreements or the SPA, nor would they have made significant investments under the Privatization Agreement.

137.   After the parties entered the Oral Contract, Spiegel was tasked with identifying lenders and procuring the debt portion of his investment in Bender Oil.

22

138.    In a July 2012 email, Spiegel told Drukker that the loans forming the bulk of Spiegel's consideration for the Bender Oil shares would be routed through two offshore companies, Shireen and Mazlin.

139.    Upon information and belief, Spiegel's sons, Michael and Matthew, are the record owners of Shireen and Mazlin. However, at all relevant times Spiegel has maintained full control over the Spiegel Companies. Spiegel completely dominates, and is the alter ego of, each of these companies. Spiegel used his domination and control over the Spiegel Companies as mechanism to commit fraud against the Drukker Companies.

140.    Spiegel told Drukker that one reason it was necessary to structure his equity transaction in this way was that the offshore companies could then be conduits for additional debt infusions should Bender Oil's operations require additional capital.

141.    In fact, unbeknownst to the Drukker Companies, Spiegel was attempting to defraud the Internal Revenue Service by laundering his funds through offshore companies.

142.    Around November 2017, the Drukker Companies learned that, in 2014, the Internal Revenue Service had flagged Spiegel for investigation due to suspicion that he was improperly sheltering income by laundering it through his offshore companies for the purpose of avoiding taxation. Upon information and belief, Spiegel entered into a voluntary disclosure arrangement with the Internal Revenue Service in order to dodge further investigation into his illegal tax-avoidance practices

143.    As part of his tax-avoidance scheme, Spiegel never told Drukker, and deliberately concealed the fact, that Spiegel himself owned and controlled the two offshore companies, Mazlin and Shireen, that would be used to provide the debt financing for his acquisition of his stake in Bender Oil.

23

144.    The Drukker Companies did not discover Spiegel's fraud until November 2017, during the Arbitration.

145.    According to the Tribunal, this fraudulent misrepresentation by Spiegel was a "dissimulation" that is "discreditable" and "makes the Tribunal cautious about accepting uncorroborated oral evidence from him." The Tribunal added that Spiegel's "dissimulation in this regard does him no credit in broader moral terms." The Tribunal further added in this regard that "not all of his conduct was necessarily creditable in a wider moral sense."

146.    In fact, Spiegel schemed to make the Spiegel Companies the beneficiaries of the debt service, which included a 6% interest rate, while Spiegel would take control of 30% of Bender Oil without attracting unwanted government scrutiny.

147.    Spiegel's scheme was also designed to elicit a commission for introducing third party financing to WJH. Spiegel had a consulting agreement with WJH under which he would earn commission if he introduced third-party financing to WJH.

148.    Had Drukker known that the Spiegel Companies were merely instruments of Spiegel, the Drukker Companies would never have entered the SPA nor agreed to pay 6% interest on what was actually a $7,000,000 equity purchase by Spiegel. Drukker agreed to the 6% interest rate only because he was led to believe that this interest rate was required by Mazlin and Shireen to effect the loan and because Spiegel represented to Drukker that Spiegel would assume the debt burden.

149.    The Spiegel's fraudulent misrepresentations damaged the Drukker Companies because they caused the Drukker Companies to lose the ability to obtain additional debt financing, which forced them to cease operations. They also caused the Drukker Companies to also lose the value of their investments under the Privatization Agreement.

24

## FIFTH CAUSE OF ACTION
### Civil Conspiracy (Against All Defendants)

150. Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

151. Each of the Defendants conspired with each of the others to commit fraud against, and break their promises to, the Drukker Companies.

152. Each of the Defendants acted overtly in furtherance of this conspiratorial agreement and intentionally participated in furtherance of the Defendants' plan to defraud the Drukker Companies.

153. The Defendants' conspiracy resulted in damages to the Drukker Companies.

154. At all relevant times, Spiegel owned, controlled and dominated his co-conspirators, the Spiegel Companies and AMM.

155. All of the Defendants conspired to fraudulently induce the Drukker Companies to enter into the Loan Agreements. Spiegel desired to become a 30% owner of Bender Oil. He elected to hold his shares in Bender Oil in AMM in order to benefit his two sons, Michael and Matthew.

156. However, the Defendants did not want to pay fair value for Bender Oil, which had been valued at around $20 million. Instead, they conspired to enter into multiple agreements with the Drukker Companies in order to seize control over 30% of Bender Oil at a nominal price.

157. In furtherance of this scheme, Spiegel promised his life-long friend Drukker that Spiegel would pay $7 million for his shares in Bender Oil. However, Spiegel would pay only a nominal amount in cash. Spiegel told Drukker that, for undisclosed tax and estate-planning purposes, the remainder of Spiegel's investment would have to be made in the form of debt. Spiegel would then assume the debt and convert his interest in Bender Oil to one of equity.

25

Case 1:19-cv-07426-JGK Document 21-1 Filed 09/24/19 Page 220 of 228
INDEX NO. 506949/2017
RECEIVED NYSCEF: 07/09/2019

158.    In furtherance of this conspiracy, Spiegel conspired with AMM, nominally owned by Spiegel's sons, to enter the SPA, which would give Spiegel the right to purchase the Bender Oil interests, through AMM, at a nominal price.

159.    At the same time, Spiegel and AMM conspired with the Spiegel Companies to enter into the Loan Agreements, which would saddle the Drukker Companies with millions of dollars in debt that Spiegel never had any intention of repaying.

160.    In this manner all of the Defendants conspired together to defraud the Drukker Companies out of 30% of Bender Oil while leaving the Drukker Companies on the hook for millions of dollars in debt to the Spiegel Companies, at 6% interest. Spiegel would take control of 30% of Bender Oil, through AMM, at a nominal price without attracting unwanted government scrutiny.

161.    The Defendants' conspiracy was also designed to elicit a commission for introducing third party financing to WJH. Spiegel had a consulting agreement with WJH under which he would earn commission if he introduced third-party financing to WJH.

162.    As a result of Defendants' actions in furtherance of their conspiracy, the Drukker Companies were defrauded into entering the Loan Agreements and SPA and were left on the hook for the debt under the Loan Agreements. Because the Drukker Companies were saddled with this large debt, they could not obtain additional financing and were forced to cease operations.

163.    Defendants thereby conspired together in a concerted plan, and intentionally participated in furtherance of the plan, to defraud the Drukker Companies and cost them damages in an amount to be determined at trial.

26

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty (Against Spiegel)

164.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

165.    Spiegel was, at all relevant times, a director of WJH.

166.    As director, Spiegel had a fiduciary duty to WJH.

167.    However, Spiegel committed misconduct against WJH by engaging in self-dealing with his own companies in their unified scheme to defraud WJH and Stubrick.

168.    Spiegel had a duty to WJH to act in WJH's best interests and to keep WJH fully informed of the facts underlying agreements about which Spiegel had personal knowledge and direct involvement.

169.    Spiegel breached his fiduciary duty to WJH because he never told WJH, and deliberately concealed the fact from WJH, that Spiegel himself owned and controlled the two offshore companies, Mazlin and Shireen, that would be used to provide the debt financing, at 6% interest, for the acquisition of his stake in Bender Oil.

170.    According to the Tribunal, this fraudulent misrepresentation by Spiegel was "a dissimulation" that is "discreditable" and "makes the Tribunal cautious about accepting uncorroborated oral evidence from him." The Tribunal added that Spiegel's "dissimulation in this regard does him no credit in broader moral terms." The Tribunal further added in this regard that "not all of his conduct was necessarily creditable in a wider moral sense."

171.    In fact, Spiegel lied to Drukker in order to facilitate Spiegel's own self-dealing at WJH's expense. Spiegel told Drukker that WJH would not be responsible for payment of the debt because Spiegel himself would assume responsibility for it.

27

172.    Spiegel schemed to make his own companies, Mazlin and Shireen, the beneficiaries of the debt service, which included a six percent interest rate, under the Loan Agreements. At the same time, Spiegel would seek to take control of 30% of Bender Oil without attracting unwanted government scrutiny.

173.    Spiegel's self-dealing scheme was also designed to elicit a commission for introducing third party financing to WJH. Spiegel had a consulting agreement with WJH under which he would earn commission if he introduced third-party financing to WJH. Yet Spiegel told Drukker that Mazlin and Shireen were independent third-party lenders, and Spiegel failed to disclose that these were, in fact, his own companies.

174.    Had WJH known that it would be held responsible to pay the debts under the Loan Agreement, WJH would not have entered into the Loan Agreements.

175.    Had WJH known that the Spiegel Companies were merely instruments of Spiegel, the Drukker Companies, including WJH, would never have agreed to pay 6% interest on what was actually a $7,000,000 equity purchase by Spiegel. Drukker agreed to the 6% interest rate only because Spiegel led him to believe that this interest rate was required by Mazlin and Shireen to effect the loans and because Spiegel represented to Drukker that Spiegel would assume the debt burden.

176.    All of these acts constitute misconduct by Spiegel, who failed to disclose his conflicts of interests to WJH, lied to WJH about his intention to assume the debt under the Loan Agreements, failed to act in the best interests of WJH, and caused WJH to be left holding the bag for millions of dollars in debt, plus interest, owed to Spiegel's own companies.

177.    As a result of Spiegel's misconduct and breaches of his fiduciary duties to WJH, the Drukker Companies were left holding the bag on the debt incurred under the Loan

28

Agreements. Because of this debt, the Drukker Companies were unable to obtain additional financing and were forced to cease operations. Thus, Spiegel's breach of his fiduciary duty damaged WJH in an amount to be determined at trial.

178.    The Drukker Companies seek not only money damages as compensation for Spiegel's breach of fiduciary duty, but also a judgment declaring that WJH is not liable for the debt, nor any interest, under the Loan Agreements made with Spiegel's Companies, Mazlin and Shireen. In the event money damages are not available, the Drukker Companies also pray that the Court permanently enjoin Spiegel from attempting to collect, or causing any of his companies to attempt to collect, any debt under the Loan Agreements.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment (Against Spiegel and the Spiegel Companies)

179.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if stated fully herein.

180.    As set forth above, the Drukker Companies and Defendants Spiegel and AMM entered into an agreement for the sale of equity in Bender Oil. Spiegel insisted that, in order to effect the equity transfer, the parties would need to enter Loan Agreements for the amount of the purchase price for the equity stake purchased by Spiegel and AMM.

181.    There is a genuine dispute amongst the parties as to whether the Loan Agreements are, as Defendants have alleged, stand-alone Loan Agreements requiring the Drukker Companies to repay the debt in full and with interest, or, as Plaintiffs allege, part of a convertible debt-to-equity structure, with the debt assumed by Spiegel and his companies, that would facilitate the transaction of 30% of Bender Oil shares from WJH to Spiegel through AMM.

182.    The present dispute presents a justiciable controversy in which the issues are present, real, definite, and substantial and affect existing legal relations between Plaintiffs and

29

Defendants. Therefore, the Court should declare the respective rights of the parties under the Loan Agreements.

183.    Accordingly, Plaintiffs are entitled to a judgment declaring that the Drukker Companies are not liable for any debts or interest under the Loan Agreements and that the Loan Agreements are part of the broader convertible debt-to-equity consideration for transfer of 30% of Bender Oil's shares to Spiegel and AMM.

**WHEREFORE,** Plaintiffs demand judgment against each of the Defendants, jointly and severally, as follows:

On the First Cause of Action, judgment in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial;

On the Second Cause of Action, judgment in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial;

On the Third Cause of Action, judgment in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial;

On the Fourth Cause of Action, judgment in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial;

On the Fifth Cause of Action, judgment in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial;

On the Sixth Cause of Action, judgment: in favor of Plaintiffs and against Defendants in an amount of compensatory damages to be determined at trial; declaring that WJH is not liable for the debt, nor any interest, under the Loan Agreements made with Spiegel's Companies, Mazlin and Shireen; and in the event money damages are not available, permanently enjoining Spiegel from attempting to collect, or causing any of his companies to attempt to collect, any

30

Case 1:19-cv-07426-JGK  Document 21-1  Filed 09/24/19  Page 225 of 228
INDEX NO. 506949/2017

RECEIVED NYSCEF: 07/09/2019

debt under the Loan Agreements;

On the Seventh Cause of Action, a judgment declaring that that the Drukker Companies are not liable for any debts or interest under the Loan Agreements and that the Loan Agreements are part of the broader convertible debt-to-equity consideration for transfer of 30% of Bender Oil's shares to Spiegel and AMM;

Pre-judgment interest in an amount to be determined, but no less than 9%; and

Such other, further, and different relief as to this Court may seem just and proper.

Dated: New York, New York
July 9, 2019

Respectfully submitted,

**SHER TREMONTE LLP**

By: /s/ Yonatan Y. Jacobs
Michael Tremonte
Yonatan Y. Jacobs
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
yjacobs@shertremonte.com

*Attorneys for Plaintiffs WJ Holding
Limited and Stubrick Limited*

31

# EXHIBIT 4

**SUPREME COURT STATE OF NEW YORK**
**COUNTY OF KINGS**

------------------------------------------------------X

WJ HOLDING LIMITED and STRUBRICK LIMITED,

       Plaintiff,

-against-

SHIREEN MARITIME LTD, MAZLIN TRADING CORP, AMM CONSULTING AND MANAGEMENT GROUP, LLC, and ALEXANDER SPIEGEL,

       Defendants.

------------------------------------------------------X

Index No. 506949/17

Motion Seq. 001
(Case not yet assigned)

**NOTICE TO CLERK OF SUPREME**
**COURT OF FILING NOTICE OF**
**REMOVAL**

TO: Clerk, Supreme Court, Kings County
  360 Adams Street
  Brooklyn, New York 11201

   PLEASE TAKE NOTICE that there is attached hereto a copy of the Notice to Adverse Party of Filing of Notice of Removal and Notice of Removal which have been filed with the Clerk of the United States Court for the Southern District of New York.

         CALLAGY LAW, P.C.
         Attorneys for Defendants,
         Shireen Maritime Ltd, Mazlin Trading Corp,
         AMM Consulting and Management Group LLC,
         and Alexander Spiegel

         By: _Michael Smikun_
           Michael J. Smikun

Dated: August 08, 2019

SUPREME COURT STATE OF NEW YORK
COUNTY OF KINGS

--------------------------------------------------------X

WJ HOLDING LIMITED and STRUBRICK          **Index No. 506949/17**
LIMITED,

                                          Motion Seq. 001
                     Plaintiff,           (Case not yet assigned)

-against-

                                          **NOTICE TO ADVERSE PARTY OF**
SHIREEN MARITIME LTD., MAZLIN             **FILING NOTICE OF REMOVAL**
TRADING CORP., AMM CONSULTING
AND MANAGEMENT GROUP, LLC, and
ALEXANDER SPIEGEL,

                     Defendants.

--------------------------------------------------------X


TO: Clerk, Supreme Court, Kings County
    360 Adams Street
    Brooklyn, New York 11201

    PLEASE TAKE NOTICE that pursuant to 28 United States Code, Section 1446 a Notice of
Removal of the above-captioned action from the Supreme Court of New York to the United Stated
District Court for the Southern District of New York was duly filed on this 8 day of August. The Notice
of Removal and Notice to the Clerk of the Superior Court of filing Notice of Removal were forwarded
to the Clerk, Supreme Court of New York. (A copy of the Notice of Removal and Notice to the Clerk
of the Supreme Court of New York of filing Notice of Removal are attached hereto.)


                              CALLAGY LAW, P.C.
                              Attorneys for Defendants,
                              Shireen Maritime Ltd, Mazlin Trading Corp,
                              AMM Consulting and Management Group LLC,
                              and Alexander Spiegel


                              By: _Michael Smikun_____

                                  Michael J. Smikun

Dated: August 08, 2019